# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

UNITED STATES CONFERENCE OF
CATHOLIC BISHOPS; THE SOCIETY
OF THE ROMAN CATHOLIC
CHURCH OF THE DIOCESE OF LAKE
CHARLES; THE SOCIETY OF THE
ROMAN CATHOLIC CHURCH OF
THE DIOCESE OF LAFAYETTE; THE
CATHOLIC UNIVERSITY OF
AMERICA,

*Plaintiffs,*

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION;
CHARLOTTE BURROWS, Chair of the
Equal Employment Opportunity
Commission, in her official capacity,

*Defendants.*

No. 2:24-cv-691

**COMPLAINT**
**(Jury Requested)**

## INTRODUCTION AND NATURE OF THE ACTION

For almost 15 years, federal agencies mandated that employers provide insurance coverage for contraceptives, including abortion-inducing drugs and devices. This controversial decision spawned litigation nationwide. The litigation repeatedly reached the Supreme Court, requiring several merits and emergency docket decisions protecting employers from the unlawful mandate's violation of their conscience. *See, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 664-74 (2020). And after all that, the agencies recently indicated they never needed to conscript religious employers in the first place. *See Coverage of Certain Preventive Services Under the ACA*, 88 Fed. Reg. 7236-01 (Feb. 2, 2023).

But now another federal agency is doubling down to impose an equally controversial nationwide abortion-accommodation mandate on the workplaces of hundreds of millions of Americans. The Equal Employment Opportunity Commission (EEOC) issued a new Final Rule requiring employers to knowingly accommodate abortions and imposing a speech code creating substantial liability on employers who express opposition to abortion and refuse to support it in their policies. *Implementation of the Pregnant Workers Fairness Act,* 89 Fed. Reg. 29,096, 29,183 (Apr. 19, 2024).

EEOC claims this authority from the Pregnant Workers Fairness Act (PWFA), a recent bipartisan law meant to help protect pregnant women in the workplace so that they may have a healthy pregnancy and a healthy baby. The Act mentions abortion precisely zero times, in sharp contrast to the *348* times the term shows up in the new Final Rule purporting to implement the Act. Yet, by a sharply divided 3-2 vote, EEOC ignored tens of thousands of comments and the repeated assurances of the PWFA's bipartisan co-sponsors that "under the [PWFA] … the EEOC, could not—could not— issue any regulation that requires abortion leave." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

1

Congress was right and EEOC is wrong. The PWFA is not an abortion-accommodation mandate. Rather, it fills a gap in federal employment law by ensuring pregnant women receive workplace accommodations to protect their pregnancies and their preborn children. Plaintiff United States Conference of Catholic Bishops (USCCB) enthusiastically supported the law's bipartisan passage. That support reflected the PWFA's uncontroversial and laudable purpose, which is fully consistent with the Catholic Church's belief that all human life is imbued with innate dignity and its goal of ensuring a fairer workplace for women. But EEOC has now shoehorned a mandate that employers across the country knowingly support abortion into a statute explicitly designed to protect the health and safety of preborn babies and their mothers.

Worse, at the same time that it expands federal law into fraught areas, EEOC also insists on nullifying the explicit religious exemption that Congress wrote into the PWFA. In the PWFA, Congress imported Title VII's religious exemption, which expressly allows employers to make employment decisions based on sincere religious beliefs. *See* 42 U.S.C. § 2000gg-5(b). Of course, since the PWFA concerns only pregnancy in the workplace, this makes clear that Congress meant to allow religious exemptions from pregnancy-accommodation claims. Yet now EEOC claims the exemption bars only *religious discrimination* claims—which aren't authorized by the PWFA in the first place. That renders the exception a nullity, protecting employers from PWFA claims that don't exist.

EEOC's attempts to rewrite the straightforward language of the PWFA to address abortions must be set aside as unlawful agency action under the Administrative Procedure Act (APA) for at least two reasons. *See* 5 U.S.C § 706(2). First, the Final Rule exceeded Congress's grant of statutory authority. EEOC's abortion-accommodation interpretation of the PWFA, and its underlying interpretation of Title VII, are contrary to the statutes' plain text and purpose: intentionally ending a

pregnancy is opposed to both pregnancy and childbirth, and is not a related medical condition to either. Second, EEOC's misinterpretation of the PWFA's religious exemption to cover only claims of religious discrimination eviscerates the exemption. These two flaws are fatal and require that the Final Rule be set aside.

Further, EEOC's interpretation of the PWFA, Title VII, and the scope of the statutes' religious exemptions also violates Plaintiffs' statutory and First Amendment rights. The government cannot force Plaintiffs to abandon their religiously motivated employment policies and practices related to the sanctity and dignity of human life, nor compel Plaintiffs to twist their ministry environments to support gravely unjust acts like abortion. EEOC's attempt to do so misapplies Title VII and the PWFA, and violates Plaintiffs' rights under the Religious Freedom Restoration Act (42 U.S.C. § 2000bb, *et seq*.) and under the First Amendment's protections for Free Exercise, Free Speech, Expressive Association, and Church Autonomy.

Plaintiffs seek preliminary and permanent relief from this Court. They ask this Court to stay the effective date of the Final Rule pending judicial review, *see* 5 U.S.C. § 705, and to preliminarily enjoin EEOC's enforcement of the Final Rule's abortion-accommodation mandate against them. Plaintiffs request that this Court declare unlawful, set aside, and permanently enjoin the Final Rule's abortion-accommodation mandate and EEOC's attempt to enforce the same pursuant to the PWFA itself. They also request that the Court declare unlawful EEOC's attempt to compel them, under both the Final Rule and the PWFA, to abandon employment policies and practices embodying their sincere beliefs regarding the sanctity and dignity of human life.

## PARTIES

1. Plaintiff The Society of the Roman Catholic Church of the Diocese of Lake Charles (Diocese of Lake Charles) is a Roman Catholic Diocese with its principal place of business in Lake Charles, Louisiana. In serving the Catholics and

communities of southwestern Louisiana, the Diocese employs more than 15 employees.

2. Plaintiff The Society of the Roman Catholic Church of the Diocese of Lafayette (Diocese of Lafayette) is a Roman Catholic Diocese with its principal place of business in Lafayette, Louisiana. In serving the Catholics and communities of Acadiana, the Diocese employs more than 15 employees.

3. Plaintiff United States Conference of Catholic Bishops (USCCB) is an assembly of the leadership of the Catholic Church in the United States. USCCB is located in Washington, D.C., and employs more than 15 employees. USCCB seeks to unify, coordinate, encourage, promote, and carry on Catholic activities in the United States; to organize and conduct religious, charitable, and social welfare work at home and abroad; to aid in education; to care for immigrants; and generally to further these goals through education, publication, and advocacy.

4. Plaintiff The Catholic University of America (CUA) is a research university located in Washington, D.C., and employs more than 15 employees. CUA is the national university of the Catholic Church in the United States and is committed to being a comprehensive Catholic institution of higher education that is faithful to the teachings of the Church.

5. As institutions and affiliates of the Catholic Church, Plaintiffs follow the religious and moral teachings of the Catholic Church. This includes the imperative to honor and affirm human life at all stages, from conception to natural death. Plaintiffs accordingly oppose direct, intentional abortion; in vitro fertilization; surrogacy; artificial contraception; and direct sterilization as violative of their religious beliefs.

6. Defendants are an official of the United States government and the United States governmental agency responsible for the issuance and implementation of the challenged regulation and guidance.

7. Defendant Charlotte A. Burrows is the Chair of the U.S. Equal Employment Opportunity Commission. She is sued in her official capacity only.

8. Defendant Equal Employment Opportunity Commission is the federal agency that enforces the PWFA and Title VII. It also may issue right-to-sue letters allowing private individuals to sue their employers for violating the Final Rule, the PWFA, or Title VII. EEOC is charged with promulgating certain regulations under the PWFA, and it promulgated the challenged regulation and guidance at issue in this case. *See* 42 U.S.C. §§ 2000gg-3(a); 2000gg-2.

## JURISDICTION AND VENUE

9. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the case involves a federal question.

10. An actual controversy exists between the parties under 28 U.S.C. § 2201(a).

11. This Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02, 5 U.S.C. §§ 703-06, and its inherent equitable powers.

12. Venue lies in this district pursuant to 28 U.S.C. § 1391.

13. This Court has the authority to grant Plaintiffs the relief they request under the APA, 5 U.S.C. §§ 705-06, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(c).

## FACTUAL BACKGROUND

### A. Pregnancy Accommodations Before the PWFA

14. Before the PWFA was passed in 2022, various federal laws provided some degree of protection to pregnant women in the workforce. But critically, none imposed a general obligation on employers to accommodate pregnancies.

15. Title VII, for example, prohibits employment discrimination based on sex, which includes—by way of the Pregnancy Discrimination Act (PDA)—actions taken "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42

U.S.C. § 2000e(k). But Title VII requires only that women "affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes … as other persons not so affected but similar in their ability or inability to work." *Id.* Thus, under Title VII, a woman seeking accommodations for her pregnancy must show that her employer accommodates workers who have similar work limitations for reasons unrelated to pregnancy. *See Young v. United Parcel Serv., Inc.,* 575 U.S. 206, 229-30 (2015). Without this showing of discrimination, Title VII does not require employers to accommodate workers' pregnancies, childbirth, or pregnancy-related medical conditions.

16. The Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a) requires employers to accommodate only certain types of pregnancy-related conditions, but not pregnancy generally. Normal pregnancies do not constitute a protected disability, leaving many pregnant women outside the ADA's scope. *See Spees v. James Marine, Inc.,* 617 F.3d 380, 396 (6th Cir. 2010) (collecting cases); *McCarty v. City of Eagan,* 16 F. Supp. 3d 1019, 1027 (D. Minn. 2014) ("reviewing case law in this and other circuits" and concluding "the fact of pregnancy itself" is not a disability "within the meaning of the ADA").

17. For its part, the Family Medical Leave Act (FMLA) allows eligible employees to take up to twelve weeks of unpaid leave during a twelve-month period "[b]ecause of a serious health condition," including pregnancy and childbirth. 29 U.S.C. § 2612(a)(1)(D). But the FMLA applies only to employees after they have been working for their employer for at least 1 year and have performed at least 1,250 hours of work for that employer during that time. 29 U.S.C. § 2611(2)(A).

18. Thus, before the PWFA, federal employment law did not require employers to affirmatively accommodate limitations and conditions related to many women's pregnancies. And although many States have enacted laws requiring employers to

accommodate pregnancies, *see* 89 Fed. Reg. at 29170-29171 tbl.1 (collecting statutes), nearly half have not.

## B.  The Text of the PWFA

19. These gaps in federal protections for pregnant women in the workplace prompted Congress to propose the PWFA, which was passed in December 2022. *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. No. 117-328, 136 Stat. 4486, 6084 (2022).

20. The PWFA makes it unlawful for a "covered" employer to fail to provide a reasonable accommodation to an employee with a "known limitation," meaning a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(2), (4); *id.* § 2000gg-1(1).

21. Further, the PWFA bars employers from denying employment opportunities to pregnant employees due to the need for accommodation or from taking an adverse employment action in the terms, conditions, or privileges of employment against an employee because she requested a reasonable accommodation. *Id.* § 2000gg-1(2)-(5).

22. The PWFA also contains provisions against retaliation and interference. For instance, the statute provides that: (i) "[n]o person shall discriminate against any employee because such employee has opposed any act or practice made unlawful by this chapter," *id.* § 2000gg-2(f)(1), and (ii) "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed, or on account of such individual having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." *Id.* § 2000gg-2(f)(2).

23. The PWFA expressly incorporates by reference the religious exemption found in Title VII, *See id.* § 2000gg-5(b) ("This chapter is subject to the applicability to

religious employment set forth in section 2000e-1(a) of this title."). That exemption provides: "This subchapter shall not apply … to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." *Id.* § 2000e-1(a).

24. All told, the PWFA's text makes its purpose plain: protecting pregnant women in the workforce and their babies by directing that women receive workplace accommodations for "pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

25. The PWFA also incorporates by reference the remedies available under Title VII. *Id.* § 2000gg-2(a). This means that private parties may bring enforcement actions—including damages actions—after exhausting administrative procedures, and EEOC maintains the full suite of investigative and enforcement powers available to it under Title VII.

## C.  PWFA's Intentional Exclusion of Abortion

26. In the 117th Congress, the U.S. House and Senate each considered and advanced bipartisan bills that would later be negotiated and enacted as the PWFA. These bills required employers to accommodate limitations related to a worker's pregnancy, childbirth, or related medical conditions. They tasked EEOC with adopting regulations "providing examples" of reasonable accommodations to help implement the statute. Pregnant Workers Fairness Act of 2021, H.R. 1065, 117th Cong. § 4 (2021); Pregnant Workers Fairness Act of 2021, S. 1486, 117th Cong. § 4 (2021). The bills did not mention abortion.

27. The legislative history accords with the text, confirming that the statute's singular intent is to accommodate pregnant women in the workforce to ensure healthy pregnancies and childbirth. Not a single member of Congress supporting the

bills argued on the floor that they would require accommodations for elective abortion; to the contrary, leading supporters emphatically denied it.

28. PWFA's House sponsors emphasized that the statute would help ensure that women would not need to sacrifice continued employment for safe pregnancies. *See, e.g.,* 167 Cong. Rec. H2346 (daily ed. May 14, 2021) (statement of Rep. Carolyn Maloney) ("No pregnant worker should have to choose between their and their baby's health or their job.").

29. Similarly, PWFA Senate co-sponsor Senator Lisa Murkowski expressed her support for the bill's "commonsense accommodations … to ensure a healthy pregnancy and a healthy baby."[1]

30. Likewise, originating Committee Chair Senator Patty Murray stated that "no one should have to choose between their job and a healthy pregnancy." 168 Cong. Rec. S7049 (daily ed. Dec. 8, 2022). She emphasized that "[w]e are really not here asking for much. This is very simple. Give pregnant workers a break, give them a seat, and give them a hand. … I can't think of a more commonsense, less controversial bill[.]" *Id.*

31. Consistent with this purpose, lawmakers from both sides of the aisle also expressly stated that the PWFA does not address abortion. Democratic bill sponsor Senator Casey emphasized in response to concerns that abortion might be at issue: "I want to say for the record … that under the Pregnant Workers Fairness Act, the [EEOC] could not—could not—issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). Republican Senator Steve Daines similarly noted that "Senator Casey's statement reflects the intent of Congress in advancing the [PWFA] today. This legislation should not be misconstrued

---

[1]   Bob Casey, *Casey, Cassidy Introduce Bipartisan Pregnant Workers Fairness Act, Propose Protections Against Workplace Discrimination* (Apr. 29, 2021), https://perma.cc/DRK4-WHVA.

by the EEOC or Federal courts to impose abortion-related mandates on employers, or otherwise to promote abortions, contrary to the intent of Congress." 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022). And Republican Senator Bill Cassidy, the PWFA's other lead sponsor, likewise "reject[ed] the characterization that [the PWFA] would do anything to promote abortion." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

32. Indeed, after concerns were raised about the PWFA's initial failure to include a religious exemption, *see, e.g.,* 166 Cong. Rec. H45l2, H45l5 (daily ed. Sept. 17, 2020) (statement of Rep. Virginia Foxx); 167 Cong. Rec. H2227 (daily ed. May 12, 2021) (statement of Rep. Guy Reschenthaler), a senior member of House leadership questioned how the law's uncontroversial requirements to provide accommodations such as "a bathroom break" and "access to water" could even trigger religious objections. *See, e.g., H.R. 2547-Comprehensive Debt Collection Improvement Act; H.R. 1065-Pregnant Workers Fairness Act: Hearing before the House Rules Comm.,* 117th Cong., at 1:14:38-1:15:13 (2021), https://bitly.cx/7IFIi (statement of Rep. Jim McGovern, Chairman, H.R. Rules Comm.). Further, Senator Cassidy confirmed on the Senate floor that the PWFA "allows employers to make employment decisions based on firmly held religious beliefs." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

33. The PWFA received wide backing from a host of civic organizations, which also reflects the law's exclusion of abortion from its coverage. The USCCB encouraged Congress to pass the PWFA on the express understanding that the statute does not involve abortion.[2] In an August 9, 2021 letter addressed to Congress, USCCB explained that it supported passage of the PWFA because "Catholic teaching is clear that policy choices around work should be made to support the family .... The Catholic bishops of the United States have repeatedly called for circumstances of employment that better support family life, especially in the challenges associated

---

[2]   *See* Secretariat of Pro-Life Activities, Pregnant Workers Fairness Act FAQ, USCCB (Mar. 24, 2023), https://perma.cc/ML5Y-MBK6.

with having children." Ex. A (USCCB Aug. 9, 2021 Letter to Congress). Ultimately, USCCB "applaud[ed]" the effort to pass the PWFA given the statute's "respect for life, family, and the dignity of workers," and USCCB "st[ood] ready to work with Congress to strengthen legal protections for pregnant workers and nursing mothers." *Id.*

34. Further, the descriptions by Congress of what the law would require—like "an extra bathroom break and stool to sit on"—referred to pregnancy and childbirth, not forcing employers to accommodate elective abortions. *See, e.g.*, 168 Cong. Rec. E1360 (daily ed. Dec. 27, 2022) (statement of Rep. Suzanne Bonamici in extension of remarks). Senator Casey echoed those points, emphasizing that the PWFA is "very straightforward" and "very simple," just a "commonsense bill" that has "broad, bipartisan support" from "over 200 advocacy groups from all parts of the ideological spectrum." 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022) (statement of bill sponsor Sen. Bob Casey).

35. Senator Murray described the PWFA's purpose as "to provide basic, common sense, low cost, and even no cost accommodations" for women "who are looking forward to welcoming a new family member," and that the proposed law was "a fundamentally bipartisan bill" that had "passed overwhelmingly on a bipartisan House vote."[3]

**D. EEOC's Inclusion of Abortion in a Proposed Rule**

36. Congress granted EEOC authority to issue implementing regulations for the PWFA. 42 U.S.C. § 2000gg-3(a) ("Such regulations shall provide examples of reasonable accommodations addressing known limitations related to pregnancy, childbirth, or related medical conditions.").

37. Notwithstanding the PWFA's clear text and purpose, some began to advocate for the idea that EEOC use the PWFA to require accommodating abortions. When

---

[3]   *Republican Senator Blocks Murray-Casey-Cassidy Effort to Pass Pregnant Workers Fairness Act,* S. Comm. on Health, Educ., Labor, & Welfare (Dec. 8, 2022), https://perma.cc/FZG3-U985.

this occurred, USCCB requested a meeting with the Office of Information and Regulatory Affairs (OIRA), pursuant to Executive Order 12866, to head off any possibility that EEOC's rule would address abortion. In a letter reflecting comments its officials delivered to OIRA, USCCB explained that although "[s]ome advocacy groups are now making the strained claim that PWFA requires accommodations for abortion. … PWFA does not have the goal of expanding access to abortion, and the EEOC should not reinterpret it as if it did." Ex. B at 1 (USCCB July 14, 2023 OIRA Letter) (relying, among other things, on statutory text, legislative history, and canons of construction).

38. But despite the statute's text and legislative history to the contrary, EEOC issued a notice of proposed rulemaking that would mandate covered employers to accommodate their employees' abortions. *Regulations to Implement the Pregnant Workers Fairness Act*, 88 Fed. Reg. 54,714 (proposed Aug. 11, 2023) (to be codified at 29 C.F.R. pt. 1636).

39. According to EEOC's Proposed Rule, "having … an abortion" constitutes an "example[] of pregnancy, childbirth, or related medical condition[]." *Id.* at 54,774. And a reasonable accommodation could include "paid" leave "for medical treatment," *id.* at 54,781-82, 54,791, including time off to obtain an abortion. In fact, the Proposed Rule made clear that an employer could not deny the use of paid leave to have an abortion if it generally allowed employees to use paid leave for reasons unrelated to obtaining an abortion. *Id.* at 54,728 & n.90.

40. Employers, according to the Proposed Rule, could be charged with retaliation unless their "ordinary workplace policies or practices do not operate to penalize employees for utilizing such accommodations" related to abortion, *id.* at 54,729, and employers could be charged with violating the PWFA's anti-coercion provision if they "indicat[e] that [an abortion accommodation] will result in" adverse employment action or otherwise "harass" an employee for seeking such an accommodation. *Id.* at

54,743-44. Moreover, because these provisions refer to "individuals" rather than "qualified employees," "an employee, applicant, or former employee need not establish that they have a known limitation or are qualified under the PWFA to bring a claim under" the PWFA's retaliation or anti-coercion provisions. *Id.* Nor must they show that they have "in fact … [been] deterred from exercising or enjoying rights under this section for the coercion to be actionable." *Id.*

41. Entities covered by the Proposed Rule include "public or private employers with fifteen or more employees, unions, employment agencies, and the Federal Government." *Id.* at 54,719; *see also id.* at 54,754 ("covered entities" under the PWFA and proposed rule "include all employers covered by Title VII and the Government Employee Rights Act of 1991"). That encompasses most employees in the U.S. workforce—117 million employees of private employers, 18.8 million state and local government employees, and 2.3 million federal employees. *Id.* at 54,755; *see also Table A-1. Employment status of the civilian population by sex and age*, U.S Bureau of Labor Statistics, https://perma.cc/7B47-CYFF (last modified May 3, 2024) (civilian labor force estimated at about 167 million).

42. The aggregate consequences of these multiple broad rulings are immense and predictable: covered employers would be required to support and devote resources, including by providing paid leave time, to assist employees' decision to intentionally end preborn life. 88 Fed. Reg. at 54,730. And every covered employer must adopt policies and procedures that affirm abortion and that prohibit any potentially "harassing" discussion of abortion in the workplace.

43. The Proposed Rule also gave short shrift to any religious objections. EEOC recognized that "[r]eligious entities *may* have a defense to a PWFA claim under the First Amendment['s ministerial exception] or the Religious Freedom Restoration Act (RFRA)." *Id.* at 54,746 (emphasis added). But it asserted that such defenses must be assessed "on a case-by-case basis." *Id.* Further, it suggested that Title VII's

13

incorporated religious exemption does "not categorically exempt religious organizations from making reasonable accommodations" under the PWFA. *Id.* at 54,747.

44. The Proposed Rule called for comments about the scope of the PWFA's religious exemption. *Id.* at 54,746. EEOC noted that "[p]ossible alternatives … that the Commission could adopt include: (a) a rule of construction that 'allows religious institutions to continue to prefer coreligionists in the pregnancy accommodation context,' specifically in connection with accommodations that involve reassignment to a job or to duties for which a religious organization has decided to employ a coreligionist; or (b) a rule that construes the PWFA as not requiring a religious entity to make any accommodation that would conflict with the entity's religion." *Id.* at 54,746. It also asked commenters to provide examples of possible accommodations that "may impact a religious organization's employment of individuals of a particular religion." *Id.*

### E.   Commenters Explain the Proposed Rule's Flaws

45. More than 54,000 comments were submitted in opposition to the Proposed Rule's abortion-accommodation mandate. 89 Fed. Reg. at 29,104.

46. Plaintiff USCCB was one of those commenters, submitting a joint comment with Plaintiff The Catholic University of America on September 27, 2023. *See* Ex. C (USCCB/CUA Sept. 27, 2023 NPRM Comment Letter).

47. As USCCB and CUA explained, "[t]he bipartisan PWFA, which the USCCB supported, has the commendable goal of advancing the well-being of pregnant women and their preborn children and ameliorating challenges associated with having children. Building a society that cares for expectant mothers and their preborn children is a priority for the bishops, who have repeatedly called for circumstances of employment that better support family life, especially challenges associated with having children. … The Act furthers our shared goals by removing the unique

disadvantages that pregnant women and women giving birth have experienced under pre-existing law when seeking accommodations in the workplace. The EEOC's proposed regulations, to the extent that they advance the same goal, are also commendable. The clarity and specificity provided in the regulations about the myriad types of accommodations that a pregnant worker might reasonably require, as well as about other matters related to implementing the Act, will benefit both employees and employers. The USCCB and Catholic University thank the EEOC for its attention to supporting mothers in the workplace." Ex. C at 1-2.

48. But USCCB and CUA continued: "[T]he proposed regulations introduce the abortion issue into a law that says nothing about abortion, flatly contradicting legislative history that expressly disclaimed any intention to require accommodations for abortion. The leading authors and sponsors of the PWFA assured their colleagues in no uncertain terms that the Act imposed no requirement with respect to abortion. It is a certainty that the bill would not have had the bipartisan support it received, and would not have passed, had it meant the opposite of what the lead authors and sponsors of the bill said it meant." Ex. C at 2.

49. USCCB and CUA also explained that requiring religious employers to provide abortion accommodations would create substantial constitutional and RFRA concerns, as religious employers often "maintain policies about employee conduct that are designed to protect the integrity of the organization's religious or mission-oriented identity" and that those policies are "constitutionally protected exercises of free speech, expressive association, and/or the free exercise of religion," and are also protected under RFRA. Ex. C at 6.

50. USCCB and CUA also warned that the Proposed Rule's anti-coercion provisions could outlaw religious organizations' policies prohibiting abortion-supporting speech and conduct by employees to "protect the integrity of the organization's religious or mission-oriented identity." Ex. C at 6. And if religious

15

employers, as an exercise of their religious beliefs and mission, counsel their employees to avoid abortion or discourage them from seeking or advocating for abortion, they could be found to be "interfering with" rights under the Proposed Rule's anti-retaliation provisions. *Id.* USCCB and CUA also explained that, in response to the Proposed Rule's request to identify accommodations that would violate their religious beliefs, any requirement to provide accommodations for in vitro fertilization, contraception, and sterilization raised conscience problems as well. Ex. C at 16.

51. Finally, USCCB and CUA warned that the Proposed Rule did not go nearly far enough to protect religious exercise, since it did "not adequately implement language in the Act" adopting the Title VII religious exemption verbatim, which "exempts religious organizations from any obligation to make an accommodation that conflicts with their religious beliefs." Ex. C at 2 (*citing*, *e.g.*, *EEOC v. Mississippi Coll.*, 626 F.2d 477 (5th Cir. 1980); *Curay-Cramer v. Ursuline Acad.*, 450 F.3d 130 (3d Cir. 2006); *Maguire v. Marquette Univ.*, 627 F. Supp. 1499 (E.D. Wis. 1986), *aff'd in part on other grounds, vacated in part*, 814 F.2d 1213 (7th Cir. 1987); *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571 (N.D. Tex. 2021), *aff'd in part, vacated in part on other grounds*, *Braidwood Mgmt. v. EEOC,* 70 F.4th 914 (5th Cir. 2023)). Accordingly, they concluded, the Proposed Rule "d[id] not give ample scope to principles of religious freedom, speech, and expressive association." Ex. C at 2.

52. USCCB and CUA were hardly alone. Many other commenters also identified severe problems as well. Democrats for Life of America argued that the rule would "undermine its very existence as a pro-life organization," such as requiring the organization to offer its employees abortion leave.[4] The Christian Employers Alliance highlighted the Proposed Rule's failures to include adequate "conscience and free-speech exemptions" or to clarify the contours of the religious exemption, predicting

---

[4]   Democrats for Life of America (DFLA), Comment Letter on PWFA Proposed Rule at 3 (Oct. 10, 2023), https://perma.cc/3FPN-NQKU.

that the Proposed Rule could chill speech and religious expression.[5] A group of Catholic medical associations argued the Proposed Rule's use of the "vague phrase, 'related medical condition,'" and "non-exhaustive" list of such conditions "extend[ed] far beyond medical conditions actually related to pregnancy" to "activities for which there exist [federal] conscience protections."[6]

53. Many other commenters agreed that the PWFA's text, structure, context, and drafting history did not support the Proposed Rule in these regards.[7]

54. The PWFA's lead Republican co-sponsor in the Senate, Bill Cassidy, highlighted the pre-passage agreement of his Democrat co-sponsor, Bob Casey, that "under the act, … the EEOC, could not—could not—issue any regulation that requires abortion leave."[8] By acting otherwise, Senator Cassidy commented, EEOC had "ignored the statute and substituted its views on abortion for those of Congress."[9] In a public statement, Senator Cassidy also noted that the "regulations completely disregard legislative intent and attempt to rewrite the law" and that "[t]he decision to disregard the legislative process to inject a political abortion agenda is illegal and

---

[5]   Christian Employers Alliance, Comment Letter on PWFA Proposed Rule at 2 (Oct. 10, 2023), https://perma.cc/MFQ3-UE3H.

[6]   Nat'l Catholic Bioethics Ctr., Catholic Med. Ass'n, & Nat'l Ass'n of Catholic Nurses, USA, Comment Letter on PWFA Proposed Rule at 4 (Oct. 10, 2023), https://perma.cc/29F3-YRAJ (quoting 88 Fed. Reg. at 54,720).

[7]   *See, e.g.,* Alliance Defending Freedom, Comment Letter on PWFA Proposed Rule at 4-9 (Oct. 2, 2023), https://perma.cc/57PA-KHLD (arguing, for example, that EEOC's interpretation of "related medical conditions" to encompass "any aspect of sexual or reproductive health" would render the term "childbirth" superfluous); Heritage Foundation, Comment Letter on PWFA Proposed Rule at 3-9 (Oct. 10, 2023), https://perma.cc/2Z8D-KX7R ("Abortion is not a 'medical condition,' rather it is the immoral and intentional ending of an innocent human life[.]").

[8]   Sen. Bill Cassidy, Comment Letter on Proposed Rule to Implement Pregnant Workers Fairness Act at 2 (Sept. 29, 2023), https://perma.cc/5GV2-HXVF, (quoting 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022) (statement of Sen. Casey)).

[9]   *Id.* at 1.

deeply concerning."[10] Similarly, the U.S. House of Representatives' Committee on Education and the Workforce, which has primary jurisdiction over the PWFA and EEOC, commented that the "PWFA [d]oes [n]ot [a]pply to [a]bortions" and rebuked EEOC for "issu[ing] regulations contrary to the statute itself."[11]

## F.   EEOC Rejects Comments and Issues the Abortion-Accommodation Rule

55. By a divided vote of 3 to 2, EEOC issued its final rule and published it in the Federal Register on April 19, 2024. *Implementation of Pregnant Workers Fairness Act,* 89 Fed. Reg. 29,096 (Apr. 19, 2024).[12] Despite overwhelming public criticism and disapproval of EEOC's proposal to cover abortions, EEOC's Final Rule enshrines a new mandate requiring employers to do precisely that. *See id.* at 29,104 (discussing "inclusion of abortion in the definition of 'pregnancy, childbirth, or related medical conditions," and noting approximately 54,000 comments against inserting abortion versus approximately 40,000 comments supporting it (capitalization altered)).

56. The Final Rule acknowledges that the PWFA is utterly silent on the issue of abortion. *See id.* at 29,111 (conceding "Congress' lack of an explicit mention of abortion in the PWFA"). EEOC nonetheless finds a sub silentio grant of authority to require abortion accommodations in employers' duties to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee." *Id.* at 29,186 (citing 42 U.S.C. § 2000gg-1(1)).

57. As EEOC notes, the PWFA defines "known limitation" as a "physical or mental *condition* related to, affected by, or arising out of pregnancy, childbirth, or related

---

[10]   Sen.   Bill   Cassidy, *Ranking Member Cassidy Blasts Biden Administration for Illegally Injecting Abortion Politics Into Enforcement of Bipartisan PWFA Law* (Aug. 8, 2023), https://perma.cc/S64H-GP89.

[11]   The Hon. Virginia Foxx, Comment at 1-2 (Oct. 10, 2023), https://perma.cc/624Z-H5D8.

[12]   Riddhi Setty, *Final EEOC Protections for Pregnant Workers Cover Abortion,* Bloomberg Law (Apr. 15, 2024), https://perma.cc/HL4C-PBMR.

medical conditions." *See id.* (29 C.F.R. § 1636.3(a) (emphasis added)). Yet rather than address the plain meaning of the phrase "medical condition," EEOC asserts that "known limitation" includes "an impediment or problem"—a category EEOC thinks is implicated whenever an employee "seek[s] health care related to pregnancy." *See id.* (29 C.F.R. § l636.3(a)(2)).

58. With this understanding, the Final Rule further asserts that "having or choosing not to have an abortion" is a "readily apparent" "medical condition" related to pregnancy, along with "lactation (including breastfeeding and pumping), miscarriage, stillbirth, … preeclampsia, gestational diabetes, and HELLP (hemolysis, elevated liver enzymes and low platelets) syndrome." *Id.* at 29,100-01, 29,191; *see also id.* at 29,183 (29 C.F.R. § 1636.3(b)) (listing examples of "related medical conditions" including "ectopic pregnancy; preterm labor; pelvic prolapse; nerve injuries; cesarean or perineal wound infection; maternal cardiometabolic disease; gestational diabetes; preeclampsia; HELLP (hemolysis, elevated liver enzymes and low platelets) syndrome; hyperemesis gravidarum; anemia; endometriosis; sciatica; lumbar lordosis; carpal tunnel syndrome; chronic migraines; dehydration; hemorrhoids; nausea or vomiting; edema of the legs, ankles, feet, or fingers; high blood pressure; infection; antenatal (during pregnancy) anxiety, depression, or psychosis; postpartum depression, anxiety, or psychosis; frequent urination; incontinence; loss of balance; vision changes; varicose veins; changes in hormone levels; vaginal bleeding; menstruation; and lactation and conditions related to lactation, such as low milk supply, engorgement, plugged ducts, mastitis, or fungal infections.").

59. EEOC nowhere addresses the differences between these other "medical condition[s]," which arise from the "systemic changes" caused by "[p]regnancy and childbirth," *Id.* at 29,190, and a voluntary termination of a pregnancy through abortion. Instead, EEOC claims that the "plain meaning" of the PWFA supports

19

abortion's inclusion, because abortion involves "the condition of being pregnant." *Id.* at 29,106-07.

60. EEOC attempts to buttress its interpretation by citing two circuit court decisions and two district court decisions (one of them unpublished), decided over the course of decades, which EEOC claims have interpreted anti-discrimination language in Title VII, as amended by the PDA, to bar employers from taking adverse actions against employees because they "contemplated having, or chose to have, an abortion." *Id.* at 29,110, 29,152 n.296.

61. EEOC also cites informal, nonbinding guidance it has issued interpreting Title VII (under which it has no substantive rulemaking authority) to prohibit discriminating against employees because of their choice to get an abortion, as well as a single PDA House Report from 1978. *E.g., id.* at 29,152 n.296, 29,191 & n.26. From there, EEOC reasons that this prior interpretation of Title VII is "settled," such that Congress must have intended to carry it forward in the PWFA. *Id.* at 29,106; *accord id.* at 29,191 n.23.

62. Other than this smattering of court cases and nonbinding guidance, EEOC does not cite any support, textual or otherwise, for its view that Congress was aware of and intended to implement EEOC's view about the prior meaning of different language in the PDA to mandate abortion accommodations in the PWFA. To the contrary, EEOC expressly acknowledged that multiple sponsors of the bill insisted it would *not* require abortion accommodations. *Id.* at 29,109. Yet, based solely on the flimsy evidence recounted above, EEOC cursorily dismissed the "54,000 comments … urging the Commission to exclude abortion from the definition of 'pregnancy, childbirth, or related medical conditions.'" *Id.* at 29,104.

63. Further, because the Final Rule requires that the covered "limitation" must be "known," the Final Rule requires "the employee, or the employee's representative," to "communicate[]" the requested abortion accommodation "to the covered entity." *Id.*

at 29,097, 29,184 (29 C.F.R. § 1636.3(h)(2)). This requires employers to knowingly accommodate abortion.

64. The Final Rule also incorporates the proposed Rule's cramped reading of religious defenses. EEOC stated that it generally believes enforcing the Final Rule to further accommodations would constitute a "compelling interest" sufficient to override employers' protected religious-liberty rights. *Id.* at 29,148-49 & n.252; 29,150 & n.261. EEOC asserts this even though the Final Rule exempts large swaths of secular employers for a variety of reasons, including categorical exemptions for employers with fewer than 15 employees, and discretionary exemptions based on what constitutes a "reasonable" accommodation or an "undue hardship." 89 Fed. Reg. at 29,151; 29,205.

65. EEOC also repeatedly emphasized that it will evaluate religious defenses, even categorical ones such as the PWFA's statutory religious exemption and the First Amendment's ministerial exception, on a "case-by-case" basis. *See, e.g.*, *id.* at 29,144; 29,146-48, 29,150. But part of the value of religious exemptions is that they are categorical protections that provide a clear prophylactic bar on certain forms of governmental entanglement and intrusion into internal religious governance.

66. For instance, for the PWFA's statutory religious exemption, 42 U.S.C. § 2000gg-5(b), the Final Rule adopts the "co-religionist"-only rule suggested in the Proposed Rule, which bars religious discrimination claims alone even though the PWFA doesn't provide a basis to raise such claims in the first place. The Final Rule states that EEOC will interpret the PWFA in the same way that it narrowly construes Title VII's exemption, meaning that the PWFA does not fully exempt qualifying religious organizations from being forced to take employment actions that violate their beliefs. 89 Fed. Reg. at 29,146.

67. According to EEOC, Title VII's exemption applies only to claims of religious discrimination, but not other types of discrimination. As EEOC explained, "[u]nder

section 702(a), … qualifying religious organizations are exempt from Title VII's prohibition against discrimination on the basis of religion, but, as U.S. courts of appeals have recognized, qualifying religious organizations are still subject to the law's prohibitions against discrimination on the basis of race, color, sex, and national origin, and they may not engage in related retaliation." *Id.* at 29,146-47 & n.239 (citing cases). EEOC acknowledged that "a few judges have recently suggested otherwise," but then rejected their views as being "not a common understanding of Title VII's religious exemption." *Id.* at 29,147 n.239. In further support of this interpretation of the religious exemption, EEOC cited a few pages of the Federal Register in which the Department of Labor determined that the exemption applies only to religion-based discrimination. *See id.* (citing *Rescission of Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption Rule*, 88 Fed. Reg. 12,842, 12,852-54 (Mar. 1, 2023)).

68. After narrowing the PWFA and Title VII religious exemptions to a near nullity, EEOC weakened them further by again insisting on subjecting them to "case-by-case" adjudication. *Id.* at 29,147.

69. The Commission took a similar approach with respect to RFRA. Despite acknowledging that it "received several comments stating that the PWFA proposed regulation would impose a substantial burden on employers' religious exercise and that the Commission lacks a compelling governmental interest in enforcing the statute, as implemented by the regulation," EEOC perfunctorily concluded that "[n]ondiscrimination laws and policies have been found to serve a compelling governmental interest." *Id.* at 29,148-49. It therefore stated that the agency will "carefully consider" RFRA defenses "on a case-by-case basis." *Id.* at 29,148.

70. The end result stacks the decks against religious employers: In EEOC's view, the agency could normally be sure that it would have a compelling interest sufficient

to override religious defenses, but religious defendants could never know ahead of time if they would face liability for exercising their rights.

71. The Final Rule also ensconces the Proposed Rule's broad understanding of the PWFA's retaliation and anti-coercion provisions in the context of abortion. *Id.* at 29,188.

72. The Final Rule will take effect on June 18, 2024. *Id.* at 29,096.

73. Commissioner Lucas objected to the issuance of the Final Rule and issued a rare statement of dissent criticizing the Commission majority's "controversial" and "misguided" decision and use of "linguistic gymnastics" to "broaden the scope of the statute in ways that … cannot reasonably be reconciled with the text." Ex. D. at 1, 16 (Commissioner Andrea Lucas's Dissent to the Final Rule).

74. The Commission erred from the start, Commissioner Lucas stated, by "skipping straight to" cherry-picked "interpretive canons instead of first resolving whether any textual ambiguity exists." *Id.* at 5. On the text, Commissioner Lucas pointed out that the "ordinary meaning" of the term "condition" is a "state of health" or "malady or sickness," meaning the PWFA requires only "accommodations of medical conditions—states of health or illness—that are created or aggravated by pregnancy and childbirth." *Id.* at 10-11. "[C]ontrary to the final rule's definition, a medical 'condition' is not the same as medical 'procedures.'" *Id.* at 11. Commissioner Lucas thus disagreed with the Final Rule's interpretation of the term "medical *condition"* to include "specific treatments, medications, or medical procedures," such as abortion. *Id.* at 11 n.11.

75. Separately, Commissioner Lucas rejected EEOC's "misleading[]" characterization of the prior regulatory and judicial interpretations of the phrase "pregnancy, childbirth, or related medical conditions." *Id.* at 4, 16. EEOC marshaled only "thin support" for its interpretation, which Commissioner Lucas reasoned was

"not sufficient to show a 'settled consensus' such that Congress should be presumed to have known of and endorsed it." *Id.* at 6.

76. Members of Congress likewise objected to the Final Rule's coverage of abortion. Rep. Virginia Foxx stated that "[a]dding this controversial provision into the PWFA is wrong. Period. Abortion is not a medical condition related to pregnancy; it is the opposite."[13] Senator Bill Cassidy criticized the Final Rule's decision to "inject abortion into a law specifically aimed at promoting healthy childbirth" as "shocking and illegal."[14]

## G. Plaintiffs' Religious Beliefs and Practices Related to the Dignity of Human Life

77. Plaintiffs follow the doctrines of the Catholic Church, including with respect to the dignity of human life and the morality of abortion.

78. The Catholic Church teaches that all people are created in the image and likeness of God and are thus imbued with human dignity. *Catechism of the Catholic Church* §§ 357, 1701 ("CCC").

79. Since its beginnings, the Catholic Church has taught that this dignity extends to the preborn—a teaching rooted in both Scripture and the natural law. *See, e.g.*, *Psalms* 139:16; *Jeremiah* 1:4-5; *Luke* 1:39-45.

80. In his 1995 Encyclical *Evangelium vitae*, Pope Saint John Paul II "declare[d]" the "doctrine" of the Catholic Church to hold that "direct abortion, that is, abortion willed as an end or as a means, always constitutes a grave moral disorder, since it is the deliberate killing of an innocent human being. … No circumstance, no purpose, no law whatsoever can ever make licit an act which is intrinsically illicit, since it is contrary to the Law of God which is written in every human heart, knowable by

---

[13]   Breccan F. Thies, *Biden Administration Finalizes Pregnant Workers' Rule with Abortion 'Political Agenda',* Washington Examiner (Apr. 15, 2024), https://perma.cc/7QJA-AKFE.

[14]   *Id.*

reason itself, and proclaimed by the Church." Pope Saint John Paul II, *Evangelium vitae*, ¶ 62 (Mar. 25, 1995), https://perma.cc/N9WB-LGNN.

81. This doctrine is reflected in the Catechism of the Catholic Church, which reaffirms that life begins at conception: "Human life must be respected and protected absolutely from the moment of conception. From the first moment of his existence, a human being must be recognized as having the rights of a person—among which is the inviolable right of every innocent being to life." CCC § 2270.

82. Section 2271 of the Catechism describes the Church's unbroken adherence to this teaching: "Since the first century the Church has affirmed the moral evil of every procured abortion. This teaching has not changed and remains unchangeable. Direct abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law."

83. Further, Section 91 of *Evangelium vitae* teaches that "[i]t is therefore morally unacceptable to encourage, let alone impose, the use of methods such as contraception, sterilization and abortion in order to regulate births."

84. Plaintiffs employ both women and men and plan to continue doing so. Plaintiffs' Catholic beliefs inform their workplace expectations for their employees.

*Diocese of Lake Charles*

85. The Diocese of Lake Charles "embraces fully the mission of the Roman Catholic Church to preach the Gospel of Jesus Christ and the teachings of the Church." *Diocesan Mission Statement*, Diocese of Lake Charles (Nov. 18, 2015), https://bit.ly/4dLsnfi.

86. That mission includes expressing and carrying out the Church's beliefs in the sanctity and dignity of human life. For instance, the Diocese of Lake Charles has adopted the Ethical and Religious Directives for Catholic Health Care Services. *DOLC Polices and Guidelines* at 103, Diocese of Lake Charles (Aug. 2023), https://perma.cc/UD48-MT8Z. These Directives recognize that "[t]he Church's

commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning," *id.* at 119, and direct that "Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted," *id.* at 121.

87. While the Diocese of Lake Charles recognizes that "procuring of an abortion" is grounds for excommunication from the Church, *id.* at 37 (citing 1983 Code c., 1397 § 2 (2024), it also endeavors to support women in reconciliation and spiritual healing after having an abortion. *Id.* at 257. For example, the Diocese of Lake Charles supports a local chapter of Rachel's Vineyard, a Catholic ministry that assists women in spiritual healing after having an abortion. *See Rachel's Vineyard Offers Hope, Healing After Abortion*, Diocese of Lake Charles (July 22, 2020), https://perma.cc/BX5A-997T.

88. The Diocese of Lake Charles does not make accommodation for employees to engage in the violation of the moral teachings of the Church, including respect for human life.

89. The Diocese of Lake Charles does not and will not provide any workplace accommodation for an employee to obtain a direct abortion. Obtaining a direct abortion is grounds for adverse employment action, up to and including termination.

90. The Diocese of Lake Charles will take appropriate adverse employment action against any employee who encourages another person to obtain a direct abortion or to request an accommodation for a direct abortion.

91. The Diocese of Lake Charles does not and will not permit its employees to advocate in favor of abortion or abortion accommodations in the workplace or outside of it.

92. The Diocese of Lake Charles will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or

conduct undermines Catholic teachings about direct abortion or to the Diocese's policies with respect to abortion.

*Diocese of Lafayette*

93. The Diocese of Lafayette follows teachings of the Catholic Church, including regarding the sanctity of all human life.

94. In accordance with these beliefs, the Diocese of Lafayette adheres to the Church's teaching "affirm[ing] the moral evil of every procured abortion" as "gravely contrary to the moral law." *Office of Pro-Life Apostolate: The Unborn*, Diocese of Lafayette, https://perma.cc/7NV9-2JKD (quoting CCC § 2271).

95. The Diocese of Lafayette has an Office of Pro-Life Apostolate that is dedicated to "promot[ing] the dignity of all human life from conception to natural death." *Office of Pro-Life Apostolate*, Diocese of Lafayette, https://perma.cc/7J2J-YRDQ. The Office is committed to both providing pregnancy resources and post-abortion healing ministries for women in need and engaging in pro-life prayer and advocacy. *Id.*

96. In accordance with these religious beliefs, the Diocese of Lafayette does not make accommodation for employees to engage in the violation of the moral teachings of the Church, including respect for human life.

97. The Diocese of Lafayette does not and will not provide any workplace accommodation for an employee to obtain a direct abortion. Obtaining a direct abortion is grounds for adverse employment action, up to and including termination.

98. The Diocese of Lafayette will take appropriate adverse employment action against any employee who encourages another person to obtain a direct abortion or to request an accommodation for a direct abortion.

99. The Diocese of Lafayette does not and will not permit its employees to advocate in favor of abortion or abortion accommodations in the workplace or outside of it.

100.   The Diocese of Lafayette will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or

27

conduct undermines Catholic teachings about direct abortion or to the Diocese's policies with respect to abortion.

*U.S. Conference of Catholic Bishops*

101.   USCCB informs its employees in its personnel manual that USCCB employees should act with conscious regard to and respect for the USCCB's religious and professional character and should refrain from conduct or advocacy inside or outside the workplace that publicly conflicts with or undermines the Catholic teachings of the USCCB.

102.   Similarly, job descriptions for USCCB employees require them to demonstrate willingness and ability to understand, respect and contribute to the mission of the Bishops and to fulfill job duties in accordance with the USCCB's Catholic identity.

103.   And with respect to employee benefits, USCCB informs its employees via its personnel manual that the USCCB does not provide any benefit in any circumstance in which the benefit or the provision of the benefit would be contrary to the authentic teaching of the Catholic Church.

104.   USCCB provides religious training and advocacy materials supporting the sanctity of human life and opposing the sin of abortion. USCCB has a Committee on Pro-Life Activities, currently led by Bishop Michael F. Burbidge, and a Secretariat of Pro-Life Activities. USCCB has issued a series of Ethical and Religious Directives for Catholic Healthcare Services to inform the provision of health services in every U.S. Catholic health institution, which prohibit providing, promoting, or condoning direct abortions. It provides a resource library containing dozens of public religious resources dedicated to expressing its religious pro-life beliefs, including sermons, prayers, educational information, and policy advocacy materials. It has a webpage dedicated to its pro-life advocacy. *See Abortion*, USCCB, https://perma.cc/7KEV-58L5. On this webpage, it also provides information about the Catholic Church's

ministry in the United States to women and men who have been harmed by abortion, called the Project Rachel Ministry, and links to religious and counseling resources available to them, including Sacramental Reconciliation. The USCCB also participates in numerous prolife events, including the annual March for Life and Respect Life Month.

105.   Given USCCB's religious mission to protect both mothers and their preborn children, it strongly supports the PWFA's goal of helping healthy pregnancies and childbirth. But for the same reason, it cannot accommodate or support direct abortion within its workplace and it must ensure that its employees effectuate that mission, not undermine it. Being required to knowingly accommodate the choice to obtain an abortion within USCCB's own ministry, and to treat the choice to obtain an abortion just as it would the choice to give birth to one's child, would directly and substantially undermine its Catholic witness and beliefs. Thus, USCCB cannot comply with the Final Rule's requirements to provide accommodations for pregnant employees to obtain abortions.

106.   Further, USCCB must be able to fully express its support for preborn human dignity and its corresponding opposition to direct abortion in its employment policies and practices, leaving it in conflict with the Final Rule's prohibitions on "retaliation," "coercion," or "interfere[nce]."

107.   USCCB takes a pastoral approach to its ministry, and will minister to its employees in a way that encourages, where appropriate and possible, reconciliation and restoration. But USCCB will not knowingly accommodate the choice to obtain or support abortion, and will take appropriate employment action to ensure as much. USCCB believes that it would be complicit in the grave sin of abortion if it knowingly accommodated its employees' abortions or if it changed its workplace policies and practices to cease expressing and enforcing its opposition to abortion in how it manages its ministry.

108.   Moreover, if USCCB were to knowingly accommodate abortions by its employees or cease expressing its opposition to abortion, it would cause scandal and lead other Catholic individuals and ministries astray. *See* CCC §§ 2284, 2286 (instructing Catholic institutions to avoid "scandal" and defining "scandal" as "an attitude or behavior which leads another to do evil"; scandal can be caused "by laws or institutions").

109.   USCCB does not and will not provide any workplace accommodation for an employee to obtain a direct abortion. Obtaining a direct abortion is grounds for adverse employment action, up to and including termination.

110.   USCCB will take appropriate adverse employment action against any employee who encourages another person to obtain a direct abortion or to request an accommodation for a direct abortion.

111.   USCCB does not and will not permit its employees to advocate in favor of abortion or abortion accommodations in the workplace or outside of it.

112.   USCCB will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or conduct undermines Catholic teachings about direct abortion or to USCCB's policies with respect to abortion.

*The Catholic University of America*

113.   CUA's essential character is as a Catholic and American institution of higher learning. It is committed to being faithful to the teachings of Jesus Christ as handed on by the Church.

114.   This includes a commitment to the Church's teachings on the dignity of human life. *See, e.g.*, Pope Saint John Paul II, *Ex corde Ecclesiae*, ¶¶ 32-33 (Aug. 15, 1990), https://perma.cc/V7H7-TJQS ("A Catholic University" must be an "effective instrument of cultural progress," including by studying "the dignity of human life"

and must place "specific priority" to communicate "*ethical and religious principles which give full meaning to human life*." (emphasis in original)).

115.    Inspired by its commitment to the dignity of every human life and the "sacred duty as a Catholic community to journey alongside families as they nourish new life in the womb and outside of it," CUA launched the Guadalupe Project in 2022. The Guadalupe Project, CUA, https://perma.cc/D34D-CG8E. This University-wide effort offers concrete support and resources to faculty, staff, and students who are pregnant and parenting through increased paid parental leave, designated maternity parking spots around campus, access to lactation spaces, and many other initiatives.

116.    Through the Guadalupe Project, CUA fosters a culture of life on campus and shares the aims of the PWFA to support expectant mothers in the workplace.

117.    Because the "identity of a Catholic university is essentially linked to the quality of its teachers and to respect for Catholic doctrine," all CUA faculty must understand CUA's Catholic identity and respect Catholic doctrine and morals in their teaching. *Ex corde Ecclesiae*, at Art. 4, §§ 1-4. A key component of faculty selection is preserving and advancing CUA's Catholic identity and mission, and faculty are expected to support CUA's mission as a requirement of the position. Similarly, in order to be approved for tenure, faculty must demonstrate how they support and contribute to CUA's Catholic mission.

118.    Faculty in CUA's Ecclesiastical Schools—the schools of Canon Law, Philosophy, and Theology and Religious Studies—are held to an even higher standard. All such teachers "must be marked by an upright life, integrity of doctrine, and devotion to duty," and will be "removed from their post[s]" if they fail to meet these standards. *See, e.g.*, Pope Francis, *Apostolic Constitution Veritatis gaudium*, Art. 26, § 1 (Jan. 29, 2018), https://perma.cc/L95Y-WNK6. And faculty who teach matters touching on faith and morals must carry out their work in full communion with the authentic Magisterium of the Church, and receive from Cardinal Wilton D.

Gregory, CUA's Chancellor and Archbishop of Washington, either a *missio canonica* (for Catholic faculty) or special permission to teach (for non-Catholic faculty). *Id.* at Arts. 20, 26-27.

119.   When faculty conduct themselves in the workplace in a manner that is not aligned with CUA's Catholic mission and identity, that is grounds for appropriate adverse employment action, including termination.

120.   CUA reserves the right to take appropriate adverse employment action against faculty members who encourage another person in the workplace to obtain a direct abortion.

121.   CUA does not and will not permit faculty members to advocate in favor of abortion or abortion accommodations in the workplace.

122.   CUA reserves the right to take appropriate adverse employment action against any faculty applicant or faculty member whose speech, advocacy, or conduct undermines Catholic teachings about direct abortion.[15]

## H.  The Final Rule Will Cause Plaintiffs Immediate Irreparable Harm.

123.   The Final Rule requires Plaintiffs to knowingly accommodate employees when they obtain abortions, even where such accommodations are contrary to Plaintiffs' sincerely held religious beliefs. As a result of the Final Rule, Plaintiffs will be pressured to divert resources—including by providing paid leave time, changing employment policies and practices, or training employees regarding the new policies and practices—to assist employees in their decision to terminate preborn life.

---

[15]   All references to "faculty" below are references to CUA faculty, and references to "employees" of "Plaintiffs" below should be understood to apply to CUA only as to its faculty unless otherwise specified. In a Catholic university setting, faculty have a heightened responsibility in carrying out the mission of the institution. Other categories of employees at CUA are also expected to participate in carrying out the institution's mission and respect its beliefs, but for purposes of this Complaint, CUA addresses only faculty.

124. The Final Rule burdens Plaintiffs' sincere religious beliefs regarding the dignity of human life by establishing that employers cannot take appropriate adverse employment actions against employees who violate their policies or practices reflecting those beliefs, such as by (i) choosing to obtain direct abortions, (ii) requesting accommodations for obtaining direct abortions, (iii) encouraging other employees to obtain direct abortions or to request accommodations for direct abortions, or (iv) opposing Plaintiffs' policies with respect to abortion.

125. The Final Rule requires Plaintiffs to change their religious speech in ways that support abortion. It does so, for instance, by requiring Plaintiffs to rescind their current policies and practices against abortion accommodations or advocacy, and to replace them with policies and procedures that (i) affirm a willingness to accommodate abortion, (ii) prohibit any potentially "harassing" discussion of abortion in the workplace, including many potential discussions regarding the moral and religious implications of abortion, and (iii) do not "interfere with" "any individual" in the exercise of abortion-related rights created by the Final Rule.

126. These requirements, among others, will cause Plaintiffs irreparable harm, as they require Plaintiffs to violate their religious beliefs, compel speech supporting abortion, restrict them from speaking in accordance with their religious beliefs, compel them to associate with faculty or employees that do not share those beliefs, and impermissibly intrude upon Plaintiffs' internal religious decision-making.

127. If Plaintiffs do not immediately take steps to begin complying with the Final Rule, they will be out of compliance by the time the Rule becomes effective on June 18, 2024. And as of that date, Plaintiffs' religious employment practices, policies, speech, and related internal governance will be threatened by EEOC's interpretation of the law and will face open-ended liability as well as intrusive and entangling investigations from applicants, employees, former employees, other individuals entitled by the Final Rule to make claims against Plaintiffs, and EEOC itself.

## CLAIMS

## <u>COUNT I</u>

**Administrative Procedure Act and Declaratory Judgment Act
Unlawful Inclusion of Abortion in Violation of PWFA**

128.   The Plaintiffs incorporate by reference all preceding paragraphs.

129.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

130.   The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitation, or short of statutory right." *Id.* § 706.

131.   The Final Rule's inclusion of abortion must be held unlawful and set aside under these provisions.

132.   The PWFA requires an employer to reasonably accommodate an employee's "known limitations related to … pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000gg-1(1), and prohibits employers from retaliating against employees who seek an accommodation under this basis or who advocate for others to receive such accommodations or who oppose an employer's failure to provide such accommodations, *id.* § 2000gg-2(f).

133.   The Final Rule interprets "known limitations related to … pregnancy, childbirth, or related medical conditions" to include abortion. The Final Rule thus requires an employer to knowingly accommodate an employee's decision to have an abortion; and prohibits an employer from retaliating against an employee for requesting an accommodation to have an abortion, for advocating for others to receive such an accommodation, or for "opposing" the employer's refusal to accommodate

abortion. The Final Rule even purports to impose liability on employers whose actions or words are deemed "to coerce, intimidate, threaten, harass, or interfere with any individual"—whether or not that individual is an employee—"on account of such individual having aided or encouraged" an employee to request an accommodation to have an abortion. 89 Fed. Reg. at 29,188.

134.   The Final Rule and EEOC's interpretation exceed the statutory authority granted under the PWFA, which does not cover abortion.

135.   Intentionally taking the life of a preborn child via an abortion is not a "limitation[ ] related to … pregnancy, childbirth, or related medical conditions," and the PWFA thus does not require an employer to accommodate an employee's decision to have an abortion. Nor does the PWFA protect an employee's demand for an accommodation to have an abortion or an employee's or non-employee's advocacy for an employer to change its policies on abortion.

136.   The Final Rule also exceeds statutory authority because it raises serious constitutional questions that, if Congress wished to delegate, needed to be expressed clearly. *See, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).

137.   Abortion concerns "matters of great social significance and moral substance." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 300 (2022). The language of the PWFA lacks the "clear congressional authorization" required before an agency can decide an issue of such "economic and political significance," *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022), such as forcing employers nationwide—including religious employers—to accommodate abortion.

138.   Given the serious constitutional questions inherent in forcing employers nationwide, including religious employers, to accommodate abortion, the language of the PWFA lacks the clarity required to overcome the constitutional avoidance canon.

35

139.    By violating the terms of the PWFA, and by violating protections of the First Amendment identified in the claims below, the Final Rule is not in accordance with law and exceeds EEOC's statutory authority.

140.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

141.    Plaintiffs have no adequate remedy at law.

142.    If the Final Rule is vacated, an "actual controversy," 28 U.S.C. § 2201(a), will still exist between Plaintiffs and EEOC given EEOC's interpretation and enforcement of the PWFA to cover abortion.

143.    Absent injunctive and declaratory relief against the Final Rule and against the PWFA, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

## <u>COUNT II</u>

**Administrative Procedure Act and Declaratory Judgment Act
Unlawful Inclusion of Abortion in Violation of Title VII**

144.    The Plaintiffs incorporate by reference all preceding paragraphs.

145.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule is a "rule" under the APA, *id.* § 551(4), and is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

146.    The Final Rule interprets Title VII to prohibit discrimination based on an employee's decision to have an abortion. 89 Fed. Reg. at 29,104.

147.    That erroneous interpretation had previously only been adopted by EEOC in its Title VII agency guidance. *See* Ex. E at 15, EEOC, Enforcement Guidance on Pregnancy Discrimination and Related Issues, § I.A.4.c (2015) ("Title VII protects women from being fired for having an abortion or contemplating having an abortion."); Ex. F at 15, EEOC, Enforcement Guidance on Harassment in the

36

Workplace, § II.A.5.b (Apr. 29, 2024) ("pregnancy, childbirth, or related medical conditions" includes "deciding to have … an abortion").

148.   EEOC lacks substantive rulemaking power under Title VII. *See Braidwood Mgmt.*, 70 F.4th at 928. The PWFA only grants EEOC authority to implement regulations "to carry out this chapter"—*i.e.*, PWFA alone. 42 U.S.C. § 2000gg-3(a).

149.   Thus, through the Final Rule, EEOC seeks to expand the substantive scope of Title VII by inserting its nonbinding Title VII interpretation into the PWFA Final rule, elevating it to the status of a binding regulation carrying the force of law despite lacking any authority to do so.

150.   The Final Rule and EEOC's interpretation also exceed the statutory authority granted under Title VII because, like the PWFA, Title VII does not cover abortion.

151.   Abortion is not the equivalent of "pregnancy, childbirth, or related medical conditions" under Title VII. 42 U.S.C. § 2000e(k).

152.   The Final Rule also exceeds statutory authority because it raises serious constitutional questions that, if Congress wished to delegate, needed to be expressed clearly. *Edward J. DeBartolo Corp.*, 485 U.S. at 575.

153.   Abortion concerns "matters of great social significance and moral substance." *Dobbs*, 597 U.S. at 300. The language of Title VII lacks the "clear congressional authorization" required before an agency can decide an issue of such "economic and political significance," *West Virginia*, 597 U.S. at 721, 723, as forcing employers nationwide, including religious employers, to accommodate abortion.

154.   Given the serious constitutional questions inherent in forcing employers nationwide, including religious employers, to treat abortion as the equivalent as "pregnancy, childbirth, or related medical conditions," the language of Title VII lacks the clarity required to overcome the constitutional avoidance canon.

155. By violating the terms of Title VII, and by violating protections of the First Amendment identified in the claims below, the Final Rule is not in accordance with law and exceeds EEOC's statutory authority.

156. Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

157. Plaintiffs have no adequate remedy at law.

158. If the Final Rule is vacated, an "actual controversy," 28 U.S.C. § 2201(a), will still exist between Plaintiffs and EEOC given EEOC's interpretation and enforcement of the PWFA and Title VII to cover abortion.

**159.** Absent injunctive and declaratory relief against the Final Rule and against Title VII, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

## COUNT III

### Administrative Procedure Act and Declaratory Judgment Act
### Unlawful Failure to Provide Religious Exemption in
### Violation of PWFA and Title VII

160. The Plaintiffs incorporate by reference all preceding paragraphs.

161. Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule is a "rule" under the APA, *id.* § 551(4), and is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

162. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitation, or short of statutory right." *Id.* § 706.

163. The text of the PWFA includes a robust religious exemption, but EEOC refused to provide that exemption in the Final Rule.

164.   The text of the PWFA provides that the statute is "subject to the applicability to religious employment set forth in section 2000e-1(a) of this title," 42 U.S.C. § 2000gg-5(b), which is the religious exemption in Title VII of the Civil Rights Act of 1964, *see id.* § 2000e-1(a).

165.   Title VII's religious exemption provides: "This subchapter shall not apply … to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a).

166.   Title VII then provides that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

167.   "This subchapter" refers to the entirety of Title VII, not just claims of religious discrimination. *See Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring).

168.   In other words, a religious employer has a statutory right under Title VII to employ individuals of a particular religious observance and practice, as well as belief, and the employer's decision to take employment action on that basis does not violate Title VII.

169.   Multiple federal courts, including the Fifth Circuit, and several judges have explained that Title VII's religious exemption protects employing only persons whose beliefs and conduct align with the employer's religious precepts. *Mississippi Coll.*, 626 F.2d at 484-85; *Curay-Cramer*, 450 F.3d at 141; *Bear Creek Bible Church*, 571 F. Supp. 3d at 590-91; *see also Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring) ("A religious school is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of 'religion' as § 2000e(j) defines that word."); *Fitzgerald v. Roncalli High Sch.*, 73 F.4th 529, 535 (7th Cir. 2023) (Brennan, J., concurring) ("'individuals of a particular religion' means individuals whose beliefs,

observances, or practices align with the employer's religious expectations"); *Billard v. Charlotte Catholic High Sch.*, ---F.4th---, 2024 WL 2034860, at *12 (4th Cir. May 9, 2024) (King, J., dissenting in part and concurring in judgment) (agreeing with Judges Easterbrook and Brennan).

170.    Because the PWFA incorporates the Title VII religious exemption by reference, the scope of the PWFA's religious exemption must mirror Title VII's.

171.    This means that, just like Title VII, a religious employer does not violate the PWFA when it denies an accommodation or takes other employment action to enforce religious conduct standards that the employer sets for employees.

172.    Thus, for example, Plaintiffs do not violate the PWFA or Title VII by applying their religious conduct standards to deny an accommodation for faculty or an employee to have an abortion, nor by disciplining or terminating faculty or an employee who has an abortion, demands an accommodation to have an abortion, advocates for other employees to receive accommodations to have abortions, or opposes Plaintiffs' policies with respect to abortion or providing accommodations for abortion.

173.    By stark contrast, EEOC has refused to include this religious exemption in the Final Rule.

174.    In the Final Rule, EEOC interprets the PWFA and Title VII religious exemptions to apply only to claims of religious discrimination, and even then only to "hiring or firing claims, rather than terms or conditions of employment." 89 Fed. Reg. at 29,147 n. 239. Under this reading, the PWFA religious exemption is a nullity because (1) the PWFA is primarily concerned with terms and conditions of employment (e.g., accommodation claims) rather than hiring or firing, and (2) the PWFA doesn't prohibit religious discrimination to begin with.

175.    To support this atextual and nonsensical interpretation of the religious exemption, the Final Rule approvingly cites the analysis from another recent rule

that adopted the same narrow reading and explicitly disagreed with *Bear Creek Bible Church* and the concurrences in *Starkey* and *Fitzgerald*. *See* 89 Fed. Reg. 29,146-74 & n.239 (citing 88 Fed. Reg. 12,852-54).

176.    EEOC's other actions further confirm that, even aside from the Final Rule, EEOC now has a policy and practice of interpreting the Title VII religious exemption narrowly and contrary to its text even beyond the Final Rule. For example, in *Bear Creek Bible Church*, the district court correctly concluded that the "plain text" of the Title VII religious exemption "is not limited to religious discrimination claims; rather it also exempts religious employers from other forms of discrimination under Title VII, so long as the employment decision was rooted in religious belief." 571 F. Supp. 3d at 591. On appeal, EEOC insisted this was "erroneous" and argued that the exemption applies only to claims of religious discrimination. EEOC Resp. & Reply Br. at 54 n.6, ECF 60, *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023) (No. 22-10145), 2022 WL 4078965.[16]

177.    In addition to being in clear violation of the text of Title VII and the PWFA, EEOC's interpretation runs afoul of the constitutional avoidance canon. EEOC's interpretation of Title VII and the PWFA causes a serious threat to First Amendment rights. *See Curay-Cramer*, 450 F.3d at 138-39. Courts may only interpret federal law to raise a serious constitutional question if Congress has clearly expressed its intent to do so. *See NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 500 (1979). Here, Congress not only failed to express such intent, but it also clearly expressed the *opposite* intention—to exempt religious organizations from being forced to employ or accommodate individuals who violate their religious beliefs and practices. EEOC's contrary interpretation thus creates avoidable constitutional conflicts that Congress in fact expressly sought to avoid.

---

[16]   The Fifth Circuit's decision did not reach this issue.

178.    EEOC's failure to provide in the Final Rule the full religious exemption to which Plaintiffs are entitled under the PWFA and Title VII is short of statutory right, not in accordance with law, and exceeds statutory authority. Similarly, EEOC's misinterpretation of the religious exemption to proscribe only claims of religious discrimination is short of statutory right and not in accordance with law and exceeds statutory authority.

179.    Likewise, EEOC's misinterpretation of the religious exemption violates the protections of the First Amendment and RFRA identified in the claims below, and thus is not in accordance with law and exceeds statutory authority.

180.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

181.    Plaintiffs have no adequate remedy at law.

182.    If the Final Rule is vacated, an "actual controversy," 28 U.S.C. § 2201(a), will still exist between Plaintiffs and EEOC given that EEOC is charged with enforcing both statutes and has repeatedly taken an unlawfully narrow interpretation of the PWFA and Title VII religious exemptions.

**183.**    Absent injunctive and declaratory relief against the Final Rule and against the PWFA and Title VII, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

## <u>COUNT IV</u>

### Administrative Procedure Act and Declaratory Judgment Act
### Arbitrary and Capricious Treatment of Religious Defenses

184.    The Plaintiffs incorporate by reference all preceding paragraphs.

185.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in court." *Id.* § 704.

186.    The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706.

187.    The Final Rule's combined inclusion of abortion and restriction of religious exemptions and protections must be held unlawful and set aside under this provision.

188.    EEOC has "promulgated an arbitrary and capricious rule by entirely failing to consider an important aspect of the problem or offering an explanation for its decision that runs counter to the evidence before it." *Little Sisters of the Poor*, 591 U.S. at 682 (cleaned up).

189.    Here, EEOC was aware of the "years of protracted litigation," *id.* at 663, caused by a similar federal agency mandate to provide abortifacient coverage in or through the health insurance plans of objecting religious employers. That mandate and related regulations were subject to "numerous" challenges by a "host of … entities," which led to the Supreme Court granting certiorari in at least seven cases from several circuits. *Id.* at 669-70, 673-74.

190.    Moreover, EEOC was aware of "concerns raised in public comments and court filings in dozens of cases—encompassing hundreds of organizations"—over that previous mandate. *Id.* at 682 (cleaned up).

191.    EEOC was also aware that the previous mandate resulted in rulings from numerous federal courts requiring full exemptions to employers with religious objections to the mandate, and to the promulgation of a new rule by agencies that likewise provided a full exemption to employers with religious objections., 88 Fed. Reg. at 7236.

192.    Yet, in promulgating its own abortion-accommodation mandate that burdens the consciences of employers with religious objections in the same or worse ways, EEOC essentially ignored the lessons learned from over a decade of nationwide

litigation over a similar federal-agency mandate, as well as the 54,000 objections to its own proposed mandate.

193.   When EEOC chose to insert abortion into the Final Rule, well knowing the religious burdens and controversy that this would entail, EEOC did not choose to grant *at least* as much of an exemption granted by Congress under Title VII and the PWFA, or *at least* as much as the exemption arrived at by the other federal agencies, or *at least* as much as required by protections of the First Amendment.

194.   Instead, EEOC chose to grant *less* protection than any of those laws. For instance, EEOC abandoned the categorical exemption granted by Congress and inserted an emaciated version. Similarly, EEOC declined to provide the kind of full exemptions that were granted to employers with religious objections to the previous insurance-coverage mandate, or to recognize that First Amendment protections like the ministerial exception categorically bar inserting the Final Rule into religious disputes.

195.   Nor did EEOC even choose to allow employers with sincere religious objection to obtain assurance from EEOC itself that their employment policies and practices declining to accommodate abortion are protected by federal law. By comparison, the Department of Education will provide such pre-clearance for educational institutions controlled by religious organizations under Title IX's religious exemption. *See* 34 C.F.R. § 106.12(b) (applying religious exemption in 20 U.S.C. § 1681(a)(3)); *accord Maxon v. Fuller Theological Seminary*, No. 20-56156, 2021 WL 5882035, at *2 (9th Cir. Dec. 13, 2021) (noting that this is "DOE's longstanding practice," albeit not one that exempt entities must use to be exempt). But here, EEOC refused "to provide legally binding responses to employer inquiries about the potential applicability of religious … defenses." 89 Fed. Reg. at 29,147.

196.   EEOC forces all objecting employers to go through "case-by-case" adjudication to determine whether they have any form of protection for their religious

beliefs. 89 Fed. Reg. at 29,144, 29,146-48, 29,150. This of course creates liability exposure and a resulting burden on objecting employers. Further, the kind of intrusive adjudication into sensitive religious beliefs and practices now required by EEOC is itself a burden on the religious autonomy of a house of worship and other religious employers. It is precisely to avoid that kind of intrusion that numerous federal laws provide categorical exemptions.

197.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

198.   Plaintiffs have no adequate remedy at law.

199.   If the Final Rule is vacated, an "actual controversy," 28 U.S.C. § 2201(a), will still exist between Plaintiffs and EEOC given that EEOC is charged with enforcing the PWFA and Title VII and has repeatedly taken an unlawfully narrow interpretation of religious liberty protections, including the PWFA and Title VII religious exemption.

200.   Absent injunctive and declaratory relief against the Final Rule and against the PWFA and Title VII, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

## COUNT V

### Violation of the Religious Freedom Restoration Act

201.   The Plaintiffs incorporate by reference all preceding paragraphs.

202.   RFRA states that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1; *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014).

203.   RFRA's "compelling interest test" "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430-31 (2006).

204.   RFRA broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4) (citing 42 U.S.C. § 2000cc-5).

205.   The Plaintiffs' sincerely held religious beliefs prohibit them from participating in, condoning, facilitating, or otherwise becoming complicit in matters contrary to their beliefs on the sanctity of human life, including abortion.

206.   Plaintiffs' sincerely held religious beliefs are reflected in their employment policies, which require faculty or employees not to speak or act inconsistent with Plaintiffs' beliefs about matters such as abortion.

207.   Plaintiffs' sincerely held religious beliefs lead them to take appropriate adverse employment action against faculty or employees who speak or act in ways that undermine Plaintiffs' beliefs on matters such as abortion.

208.   Plaintiffs' sincerely held religious beliefs lead them to express their beliefs about matters such as abortion, including to individuals who are or may be applicants, employees, and former employees. This expression of belief includes Plaintiffs' view that individuals should not choose abortion and that choosing life is the only option that respects the dignity of both the mother and her preborn child.

209.   Plaintiffs' adherence to and expression of these religious beliefs is a religious exercise.

210.   Plaintiffs' decision to require their faculty or employees to comply with these religious beliefs is a religious exercise.

211.    The Final Rule and EEOC's interpretation of the PWFA and Title VII create government-imposed coercive pressure on the Plaintiffs to change or violate their religious beliefs.

212.    The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, chill the Plaintiffs' religious exercise.

213.    The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, expose the Plaintiffs to years-long civil suits, substantial financial liability, and intrusive and entangling government investigations simply for practicing their millennia-old sincerely held religious beliefs.

214.    The Final Rule and EEOC's interpretation of the PWFA and Title VII thus impose a substantial burden on the Plaintiffs' religious exercise.

215.    The substantial burden that the Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, place on Plaintiffs' religious exercise furthers no compelling governmental interest as applied to Plaintiffs.

216.    The substantial burden that the Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, place on Plaintiffs' religious exercise is not the least-restrictive means of furthering EEOC's interests with respect to Plaintiffs, if any exist.

217.    Yet the Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, purport to pre-determine that EEOC's interests are compelling and sufficiently narrowly tailored, a claim it cannot lawfully make under controlling precedent.

218.    The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, violate the Plaintiffs' rights secured to them by RFRA, 42 U.S.C. § 2000bb *et seq.*

219.   Absent injunctive and declaratory relief against the Final Rule and against the PWFA and Title VII, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

**COUNT VI**

**Violation of First Amendment of the United States Constitution
Free Exercise Clause**

220.   The Plaintiffs incorporate by reference all preceding paragraphs.

221.   "[L]aws burdening religious practice must be of general applicability." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

222.   A law fails general applicability if it "treat[s] any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

223.   A law is also not generally applicable where it reserves discretion for the government "to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021).

224.   The Plaintiffs' sincerely held religious beliefs prohibit them from participating in, condoning, facilitating, or otherwise becoming complicit in matters contrary to the sanctity of human life, including abortion.

225.   Plaintiffs' sincerely held religious beliefs lead them to maintain employment policies requiring faculty or employees not to speak or act inconsistent with Plaintiffs' religious beliefs about matters such as abortion.

226.   Plaintiffs' sincerely held religious beliefs lead them to take appropriate adverse employment action against faculty or employees who speak or act in ways that undermine Plaintiffs' beliefs on matters such as abortion.

227.   Plaintiffs' sincerely held religious beliefs lead them to broadly express their beliefs about matters such as abortion to the public, including to individuals who are or may be applicants, employees, and former employees. This expression of belief

48

includes Plaintiffs' view that individuals should not choose abortion and that choosing life is the only option that respects the dignity of both the mother and her preborn child.

228.    Plaintiffs' adherence to and expression of these religious beliefs is a religious exercise.

229.    Plaintiffs' decision to require their faculty or employees to comply with these religious beliefs is a religious exercise.

230.    The Final Rule and EEOC's interpretation of the PWFA and Title VII create government-imposed coercive pressure on the Plaintiffs to change or violate their religious beliefs.

231.    The Final Rule and EEOC's interpretation of the PWFA and Title VII chill the Plaintiffs' religious exercise.

232.    The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, expose the Plaintiffs to substantial financial liability and intrusive and entangling governmental investigations and civil litigation simply for practicing their millennia-old sincerely held religious beliefs.

233.    The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, thus burden the Plaintiffs' religious exercise.

234.    The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, are not neutral and generally applicable laws. Among other things, they leave appreciable damage to EEOC's interests unregulated by exempting secular and religious employers with less than 15 employees. 89 Fed. Reg. at 29,151. Further, they allow the government discretion to make "case-by-case" decisions on whether a proposed accommodation was sufficiently "reasonable" and whether accommodating a particular employee or particular request is an "undue hardship." 89 Fed. Reg. at 29,205.

235.    The burden that the Final Rule and EEOC's interpretation of the PWFA and Title VII place on Plaintiffs' religious exercise furthers no compelling governmental interest, particularly as applied to Plaintiffs.

236.    The burden that the Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, place on Plaintiffs' religious exercise is not the least restrictive means of furthering EEOC's interests with respect to Plaintiffs, if any exist.

237.    Yet the Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, purport to pre-determine that EEOC's interests are compelling and sufficiently narrowly tailored, a claim it cannot lawfully make under controlling precedent.

238.    The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, violate the Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment.

**239.**    Absent injunctive and declaratory relief against the Final Rule and against the PWFA and Title VII, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

**<u>COUNT VII</u>**

**Violation of First Amendment of the United States Constitution
Church Autonomy Doctrine**

240.    The Plaintiffs incorporate by reference all preceding paragraphs.

241.    The First Amendment church autonomy doctrine protects the freedom of churches "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This includes the freedom to make "personnel decision[s] based on religious doctrine"—including for

individuals who would not qualify as ministers. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658-60 & n.2 (10th Cir. 2002).

242.   As a matter of church government, faith, and doctrine, Plaintiffs require that their faculty or employees respect Plaintiffs' religious beliefs prohibiting engaging in conduct or advocacy contrary to the sanctity of human life, including abortion.

243.   The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, violate the Plaintiffs' rights secured to them by the church autonomy doctrine by exposing Plaintiffs to substantial liability and to intrusive and entangling governmental investigations and civil litigation simply for practicing their millennia-old religious beliefs.

244.   Absent injunctive and declaratory relief against the Final Rule and against the PWFA and Title VII, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

## COUNT VIII

### Violation of First Amendment of the United States Constitution
### Ministerial Exception

245.   The Plaintiffs incorporate by reference all preceding paragraphs.

246.   As a "component" of the church autonomy doctrine, the ministerial exception bars the government from interfering with a church's selection, supervision, and, if necessary, removal of an employee whose religious duties make him or her a "minister." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).

247.   Some of the Plaintiffs' faculty or employees have important religious duties and qualify as "ministers."

248.   The ministerial exception categorically bars all PWFA or Title VII lawsuits brought by, on behalf of, or about the employment of a "minister," whether the claim

51

involves termination, failure to hire, failure to accommodate, or any other terms and conditions of employment. *See, e.g.*, *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021) (en banc) (ministerial exception barred hostile work environment claim).

249.   The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, fail to protect the full scope of the protection that the ministerial exception provides to Plaintiffs regarding those faculty or employees who qualify as ministers.

250.   The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, fail to acknowledge that the ministerial exception bars claims arising under the PWFA and Title VII regarding the terms and conditions of employment of those faculty or employees who qualify as ministers.

251.   The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, violate the Plaintiffs' rights secured to them by the ministerial exception by exposing Plaintiffs to substantial liability and to intrusive and entangling governmental investigations and civil litigation over the employment decisions they make regarding their ministers.

252.   Absent injunctive and declaratory relief against the Final Rule and against the PWFA and Title VII, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

## COUNT IX
### Violation of First Amendment of the United States Constitution
### Expressive Association

253.   The Plaintiffs incorporate by reference all preceding paragraphs.

254.   The First Amendment protects the right of expressive associations to associate with those who advance, and do not harm, their expression. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000); *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 858, 862-63 (7th Cir. 2006).

255.   As an expression of Plaintiffs' religious beliefs, Plaintiffs hire only those faculty or employees who agree to respect Plaintiffs' religious conduct standards regarding matters concerning the sanctity of human life, including its beliefs on abortion.

256.   Plaintiffs' sincerely held religious beliefs lead them to broadly express their beliefs about matters such as abortion to the public, including to individuals who are or may be applicants, employees, and former employees. This expression of belief includes Plaintiffs' view that individuals should avoid choosing abortion and that choosing life is a preferable and favored decision.

257.   If Plaintiffs are forced to hire or retain faculty or employees whose words or conduct would undermine Plaintiffs' religious expression, such as by advocating for Plaintiffs to take action inconsistent with their religious beliefs and messages, Plaintiffs' religious expression will be irreparably harmed.

258.   The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, violate the Plaintiffs' rights secured to them by the expressive association doctrine of the First Amendment to the United States Constitution.

259.   Absent injunctive and declaratory relief against the Final Rule and against the PWFA and Title VII, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

## COUNT X

### Violation of First Amendment of the United States Constitution
### Freedom of Speech

260.   The Plaintiffs incorporate by reference all preceding paragraphs.

261.   The First Amendment protects religious organizations from content-based limitations on their speech. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

53

262.    Plaintiffs regularly speak to their faculty or employees and the public about their religious beliefs concerning the sanctity of human life, including their beliefs on abortion.

263.    Plaintiffs' job descriptions and employee handbooks make clear that Plaintiffs will not provide employment benefits or accommodations that conflict with their religious beliefs, and that faculty or employees must agree to respect those religious beliefs. Plaintiffs also advocate regarding their beliefs on matters such as abortion and make clear that they discourage individuals from choosing to obtain an abortion.

264.    By speaking to their faculty or employees about their religious beliefs regarding important religious matters such as abortion, and by failing to adopt the Final Rule's required policies communicating willingness to accommodate abortions, Plaintiffs risk investigations, enforcement actions, and liability under the Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC.

265.    EEOC admits in the Final Rule that the speech contained in an employer's policies and manuals can violate the Final Rule's retaliation and coercion provisions. *See* 89 Fed. Reg. at 29,141-42 & n.201, 29,214-18. But even after acknowledging this threat to Free Speech, the Final Rule includes no exception for protected speech.

266.    Moreover, EEOC has made it clear that it interprets Title VII to regulate an employer's speech to its employees about abortion. Ex. F at 15, Enforcement Guidance on Harassment in the Workplace, § II.A.5.b (Apr. 29, 2024) ("pregnancy, childbirth, or related medical conditions" includes "deciding to have … an abortion"). EEOC even purports to hold religious employers like Plaintiffs liable for the speech of their employees who share Plaintiffs' religious beliefs—in some cases even for religious speech that occurs outside the workplace or on a private social media account. *Id.* at 47, § III.B.3.d; *Id.* at 55, § III.C.2.c.

267.   The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, violate the Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment to the United States Constitution. *See NIFLA v. Becerra*, 585 U.S. 755, 766 (2018).

268.   Absent injunctive and declaratory relief against the Final Rule and against the PWFA and Title VII, as interpreted and enforced by EEOC, the Plaintiffs have been and will continue to be harmed.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray the Court:

a.   Declare that the Final Rule's inclusion of abortion is invalid under the Administrative Procedure Act;

b.   Declare that the Final Rule, the PWFA, and Title VII cannot apply to Plaintiffs' religious conduct standards related to matters such as abortion.

c.   Declare that Plaintiffs' religious conduct standards for faculty or employees are protected by the religious exemptions in the PWFA and Title VII;

d.   Declare that the Final Rule and EEOC's interpretation and enforcement of the PWFA and Title VII are invalid under the Religious Freedom Restoration Act;

e.   Declare that the Final Rule and EEOC's interpretation and enforcement of the PWFA and Title VII are invalid under the First Amendment to the United States Constitution;

f.   Declare that the ministerial exception bars all claims under the Final Rule, the PWFA, or Title VII by or regarding the employment of Plaintiffs' faculty or employees who qualify as "ministers";

g.   Vacate the Final Rule's inclusion of abortion;

h.   Issue preliminary and permanent injunctions enjoining EEOC from enforcing the Final Rule, the PWFA, and Title VII to require Plaintiffs to accommodate employees' abortions and similar matters in violation of Plaintiffs' religious

beliefs on the sanctity of human life, or to penalize Plaintiffs for taking employment action to enforce Plaintiffs' religious mission-alignment expectations regarding matters such as abortion;

i.   Award nominal damages;

j.   Award plaintiffs the costs of this action and reasonable attorney's fees; and

k.   Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs hereby request a trial by jury on all issues so triable.

Respectfully submitted this 22nd day of May, 2024.

Respectfully submitted,

Jonathan Berry*
James R. Conde*
Boyden Gray PLLC
801 17th St. NW, Suite 350
Washington, DC 20006
Phone: (202) 955-0620
Fax: (202) 955-0621
jberry@boydengray.com

/s/ Daniel H. Blomberg
Daniel H. Blomberg*
   *Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
   (LA Bar No. 38852)
Laura Wolk Slavis*
Andrea R. Butler*
Jordan T. Varberg*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Phone: (202) 955-0095
Fax: (202) 955-0090
dblomberg@becketlaw.org

***Application for admission pro hac vice forthcoming**

*Counsel for Plaintiffs*

Dated: May 22, 2024