**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *et al.*, <br><br> *Defendants.* | No. 2:24-cv-691 <br><br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 2

    A.  The PWFA expands protections for pregnant workers. ...................................................... 2

    B.  The PWFA excludes abortion. ........................................................................................... 2

    C.  EEOC proposes rule mandating abortion accommodations. ............................................ 4

    D.  EEOC requires abortion accommodation in the Final Rule. ............................................. 4

    E.  Plaintiffs file suit to protect their religious beliefs. .......................................................... 6

LEGAL STANDARD .................................................................................................................. 8

ARGUMENT .............................................................................................................................. 8

I.  Plaintiffs' claims are likely to succeed on the merits. ........................................................ 8

    A.  The Final Rule violates the APA because it exceeds EEOC's statutory authority
       under the PWFA by mandating abortion accommodations (Count I). ............................. 8

        1.  PWFA's text forecloses EEOC's abortion-accommodation mandate. ........................ 8

        2.  EEOC's interpretation violates the major questions doctrine. ................................... 12

    B.  The Final Rule violates the APA by falling short of statutory right in limiting the
       PWFA's religious exemption (Count III) ......................................................................... 15

        1.  EEOC's cramped interpretation sharply contradicts the text of the PWFA
           and Title VII religious exemptions. ........................................................................... 16

        2.  EEOC's interpretation violates the constitutional avoidance canon. ......................... 18

    C.  The Final Rule violates RFRA (Count V). ...................................................................... 20

    D.  The Final Rule violates the Free Exercise Clause (Count VI). ........................................ 23

II.  Plaintiffs meet the other requirements for a preliminary injunction. ................................. 24

CONCLUSION .......................................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................................... 27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)................................................................................22

*Bear Creek Bible Church v. EEOC*,
571 F. Supp. 3d 571 (N.D. Tex. 2021) ................................ 16, 17, 23-24

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)...................................................................12-13, 14-15

*Billard v. Charlotte Catholic High Sch.*,
No. 22-1440 2024 WL 2034860 (4th Cir. May 8, 2024, amended May 9,
2024) ....................................................................................... 16, 19-20

*Boechler, P.C. v. Commissioner of Internal Revenue*,
596 U.S. 199 (2022).................................................................................11

*Bostock v. Clayton County*,
590 U.S. 644 (2020)...................................................................................21

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)...................................................................................22

*BP P.L.C. v. Mayor & City Council of Balt.*,
141 S. Ct. 1532 (2021)...............................................................................11

*Braidwood Mgmt. v. EEOC*,
70 F.4th 914 (5th Cir. 2023) ................................................... 20, 21-22, 24

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)...................................................................20, 21, 22

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ......................................................................8

*Chisom v. Roemer*,
501 U.S. 380 (1991)...................................................................................10

*Cochran v. SEC*,
20 F.4th 194 (5th Cir. 2021) ...............................................................8, 16

*Cooper/T. Smith Stevedoring Co. v. Liuzza*,
293 F.3d 741 (5th Cir. 2002) ....................................................................18

*Curay-Cramer v. Ursuline Academy*,
    450 F.3d 130 (3d Cir. 2006)................................................................17, 19

*DeJesus v. Florida Cent. Credit Union*,
    No. 8:17-cv-2502, 2018 WL 4931817 (M.D. Fla. Oct. 11, 2018)..........................................11

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022)..........................................................................14

*Doe v. C.A.R.S. Prot. Plus, Inc.*,
    527 F.3d 358 (3d Cir. 2008)................................................................11, 12

*Ducharme v. Crescent City Déjà Vu, L.L.C.*,
    406 F. Supp. 3d 548 (E.D. La. 2019) ......................................................11

*EEOC v. Houston Funding II, Ltd.*,
    717 F.3d 425 (5th Cir. 2013) ..............................................................9

*EEOC v. Mississippi Coll.*,
    626 F.2d 477 (5th Cir. 1980) ..............................................................17

*Emp. Div. v. Smith*,
    494 U.S. 872 (1990)..........................................................................24

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..........................................................13, 14, 15

*Fellowship of Christian Athletes v. SJUSD*,
    82 F.4th 664 (9th Cir. 2023)................................................................23

*Fitzgerald v. Roncalli High Sch., Inc.*,
    73 F.4th 529 (7th Cir. 2023) ..............................................................16

*Franciscan All., Inc. v. Azar*,
    414 F. Supp. 3d 928 (N.D. Tex. 2019) ...................................................21

*Franciscan All., Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ..............................................................24

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)..........................................................14, 23, 24

*Gonzales v. O Centro Espírita Beneficente União*,
    546 U.S. 418 (2006)..........................................................................22

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)..........................................................13, 14

*Holt v. Hobbs*,
574 U.S. 352 (2015)........................................................................20, 22

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)..............................................................................18

*Krauel v. Iowa Methodist Med. Ctr.*,
95 F.3d 674 (8th Cir. 1996) ............................................................ 11-12

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
591 U.S. 657 (2020)........................................................... 20, 21, 22-23

*Maxon v. Fuller Theological Seminary*,
No. 20-56156, 2021 WL 5882035 (9th Cir. Dec. 13, 2021)...................22

*McAllen Grace Brethren Church v. Salazar*,
764 F.3d 465 (5th Cir. 2014) ................................................................21

*National R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002)..............................................................................12

*NFIB v. OSHA*,
595 U.S. 109 (2022)........................................................................ 12-13

*Nken v. Holder*,
556 U.S. 418 (2009)..............................................................................25

*NLRB v. Catholic Bishop*,
440 U.S. 490 (1979)........................................................................ 18-19

*Nw. Immigrant Rts. Project v. US CIS*,
496 F. Supp. 3d 31 (D.D.C. 2020) ..........................................................8

*Opulent Life Church v. City of Holly Springs*,
697 F.3d 279 (5th Cir. 2012) ................................................................25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020)..........................................................................19

*Planned Parenthood v. Casey*,
505 U.S. 833 (1992)................................................................................9

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)................................................................................14

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*,
426 U.S. 696 ........................................................................................19

*Southwest Airlines Co. v. Saxon*,
   596 U.S. 450 (2022)................................................................................................10

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
   41 F.4th 931 (7th Cir. 2022) ...........................................................................16, 17

*Tandon v. Newsom*,
   593 U.S. 61 (2021)................................................................................................23

*Texas v. Becerra*,
   89 F.4th 529 (5th Cir. 2024) ................................................................................11

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)................................................................................................18

*Turic v. Holland Hosp., Inc.*,
   85 F.3d 1211 (6th Cir. 1996) ...........................................................................11, 12

*Turtle Island Foods, S.P.C. v. Strain*,
   65 F.4th 211 (5th Cir. 2023) ................................................................................18

*In re Union Pac. R.R. Emp. Pracs. Litig.*,
   479 F.3d 936 (8th Cir. 2007) ...........................................................................11-12

*United States v. Hamilton*,
   46 F.4th 389 (5th Cir. 2022) ................................................................................20

*University of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013)..............................................................................................12

*Van Buren v. United States*,
   593 U.S. 374 (2021)..............................................................................................10

*VanDerStok v. Garland*,
   86 F.4th 179 (5th Cir. 2023) ............................................................................8, 18

*Warsoldier v. Woodford*,
   418 F.3d 989 (9th Cir. 2005) ...............................................................................22

*West Virginia v. EPA*,
   597 U.S. 697 (2022)...............................................................................12, 13, 14, 15

*Whole Woman's Health v. Smith*,
   896 F.3d 362 (5th Cir. 2018) ...............................................................................19

*Wilkins v. United States*,
   598 U.S. 152 (2023)..............................................................................................11

*Yates v. United States*,
     574 U.S. 528 (2015) ....................................................................................10

**Statutes**

5 U.S.C. § 705 .................................................................................................1

5 U.S.C. § 706 .................................................................................................8

42 U.S.C. § 238n ...........................................................................................15

42 U.S.C. § 300a-7 ........................................................................................15

42 U.S.C. § 2000bb-1 ....................................................................................20

42 U.S.C. § 2000e ...............................................................................2, 5, 16

42 U.S.C. § 2000e-1 .........................................................................5, 16, 17

42 U.S.C. § 2000e-2 ...............................................................................24, 25

42 U.S.C. § 2000gg .........................................................................2, 9, 10, 21

42 U.S.C. § 2000gg-1 ..............................................................................2, 8-9

42 U.S.C. § 2000gg-2 ...................................................................2, 18, 20, 24, 25

42 U.S.C. § 2000gg-3 .....................................................................................4

42 U.S.C. § 2000gg-5 .........................................................................2, 5, 16, 17

42 U.S.C. § 12113 ..........................................................................................18

42 U.S.C. § 18023 ..........................................................................................15

42 U.S.C. § 18113 ..........................................................................................15

**Regulations**

29 C.F.R. § 1636.3 .....................................................................................5, 20

34 C.F.R. § 106.12 ........................................................................................22

**Other Authorities**

168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022)........................................3

168 Cong. Rec. S7043 (daily ed. Dec. 8, 2022)..................................3, 10-11

2023 Consolidated Appropriations Act, Pub. L. No. 117-328, 507(d)(1), 136 Stat.
4459 (2022) ...................................................................................................15

88 Fed. Reg. 54,714 (Aug. 11, 2023) ................................................................4

89 Fed. Reg. 29,096 (Apr. 19, 2024) ...................................................... *passim*

Sen. Cassidy, *Ranking Member Cassidy Blasts Biden Administration for
Illegally Injecting Abortion Politics into Enforcement of Bipartisan
PWFA Law* (Aug. 8, 2023) .............................................................................4

Comment from Sen. Cassidy (Sept. 29, 2023) ..................................................4

*EEOC Starts Accepting Charges Under New Pregnant Workers Fairness Act*,
EEOC (June 27, 2023) .....................................................................................25

Michael W. McConnell, *The Ninth Amendment in Light of Text and History*,
2010 Cato Sup. Ct. Rev. 13 .............................................................................14

*New Oxford Am. Dictionary* (3d ed. 2010) .......................................................9

Pregnant Workers Fairness Act, H.R. 1065, 117th Cong. (2021) ...............2-3

Pregnant Workers Fairness Act, S. 1486, 117th Cong. (2021) ....................2-3

*Facts & Data on Small Business*, Small Business &
Entrepreneurship Council ...............................................................................23

*Stedmans Medical Dictionary* (Nov. 2014) ......................................................9

**INTRODUCTION**

After over a decade of nationwide litigation was necessary to prevent federal agencies from forcing employers like the Little Sisters of the Poor to cover abortifacients, EEOC is now seeking to impose a similarly unlawful mandate. It has issued a regulation requiring the country's employers to directly accommodate abortion, both in word and deed, in their workplace policies and practices.

But Congress never gave EEOC authority to do that. The law EEOC relies on, the Pregnant Workers Fairness Act (PWFA), mentions abortion precisely zero times. And its bipartisan congressional sponsors repeatedly promised that all their "commonsense" law did was help women in the workplace "have a healthy pregnancy and a healthy baby," and emphatically did *not* authorize EEOC to promote abortion. Plaintiff United States Conference of Catholic Bishops (USCCB) supported the PWFA for precisely those reasons—yes to supporting women and children, no to supporting abortion. If Congress had wanted to make the nation's employers treat abortion as the equivalent of pregnancy and childbirth, it would have said so. It didn't.

Making matters worse, at the same time EEOC's Final Rule imposes an unauthorized abortion mandate, it nullifies the explicit and categorical religious exemption that Congress wrote into the PWFA. The rule eviscerates the exemption by saying it protects only from *religious* discrimination claims—a class of claims that the PWFA does not even authorize. In EEOC's eyes, Congress created an exemption that doesn't exempt anything.

So where Congress *didn't* speak, EEOC is speaking for it, and where Congress *did* speak, EEOC is gagging it. That violates the Administrative Procedure Act. And, as of the Final Rule's effective date on June 18, 2024, it will also create irreparable harm to First Amendment rights protected by the Religious Freedom Restoration Act and the Free Exercise Clause.

This Court should accordingly stay the effective date of the Final Rule pending judicial review. 5 U.S.C. § 705. And it should preliminarily enjoin EEOC's enforcement of the Final Rule's abortion-accommodation mandate against Plaintiffs, Catholic ministries faithfully embodying the Church's beliefs on the dignity of human life in their employment policies and practices.

**STATEMENT OF FACTS**

**A.  The PWFA expands protections for pregnant workers.**

Congress passed the PWFA with one simple purpose: to expand protections for pregnant women in the workplace. To that end, the PWFA requires a "covered" employer to provide a reasonable accommodation to an employee with a "known limitation," meaning a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(2), (4); *id.* § 2000gg-1(1). The PWFA bars employers from denying employment opportunities to pregnant employees due to the need for accommodation and from taking an adverse employment action for requesting an accommodation. *Id.* § 2000gg-1(2)-(5). It also prohibits retaliating against an employee who advocates for an accommodation or interfering with an employee's exercise of her statutory right to an accommodation. *Id.* at § 2000gg-2(f)(1)-(2).

Though PWFA is a standalone statute, it incorporates some of Title VII's provisions. This includes Title VII's remedies and enforcement provisions. *Id.* § 2000gg-2(a). Private parties may bring enforcement actions—including damages actions—for alleged violations, and EEOC maintains the full suite of investigative and enforcement powers available to it under Title VII.

The PWFA also incorporates Title VII's religious exemption. *Id.* at § 2000gg-5(b). Title VII fully exempts "a religious corporation, association, educational institution, or society" from any application of Title VII concerning "the employment of individuals of a particular religion." *Id.* § 2000e-1(a). Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j). Thus, the PWFA exempts religious employers' employment decisions that are based on an individual's observance, practice, or belief.

**B.  The PWFA excludes abortion.**

Beginning in 2021, the U.S. House and Senate each considered and advanced bipartisan bills that became the PWFA. These bills required employers to accommodate limitations related to a worker's pregnancy, childbirth, or related medical conditions. They also tasked EEOC with adopting regulations "providing examples" of such reasonable accommodations. Pregnant

Workers Fairness Act, H.R. 1065, 117th Cong. § 4 (2021); Pregnant Workers Fairness Act, S. 1486, 117th Cong. § 4 (2021). Like the final Act, the bills never mentioned abortion.

The bills' legislative history accords with both the initial bills' text and the statute's final form. Not one member of Congress supporting the bills argued on the floor that the PWFA would require accommodations for elective abortion. Rather, leading supporters repeatedly and emphatically denied it. Compl. (ECF No. 1) ¶ 31. For instance, lead Senate sponsor Democratic Senator Bob Casey stated "for the record" that EEOC "could not—could not—issue any regulation that requires abortion leave." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). Republican Senator Bill Cassidy, PWFA's other lead sponsor, likewise "reject[ed] the characterization that [the PWFA] would do anything to promote abortion." *Id.*; *see also* Compl. ¶ 31 (collecting examples).

Far from imposing a nationwide abortion-accommodation mandate, the PWFA's supporters stressed that the law was narrow, simple, bipartisan, and uncontroversial. For instance, originating Committee Chair Senator Patty Murray emphasized: "We are really not here asking for much. This is very simple. Give pregnant workers a break, give them a seat, and give them a hand. … I can't think of a more commonsense, less controversial bill[.]" 168 Cong. Rec. S7049 (daily ed. Dec. 8, 2022). She also described the PWFA's purpose as "to provide basic, common sense" accommodations for women "who are looking forward to welcoming a new family member," and observed that the proposed law was "a fundamentally bipartisan bill" that had "passed overwhelmingly on a bipartisan House vote." Compl. ¶ 35. Similarly, PWFA cosponsor Senator Lisa Murkowski expressed her support for the bill's "commonsense accommodations … to ensure a healthy pregnancy and a healthy baby." *Id.* ¶ 29. And Senator Casey echoed those points, emphasizing that the PWFA is "very straightforward" and "very simple," just a "commonsense bill" that has "broad, bipartisan support" from "over 200 advocacy groups from all parts of the ideological spectrum," including Plaintiff USCCB. 168 Cong. Rec. S10081-82 (daily ed. Dec. 22, 2022); *see* Compl. ¶ 33 (USCCB's support was on the express understanding that the statute does not address abortion).

**C. EEOC proposes rule mandating abortion accommodations.**

Pursuant to its rulemaking authority, 42 U.S.C. § 2000gg-3(a), EEOC issued a Proposed Rule on August 11, 2023, that proposed mandating abortion accommodations. *See* 88 Fed. Reg. 54,714.

According to the Proposed Rule, "having … an abortion" constitutes an "example[ ] of pregnancy, childbirth, or related medical condition." *Id.* at 54,774. Required accommodations would include paid leave to obtain an abortion. *Id.* at 54,781-82, 54,791. And employers could be liable unless their "ordinary workplace policies or practices" posed no obstacle to abortion accommodations. *Id.* at 54,729. Employers could also be liable if they "indicat[e]" that an abortion accommodation could yield adverse employment action, or if they are otherwise understood to "harass" an applicant, employee, or former employee for seeking such an accommodation—even if the alleged actions did not "in fact … deter[ ]" abortion. *Id.* at 54,743-44. Finally, EEOC suggested limiting the PWFA's religious exemption to bar only religious discrimination claims—claims the PWFA does not allow. *Id.* at 54,746-47.

More than 54,000 individuals and organizations submitted comments opposing the Proposed Rule's abortion-accommodation mandate. *See* 89 Fed. Reg. 29,096, 29,104 (Apr. 19, 2024). Plaintiffs USCCB and The Catholic University of America submitted a joint comment on September 27, 2023. *See* Compl. Ex. C. They explained that the Proposed Rule threatened devastating harm to their ability to operate in accordance with their religious beliefs regarding abortion and the sanctity of human life. *Id.* at 6, 16. Senator Cassidy said in his comment that EEOC had "ignored the statute and substituted its views on abortion for those of Congress," warning that the "regulations completely disregard legislative intent and attempt to rewrite the law" and that "[t]he decision to disregard the legislative process to inject a political abortion agenda is illegal and deeply concerning."[1]

**D. EEOC requires abortion accommodation in the Final Rule.**

Despite these comments, and by a 3 to 2 vote, EEOC issued a Final Rule codifying its abortion-accommodation mandate and taking effect on June 18, 2024. 89 Fed. Reg. 29,096; Compl. ¶ 72.

---

[1]   *See* Comment from Sen. Cassidy at 1 (Sept. 29, 2023), https://perma.cc/L4F8-K2K6; Sen. Cassidy, *Ranking Member Cassidy Blasts Biden Administration* (Aug. 8, 2023), https://perma.cc/KZV3-6LX7.

The Final Rule concedes the "lack of an explicit mention of abortion in the PWFA." *Id.* at 29,111. It nonetheless finds a grant of authority to require abortion accommodations in employers' duties to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee." *Id.* at 29,186 (citing 42 U.S.C. § 2000gg-1(1)). And, because the limitation must be "known," the Final Rule requires employers to knowingly accommodate abortion. *Id.* at 29,097, 29,184 (29 C.F.R. § 1636.3(h)(2)).

To support this view, EEOC claims there is a "settled" abortion-mandating interpretation of a Title VII provision, and that Congress must have intended to carry that interpretation forward into the PWFA. *Id.* at 29,106; *accord id.* at 29,191 n.23. The Title VII provision was a 1970s amendment to Title VII, the Pregnancy Discrimination Act (PDA), prohibiting discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). And EEOC's authority showing it "settled" that this language includes abortion consisted of (1) EEOC's own nonbinding guidance, 89 Fed. Reg. at 29,152 n.296; (2) a single 1978 House Report on the PDA's legislative history, *id.* at 29,191 & n.26; and (3) a handful of court decisions spaced out over several decades. *Id.* at 29,110, 29,152 n.296.

EEOC also narrowed any religious defenses a religious employer might raise against the mandate. For the PWFA's explicit religious exemption, 42 U.S.C. § 2000gg-5(b), the Final Rule adopted the narrow interpretation that EEOC had previously proposed, protecting only against a class of claims (religious discrimination) that are not cognizable under the PWFA in the first place. 89 Fed. Reg. at 29,146-47 & n.239. Moreover, instead of the categorical bar created by the exemption's text, 42 U.S.C. § 2000e-1(a), EEOC insisted that any such defenses must be evaluated on a "case-by-case" basis. 89 Fed. Reg. at 29,147.

The Commission took the same "case-by-case" approach with respect to the Religious Freedom Restoration Act ("RFRA") and a number of First Amendment defenses. 89 Fed. Reg. at 29,147-51. EEOC predicted that defenses under RFRA and the First Amendment would normally fail after lengthy adjudication. *Id.* at 29,147-49, 29,151.

The Final Rule also requires that its retaliation and coercion provisions "should be interpreted broadly" to cover anything that "well might have dissuaded a reasonable worker" from using its abortion entitlement. *Id.* at 29,215; *accord* 29,214-18. EEOC further indicated that speech opposing abortion accommodations in employers' "statements regarding religious beliefs," "mission statements," or "code[s] of conduct" can be illegal. *Id.* at 29,141-42 & n. 201. And it said that workplaces would have to police "unwelcome, critical" employee speech against abortion to prevent a "discriminatory work … atmosphere." *Id.* at 29,214, 29,218.

All told, the Final Rule requires employers to knowingly accommodate employees' abortions; prohibits employers from taking adverse action against employees for requesting abortion accommodations, for advocating for others to receive abortion accommodations, or for "oppos[ing]" employer refusals to accommodate abortion; and threatens liability on employers whose speech or acts are deemed "to coerce, intimidate, threaten, harass, or interfere with any individual" supporting employee abortion accommodations. *Id.* at 29,188. And the Final Rule narrowly construes defenses available to religious employers, all of which could be vindicated only after case-by-case adjudication.

Commissioner Andrea Lucas issued a sharp dissent, pointing out that EEOC had engaged in "linguistic gymnastics" to depart from the statute's plain meaning. *See* Compl. ¶¶ 73-75 & Ex. D.

**E.  Plaintiffs file suit to protect their religious beliefs.**

Plaintiffs are the U.S. Conference of Catholic Bishops, an assembly of the hierarchy of Catholic bishops in the United States; the Dioceses of Lake Charles and of Lafayette, dioceses of the Roman Catholic Church located in Louisiana; and The Catholic University of America, the national university of the Catholic Church in the United States. Plaintiffs follow the historic teachings of the Catholic Church, which teaches that all people, including the preborn, are created in the image and likeness of God and are thus imbued with human dignity. Kunkel Decl. ¶ 10. The Church further teaches that "direct abortion, that is, abortion willed as an end or as a means, always constitutes a grave moral disorder, since it is the deliberate killing of an innocent human being."

Kunkel Decl. ¶ 15. The Church forbids the faithful from in any way supporting or encouraging direct abortion, or being complicit in the actions of those who do. Kunkel Decl. ¶ 14-16, 42.

Plaintiffs follow these religious teachings and do not allow their employees (and in particular, in the case of CUA, their faculty) to speak and act in ways that conflicts with those beliefs, such as by advocating in favor of abortion or abortion accommodations in the workplace. Ridderhoff Decl. ¶ 29-32; Caraway Decl. ¶ 8-12; Fontenot Decl. ¶ 8-12; Brown Decl. ¶ 25-27. But the Final Rule requires Plaintiffs to knowingly accommodate employees when they obtain abortions, even where such accommodations are contrary to Plaintiffs' sincerely held religious beliefs. Ridderhoff Decl. ¶ 29-33; Caraway Decl. ¶ 8-13; Fontenot Decl. ¶ 9-13. It also prohibits Plaintiffs from taking adverse actions against employees or faculty that advocate for abortions accommodations, even where such actions are required by Plaintiffs' beliefs. Ridderhoff Decl. ¶ 29-33; Caraway Decl. ¶ 8-13; Fontenot Decl. ¶ 9-13; Brown Decl. ¶ 25-28. Further, the Final Rule requires Plaintiffs to change their religious speech in ways that support abortion, rescinding their current policies and practices expressing opposition to abortion accommodations or advocacy, and replacing them with policies or procedures that (i) affirm a willingness to accommodate abortion, (ii) prohibit any potentially "unwelcome" or "critical" discussions opposing abortion in the workplace, and (iii) do not "interfere with" "any individual" in the exercise of the Final Rule's abortion-related rights. 89 Fed. Reg. at 29,215-16; 29,218; 29,141-42 & n. 201; 29,188.

Plaintiffs must immediately take steps to begin complying with the Final Rule—including by changing their employment policies and practices, and by training employees regarding the new policies and practices—to avoid noncompliance by the Rule's June 18, 2024 effective date. As of that date, the Final Rule will threaten Plaintiffs with open-ended liability, investigations, and litigation by applicants, employees, former employees, and this EEOC due to Plaintiffs' religious employment practices, policies, speech, and related internal governance.

To protect their rights, Plaintiffs sued on May 21, 2024, and seek immediate relief. EEOC has refused to voluntarily stay its Final Rule pending judicial review of its abortion-accommodation mandate. Def.'s Mem., *Tennessee v. EEOC*, No. 2:24-cv-84 (E.D. Ark. May 17, 2024), ECF 34.

## LEGAL STANDARD

In determining whether to grant a preliminary injunction and stay the effective date of a Final Rule, a court should consider "(1) a substantial threat of irreparable harm to the movant absent the injunction, (2) the likelihood of the movant's ultimate success on the merits, (3) the balance of harms to the parties, and (4) the public interest." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 233 (5th Cir. 2024); *Nw. Immigrant Rts. Project v. US CIS*, 496 F. Supp. 3d 31, 45 (D.D.C. 2020) (applying same factors to request for stay under 5 U.S.C. § 705). The APA requires courts to "hold unlawful and set aside" agency regulations that are "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory … authority." 5 U.S.C. § 706.

## ARGUMENT

## I.  Plaintiffs' claims are likely to succeed on the merits.

### A.  The Final Rule violates the APA because it exceeds EEOC's statutory authority under the PWFA by mandating abortion accommodations (Count I).

#### 1.  PWFA's text forecloses EEOC's abortion-accommodation mandate.

The Final Rule violates the APA because it was promulgated in excess of EEOC's authority under the PWFA. "How do we know when an agency has exceeded its statutory authority? Simple: the plain language of the statute tells us so." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023), *cert. granted*, 2024 WL 1706014 (U.S. Apr. 22, 2024) (No. 23-852). The PWFA concerns "pregnancy, childbirth, or related medical conditions." Abortion is none of those things, and it is so *un*-related to pregnancy and childbirth that it is literally their opposite. The Congressional Record overwhelmingly confirms that reading: the PWFA's supporters insisted they were creating simple and uncontroversial protections, *not* an abortion mandate. EEOC's assertions to the contrary rely primarily on its speculation about what Congress intended, which tellingly fails to grapple with what Congress actually said.

*Text*. The analysis "start[s], of course, with the statutory text." *Cochran v. SEC*, 20 F.4th 194, 200 (5th Cir. 2021) (en banc). Here, the PWFA says nothing about abortion. Instead, it requires

that employers accommodate "known limitations related to … pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1(1). And these "known limitations" must themselves be "physical or mental condition[s]." *Id.* § 2000gg(4). Thus, the PWFA requires accommodation for "physical or mental conditions" arising from "pregnancy, childbirth, or related medical conditions."

Direct abortion is not a "physical or mental condition" arising from pregnancy or childbirth. The Final Rule doesn't claim otherwise, which is why "abortion" is conspicuously absent from the rule's definition of "pregnancy" and "childbirth." 89 Fed. Reg. at 29,183. Instead, the Final Rule places "abortion" in its definition of "related medical conditions." *Id.*

But that falls flat. The term "medical" generally references "the diagnosis and treatment of disease and the maintenance of health." *EEOC v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 n.4 (5th Cir. 2013) (quoting *Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health* (7th ed. 2003)); *see* "Medical," *New Oxford Am. Dictionary* 1087 (3d ed. 2010) ("of or relating to the … treatment of illness and injuries"). The ordinary meaning of "condition" is a "state of health or physical fitness" or "illness or other medical problem." *New Oxford Am. Dictionary* 362; *see Houston Funding II*, 717 F.3d at 428 n.4 (similar). In the Title VII context, a "condition" related to pregnancy is a "physiological" state that is "initiated by pregnancy and concludes sometime thereafter." *Houston Funding II*, 717 F.3d at 428-29.

There are a panoply of "physical or mental conditions" arising from "medical conditions" related to pregnancy, such as "gestational diabetes; preeclampsia; HELLP (hemolysis, elevated liver enzymes and low platelets) syndrome; hyperemesis gravidarum; [and] anemia." 89 Fed. Reg. at 29,183. Conditions like gestational diabetes amount to negative health states, which can be assessed using various diagnostic criteria and mitigated with any number of possible treatments.

Direct abortion, by stark contrast, is a "procedure[ ]," not a condition, *Planned Parenthood v. Casey*, 505 U.S. 833, 845 (1992), and one voluntarily performed based on desire, not "medical" justification. *See* "Elective abortion," *Stedmans Medical Dictionary* 1470 (Nov. 2014) ("[A]n abortion without medical justification"). It is not a "physiological" state or a "treatment of

disease." Pregnancy is not a disease. And abortion "treats" the "condition of being pregnant" only by ending it. 89 Fed. Reg. at 29,107. That does not effectuate the PWFA's goal of "a healthy pregnancy and a healthy baby." Compl. ¶ 29.

Nor can the decision to have a direct abortion be treated as the equivalent of involuntary miscarriage or stillbirth, as EEOC seeks to do. *See* 89 Fed. Reg. at 29,107, 29,183. The tragic outcomes of miscarriage and stillbirth that unintentionally occur during some pregnancies *are* a "physiological" state that is related to the nonviable pregnancy itself and are often accompanied by "physical or mental condition[s]" that may sometimes require treatment, 42 U.S.C. § 2000gg(4), including removing fetal tissue, treating potential infection and hemorrhaging, monitoring hormones both before and after embryonic or fetal demise, and addressing mental-health concerns. Unlike abortion, those conditions "relate[ ] to, [are] affecte[d] by, or arise[ ] out of" the unviable pregnancy itself, not a voluntary external procedure.

The "well-settled" ejusdem generis canon leads to the same result, precluding the conclusion that the phrase "related medical conditions" includes abortion. *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). "Where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects *similar in nature* to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (emphasis added) (cleaned up). And here, the general term "related medical condition[ ]" refers to conditions like "pregnancy" and "childbirth," which are fundamentally *dis*similar from a procedure that *ends* a pregnancy and *eliminates* the possibility of childbirth.

***Legislative intent.*** What the text makes clear, the legislative history confirms. *Van Buren v. United States*, 593 U.S. 374, 396 (2021). The bill's sponsors said that any "abortion-related mandates" would be "contrary to the intent of Congress," and EEOC "could not—could not" apply the statute to sweep in abortion. Compl. ¶ 31. And "if Congress had … an intent" to adopt such a "sweeping" and "unorthodox" abortion-accommodation regime, surely "at least some of the Members" supporting the law "would have identified or mentioned it at some point." *Chisom v. Roemer*, 501 U.S. 380, 396 & n.23 (1991). None did. Instead, supporters repeatedly emphasized

that the law couldn't be any "less controversial." 168 Cong. Rec. S7049 (daily ed. Dec. 8, 2022) (statement of Sen. Murray). That's not the stuff of a nationwide abortion-accommodation mandate.

***EEOC's claims.*** Yet Congressional intent is primarily where EEOC hangs its regulatory hat. EEOC argues that a handful of lower-court cases, a decades-old House Report on a different law (the PDA), and its own nonbinding guidance on the PDA show there is a "settled" understanding that "related medical condition" includes abortion. 89 Fed. Reg. at 29,105 & n.65, 29,106, 29,191 & n.26.[2] From there, EEOC insists that Congress *must* have intended to incorporate this way of thinking into the PWFA. *Id.* at 29,106.

That would be a stretch even without the legislative record here. With it, EEOC's argument stumbles right out of the gate. And things don't get any better from there. Even assuming the cases EEOC cites were correctly decided or, more dubiously still, that they survive *Dobbs*, a "smattering of lower court opinions" cannot show that "Congress knew of and endorsed" EEOC's (mis)interpretation. *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1541 (2021). While courts may sometimes "treat a long line of Supreme Court decisions left undisturbed by Congress as a clear indication" of Congressional meaning, "no such long line of authority exists here." *Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 208 (2022) (cleaned up). And "the Government's handful of lower court opinions [cannot] stand in for a ruling of [the Supreme] Court." *Wilkins v. United States*, 598 U.S. 152, 165 (2023). EEOC cannot "ignore clear statutory language on the ground that other courts have." *BP P.L.C.*, 141 S. Ct. at 1541. And that is particularly true here, where the underlying decisions invoke the now-repudiated constitutional right to abortion. *See Texas v. Becerra*, 89 F.4th 529, 541 (5th Cir. 2024).

Worse yet for EEOC, there is not even a *lower-court* consensus. To the contrary, the Eighth Circuit has twice held that the phrase "[r]elated medical conditions" as used in the PDA does *not* cover infertility or contraception because "[p]regnancy and childbirth, which occur after

---

[2]   Citing *Doe v. C.A.R.S. Prot. Plus, Inc*., 527 F.3d 358, 364 (3d Cir. 2008); *Turic v. Holland Hosp., Inc*., 85 F.3d 1211, 1214 (6th Cir. 1996); *Ducharme v. Crescent City Déjà Vu, L.L.C.*, 406 F. Supp. 3d 548, 556 (E.D. La. 2019); *DeJesus v. Florida Cent. Credit Union*, No. 8:17-cv-2502, 2018 WL 4931817, at *1 (M.D. Fla. Oct. 11, 2018).

conception, are strikingly different" from infertility or contraception, "which *prevent*[ ] *conception*." *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 679 (8th Cir. 1996) (emphasis added) (infertility); *In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 942 (8th Cir. 2007) (contraception). Similarly here, pregnancy and childbirth, which produce new life, are "strikingly different" from abortion, which terminates the life of a conceived child. *Krauel*, 95 F.3d at 679.

EEOC's other support for its new rule is its allegedly "longstanding" guidance interpreting the PDA to cover abortion, 89 Fed. Reg. at 29,106 & n.66, which it conveniently fails to note is nonbinding and receives no deference, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002). Nor does it cite a single instance in which it has taken independent enforcement action under this understanding, *see, e.g.*, *Doe*, 527 F.3d 358 (plaintiff proceeding without EEOC); *Turic*, 85 F.3d 1211 (same), or a single instance of a court relying on those guidelines since the Supreme Court's modern pivot away from reflexive use of so-called *Skidmore* deference, *see, e.g.*, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360-61 (2013). Thus, this flimsy and unpersuasive guidance, which espouses a position EEOC has not claimed to have used to take enforcement actions against employers, cannot be used to misinterpret the *PWFA*, a stand-alone statute distinct from Title VII. Though that would be true in every case, it is especially true here, where the guidance has no basis in the text of the statute.[3]

In sum, the PWFA does not authorize EEOC to impose an abortion-accommodation mandate.

### 2.  EEOC's interpretation violates the major questions doctrine.

The weakness of EEOC's interpretation is even clearer in light of the major questions doctrine. That doctrine "address[es] a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 724. The doctrine is rooted both in separation of powers principles and "common sense" notions of legislative delegations. *Id.* at 722-23; *see also NFIB v. OSHA*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring) ("If administrative agencies seek to regulate the

---

[3]    EEOC also relies on a single 1978 House Report from the PDA. *See, e.g.*, 89 Fed. Reg. at 29,191 & n.26. But a snippet of legislative history cannot substantiate a "wafer-thin" textual argument, *West Virginia v. EPA*, 597 U.S. 697, 721 (2022), especially when that history comes from the heyday of that methodology's abuse.

daily lives and liberties of millions of Americans, … they must at least be able to trace that power to a clear grant of authority from Congress."); *Biden v. Nebraska,* 143 S. Ct. 2355, 2380 (2023) (Barrett, J., concurring) (citation omitted) ("Because the Constitution vests Congress with '[a]ll legislative Powers,' a reasonable interpreter would expect it to make the big-time policy calls itself."). Viewed through either lens, the major questions doctrine serves as a pivotal safeguard against executive overreach when agencies attempt to regulate in areas of vast "political significance," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

To apply the major questions doctrine, courts examine in "context" the "history and the breadth of the authority that the agency has asserted and the economic and political significance of that assertion" to ensure that Congress indeed intended "to confer on [the agency] such vast authority." *West Virginia*, 597 U.S. at 721 (cleaned up); *id.* at 749 (Gorsuch, J., concurring). Relevant context includes "the nature of the question presented," *id.* at 721, and whether it "has been the subject of an earnest and profound debate across the country," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (cleaned up); *West Virginia*, 597 U.S. at 732. Other statutes addressing the same issue also inform the contextual analysis, *see*, *e.g.*, *Brown & Williamson*, 529 U.S. at 133, 137-39, as they provide "the manner in which Congress" regulates the issue, *West Virginia*, 597 U.S. at 722-23. If this "context" does not provide a "clear delegation" from Congress, then the regulatory action is invalid. *Biden*, 143 S. Ct. at 2374; *see also id.* at 2376 (Barrett, J., concurring) (major questions doctrine "emphasize[s] the importance of context when a court interprets a delegation to an administrative agency").

Applied here, the doctrine means that even if the PWFA's text and legislative history were somehow inconclusive (they aren't), EEOC's claimed authority would still fail because EEOC cannot decide an issue of such "political significance" without "clear congressional authorization." *West Virginia*, 597 U.S. at 722-23. That clear authorization is obviously lacking here. Indeed, even the EEOC is forced to concede that there is a "lack of an explicit mention of abortion in the PWFA," let alone a grant of explicit authority to regulate it. 89 Fed. Reg. at 29,111.

Nor can it be seriously disputed that the Final Rule raises at least two major questions, starting with abortion itself. Abortion is a "national controversy" that has "inflamed our national politics" and debate "for a half century." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 229, 269 (2022). It strains credulity to think that, in this context, Congress would delegate the authority to mandate an abortion accommodation on workplaces employing over 100 million Americans in anything but the clearest of terms. *See Gonzalez*, 546 U.S. at 267 (national debate "makes the oblique form of the claimed delegation all the more suspect"); *West Virginia*, 597 U.S. at 723 (rejecting "delegation claimed to be lurking" in ambiguous statutory text). The doctrine thus forecloses any interpretation that would allow EEOC to invoke a "merely plausible textual basis" to decide such a "highly consequential" issue with "staggering" political ramifications. *West Virginia*, 597 U.S. at 723-24; *Biden*, 143 S. Ct. at 2373.

The second major question is religious exercise. As explained in detail below, the Final Rule has obvious and serious free exercise ramifications. Compl. ¶¶ 123-127, 201-239; *infra* at 15-24. Requiring clear authorization from Congress before imposing religious burdens comports with the historical judicial protection for natural rights like religious liberty. Both before and at the Founding, courts used "equitable interpretation … which entails the narrow construction of statutes so as to avoid violations of natural rights." Michael W. McConnell, *The Ninth Amendment in Light of Text and History*, 2010 Cato Sup. Ct. Rev. 13, 18. This approach meant that "natural rights control in the absence of sufficiently explicit positive law to the contrary," which can be viewed "as a clear statement rule for abrogating" natural rights. *Id.* Moreover, the Supreme Court has also recognized that the major questions doctrine applies when Congress asserts broad authority over areas enjoying a "unique place in American history and society," *Brown & Williamson*, 529 U.S. at 159, of which this nation's "first freedom" is a preeminent example. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 23 (2020) (Gorsuch, J., concurring); *Fulton v. City of Philadelphia*, 593 U.S. 522, 572-77 (2021) (Alito, J., concurring) (recounting the "long, rich, and complex history" of the "right to religious liberty"). Because the Final Rule

imposes "profound burdens" on the "individual right[ ]"of free exercise without a clear delegation from Congress, it cannot stand. *Biden*, 143 S. Ct. at 2374-75.

The litany of other federal legislation concerning religious and moral objections to abortion confirms that Congress is acutely aware that abortion mandates can infringe on religious exercise, *see Brown & Williamson*, 529 U.S. at 143-44, "ma[king] it very unlikely that Congress" delegated to EEOC the authority to require an abortion accommodation here, *West Virginia*, 597 U.S. at 723; *see, e.g.*, 42 U.S.C. § 300a-7(c)(1), (d) (Church Amendments); 42 U.S.C. § 238n(a), (c)(2) (Coates-Snow Amendment); 2023 Consolidated Appropriations Act, Pub. L. No. 117-328, 507(d)(1), 136 Stat. 4459, 4908-09 (2022) (Weldon Amendment); 42 U.S.C. §§ 18113, 18023(a)(1), (b)(1)(A), (b)(4) (Affordable Care Act). This legislative backdrop provides further context "as to the manner in which Congress" regulates abortion, *West Virginia*, 597 U.S. at 722-23, and shows how unlikely it is that Congress granted EEOC the authority to superimpose an abortion requirement onto the PWFA. *See also Biden*, 143 S. Ct. at 2384 (Barrett, J., concurring) (explaining that the major questions doctrine avoids "interpret[ing] a statute for all it is worth when a reasonable person would not read it that way").

**B. The Final Rule violates the APA by falling short of statutory right in limiting the PWFA's religious exemption (Count III).**

EEOC also unlawfully narrowed the religious exemptions found in the PWFA and Title VII. EEOC takes the view that Title VII's religious exemption protects only against claims for religious-based discrimination, and it has imported that erroneous conclusion into the PWFA. 89 Fed. Reg. at 29,146-47 & n.239. Both conclusions are wrong, as the Fifth Circuit and judges around the country have repeatedly explained in the Title VII context. And the PWFA's context makes EEOC's error blindingly obvious. Because the PWFA does not authorize religious-discrimination claims, EEOC's position renders the statutory exemption a complete nullity, protecting only against claims that don't exist. That's not how statutory interpretation works. The Final Rule's cramped religious exemption must accordingly be set aside.

### 1. EEOC's cramped interpretation sharply contradicts the text of the PWFA and Title VII religious exemptions.

As with Count I, the Court must start with the text. *Cochran*, 20 F.4th at 200. The text of the PWFA directly incorporates Title VII's religious exemption and makes the entire PWFA "subject to" the exemption. 42 U.S.C. § 2000gg-5(b). Title VII, in turn, states: "This *subchapter* shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Title VII thus exempts religious entities from the requirements of the "subchapter"—*e.g.*, all of Title VII, not merely one category of claims—when they engage in exempted conduct.

What is the exempted conduct? The text makes that clear: It is the "employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). And what does it mean to employ "individuals of a particular *religion*"? The text makes that clear, too, defining religion to include "*all aspects* of religious *observance and practice*, as well as belief." *Id.* § 2000e(j) (emphases added). In other words, the exemption applies when a religious employer makes an employment decision based on an individual's particular religious "belief," "observance," or "practice"—regardless of how the individual styles his claim.

Other courts and judges have repeatedly come to that conclusion. *See Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 590 (N.D. Tex. 2021) ("Read plainly … Title VII does not apply to religious employers when they employ individuals based on religious observance, practice, or belief."); *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring) ("A religious school is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of 'religion' as § 2000e(j) defines that word."); *Fitzgerald v. Roncalli High Sch.*, 73 F.4th 529, 535 (7th Cir. 2023) (Brennan, J., concurring) ("'individuals of a particular religion' means individuals whose beliefs, observances, or practices align with the employer's religious expectations"); *Billard v. Charlotte Catholic High Sch.*, No. 22-1440, 2024 WL 2034860, at *12 (4th Cir. May 9, 2024) (King, J., dissenting in part and concurring in judgment) (agreeing with Judges Easterbrook and Brennan).

16

This point is further underscored by the other exemption listed in Section 2000e-1(a) alongside the religious exemption: the "alien" exemption. Both exemptions are introduced with the same language: "This subchapter shall not apply *to an employer with respect to the employment of aliens outside any State* …." 42 U.S.C. § 2000e-1(a) (emphasis added). If the religious exemption were limited to certain types of claims (i.e., religious discrimination), one would expect the alien exemption to have a similar limitation (*e.g.* claims of race or national-origin discrimination). But courts have imposed no such limitation on the alien exemption. Rather, that language "mean[s] what it says: none of Title VII's substantive rules applies to aliens covered by § 702(a)." *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring) (citing cases). Thus, the two exemptions "must be read equally broadly." *Bear Creek,* 571 F. Supp. 3d at 591.

Contrary to the Final Rule, then, Title VII's religious exemption is not so flimsy as to exempt religious employers *only* "from Title VII's prohibition against discrimination on the basis of religion." 89 Fed. Reg. at 29,146. Rather, it protects religious employers from *any* Title VII claim if they made an employment decision based on an individual's particular religious belief, observance, or practice. And that's exactly how the Fifth Circuit has applied it, barring a sex-discrimination investigation under Title VII where a religious employer "applied its policy of preferring Baptists over non-Baptists." *EEOC v. Mississippi Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980); *accord Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 132 (3d Cir. 2006) (religious exemption bars sex-discrimination claim); *Bear Creek*, 571 F. Supp. 3d at 591 ("The plain text of [the religious] exemption" bars sex-discrimination claims "when [a religious employer] refuses to employ an individual … based on religious observance, practice, or belief").

The PWFA incorporates these principles wholesale into its own religious exemption. 42 U.S.C. § 2000gg-5(b). Therefore, as with Title VII, a religious employer does not have to provide accommodations under the PWFA where doing so would require accommodation of beliefs, observance, or practices that conflict with the employer's religion.

EEOC makes no attempt to follow the plain language of the Title VII/PWFA religious exemption. And it dismisses the significant number of cases and judges that have upheld the plain

statutory meaning as being merely a "few judges" who have contradicted the "common understanding of Title VII's religious exemption." 89 Fed. Reg. at 29,147 n.239.

There's a reason EEOC stops at a (mistaken) appeal to authority instead of the text: EEOC's interpretation of the PWFA's religious exemption renders the exemption meaningless. *See, e.g.*, *Cooper/T. Smith Stevedoring Co. v. Liuzza*, 293 F.3d 741, 746 (5th Cir. 2002) (courts cannot "render as meaningless the language of the statute."). Borrowing from its current interpretation of the Title VII exemption, EEOC claims that the PWFA exemption protects religious entities from claims of religious discrimination only. 89 Fed. Reg. at 29,146. But the PWFA does not prohibit religious discrimination, full stop. Instead, it guarantees that employees may receive reasonable accommodations for their pregnancies. 42 U.S.C. § 2000gg-2. If the exemption were interpreted as EEOC proposes, then it would not exempt anything. EEOC's approach is like reading the ADA's religious exemption as protecting only against *religious* discrimination, even though the statute prohibits solely *disability* discrimination. 42 U.S.C. § 12113(d)(1). It's nonsensical.

Because statutes should be interpreted to avoid rendering entire sections as void, *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001), and because the Final Rule's religious exemption "clearly conflicts with the plain language" of the PWFA and Title VII, it "constitutes unlawful agency action" and must be set aside. *VanDerStok*, 86 F.4th at 190.

**2.   EEOC's interpretation violates the constitutional avoidance canon.**

Rejecting EEOC's reading of the exemption is required for another reason, too: avoiding the unconstitutional entanglement and intrusion it would create into religious entities' autonomy over internal religious affairs. "Under the constitutional-avoidance canon, … a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *see also Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 219 (5th Cir. 2023).

Thus, for instance, *NLRB v. Catholic Bishop* held that Catholic schools couldn't be ordered by the NLRB to collectively bargain with "lay teachers" given the "serious constitutional questions" that would follow. 440 U.S. 490, 494-95, 501 (1979). Otherwise, in schools where employment

practices are governed by "religious creeds," civil adjudication would "necessarily involve inquiry" into "the school's religious mission," and the "very process of inquiry" could itself "impinge on rights guaranteed by the Religion Clauses." *Id.* at 502.

So too here. In fact, EEOC's cramped interpretation of the religious exemption would create two serious constitutional problems. First, it would force religious groups to employ individuals whom it had already found to be religiously disqualified because they have advocated for abortion in the workplace. But the "principle of church autonomy" guarantees religious groups "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020). As the Fifth Circuit has recognized in the context of an attempt to use judicial power to chill the Catholic Church's beliefs and practices related to abortion, civil courts may not intrude upon the "private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs." *Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018). Critically, this prohibition on entanglement "does not protect the church alone," but it also serves important separation of powers interests by "confin[ing] the state and its civil courts to their proper roles." *Billard*, 2024 WL 2034860, at *5.

Second, even attempting to adjudicate claims arising from the abortion mandate would create intrusion and entanglement of the kind *Catholic Bishop* found too much. Indeed, it is precisely for this reason that the Third Circuit found sex discrimination claims barred by Title VII's religious exemption. *Curay-Cramer*, 450 F.3d at 137-39 (relying on *Catholic Bishop* and concluding that inquiry into "violations of Church doctrine" would "violate the First Amendment"). For this reason, the Religion Clauses of the First Amendment forbid civil courts from becoming "entangled in essentially religious controversies" over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of [members] to the standard of morals required of them." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 713-14.

"Title VII's religious exemptions" are "constitutionally inspired, implementing the First Amendment's command to avoid 'intrusive inquiry into religious belief.'" *Billard*, 2024 WL

2034860, at *8. The Final Rule's narrow, entangling construction of the religious exemption ignores that inspiration and invites "a hoard of constitutional problems." *United States v. Hamilton*, 46 F.4th 389, 398 n.3 (5th Cir. 2022). It should be rejected.

### C.  The Final Rule violates RFRA (Count V).

Congress enacted RFRA to provide "very broad protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 352, 356 (2015). Under RFRA, the federal government may not "substantially burden a person's exercise of religion" unless that burden is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). RFRA's protections must be construed "in favor of a broad protection of religious exercise" to the "maximum extent" possible. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 & n.5 (2014).

*Substantial Burden.* The Final Rule imposes a substantial burden on Plaintiff's religious exercise. A substantial burden is one that imposes "substantial adverse practical consequences" on an employer for following its religious beliefs or that "cause[s] the objecting party to violate its religious beliefs" to comply with the law. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 692 (2020) (Alito, J., concurring) (discussing *Hobby Lobby*, 573 U.S. at 720-726). As the Fifth Circuit ruled just last year, a substantial burden exists where EEOC forces religious employers to "choose between two untenable alternatives: either (1) violate Title VII and obey their convictions or (2) obey Title VII and violate their convictions." *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 937 (5th Cir. 2023).

EEOC's rule puts Plaintiffs in this predicament. As a direct result of the Final Rule, Plaintiffs must knowingly violate their sincerely held beliefs regarding the moral evil of abortion or risk liability and face years-long expensive and entangling litigation by both the EEOC and private parties. *See* 42 U.S.C. § 2000gg-2(a) (remedies); 29 C.F.R. § 1636.3(h)(2) (notification requirement); Compl. ¶¶ 77-127. They face the same pressure to alter their religious speech concerning abortion, including their employment policies and their religious decisions about how best to handle a situation where an employee or faculty member speaks or acts about abortion in a manner that conflicts with Plaintiffs' beliefs. Compl. ¶¶ 88-92, 97-100, 109-112, 119-122. This

more than suffices to establish a substantial burden. As the Fifth Circuit held, "[b]eing forced to employ someone to represent the company who behaves in a manner directly violative of the company's convictions is a substantial burden," as is being forced to "broadly change" its "employment policies" and "tacitly endorse" behavior "it sees as sinful." *Braidwood*, 70 F.4th at 938; *see also, e.g.*, *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 943 (N.D. Tex. 2019); *Hobby Lobby*, 573 U.S. at 724-25 (discussing moral complicity); *Little Sisters*, 591 U.S. at 693 (Alito, J., concurring) (similar).

***Compelling Interest.*** Nor does EEOC have a compelling interest in burdening Plaintiffs' religious beliefs. To show a compelling interest, EEOC must demonstrate that the Final Rule furthers an interest "of the highest order." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014). "General statements of its interests are not sufficient"; EEOC must demonstrate how the interests are compelling as applied "to the person whose sincere exercise of religion is being seriously impaired." *Id.* (cleaned up).

EEOC cannot come close to meeting this exacting test. EEOC spends one sentence attempting to establish a compelling interest against any hypothetical religious defenses, asserting that "[n]ondiscrimination laws and policies have been found to serve a compelling governmental interest." 89 Fed. Reg. at 29,148. This cursory dodge fails for numerous reasons. Most obviously, the PWFA says nothing on the subject of abortion, while explicitly providing for care that protects healthy "pregnancy" and "childbirth." 42 U.S.C. § 2000gg(4). Nor did any legislator from the Congressional floor ever state that such a compelling interest lay dormant in the PWFA's text. To the contrary, the PWFA's sponsors repeatedly *denied* they were imposing an abortion mandate. A denied interest is not a compelling one. *Little Sisters*, 591 U.S. at 697 (Alito, J., concurring) ("if Congress thought that there was a compelling need" at issue, "why didn't Congress mandate that [provision] in [the law] itself?").

EEOC also fails to explain, let alone explain away, *Bostock*'s statement that RFRA "supersede[s] Title VII's [antidiscrimination] commands in appropriate cases." *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020). As the Fifth Circuit has noted, *Bostock*'s "qualification would

21

be a nullity if the government's compelling interest in purportedly eradicating sex discrimination were a trump card against every RFRA claim." *Braidwood*, 70 F.4th at 939. It is not a nullity. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 591-92 (2023) (however "compelling" an antidiscrimination interest might be, it cannot be invoked to run roughshod over "the demands of the Constitution."); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 650, 657, 659 (2000) (same).

**Least Restrictive Means.** EEOC also flunks RFRA because it cannot show it has used the "least restrictive means" of achieving its purported interests. *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 423 (2006). This test requires EEOC to "show[ ] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Hobby Lobby*, 573 U.S. at 728. "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 574 U.S. at 365. And if the government failed to "demonstrate[ ] that it … actually considered and rejected the efficacy of less restrictive measures before adopted the challenged" rule, it fails from the start. *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005).

Here, a consequence of EEOC's attempt to hide abortion in a pregnancy statute, and to cut down the PWFA's religious exemption to a nullity, is that Congress never actually tried to evaluate whether there were less restrictive ways to accomplish its objectives than substantially burdening religion. Congress didn't intend to burden religion at all, so it didn't justify any such burden.

Nor is there any justification for EEOC's choice to adopt a "case-by-case" approach to RFRA. For starters, it could have avoided the RFRA question altogether by applying the statute as written, giving the incorporated Title VII exemption its proper interpretation. Or it could have followed the Department of Education's approach under Title IX, under which employers can pro-actively submit voluntary requests for review of policies and receive assurances that they are protected by federal law. 34 C.F.R. § 106.12(b); *accord Maxon v. Fuller Theological Seminary*, No. 20-56156, 2021 WL 5882035, at *2 (9th Cir. Dec. 13, 2021) (noting this is "DOE's longstanding practice"). Or, it could have looked to the recent experience of other federal agencies' failed attempts to force religious employers to participate in abortion, which eventually concluded after over a decade of

nationwide litigation by giving such objectors exemptions outright. *See Little Sisters*, 591 U.S. at 663. But EEOC did none of these things, forcing religious objectors to submit to litigation and investigations to find out if RFRA protected them at all.

**D.   The Final Rule violates the Free Exercise Clause (Count VI).**

EEOC's rule also violates "bedrock" Free Exercise rights against discriminatory laws. *Fellowship of Christian Athletes v. SJUSD*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc).

First, if a policy burdening religion reserves discretion for the government "to decide which reasons for not complying with the policy are worthy of solicitude," that requires strict scrutiny. *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021). EEOC states that it reserves discretion to make "case-by-case" decisions on whether accommodating abortion for a particular employee or particular situation is an "undue hardship" that can be denied. 89 Fed. Reg. at 29,205. Indeed, EEOC rejected calls from commentors that abortion accommodations be considered a "per se undue hardship" for employers with sincere religious objections. *Id.* at 29,153. In doing so, EEOC claimed "the religious beliefs of employers that share the same religion are not monolithic" and so an "individualized assessment" of the claimed hardship is required. *Id.* All this easily qualifies as the kind of discretionary evaluation of worthiness that *Fulton* subjects to searching scrutiny, and twice over. It allows EEOC to decide both whether dollars-and-cents interests are compelling enough to exempt a secular employer, and whether an employer's religious belief is sufficiently important in EEOC's eyes to warrant its solicitude.

Second, if a law "treat[s] *any* comparable secular activity more favorably than religious exercise," it again must pass strict scrutiny. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). As noted above, EEOC exempts any secular employer who can show an "undue hardship." 89 Fed. Reg. at 29,204-05. And the Final Rule exempts employers with less than 15 employers from its abortion mandate, exempting most private employers and leaving a multitude of employees uncovered. 89 Fed. Reg. at 29,151; *see Facts & Data on Small Business*, Small Business & Entrepreneurship Council, https://perma.cc/RG8H-XBD4. Because EEOC chose to treat such secular interests more favorably than religious objections to abortion for "no apparent

reason other than administrative convenience," EEOC must satisfy strict scrutiny. *See Bear Creek Bible Church*, 571 F. Supp. 3d 571, 613 (EEOC interpretation of Title VII burdening religion subject to strict scrutiny because, *inter alia*, it exempted employers with fewer than 15 employees).

Indeed, even without the discrimination barred in *Fulton* and *Tandon*, the Free Exercise Clause requires strict scrutiny whenever government "imposes a substantial burden on religious exercise" like the Final Rule's burden here. *See Fulton*, 593 U.S. at 614 (Alito, J., concurring).[4]

Having triggered strict scrutiny, EEOC fails it for the reasons identified above under RFRA.

## II. Plaintiffs meet the other requirements for a preliminary injunction.

*Irreparable Harm.* Plaintiffs are also entitled to a preliminary injunction because they will suffer irreparable harm if the Final Rule is allowed to go into effect. As the Fifth Circuit has recognized, "the loss of freedoms guaranteed by the First Amendment … and RFRA … constitute per se irreparable harm." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 380 (5th Cir. 2022); *see also Diocese of Brooklyn*, 592 U.S. at 19 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") Thus, for the same reasons that Plaintiffs are likely to prevail on the merits of these claims, they have demonstrated that they will suffer irreparable injury absent an injunction on those claims.

The irreparable harm is particularly clear here. Forcing Plaintiffs to "endorse non-conforming religious behavior for any period" cannot be remedied with damages after the fact and therefore constitutes irreparable harm. *Braidwood*, 70 F.4th at 932 n.33. If Plaintiffs adhere to their deeply held religious beliefs, they expose themselves to substantial potential liability from claims by applicants and current and former employees, as well as EEOC enforcement action. *See* 42 U.S.C. § 2000gg-2(a)(1), (a)(3) (identifying PWFA remedies); 42 U.S.C. § 2000e-2(a)(1) (outlining that applicants and current and former employees can have standing to sue for employment discrimination). A preliminary injunction is thus required.

---

4    Plaintiffs recognize that this argument is barred by *Employment Division v. Smith*, 494 U.S. 872, 874 (1990), and preserve it here for appeal.

**Balance of Harms and Public Interest.** The factors of "harm to the opposing party and weighing the public interest … merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, since Plaintiffs are likely to succeed on the merits, Defendants must "present powerful evidence of harm[s] to [their] interests" if an injunction were granted. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012). Defendants cannot meet this high standard. Instead, when balancing the hardships between the parties, the scale clearly tips in Plaintiffs' favor.

On one side of the scale, Plaintiffs face an impossible choice: either forfeit their constitutionally protected rights, or face open-ended, unending exposure to employment discrimination suits and accompanying liability. That choice is unacceptable, which is why "injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life*, 697 F.3d at 298 (cleaned up).

Defendants, on the other hand, lose nothing except the ability to enforce an extra-statutory interpretation of the PWFA. EEOC has been accepting charges under the PWFA without the benefit of the Final Rule for nearly a year,[5] meaning employees with statutorily *legitimate* claims for failure to accommodate under the PWFA—such as for failure to provide necessary bathroom breaks or light duty for pregnant women—will still be able to proceed even if the Rule is partially vacated or enjoined. The statute itself provides the remedies and enforcement mechanisms, and the Final Rule is not necessary for pregnant workers to be protected by the PWFA. *See* 42 U.S.C. § 2000gg-2(a)(1), (a)(3); 42 U.S.C. § 2000e-2(a)(1). Thus, Defendants suffer no prejudice, as their only harm is being prevented from implementing an ultra vires interpretation of the statute.

## CONCLUSION

Plaintiffs respectfully request this Court stay enforcement of the Final Rule and grant Plaintiffs' motion for a preliminary injunction.

---

[5]   *See EEOC Starts Accepting Charges Under New Pregnant Workers Fairness Act*, EEOC (June 27, 2023), https://perma.cc/7NNC-6643.

Respectfully submitted,

Jonathan Berry*
James R. Conde*
Boyden Gray PLLC
801 17th St. NW, Suite 350
Washington, DC 20006
Phone: (202) 955-0620
Fax: (202) 955-0621
jberry@boydengray.com

/s/ Daniel H. Blomberg
Daniel H. Blomberg*
  *Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
  (LA Bar No. 38852)
Laura Wolk Slavis*
Andrea R. Butler*
Jordan T. Varberg*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Phone: (202) 955-0095
Fax: (202) 955-0090
dblomberg@becketlaw.org

*Application for admission pro hac vice forthcoming*

*Counsel for Plaintiffs*

Dated: May 22, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2024, the foregoing was electronically filed using the CM/ECF system. A copy of the foregoing will also be promptly served upon Defendants pursuant to Fed. R. Civ. P. 5(b) and emailed to counsel for EEOC, who have appeared before this Court to represent EEOC in a similar pending challenge, at the email addresses below:

Daniel Schwei, Esq. (daniel.s.schwei@usdoj.gov)

Laura B. Bakst, Esq. (laura.b.bakst@usdoj.gov)

Alexandra J. Widas, Esq. (alexandra.j.widas@usdoj.gov)

/s/ Daniel H. Blomberg
Daniel H. Blomberg*
  *Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
  (LA Bar No. 38852)

*Application for admission pro hac vice forthcoming*