# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### DELTA DIVISION

**STATES OF TENNESSEE, ARKANSAS,
ALABAMA, FLORIDA, GEORGIA, IDAHO,
INDIANA, IOWA, KANSAS, MISSOURI,
NEBRASKA, NORTH DAKOTA, OKLAHOMA,
SOUTH CAROLINA, SOUTH DAKOTA,
UTAH, and WEST VIRGINIA**                                    **PLAINTIFFS**

**v.**                              **No. 2:24-cv-84-DPM**

**EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION**                                    **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

The Congress passed the Pregnant Workers Fairness Act in 2022 to require many employers to do more to accommodate pregnant employees. The Act was of a piece with Title VII, and drew on that statute's enforcement structure as well as the Americans with Disabilities Act's provisions about reasonable accommodations, communication between employers and employees, and minimization of any resulting burden on employers. Congress had taken a step in this direction more than forty years before in the Pregnancy Discrimination Act. That statute overturned *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), and amended Title VII, making plain that our law would not tolerate workplace discrimination related to pregnancy. In the Pregnant Workers Fairness Act, with broad and

bipartisan majorities in the House of Representatives and the Senate, Congress took another step. Just as pregnancy-related discrimination was prohibited, reasonable pregnancy-related accommodations were required, and no pregnancy-related retaliation would be tolerated.

The new Act is codified in Title 42, alongside Title VII. It defines some terms, drawing on the other workplace-related statutes. The keystone term is "known limitations."

> [T]he term "known limitation" means physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions that the employee or employee's representative has communicated to the employer whether or not such condition meets the definition of disability specified in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12102)[.]

42 U.S.C. § 2000gg(4). An important embedded term is "related medical conditions," which Congress left undefined. As to enforcement and remedies, and as relevant to the State employers who filed this case, Congress incorporated the applicable provisions of Title VII covering a government, governmental agency, or political subdivision. 42 U.S.C. §§ 2000gg-2(a) & 2000e-5(f). As authorized by Section 5 of the Fourteenth Amendment, Congress also abrogated the several States' Eleventh Amendment immunity against suit for job-related actions covered by the Act. 42 U.S.C. § 2000gg-4. Last, Congress delegated implementation authority to the Equal Employment Opportunity Commission. The general mandate was to

issue regulations "to carry out" the Act. In particular, Congress required the EEOC to "provide examples of reasonable accommodations addressing known limitations related to pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-3(a).

Though it missed its one-year deadline by a few months, in April 2024 the Commission adopted its Final Rule and interpretive guidance. 29 C.F.R. § 1636 & app. A. The regulation itself is brief as these things go; it covers less than seven pages in the Federal Register. The interpretive guidance, which includes more than 50 examples, runs more than 130 pages. The final rule and interpretive guidance go into effect on 18 June 2024.

Less than a week after the EEOC issued the regulation, Tennessee and sixteen other States filed this case. The States challenged the aspects of the regulation dealing with abortion. The regulation included abortion in a non-exhaustive list of "examples of conditions that are, or may be, 'related medical conditions'" for the purposes of the Act. *Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096, at 29,183 (19 April 2024). The States also sought, by way of a preliminary injunction or a § 705 stay under the Administrative Procedures Act, to stop the whole regulation from taking effect. The parties have briefed the motion. With all parties' agreement,

the Court allowed *amicus* briefs.[1]  They're helpful and appreciated. The Court also held a half-day oral argument, which focused the issues.

The States confirmed that they make no challenge to the Pregnant Workers Fairness Act itself.  Several of them have similar protective statutes.  *E.g.*, TENN. CODE ANN. § 50-10-103(b)(1) & ARK. CODE ANN. § 16-123-102(1).  Nor do the States challenge most of the new regulation implementing the federal Act.  They recognize almost all of EEOC's final rule as salutary.  The States quarrel, instead, with how the rule addresses accommodations connected with some abortions—some, not all.

---

[1]  *Doc. 43-1* (Small Business Majority, Main Street Alliance, and the American Sustainable Business Council); *Doc. 49-1* (States of Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Wisconsin, and the District of Columbia); *Doc. 51-1* (American Civil Liberties Union;  American Civil Liberties Union of Arkansas;  National Women's Law Center;  A Better Balance;  Actors' Equity Association;  American Federation of Labor and Congress of Industrial Organizations;  American Federation of State, County and Municipal Employees, AFL-CIO;  American Federation of Teachers;  American Postal Workers Union, AFL-CIO; Center for WorkLife Law;  Communications Workers of America; Legal Aid at Work;  NCLEJ;  National Education Association;  National Employment Law Project;  National Nurses United;  National Partnership for Women & Families;  One Fair Wage;  Public Counsel; Service Employees International Union;  and United Food and Commercial Workers International Union).

The States acknowledge that some pregnant women will need, and be entitled to, workplace accommodations in connection with an abortion. *Doc. 62 at 23-25*. In the Act's words, the employee will have some "physical or mental condition" connected to pregnancy that prompts an abortion. Perhaps a worker is diabetic; her diabetes is "affected by" her pregnancy; and abortion is used to treat her. Reasonable accommodation, the States agree, would follow. Perhaps a worker's pregnancy is troubled—it could be ectopic (in a fallopian tube, rather than in the uterus), or there could be a miscarriage. Or perhaps an employee had an abortion without seeking any workplace accommodation to do so; and cramping or bleeding resulted. Again, there's no dispute that a State employer would owe some job-related adjustments. In situations like these, the States agree that a State employer must make reasonable accommodations as required by the Act and the EEOC's implementing regulation.

The States challenge only how the regulation addresses what the States call elective abortion; that is, an abortion prompted exclusively by the woman's choice, where no "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions . . ." exists, but where getting the abortion creates some limitations on the employee's ability to do her job. In the plaintiff States, these elective abortions, and almost all abortions, are illegal.

The States contend that the EEOC's rulemaking to cover this situation breaks faith with Congress's words in the Act, rests on flawed reasoning, offends the U.S. Constitution in various ways, and in substance violates the Administrative Procedures Act. The States also point to their strong anti-abortion public policies, present in some of their Constitutions and many statutes. *E.g.*, ALA. CONST. art. I, § 36.06; ARK. CONST. amend. LXVIII, § 2; IDAHO CODE ANN. § 18-622; UTAH CODE ANN. § 76-7-301.1(3). This combination of difficulties, the States continue, justifies a stay under the APA, a nationwide preliminary injunction, or both while this case is being adjudicated on the merits in coming months. The States seek this extraordinary relief based on their challenge to one potential application of one part of the final rule's comprehensive regulatory architecture for implementing the Pregnant Workers Fairness Act's accommodation and anti-retaliation mandates.

The EEOC defends its work on the merits, arguing that no preliminary relief is justified. First, though, the Commission challenges the States' standing to bring the case. The Commission says this Court lacks subject matter jurisdiction because the States' asserted injuries are speculative and, in any event, neither traceable to the regulation nor redressable by the stay/injunction sought. The States, of course, disagree on all these points.

\*

The States must show three things to satisfy Article III's standing requirements: injury in fact, causation, and redressability. *School of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022). An injury must be "concrete, particularized, and actual or imminent[.]" *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). At this stage of the case, the Court assesses standing based on the States' factual allegations. *School of the Ozarks*, 41 F.4th at 997.

They press dual theories of injury—sovereign harms and economic harms. The sovereign harms, the States say, are twofold: the rule will abridge their ability to regulate abortions and their interests in maintaining a pro-life message in dealing with state employees. The economic harms are the rule-related compliance costs the States say they will incur in response to potential enforcement. These costs would be unrecoverable because the Commission, as an arm of the United States, enjoys sovereign immunity. The States don't claim any actual harm yet, only that they face imminent injury. For the following reasons, the States haven't shown that the Commission's rule is likely to cause their alleged harms. *FDA v. Alliance for Hippocratic Medicine*, No. 23-235, slip op. at 9-10 (U.S. 13 June 2024).

The sovereign harms are not imminent because there is no credible threat of enforcement. *School of the Ozarks*, 41 F.4th at 1000. The States concede that they must accommodate *conditions* for which

abortion may be the indicated treatment. See the examples mentioned before. They don't fear enforcement on that front. Rather, they seek relief from future actions requiring them to accommodate *abortions* in the absence of any underlying mental or physical condition. On the merits, the States raise arguable points about the fit between the Act and part of the final rule. But for standing purposes, imminent enforcement action is too speculative.

Consider the hypothetical offered by the Commission.

- A pregnant state employee with no qualifying condition decides to have an abortion that is illegal under state law;

- The employee will need an accommodation because of the abortion;

- No existing leave or other benefits will be available to the employee;

- The employee will seek an accommodation, explaining that she wants to get an abortion that is illegal under her State law;

- The State employer will deny any accommodation;

- The employee will file a charge with the EEOC;

- The EEOC will reject the State employer's defenses, find that reasonable cause exists, fail to secure a conciliation agreement, and refer the charge to the Department of Justice;

- And the Department—after independent review—will decide to bring an enforcement action against the State employer or issue the employee a right-to-sue letter.

*Doc. 34 at 25.* This many-step series of events is certainly possible, but it is not "certainly impending." *Clapper v. Amnesty International USA*, 568 U.S. 398, 416 (2013); *see also School of the Ozarks*, 41 F.4th at 1000. The fourth step—an employee who says, "I need time off to get an illegal abortion"—seems particularly unlikely. Under the new rule, the employee does not have to provide her employer details about her medical care, though an employer can require some supporting documentation in certain instances. 89 Fed. Reg. at 29,184 & 29,186.

Even assuming an injury in fact, though, the States' sovereign-injury theory still fails for lack of causation and redressability. These standing requirements are "often flip sides of the same coin." *Alliance for Hippocratic Medicine*, slip op. at 8 (quotations omitted). The requested relief—enjoining the EEOC from enforcing the rule or staying the rule under § 705—will not eliminate the threat of enforcement under the statute.

Unlike in situations involving private employers, the EEOC cannot bring enforcement actions against state employers. 42 U.S.C. §§ 2000gg-2(a)(1) & 2000e-5(f)(1). Like Title VII, the Pregnant Workers Fairness Act first requires a state employee to exhaust her claim by filing a charge with the EEOC. 42 U.S.C. § 2000e-5(b), (e)(1). The EEOC must investigate and decide a threshold question: Is there reasonable cause to believe that the charge is true? If not, it must dismiss the charge and issue the employee a right-to-sue letter. If there is, the

EEOC must try to secure a conciliation agreement between the employer and employee through informal means. If an agreement isn't reached within thirty days after a charge is filed, the EEOC "shall take no further action and shall refer the case to" the Department of Justice. § 2000e-5(f)(1). From there, the Department has two choices: bring its own action, or notify the employee of her right to sue. In any event, whether the EEOC dismisses the charge or refers it to the Department, any enforcement action against the States will always result from "the independent action of some third party not before the court"—the employee or the Department of Justice. *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957 (8th Cir. 2015) (quotations omitted). These independent third parties don't preclude standing, but their presence center stage makes it "substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021).

The unchallenged Pregnant Workers Fairness Act—not the final rule—is what requires State employers to accommodate "known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee . . .." 42 U.S.C. § 2000gg-1. The Commission's regulation only includes "abortion" in a list of "*examples* of conditions that are, or *may be*, 'related medical conditions[.]'" 89 Fed. Reg. at 29,183 (emphasis added). "The Commission emphasizes that the list of 'pregnancy, childbirth or related medical conditions' . . . is non-exhaustive[.]" 89 Fed. Reg.

at 29,192.  Pausing all or part of the regulation or its enforcement will not eliminate the deeper question:  Does the Act itself require State employers to accommodate elective abortions that are illegal under State law?  The relief requested from this Court will not prevent an aggrieved employee from filing such a charge, or trying to file one, or eventually asking a court that question.  *Compare School of the Ozarks*, 41 F.4th at 1001.

The States lean hard on a Sixth Circuit case indicating that, if the desired relief would lessen their injury, complete relief is unnecessary to satisfy the redressability criterion.  *Lavin v. Husted*, 689 F.3d 543, 546 (6th Cir. 2012) ("meaningful" relief); *see also Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (relief that "could potentially lessen" the injury).  But the binding precedent from the Eighth Circuit does not adopt this standard.  The States "must show that the requested relief would eliminate the alleged threat of imminent enforcement . . .." *School of the Ozarks*, 41 F.4th at 1001.  And "it must be *the effect of the court's judgment on the defendant* that redresses the plaintiff's injury, whether directly or indirectly." *Digital Recognition Network*, 803 F.3d at 958 (emphasis original).  The only defendant in this case is the EEOC.  The States' requested relief therefore does not eliminate the hypothetical enforcement actions that they allege are imminent. *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023).

The redressability requirement "is not met when a plaintiff seeks relief against a defendant with no power to enforce the challenged statute." *Digital Recognition Network*, 803 F.3d at 958. Well, the States fairly respond, the EEOC is involved in enforcing the Act and regulation in a preliminary way. And enjoining the Commission from accepting or referring any charge based on an elective abortion illegal under state law would at least make it harder for a complaining employee to seek relief. She couldn't exhaust her administrative remedies, a prerequisite to suit. *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1846 (2019).

But Title VII's charge-filing requirement, which the new Act incorporates, is a non-jurisdictional (though mandatory) claim-processing rule. *Fort Bend County*, 139 S. Ct. at 1850-51. It can be forfeited. *Ibid.* And compliance with the filing period "is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). The Supreme Court has reserved decision on whether mandatory claim-processing rules may be subject to other equitable exceptions. *Fort Bend County*, 139 S. Ct. at 1849 n.5.

A Court order enjoining the administrative process for claims about elective abortion would be strong medicine supporting equitable relief from Title VII's non-jurisdictional exhaustion requirement based on unavailability or futility. The animating premise of the exhaustion requirement in this statute, and the many benefits of the administrative

–12–

process this requirement secures, is that the agency's door was, at some point, actually open to the claimant. The States would be hard put to insist that a claimant must exhaust a process they had eliminated by injunction. How this interesting issue might be resolved, though, is not the dispositive point. The relief the States request would probably gum up the works, and perhaps reduce the number of these potential claims, but it would not eliminate a pregnant employee's right under the Act to seek relief in a court against a State employer for denying an accommodation for time off to get an elective abortion. And interim relief from this Court would not prevent suit in these circumstances by the Department of Justice to enforce the Act. Either way, the States' alleged sovereign injuries would not be redressed.

That leaves the alleged economic harms. The States don't claim any sunk costs. They only say that their compliance costs are imminent. *E.g., Doc. 1 at 34; Doc. 62 at 14.* This economic-harm theory fails for two reasons.

First, the challenged costs—those resulting only from rule-related compliance activities associated with illegal, elective abortions—are neither concrete nor particularized. A concrete injury is one that is "real and not abstract." *Alliance for Hippocratic Medicine,* slip op. at 8. A particularized injury "must affect the plaintiff in a personal and individual way and not be a generalized grievance." *Ibid.* (quotations omitted).

–13–

The Commission estimates that public employers like the States will incur a one-time administrative cost of $76.03 for implementing the entire new regulation. 89 Fed. Reg. at 29,175-77. The States say this number is too low, though they offer no contrary proof. Their fallback point is that EEOC's estimate shows that their rule-related compliance costs will be something more than zero. *Doc. 47 at 9*. That's reasonable as it relates to the rule as a whole. "[A] loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (quotations omitted). The States, however, challenge only a sliver of the whole. Many abortion-related accommodations, they acknowledge, will be covered. *Doc. 62 at 23-25*. And they haven't, for example, offered particulars about how the challenged slice imposes additional compliance costs beyond those required by the unchallenged parts of the regulation, or even the Act itself. *California*, 593 U.S. at 677-80. The States' affidavits speak in general—and mostly identical—terms. *Doc. 17-1 to 17-8 & Doc. 47-1*. The Court asked for details at the hearing. The States responded: "[I]t could be a few dollars in this case, but we don't know." *Doc. 62 at 14*. That's speculative.

Second, even assuming some concrete and particularized compliance costs related to illegal, elective abortions, these costs are not fairly traceable to any threat of enforcement. That is, the States cannot transform their sovereign-harm theory into an economic-harm theory

by incurring costs for the former. They "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416; *see also Alliance for Hippocratic Medicine*, slip op. at 22.

A final point on standing bears mention. The States argue that a "regulated party that is the object of an agency action always has standing to challenge" that action. *Doc. 62 at 12*. This is an overstatement. When a party is the object of agency action, "there is *ordinarily* little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (emphasis added). This 'object of the action' theory of standing is the norm; but it is not a hardline rule. *California*, 593 U.S. at 671; *School of the Ozarks*, 41 F.4th at 999. Applying this theory is particularly appropriate when a party presses a procedural challenge, which could result in a do-over of some part of the administrative process. *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 871 (8th Cir. 2013). The States press no procedural challenge here. More importantly, they haven't established Article III's "irreducible constitutional minimum"—injury in fact, causation, and redressability. *Lujan*, 504 U.S. at 560.

\*

If the Court has erred on standing, and subject matter jurisdiction exists, then it must address the request for extraordinary interim relief: Are the States entitled to a § 705 stay, or a nationwide preliminary injunction, while the case proceeds to a final judgment?  Each is a different tool for maintaining the status quo.  The legal standard for measuring whether to grant either form of interim relief is essentially the same.  *State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Commission*, 812 F.2d 288, 290 (6th Cir. 1987).

The States must establish four things: (1) a likelihood of success on the merits;  (2) a likelihood that they will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor;  and (4) an injunction is in the public interest. *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1016 (8th Cir. 2023) (quotations omitted). The States must shoulder this burden "because a preliminary injunction is an extraordinary remedy never awarded as of right."  *Ibid.* (quotations omitted).

Irreparable harm can be a threshold issue.  *Morehouse*, 78 F.4th at 1016-17;  *see also Labrador v. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring).  It is here.  The States "must show that irreparable injury is *likely* in the absence of an injunction, not merely a possibility of irreparable harm before a decision on the merits can be

rendered." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (emphasis original and quotations omitted); *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). The States again press two kinds of irreparable harms—sovereign harms (their ability to regulate abortions and their interests in maintaining a pro-life message to employees) and economic harms (compliance costs). *Doc. 1 at 34-35.* Neither presents "a clear and present need for equitable relief." *Morehouse*, 78 F.4th at 1017.

The States have a sovereign interest in their "power to create and enforce a legal code, both civil and criminal[.]" *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). A state suffers irreparable harm when it is barred from enforcing its duly enacted laws. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Organization for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020). The States claim that the final rule "fundamentally infringes on [their] sovereignty by hampering their duly enacted laws regulating abortion." *Doc. 18 at 42.* The Court disagrees. As the Commission notes, the States' abortion-related laws fall into three buckets—substantive abortion laws, restrictions on publicly funded abortions, and public policy declarations. *Doc. 62 at 61-63.*

The substantive abortion laws cited by the States only regulate abortion providers.[2] But the final rule doesn't regulate abortion providers. "[T]he PWFA is a workplace anti-discrimination law. It does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted." 89 Fed. Reg. at 29,104. There is no present or potential conflict between the States' abortion restrictions and the EEOC's rule. The States, therefore, haven't shown a likelihood of irreparable harm here. *See, e.g., Tennessee v. United States Department of Health & Human Services,* No. 3:23-cv-384, 2024 WL 1053247, at *19 (E.D. Tenn. 11 March 2024).

Some States also allege that the final rule infringes on their ability to restrict publicly funded abortions.[3] But, again, the States' laws do

---

[2] TENN. CODE ANN. § 39-15-213(b); ARK. CODE ANN. §§ 5-61-303, 304, 403 & 404; ALA. CODE §§ 26-23H-4(b) & 23H-6(a); FLA. STAT. § 390.0111; GA. CODE ANN. §§ 16-12-140 & 141; IDAHO CODE § 18-8702; IND. CODE § 16-34-2-1(a); IOWA CODE §§ 146A, 146B, 146D & 146E; MO. REV. STAT. § 188.017; NEB. REV. STAT. § 71-6915; N.D. CENT. CODE § 12.1-19.1-02; OKLA. STAT. tit. 21, § 861; S.C. CODE ANN. §§ 44-41-630(B), 640, 650 & 660; S.D. CODIFIED LAWS § 22-17-5.1; UTAH CODE ANN. § 76-7a-201; W. VA. CODE § 16-2R-3.

[3] ARK. CONST. amend. LXVIII, § 1; TENN. CODE ANN. § 9-4-5116; ALA. CODE § 26-23C-2(a)(7); FLA. STAT. § 286.31(2); IDAHO CODE § 18-8705; IND. CODE § 16-34-1-2; KAN. STAT. ANN. § 65-6733(a); MO. REV. STAT. §§ 188.205, .210 & .215; N.D. CENT. CODE § 14-02.3-01(3); S.C. CODE ANN. § 44-41-90(A); UTAH CODE ANN. § 76-7-331(2). Florida law,

not conflict with the final rule.  "Nothing in the PWFA requires an employer to pay for an abortion or provide health care benefits for abortion in violation of State law."  89 Fed. Reg. at 29,109.  Nor does it "require reasonable accommodations that would cause an employer to pay any travel-related expenses for an employee to obtain an abortion."  89 Fed. Reg. at 29,104.  And, to the extent time off may be a reasonable accommodation, unpaid leave is all that's required.  *Ibid.*  It's unclear if or how any State funds will be used to finance or facilitate elective abortions that are illegal under State law.  But if it is possible, the States haven't shown it is likely.

Last, some States have also codified pro-life policy declarations.[4] Some, like Arkansas, have done so by constitutional amendment: "The policy of Arkansas is to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution."  ARK. CONST. amend. LXVIII, § 2;  *see also* ALA. CONST. art. I, § 36.06(a) & (b).  Others, like Indiana, have done so by statute: "Childbirth is preferred, encouraged, and supported over abortion."  IND. CODE § 16-34-1-1.  The States may, of course, enact separate

---

however, contains a likely applicable exception for expenditures required by federal law.  FLA. STAT. § 286.31(2)(a).

[4]  ALA. CONST. art. I, § 36.06(a) & (b);  ARK. CONST. amend. LXVIII, § 2; TENN. CODE ANN. § 39-15-214;  IND. CODE § 16-34-1-1;  N.D. CENT. CODE § 14-02.3-01(1);  UTAH CODE ANN. § 76-7-301.1(1) & (2).

–19–

legislation to carry out these policies, and some have. But these non-binding policy declarations are not themselves enforceable. They don't, for example, regulate any behavior or provide for the administration of any state programs. *E.g.*, *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269-70 (4th Cir. 2011); *see also Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015). The States, therefore, have not shown a likelihood of irreparable harm to their "power to create and enforce a legal code . . .." *Snapp*, 458 U.S. at 601.

What about the economic harms? The States only need to prove a likelihood of irreparable harm, not a certainty. *Morehouse*, 78 F.4th at 1018. There's no doubt that the "threat of unrecoverable economic loss" amounts to irreparable harm. *Iowa Utilities Board v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996). But, for the reasons already discussed, the States haven't identified how the narrow compliance costs at issue here are actual and not theoretical. *Morehouse*, 78 F.4th at 1018. They haven't tried to "quantify, or clearly explain, their generally alleged compliance costs." *Ibid.* It would be inequitable to grant them the extraordinary relief they seek on this record.

The States failure to show a likelihood of irreparable harm is enough for the Court to deny the motion for a preliminary injunction. *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021). Some words, though, are appropriate on the likelihood of success on the merits. The general rule, at least for now, is that "when Congress

authorizes an agency to issue regulations interpreting a statute that the agency enforces, we defer to the agency's interpretation of an ambiguous statute so long as the interpretation is reasonable." *Union Pacific Railroad Company v. United States*, 865 F.3d 1045, 1048 (8th Cir. 2017). That legal rule may change soon. *Relentless, Inc. v. Department of Commerce*, 144 S. Ct. 325 (2023) (granting certiorari); *Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429 (2023) (same). But this Court's job is to apply the law as it is today, not as it may be tomorrow. *Hohn v. United States,* 524 U.S. 236, 252-53 (1998).

Under the familiar *Chevron* framework, this Court "must first determine whether the statute is ambiguous[.]" *Union Pacific Railroad Company*, 865 F.3d at 1048. If it isn't, the Court must "apply the statute as written; if it is ambiguous, [the Court] must decide whether the agency's interpretation is reasonable." *Ibid*. No, say the States. They argue that the major questions doctrine applies, so the EEOC "must point to clear congressional authorization for the power it claims." *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 723 (2022).

The States focus on the political significance of the ongoing state-by-state debate over abortion. It is, no doubt, a "profoundly difficult and contentious issue[.]" *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 337 (2022) (Kavanaugh, J., concurring). But the Supreme Court has not said that something is a "major question"

simply because it involves a particularly controversial topic. Rather, the major questions doctrine applies in "extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721.

The Supreme Court has identified the signs of one of these extraordinary cases.

- Has the EEOC "claim[ed] to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority"? *West Virginia*, 597 U.S. at 724; *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2383 (2023) (Barrett, J., concurring).

No. The Pregnant Workers Fairness Act is newly minted. And the EEOC's interpretation of the Act is consistent with its almost five-decades-long interpretation of the phrase "related medical conditions" in the Pregnancy Discrimination Act. 29 C.F.R. § 1604 & app.

- Did the EEOC locate this "newfound power in the vague language of an ancillary provision of the Act, one that was designed to function as a gap filler and had rarely been used in the preceding decades"? *West Virginia*, 597 U.S. at 724.

No. The coverage section is the new Act's foundation.

- Did the EEOC's assertion of authority from the statute allow "it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself"? *Ibid.*

Not as far as the Court can tell. The States offer no such legislative history about the Pregnant Workers Fairness Act.

- Did the EEOC claim "the power to resolve a matter of great political significance, or end an earnest and profound debate across the country"? *West Virginia*, 597 U.S. at 743 (Gorsuch, J., concurring).

No. The final rule does not affect each States' regulation of abortion within their boundaries. It addresses workplace accommodations.

- Is the EEOC seeking "to regulate a significant portion of the American economy or require billions of dollars in spending by private persons or entities"? *West Virginia*, 597 U.S. at 743 (Gorsuch, J., concurring).

No. The Act and rule reflect women's important role in the American economy. The challenged part of the regulation is a corner of that big room.

- Is the EEOC seeking "to intrude into an area that is the particular domain of state law"? *Ibid.*

No. Congress has been regulating the workplace for decades. States have, too. States do not have a monopoly on regulating workplace accommodations or abortion. "The Constitution is neutral and leaves the issue for the people and their elected representatives to

resolve through the democratic process in the States or Congress—like the numerous other difficult questions of American social and economic policy that the Constitution does not address." *Dobbs*, 597 U.S. at 338 (2022) (Kavanaugh, J., concurring); *see also United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996) (Richard S. Arnold, J.). Some tension does not equal intrusion.

- Is the EEOC asserting a newfound authority to regulate in an area despite its own "longstanding disavowal of authority to regulate it"? *Nebraska*, 143 S. Ct. at 2382 (Barrett, J., concurring).

No. EEOC has been regulating the workplace for almost sixty years.

- Is the EEOC making "broad invocations of power" based on a "relatively narrow statute[] that purport[s] to delegate that power"? *Ibid.*

No. The regulation tracks the statute.

- Is the EEOC regulating outside its wheelhouse, such "that a reasonable speaker would not understand Congress to confer an unusual form of authority without saying more"? *Nebraska*, 143 S. Ct. at 2382-83 (Barrett, J., concurring).

No. The workplace is EEOC's wheelhouse.

Beyond the intense controversy surrounding abortion, there are no signs that this is a major questions case. *Chevron*'s general rule applies.

Is the Pregnant Workers Fairness Act unambiguous and, if not, is the EEOC's interpretation reasonable? The States focus on the word condition. They argue that abortion is a procedure, not a condition, and therefore the EEOC over-reached by including abortion in its list of "examples of conditions that are, or may be, 'related medical conditions.'" 89 Fed. Reg. at 29,183. And the States argue that abortion—standing alone—cannot be a "known limitation" related to, affected by, or arising out of pregnancy because it is not a "physical or mental condition." 42 U.S.C. § 2000gg(4). The EEOC, for its part, acknowledges that abortion itself isn't a physical or mental condition. *Doc. 62 at 50.* It focuses instead on conditions that could precede an abortion, like cramping, or follow an abortion, like pain and fatigue. The States concede that an employee has a right to a reasonable accommodation for those conditions, including in circumstances involving abortion. *Doc. 62 at 24-25.* The EEOC also argues that unavailability from work to travel to and obtain an abortion is itself a physical condition arising from or affected by pregnancy. The States disagree.

A preliminary point before turning to the deep issue. There is a real disagreement here, but not as much as the politically charged filings suggest. The States concede that under the Act, which they are not challenging, a qualified employee who has any "physical or mental condition related to, affected by, or arising out of pregnancy" is entitled

reasonable accommodations, even if treatment of the condition will result in an abortion, or if the condition was the result of an abortion. That would seem to apply to most, if not all, cases. What pregnancy doesn't have accompanying physical or mental conditions? To be sure, disputes almost certainly will arise over what type of reasonable accommodations are due to an employee experiencing typical physical conditions related to, affected by, or arising out of her pregnancy. But those fact-intensive disputes are best settled on a case-by-case basis, through the administrative process and litigation if need be, not in a pre-enforcement challenge to the EEOC's regulation.

On the deep issue, this Court's tentative conclusion is that the States have the better argument on the text. Abortion doesn't fit into the ordinary meaning of condition. *See Doc. 1 at 205-06* (listing definitions). And yet two Courts of Appeals and a district court have held that abortion is a "related medical condition" for the purposes of Title VII. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008); *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996); *Ducharme v. Crescent City Deja Vu, L.L.C.*, 406 F. Supp. 3d 548, 556 (E.D. La. 2019). This precedent stands with the EEOC's interpretation and against this Court's initial reading. That disagreement is a good indication that the same phrase in the Pregnant Workers Fairness Act is "susceptible to more than one reasonable interpretation," and therefore ambiguous. *Owner-Operator Independent Drivers Association,*

–26–

*Inc. v. Supervalu, Inc.*, 651 F.3d 857, 862 (8th Cir. 2011). And ambiguity, of course, entitles the Commission's interpretation to some deference.

Reading the statute in context, which this Court must do, *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022), adds cloudiness rather than clarity. Consider, for example, a qualified and completely healthy employee who asks to leave work to attend a routine pre-natal appointment. There's no real dispute that she would be entitled to a reasonable accommodation. The House Report cites this situation as an example of an accommodation that would be available under the Act. H.R. REP. NO. 117-27(I), at 29 (2021). So does the EEOC's regulation. 89 Fed. Reg. at 29,203 (Example No. 35). For purposes of the statute, little seems to distinguish this employee's circumstances from an employee who asks for time off to get an abortion. Neither are experiencing any "physical or mental conditions" other than being pregnant. It wouldn't make any sense to consider the employee seeking routine pre-natal care as having a known limitation, while the employee seeking an abortion as not having one. But that is precisely how the States argue the Act should be read.

One more example. Consider the Tennessee employee who says she needs Friday off for a pregnancy-related doctor's appointment. The Act and regulation do not require the employee to provide specifics about the appointment. Instead, employers are limited in what kind of information and documentation they can ask from the employee.

The request for unpaid leave is approved, and the employee travels to Illinois, where she has a legal abortion. She returns to her job on Monday. The employer is none the wiser. And the employee has complied with Tennessee's law. This scenario strikes the Court as far more likely than a state employee asking for time off for a procedure she knows is illegal in her home state.

Because the States lack standing and haven't shown a likelihood of irreparable harm, the Court need not decide whether they have shown a likelihood of success on the merits. Good arguments exist on both sides of that question. The Court also need not balance the equities at this point. At bottom, the States haven't made a compelling case for issuing a nationwide injunction of the entire EEOC regulation. This case presents a narrow disagreement over a few words, a disagreement that seems unlikely to flower into few, if any, real-world disputes, especially given the undisputed reach of the new Act and the unchallenged portions of the implementing regulation. The States' fear of overreach by one branch of the federal government cannot be cured with overreach by another. *Alliance for Hippocratic Medicine*, slip op. at 7.

\*     \*     \*

Because the States lack standing, this Court lacks subject-matter jurisdiction. The States' motion for a preliminary injunction, *Doc. 17*, is denied as moot. The complaint will be dismissed without prejudice.

–28–

So Ordered.

_____

D.P. Marshall Jr.
United States District Judge

14 June 2024