## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

**THE STATE OF LOUISIANA,**            **CIVIL DOCKET NO. 2:24-cv-00629**
**ET AL**

**VERSUS**                              **JUDGE DAVID C. JOSEPH**

**EQUAL EMPLOYMENT**                     **MAGISTRATE JUDGE THOMAS P.**
**OPPORTUNITY COMMISSION**              **LEBLANC**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**UNITED STATES CONFERENCE OF**         **CIVIL DOCKET NO. 2:24-cv-00691**
**CATHOLIC BISHOPS, ET AL**

**VERSUS**                              **JUDGE DAVID C. JOSEPH**

**EQUAL EMPLOYMENT**                     **MAGISTRATE JUDGE THOMAS P.**
**OPPORTUNITY COMMISSION,**             **LEBLANC**
**ET AL**

## MEMORANDUM ORDER

Before the Court are two consolidated MOTIONS FOR PRELIMINARY INJUNCTION

filed by, respectively: (i) the States of Louisiana and Mississippi in the matter entitled

*State of Louisiana, et al v. EEOC*, 2:24-cv-00629-DCJ-TPL (the "*States* lawsuit") [Doc.

17]; and (ii) four entities affiliated with the Roman Catholic church[1] in *USCCB v.*

*EEOC, et al*, 2:24-cv-00691-DCJ-TPL (the "*Bishops* lawsuit") [Doc. 11] (collectively,

the "Motions").   In both Motions, Plaintiffs ask this Court to preliminary enjoin

---

[1]      The Plaintiff entities in the *Bishops* lawsuit are the United States Conference of
Catholic Bishops ("USCCB"), Society of the Roman Catholic Church of the Diocese of Lake
Charles ("Diocese of Lake Charles"), Society of the Roman Catholic Church of the Diocese of
Lafayette ("Diocese of Lafayette"), and Catholic University of America ("Catholic University")
(collectively, the "*Bishops* Plaintiffs").  The defendants in the *Bishops* lawsuit are EEOC and
Charlotte Burrows, Chair of the EEOC, sued in her official capacity only.

Defendants from enforcing an Equal Employment Opportunity Commission ("EEOC") Final Rule that implements and interprets the Pregnant Workers Fairness Act ("PWFA" or "Act"), 42 U.S.C. § 2000gg, *et seq.*, and Title VII, 42 U.S.C. § 2000e, *et seq.*, to the extent that it requires employers to accommodate the purely elective abortions of employees.  All Plaintiffs also ask this Court to postpone pending judicial review the effective date of the portion of the Final Rule mandating that covered employers provide workplace accommodation for purely elective abortions. 5 U.S.C. § 705

After careful consideration of the arguments of the parties, the record before the Court, and the governing law, the Court finds that the EEOC has exceeded its statutory authority to implement the PWFA and, in doing so, both unlawfully expropriated the authority of Congress and encroached upon the sovereignty of the *States* Plaintiffs.  Plaintiffs' Motions are therefore GRANTED IN PART, and the Court issues a preliminary injunction against the EEOC as set forth below.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In December 2022, Congress passed, and President Biden signed, the PWFA as part of the year-end consolidated appropriations package.  *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. 117-328 (2022), 136 Stat. at 6084; 42 U.S.C. §§ 2000gg – 2000gg-6.  Aimed at addressing gaps in existing legislation regarding protections for pregnant workers, the PWFA adopts an accommodation regime similar to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, for pregnant workers and adopts the powers, remedies, and procedures of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-4 *et seq.*, as enforcement measures.

Principally, the PWFA requires employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 2000gg-1(1).  The PWFA defines "known limitation" as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

In effect, the PWFA prohibits employers from denying employment opportunities due to a covered employee's need for a reasonable accommodation or retaliating against an employee for requesting or using a reasonable accommodation. 42 U.S.C. §§ 2000gg-1(3), (5).  Nor can an employer "require a qualified employee to take leave, whether paid or unpaid, if another reasonable accommodation can be provided to the known limitation."  42 U.S.C. § 2000gg-1(4).  The PWFA adopts the ADA's definitions for "reasonable accommodation" and "undue hardship," as well as the ADA's "interactive process" for determining a proper accommodation.  42 U.S.C. § 2000gg(7).  It also specifically provides that employers cannot "require a qualified employee ... to accept an accommodation other than any reasonable accommodation arrived at through the interactive process." 42 U.S.C. § 2000gg-1(2).  The PWFA's requirements apply to any private employer with 15 or more employees and government employers, including the States of Louisiana and Mississippi ("covered entities"). 42 U.S.C. § 2000gg.  Pursuant to Section 5 of the Fourteenth Amendment, the PWFA also specifically waives the Eleventh Amendment immunity of state employers for covered employment-related actions.  42 U.S.C. § 2000gg-4.

As part of the Act, Congress tasked the EEOC with issuing regulations to carry out the PWFA and directed that such regulations "shall provide examples of reasonable accommodations addressing known limitations related to pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-3. On August 11, 2023, the EEOC proposed a rule that would require covered employers – including States – to accommodate, among other things, elective abortions. 88 Fed. Reg. 54,714 (Aug. 11, 2023) (Proposed Rule). Specifically, the EEOC stated in the proposed rule that "having ... an abortion" constitutes an "example[] of pregnancy, childbirth, or related medical condition[]" and that employers are therefore required to provide employees with reasonable accommodations for abortions under the PWFA (the "abortion accommodation mandate"). *Id.* On April 19, 2024, the EEOC issued the final regulation implementing the PWFA. *Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024) (hereafter, "Final Rule"). Despite widespread opposition,[2] the Final Rule included the abortion accommodation mandate.

On May 13, 2024, the *States* Plaintiffs filed the instant lawsuit against the EEOC, asserting that the abortion accommodation mandate of the Final Rule violates the Administrative Procedure Act ("APA") and the Constitution. [Doc. 1, ¶ 82]. In their Motion for Preliminary Injunction, filed on June 3, 2024 [Doc. 17], the *States* Plaintiffs challenge the Final Rule with respect to any duty "to accommodate purely

---

[2]     Specifically, more than 54,000 individuals and organizations submitted comments opposing the Proposed Rule's abortion accommodation mandate, including Plaintiffs Louisiana, Mississippi, USCCB, and Catholic University.

elective abortions,[3] including those that would be prohibited by [that] State's law" in light of state legislation that restricts and limits abortion following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228, 213 L.Ed.2d 545 (2022).[4]  EEOC responded on June 9, 2024.  [Doc. 21].[5]

---

[3]     The *States* Plaintiffs define "purely elective abortions" as "medically unnecessary abortions in violation of Louisiana and Mississippi law."  [Doc. 17-1, p. 15].

[4]     EEOC filed a Motion to Transfer [Doc. 5] in the *States* case, seeking to transfer the matter to the United States District Court for the District of Columbia on grounds venue is not proper in this district.  The Court denied the Motion and stated its reasons on the record at the June 5, 2024, hearing.  [Doc. 28].

[5]     Louisiana prohibits all abortions except those that are determined to be medically necessary to prevent the death or substantial risk of death of the mother.  *See* La. R.S. § 40:1061, La. R.S. § 14:87.7, and La. R.S. § 14:87.8.1.  The Louisiana Legislature has expressly set forth the State's policy with respect to abortion:

> § 1061.1.     Legislative intent; construction of abortion provisions law regulating abortion:
>
> A. (1) It is the intention of the Legislature of Louisiana to regulate, prohibit, or restrict abortion to the fullest extent permitted by the decisions of the Supreme Court of the United States.  The legislature does solemnly declare, find, and reaffirm the longstanding public policy of this state that every unborn child is a human being from the moment of conception and is, therefore, a legal person for purposes under the laws of this state and Constitution of Louisiana.
>
> (2) The legislature further finds and declares that the longstanding policy of this state to protect the right to life of every unborn child from conception by prohibiting abortion is impermissible only because of the decisions of the Supreme Court of the United States and that, therefore, if those decisions of the Supreme Court of the United States are ever reversed or modified or the United States Constitution is amended to allow protection of the unborn then the public policy of this state to prohibit abortions shall be enforced.

La. R.S. § 40:1061.1.

Mississippi prohibits all abortions except those that are "necessary for the preservation of the mother's life or "where the pregnancy was caused by rape."  *See* Miss. Code Ann. § 41-41-45; Miss. Code Ann. § 97-3-3.

On May 22, 2024, the *Bishops* Plaintiffs filed their Complaint [Doc. 1], along with a Motion for Preliminary Injunction.[6]  [Doc. 11].  In their Motion, the *Bishops* Plaintiffs allege that the Final Rule requires them to knowingly accommodate employees when they obtain abortions, even where such accommodations are contrary to their sincerely held religious beliefs; prohibits the *Bishops* Plaintiffs from taking adverse actions against employees or faculty that advocate for abortion accommodation, even where such actions are required by the Bishops' beliefs; and requires the *Bishops* Plaintiffs to change their religious speech and messaging concerning abortion in ways that support abortion.  EEOC responded to the Motion on June 5, 2024.  [Doc. 29].  Reply briefs to both Motions were filed on June 11, 2024 [Doc. 32, 24-cv-00629]; [Doc. 40, 24-cv-00691].

The Court conducted a hearing on June 5, 2024, to address a limited consolidation pursuant to FRCP 42(a)(2) of the *States* and *Bishops* cases for purposes of hearing and adjudicating the preliminary injunction Motions.  With no objection from any party, the cases were consolidated for purposes of the two Rule 65 Motions and, thereafter, jointly conducting pretrial discovery and motions practice.  [Doc. 18, 24-cv-00629]; [Doc. 28, 24-cv-00691].  Oral argument on the preliminary injunction Motions was conducted on June 12, 2024, [Doc. 33, 24-cv-00629]; [Doc. 41, 24-cv-00691], followed by the filing of the parties' supplemental, post-hearing memoranda.

---

[6]     The *Bishops* lawsuit was originally assigned to Judge James D. Cain, Jr. in the Lake Charles Division.  Given the related nature of the *States* and *Bishops* cases, the *Bishops* case was transferred to this Court on May 24, 2024.  [Doc. 15].

[Docs. 45, 46, 24-cv-00629]; [Docs. 51, 52, 24-cv-00691].  All briefing and argument on the issues having now been completed, the Motions are ripe for review.

<u>LAW AND ANALYSIS</u>

## I.    Article III Standing

Standing is "built on a single basic idea – the idea of the separation of power." *Food & Drug Administration, et al. v. Alliance for Hippocratic Medicine, et al.*, --- S. Ct. ---, 2024 WL 2964140, at *5 (June 13, 2024).  "Article III requires a plaintiff to show that she has suffered an injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Haaland v. Brackeen*, 599 U.S. 255, 291-92, 143 S. Ct. 1609, 216 L.Ed.2d 254 (2023); *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 924 (5th Cir. 2023); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992).  A plaintiff can demonstrate a cognizable injury in a pre-enforcement challenge only if it establishes that: (1) it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) "there exists a credible threat of prosecution thereunder." *Braidwood*, 70 F.4th at 925, *citing Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S. Ct. 2334, 189 L.Ed.2d 246 (2014).  The two key questions in most standing disputes are injury-in-fact and causation.  *FDA*, 2024 WL 2964140, at *1.  The party or parties invoking the Court's jurisdiction bear the burden of satisfying the Article III requirement by demonstrating that they have standing to adjudicate their claims in federal court.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  Finally, "[t]he manner and degree of evidence" required is "less" in the earlier stages

of litigation; the Plaintiffs need "only" be "likely" to ultimately show "each element of standing." *Speech First v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020).

## A.    The *States* Plaintiffs

EEOC argues that the *States* Plaintiffs lack standing on grounds their alleged injuries are speculative; any compliance costs are unproven; the Final Rule does not interfere with the enforcement of any State laws; and the *States* Plaintiffs have not demonstrated any speech injury.  Louisiana and Mississippi argue they will suffer imminent injury-in-fact should the abortion accommodation mandate of the Final Rule take effect, because of increased regulatory burdens, increased compliance costs under penalty of enforcement actions, and damage to their sovereignty and free speech rights.

"If, in a suit challenging the legality of government action, the plaintiff is himself an object of the action, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019).  *See also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) (under the "ordinary rule," a party that is the "object[ ] of the [r]egulation[] may challenge it.").  Here, Louisiana and Mississippi – as employers and without the shield of Eleventh Amendment sovereign immunity – are directly regulated by the PWFA and the Final Rule. Therefore, if implemented in excess of Congressional authorization, the Final Rule will "cause[] [the States] injury, and … a judgment preventing ... the action will redress it." *Lujan*, 504 U.S. at 561–62; *EEOC*, 933 F.3d at 449.

Moreover, while EEOC argues the costs identified by the *States* Plaintiffs are "unproven," the Final Rule itself notes such costs arise independently from any accommodation expenses. 89 Fed. Reg. 29,177 ("Administrative costs, which include rule familiarization, posting new EEO posters, and updating EEO policies and handbooks, represent additional, one-time direct costs to covered entities."). The *States* Plaintiffs proffer declarations evidencing that changing State policies alone will cost the States, at minimum, an estimated $500 and 120 employee hours in training costs, legal expenses, administrative costs, and productivity losses.[7] For Article III standing purposes, such compliance costs are classic "pocketbook injury" redressable through a pre-enforcement APA rule challenge. *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). Thus, aside from any employee or DOJ enforcement lawsuits under the PWFA, the States demonstrate that the unrecoverable costs of "[m]oving into compliance" with the abortion accommodation mandate of the Final Rule are cognizable and alone sufficient to constitute an injury-in-fact. *Wages & White Lion Investments, LLC v. United States Food and Drug Administration*, 16 F.4th 1130, 1142 (5th Cir. 2021) (holding that regulatory compliance costs are unrecoverable and therefore amount to irreparable harm "because federal agencies generally enjoy sovereign immunity for any monetary damages"); *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 194 (5th Cir. 2023) (finding that the plaintiff's financial

---

[7]     *See* Declaration of Sandra Schober, Deputy Undersecretary of the Administrative Services Division at the Louisiana Department of Justice, Office of the Attorney General, [Doc. 17-2, ¶¶ 15–18]; Declaration of Kelly Hardwick, State Personnel Director for the State of Mississippi and Executive Director of the Mississippi State Personnel Board, [Doc. 17-3, ¶¶ 10–12].

harm was irreparable in an APA challenge where "[t]here [was] no suggestion ... that [the plaintiff] could overcome the FDA's sovereign immunity to recover costs"); *Restaurant Law Center v. United States Department of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (A general rule of thumb is that the "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm.").

While the States argue that compliance harms alone are sufficient to establish standing, more fundamental is the States' concern that the EEOC's implementation of the Final Rule to include an abortion accommodation mandate: (i) was not authorized by Congress in the PWFA; (ii) exceeds the rule-making power of the executive branch; and (iii) interferes with the States' ability to enforce their laws and implement the chosen public policies of their citizens.  Generally, states have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction – this involves the power to create and enforce a legal code, both civil and criminal." *Texas v. Miguel Cardona, et al.*, 2024 WL 2947022, at *11 (N.D. Tex. 6/11/24) (O'Connor, J.), *citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982).  "Pursuant to that interest, states may have standing based on: (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *Cardona*, 2024 WL 2947022, at *11, *citing Texas v. United States (DAPA)*, 809 F.3d 134, 171 (5th Cir. 2015).  Each of these federal "intrusions are analogous to pressure to change state law." *Cardona*, 2024 WL 2947022, at *11, *citing DAPA*, 809 F.3d at 153.  *See also Texas v. Equal Employment Opportunity Commission*, 933 F.3d 433, 446-47 (5th Cir. 2019) (being pressured to change state

law constitutes an injury because states have a sovereign interest in the power to create and enforce a legal code). More specifically, "[b]ecause a state alone has the right to create and enforce its legal code, only the state has the kind of direct stake necessary to satisfy standing in defending the standards embodied in that code." *Cardona*, 2024 WL 2947022, at *11, *citing Texas v. Becerra*, 623 F. Supp. 3d 696, 714 (N.D. Tex. 2022) (Hendrix, J.).

Here, the people of both Mississippi and Louisiana, through the democratic process, have unambiguously expressed their opposition to purely elective abortions by passing laws prohibiting the same. Louisiana law specifically requires the state to "protect the right to life of every unborn child from conception by prohibiting abortion." La. R.S. § 40:1061. Mississippi's laws prohibit all abortions except those that are "necessary for the preservation of the mother's life" or "where the pregnancy was caused by rape." *See* Miss. Code Ann. § 41-41-45; Miss. Code Ann. § 97-3-3. And the Supreme Court has confirmed that the states are free to regulate abortion in accordance with the democratic process. *Dobbs*, 597 U.S. at 292.

The *States* Plaintiffs now posit that an administrative agency of the executive branch of the federal government, without Congressional authorization, has exceeded its authority through the rule-making process in a way that subverts the will of the citizens of Louisiana and Mississippi. Therefore, in addition to the increased regulatory burden that "typically satisfies the injury in fact requirement," *Contender Farms*, 779 F.3d at 266, the *States* Plaintiffs contend, in essence, that the EEOC's abortion accommodation mandate undermines their sovereignty and the democratic process within those states. Because the principles of federalism afford the states a

sovereign interest in creating and enforcing their own laws and public policy, the *States* Plaintiffs clearly have Article III standing to challenge the Final Rule.

Considering that the *States* Plaintiffs have demonstrated harm in the form of regulatory burden, increased costs to implement the abortion accommodation mandate, and damage to their sovereignty, the Court finds that the *States* Plaintiffs have standing to challenge the Final Rule's abortion accommodation mandate.

### B.    The *Bishops* Plaintiffs

Chiefly, the *Bishops* Plaintiffs argue that under the abortion accommodation mandate of the Final Rule, they must knowingly violate their sincerely held beliefs regarding what they term the "moral evil" of "direct" abortion or risk liability and face years-long expensive and entangling litigation by both the EEOC and private parties.  The *Bishops* Plaintiffs allege immediate harm in that they must take steps to begin complying with the Final Rule – including changing their employment policies and practices, and training employees regarding the new policies and practices – to avoid noncompliance by the Final Rule's effective date, which could subject them to open-ended liability, investigations, and litigation by applicants, employees, former employees, and the EEOC.  [Doc. 1, ¶ 127].

To support their claim of imminent harm, the *Bishops* Plaintiffs proffer several declarations[8] that demonstrate the profound convictions of their members and

---

[8]    *See also* Declaration of J. Steven Brown, Professor of Mechanical Engineering, Senior Vice Provost for Academic Administration, and Dean of Graduate Studies at Catholic University of America [Doc. 11-3]; Declaration of Maureen K. Fontenot, Chancellor/Director of Human Resources for the Society of the Roman Catholic Church of the Diocese of Lafayette [Doc. 11-4]; Declaration of Father Ronald Kunkel, Executive Director of USCCB's Secretariat

employers on the subject of abortion.  Take, for instance, the Declaration of Father Joseph Caraway, Chancellor of The Society of the Roman Catholic Church of the Diocese of Lake Charles, who attests that the mission of the Diocese of Lake Charles includes "expressing and carrying out the Church's beliefs in the sanctity and dignity of human life."  [Doc. 11-2, ¶¶ 2-6].  Father Caraway declares that the Diocese has adopted the Ethical and Religious Directives for Catholic Health Care Services, DOLC Polices and Guidelines at 103, Diocese of Lake Charles (Aug. 2023), which recognize that "[t]he Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning," and direct that "[a]bortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted[.]"  *Id.* at ¶ 6. Father Caraway explains:

> 9.  The Diocese does not and will not provide any workplace accommodation for an employee to obtain a direct abortion.  Obtaining a direct abortion is grounds for adverse employment action, up to and including termination.
>
> 10.   The Diocese will take appropriate adverse employment action against any employee who encourages another person to obtain a direct abortion or to request an accommodation for a direct abortion.
>
> 11.   The Diocese does not and will not permit its employees to advocate in favor of abortion or abortion accommodations in the workplace or outside of it.
>
> 12.   The Diocese will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or conduct undermines Catholic teachings about direct abortion or to the Diocese's policies with respect to abortion.

---

of Doctrine and Canonical Affairs [Doc. 11-5]; and Declaration of Theresa Ridderhoff, Associate General Secretary in the Office of the General Secretariat of USCCB [Doc. 11-6].

13. I am aware that the EEOC has issued a final rule implementing the Pregnant Workers Fairness Act. *See Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29096 (Apr. 19, 2024). This rule does not adequately exempt religious employers like the Diocese. I regard EEOC's rule as threatening the Diocese with penalties, lawsuits, investigations, and other burdens unless the Diocese alters its employment policies and practices regarding abortion that are described above.

*Id.* at ¶¶ 9-13.

EEOC argues the *Bishops* Plaintiffs lack standing on grounds that any enforcement threat from EEOC is highly speculative and unlikely given that the *Bishops* Plaintiffs identify no employee who has sought an accommodation or leave for an abortion or who has filed an EEOC charge for the denial of such request, nor have they identified any EEOC enforcement actions brought against any employer in such a circumstance. Thus, EEOC argues the *Bishops* Plaintiffs have presented nothing more than an abstract, unripe claim, for which there is no hardship in declining review in this Court, given their ability to raise all of the same arguments as defenses in the event an employee ever files an EEOC charge.

The Fifth Circuit rejected the same argument by the EEOC in *Braidwood*. The *Braidwood* plaintiffs sought a declaratory judgment that EEOC's guidance interpreting statutory prohibitions on sex discrimination to include sexual orientation and gender identity violated the First Amendment and the Religious Freedom Restoration Act ("RFRA"). 70 F.4th at 919-21. Although it was undisputed that the plaintiffs' employment policies facially violated the EEOC's policies, the policies had not been enforced against any individual employee. *Id.* at 921. As it does here, EEOC catalogued a laundry list of hypothetical scenarios necessary for the

plaintiffs to adequately allege injury, arguing that, until an employment action culminated in an actual charge filed with the EEOC and EEOC decided to pursue that charge, the plaintiffs could not establish standing.  *Id.* at 926.  Discrediting EEOC's argument, the Fifth Circuit explained:

> Plaintiffs' credible-threat analysis is quite simple.  First, they admit they are breaking EEOC guidance, which the EEOC does not seriously contest.  They posit statutory and constitutional issues with the laws under which they are at risk of being prosecuted: Those issues, they allege, are already forcing plaintiffs to choose either to restrict their religious practices or to risk potential penalties.  And the EEOC's actions in *Harris*, which the EEOC won under a less violative set of facts, indicate that plaintiffs, too, have a legitimate fear of prosecution, chilling their rights.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion).  Finally, the EEOC refuses to declare affirmatively that it will not enforce Title VII against the plaintiffs' policies on homosexual and transgender behavior.

*Id.* at 926–27.  *See also Franciscan All. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022) (where plaintiff refused to offer gender-reassignment surgeries or abortions in violation of an HHS regulation enacted pursuant to the Patient Protection and Affordable Care Act, and HHS steadfastly refused to promise that it would not enforce the Rule, court held plaintiff had standing to challenge the rule, noting "the loss of freedoms guaranteed by the First Amendment … and RFRA … constitute per se irreparable harm."), *citing Opulent Life Church v. City of Holly Springs.*, 697 F.3d 279, 294 (5th Cir. 2012).

Here, too, the *Bishops* Plaintiffs posit that their deeply held religious beliefs will not permit them to comply with the abortion accommodation mandate; they raise statutory and constitutional issues with the mandate under which they are at risk of

being prosecuted; they cite EEOC's arguments in this case that RFRA exceptions must be handled on a case-by-case basis; and they argue a legitimate fear of prosecution in light of EEOC's demonstrated violations of Catholic University's religious exemptions in *EEOC v. Catholic Univ.*, 83 F.3d 455, 466 (D.C. Cir. 1996). And they cite the specific finding by the *Braidwood* court, rejecting the EEOC's argument that plaintiffs should be required to raise any RFRA or constitutional claim as a defense, finding that the potential harms were obvious and redressable by judicial relief. *Id.* at 929–30.

Similarly, forcing the *Bishops* Plaintiffs to address their religious exceptions on a case-by-case basis – which, as a practical matter, would require them to wait until an EEOC investigation has opened and then retain attorneys to investigate the claim and assert individual defenses against the EEOC – presents, at a minimum, a substantial likelihood of added regulatory burden and compliance costs. *Braidwood* made it clear that forcing religious employers to "choose between two untenable alternatives: either (1) violate Title VII and obey their convictions, or (2) obey Title VII and violate their convictions," constitutes injury. *Id.* at 937. Considering the foregoing, the Court finds that the *Bishops* Plaintiffs have standing to challenge the abortion accommodation mandate of the Final Rule.

## II.    Motion for Preliminary Injunction

To obtain a preliminary injunction, a movant must establish: (i) a substantial likelihood of success on the merits; (ii) a substantial threat of irreparable injury if the injunction is not issued; (iii) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (iv) that the

grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (citation omitted). "The first two factors of the traditional standard are the most critical. And [t]here is authority that likelihood of success on the merits … is the most important of the preliminary injunction factors." *Career Colleges & Sch. Of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 233 (5th Cir. 2024) (internal quotation marks and quoted sources omitted). It is well-established that the decision regarding whether to grant preliminary injunctive relief is committed to the district court's sound discretion. *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).

Under the APA, courts may "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 704, 706(2); *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).[9] Here, the EEOC "must point to explicit Congressional authority justifying [its] decisions." *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019). In an APA challenge, "the core inquiry" is "whether the proposed agency rule is a lawful extension of the statute under which the agency purports to act." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir.

---

[9]     "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L.Ed.2d 369 (1986). *See also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, 102 L.Ed.2d 493 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 313 n.10 (5th Cir. 2019) ("To be sure, agencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions.").

2023).  The answer lies in statutory interpretation.  *Id.*  Only where the statutory text

shows that EEOC has "clear congressional authorization" to enact a regulation can

such a regulation withstand judicial scrutiny.  *West Virginia v. Env't Prot. Agency*,

597 U.S. 697, 724, 142 S. Ct. 2587, 2614 (2022) ("*EPA*"), *quoting Util. Air Regul. Grp.*

*v. E.P.A.*, 573 U.S. 302, 324, 134 S. Ct. 2427, 189 L.Ed.2d 372 (2014).

### A.    Substantial Likelihood of Success on the Merits

#### 1.    The *States* Plaintiffs

##### a.    Statutory Authority

The Court's inquiry starts with the fact that the text of the PWFA makes no

reference to abortion; it does not contain the word "abortion" even once.  However,

EEOC argues that because Title VII protects employees who choose to have (or not to

have) an abortion – and because Congress enacted the PWFA with identical language

as Title VII for the express purpose of expanding Title VII's protections – the PWFA

must also be understood to protect employees who choose to have (or not to have) an

abortion.[10]  But EEOC rests its argument entirely on its own enforcement guidelines

on pregnancy discrimination and two pre-*Dobbs* lower court decisions wherein

---

[10]      Specifically, EEOC points to Congress's amendment of Title VII in 1978, which
clarifies that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited
to, because of or on the basis of pregnancy, childbirth, or related medical conditions[.]" 42
U.S.C. § 2000e(k).  In that same subsection, Congress provided that "[t]his subsection shall
not require an employer to pay for health insurance benefits for abortion, except where the
life of the mother would be endangered if the fetus were carried to term, or except where
medical complications have arisen from an abortion."  *Id.*  EEOC argues that the latter
sentence confirms that abortion is included within the preceding statutory phrase
"pregnancy, childbirth, or related medical conditions" in Title VII, and that because the same
phrasing is used in the PWFA, Congress clearly intended for the PWFA to include
accommodation for abortion.

employers were barred from taking adverse actions against employees because the employees "contemplated having, or chose to have, an abortion" under Title VII, contending that these two cases comprise "settled" law on the issue.[11]  89 Fed. Reg. 29,110, 29,152 n.296.

The Court is not persuaded by EEOC's textual interpretation of the abortion accommodation mandate for several reasons.  First, "[h]ornbook canons of statutory construction require that every word in a statute be interpreted to have meaning, and Congress's use and withholding of terms within a statute is taken to be intentional." *U.S. Chamber of Commerce. v. U.S. Dep't of Labor*, 885 F.3d 360, 381 (5th Cir. 2018). Thus, we must begin with the presumption that Congress's decision <u>not</u> to include any reference to abortion in the PWFA was intentional.  Indeed, while the PWFA explicitly cross-references provisions of Title VII throughout, the PWFA does not incorporate Title VII's amended pregnancy provision.  42 U.S.C. § 2000e(k).  And although Congress directed that certain terms incorporated in PWFA from the ADA "shall be construed as such terms are construed" thereunder, 42 U.S.C. § 2000gg(7), no provision of the PWFA requires incorporation of the "pregnancy, childbirth, or related medical conditions" language of 42 U.S.C. § 2000e(k).

---

[11]      *See* Enforcement Guidance on Pregnancy Discrimination, at (I)(A)(4)(c) & n.58; https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues (providing that the term "pregnancy, childbirth, or related medical conditions" includes current pregnancy, past pregnancy, potential or intended pregnancy, and related medical conditions); *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3rd Cir. 2008) (holding that Title VII, as amended by the PDA, prohibits an employer from discriminating against a female employee because she has exercised her right to have an abortion); *Turic  v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (finding the termination of a pregnant employee because she contemplated having an abortion violated the PDA).

The parties argue extensively in their briefing about whether an abortion is a "condition" or a "procedure."  As a matter of basic statutory interpretation using plain-meaning analysis, the Plaintiffs clearly have the stronger position.  The decision to obtain a purely elective abortion is not undertaken to treat a "medical condition" related to pregnancy or childbirth.  It is thus better described as a medical "procedure," as Plaintiffs suggest.  And the EEOC's arguments to the contrary amount to little more than semantic gymnastics.

This notwithstanding, the Court sees this issue as even more straightforward. "Abortion" is a term that is readily understood by everyone.  If Congress had intended to mandate that employers accommodate elective abortions under the PWFA, it would have spoken clearly when enacting the statute, particularly given the enormous social, religious, and political importance of the abortion issue in our nation at this time (and, indeed, over the past 50 years).  The Court is therefore not persuaded, on the record before it, that Congress could reasonably be understood to have granted the EEOC the authority to interpret the scope of the PWFA in a way that imposes a nationwide mandate on both public and private employers – irrespective of applicable abortion-related state laws enacted in the wake of *Dobbs* – to provide workplace accommodation for the elective abortions of employees.

In this sense, EEOC's use of its regulatory power to insert the issue of abortion into a law designed to ensure healthy pregnancies for America's working mothers squarely implicates the "major questions doctrine" as enunciated by the Supreme Court. *EPA*, 597 U.S. at 724.  The major questions doctrine applies when an "agenc[y] assert[s] highly consequential power beyond what Congress could reasonably be

understood to have granted." *Id.*, *quoting Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324, 134 S. Ct. 2427, 189 L.Ed.2d 372 (2014) (internal quotation marks omitted). Under this commonsense principle, courts should "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *EPA*, 597 U.S. at 729 ("We also find it 'highly unlikely that Congress would leave' to 'agency discretion' the decision of how much coal-based generation there should be over the coming decades."); *See also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 123, 120 S. Ct. 1291, 1296, 146 L.Ed.2d 121 (2000) ("It is highly unlikely that Congress would leave the determination as to whether the sale of tobacco products would be regulated, or even banned, to the FDA's discretion in so cryptic a fashion.").

EEOC contends that the major questions doctrine has no relevance in this case, arguing the abortion accommodation mandate presents an "ordinary question of statutory interpretation," and imposes "general workplace protections for workers who choose to, and choose not to, have an abortion." [Doc. 29, p. 26, 24-cv-00691]. EEOC goes on to assert that the agency "was not exercising its own discretion" in deciding what conditions are covered or the scope of any religious exceptions but rather was enforcing "policy decisions" made by "Congress itself." *Id.* The Court finds these arguments disingenuous. Since the Supreme Court decision of *Roe v. Wade* in 1973, abortion has been one of the most important social, religious, and political issues of our time and is a major issue in every federal election. *See Dobbs*, 597 U.S. at 223 ("Abortion presents a profound moral issue on which Americans hold sharply conflicting views."); *Dobbs*, 597 U.S. at 337 ("Abortion is a profoundly difficult and

contentious issue because it presents an irreconcilable conflict between the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life. The interests on both sides of the abortion issue are extraordinarily weighty.") (Kavanaugh, J, concurring).  *See also Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 850, 112 S. Ct. 2791, 2806, 120 L.Ed.2d 674 (1992) ("Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage."), *overruled by Dobbs*, 597 U.S. at 302.  Indeed, a 2023 Gallup poll reported that a record high 28% of registered voters say they will only vote for candidates for major offices who share their position on abortion.[12]  Accordingly, EEOC must point to "clear congressional authorization" to extend the PWFA to impose an abortion accommodation mandate on public and private employers.  *Utility Air*, 573 U.S. at 324.  Not only is the EEOC unable to point to any language in the PWFA empowering it to mandate the accommodation of elective abortions, but there can be little doubt in today's political environment that any version of the PWFA that included an abortion accommodation requirement would have failed to pass Congress.  The Court therefore finds that the EEOC's arguments fail at this stage of the proceeding.

Second, EEOC's "smattering of lower court opinions" addressing abortion in the context of Title VII hardly qualifies as a judicial consensus "so broad and unquestioned that we must presume Congress knew of and endorsed it."  *BP p.l.c. v.*

---

[12]     https://news.gallup.com/poll/507527/abortion-remains-potent-issue-pro-choice-voters.aspx.

*Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1541 (2021), *citing Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 350-52, 125 S. Ct. 694, 704, 160 L.Ed.2d 708 (2005) (a "supposed judicial consensus" that "boils down to the decisions of two Courts of Appeals" is not sufficiently "broad and unquestioned" to support congressional ratification).

However, one judicial opinion this Court *can* presume Congress was aware of when it passed the PWFA was the *Dobbs* decision.  Title VII was amended in 1978 to include anti-discrimination protection for pregnancy, childbirth, and related conditions.  The EEOC's implementing regulations incorporated the constitutional protection of abortion established in *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L.Ed.2d 147 (1973).  But the PWFA was enacted in December 2022, six months after the Supreme Court decided *Dobbs*, which removed abortion as a constitutional concern and expressly returned the issue to the States.  With *Dobbs* and all of its implications fresh in the minds of lawmakers, it is not credible that Congress clearly intended that the PWFA include an abortion accommodation mandate.

And if there were any remaining doubt, the legislative history unambiguously confirms that Congress specifically <u>did not</u> intend for the PWFA to require employers to accommodate abortion.  Indeed, lawmakers from both sides of the aisle expressly stated that the PWFA does not address abortion.  The Democratic sponsor of the PWFA, Senator Bob Casey, emphasized in response to concerns that abortion might be at issue: "I want to say for the record … that under the [PWFA], the [EEOC] could not – could not – issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law."

168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).   Republican Senator Steve Daines similarly noted that "Senator Casey's statement reflects the intent of Congress in advancing the [PWFA] today.   This legislation should not be misconstrued by the EEOC or Federal courts to impose abortion-related mandates on employers, or otherwise to promote abortions, contrary to the intent of Congress."   168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022).   And Republican Senator Bill Cassidy, also a sponsor of the PWFA, likewise "reject[ed] the characterization that [the PWFA] would do anything to promote abortion."   168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). Additionally, after concerns were raised about the PWFA's initial failure to include a religious exemption, Senator Cassidy confirmed on the Senate floor that the PWFA "allows employers to make employment decisions based on firmly held religious beliefs." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

At its core, this is a textbook case of a federal administrative agency exceeding its statutory authority in a way that both usurps the role of Congress and violates authority vested in the states under the principles of federalism.   Considering the foregoing, this Court finds a likelihood of success of the merits that EEOC's textual interpretation of the PWFA to include an abortion accommodation mandate exceeds that agency's Congressional authorization.

### b.   State Sovereignty and Free Speech

As discussed above, because the abortion accommodation mandate forces the *States* Plaintiffs to provide (and fund) accommodations for elective abortions that directly conflict with the States' own laws and policies, the abortion accommodation mandate "is destructive of state sovereignty." *Garcia v. San Antonio Metro. Transit*

*Auth.*, 469 U.S. 528, 554 (1985).  The people of Louisiana and Mississippi, through their elected representatives, have chosen to enact legislation and promote public policy that is antithetical to the directives of the abortion accommodation mandate. The *States* Plaintiffs therefore adequately demonstrate that they are likely to succeed on their claims that the abortion accommodation mandate violates the principles of federalism and encroaches on state sovereignty.

Finally, although the First Amendment does not confer rights on States, the "Supreme Court has made clear that the government (state and otherwise) has a 'right' to speak on its own behalf." *Missouri v. Biden*, 83 F.4th 350, 372 (5th Cir.), *cert. granted sub nom.  Murthy v. Missouri*, 144 S. Ct. 7, 217 L.Ed.2d 178 (2023), *citing Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229, 120 S. Ct. 1346, 146 L.Ed.2d 193 (2000).  The abortion accommodation mandate unquestionably impedes on the authority of Louisiana and Mississippi to control their own messaging with respect to the issue of abortion within their borders.

For the foregoing reasons, the Court concludes that the *States* Plaintiffs satisfy their burden of showing that they are likely to succeed on the merits of their claims that the abortion accommodation mandate of the Final Rule is arbitrary and capricious and exceeds the EEOC's statutory authority.[13]

---

[13]    The Court's findings with respect to the textual analysis of the abortion accommodation mandate are equally applicable to the *Bishops* Plaintiffs, who make the same argument.

2.    **The *Bishops* Plaintiffs**

a.    **Free Speech and Religious Exceptions**

The *Bishops* Plaintiffs start with the premise that their religious teachings do not allow their employees to speak or act in ways that conflict with fundamental Roman Catholic beliefs.  In this manner, the *Bishops* Plaintiffs contend that the abortion accommodation mandate prohibits them from taking adverse employment actions against employees or faculty that advocate for abortion; requires the *Bishops* Plaintiffs to change their religious speech in ways that supports elective abortion; and requires them to knowingly accommodate employees when they obtain elective abortions.  The *Bishops* Plaintiffs also argue that EEOC unlawfully narrowed the religious exemptions found in the PWFA and Title VII.  EEOC responds that the *Bishops* Plaintiffs have submitted no evidence demonstrating that these alleged injuries will occur imminently, or that the EEOC would proceed with an enforcement action against them.  EEOC also argues that the *Bishops* Plaintiffs have a host of available defenses – including the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*, and the ministerial exception – that can be urged if and when a charge is filed against them.  Thus, EEOC contends that the *Bishops* Plaintiffs cannot establish that the Final Rule's interpretation of religious exceptions injures them, or that the Final Rule fails to offer sufficient protection for the conduct that violates the Final Rule.  The Court disagrees.

The text of the PWFA directly incorporates Title VII's religious exemption and makes the entire PWFA "subject to" the exemption.  42 U.S.C. § 2000gg-5(b).[14]  Title VII states: "This subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion."  42 U.S.C. § 2000e-1(a).  The *Bishops* Plaintiffs argue that Title VII thus exempts religious entities from the requirements of the entire "subchapter" – *e.g.*, all of Title VII, not merely one category of claims – protecting religious employers from *any* Title VII claim if an employer made an employment decision based on an individual's particular religious belief, observance, or practice.  *See, e.g., EEOC v. Mississippi Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980) (barring a sex-discrimination investigation under Title VII where a religious employer "applied its policy of preferring Baptists over non-Baptists."); *Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 132 (3d Cir. 2006) (religious exemption bars sex-discrimination claim); *Bear Creek*, 571 F. Supp. 3d at 591 ("The plain text of [the religious] exemption" bars sex-discrimination claims "when [a religious employer] refuses to employ an individual … based on religious observance, practice, or belief).

But the Final Rule takes a narrower view of Section 107(b), as follows:

> Under the Commission's interpretation of section 107(b), the PWFA does not fully exempt qualifying religious organizations from making

---

[14]   The religious exception of the PWFA is contained in Section 107(b) and provides as follows:

(b) Rule of construction

This chapter is subject to the applicability to religious employment set forth in section 2000e-1(a) of this title.

42 U.S.C.A. § 2000gg-5(b).

> reasonable accommodations.  This is analogous to section 702(a), which likewise does not operate as a total exemption from Title VII's requirements.
>
> Under section 702(a), for example, qualifying religious organizations are exempt from Title VII's prohibition against discrimination on the basis of religion, but, as U.S. courts of appeals have recognized, qualifying religious organizations are still subject to the law's prohibitions against discrimination on the basis of race, color, sex, and national origin, and they may not engage in related retaliation. If a qualifying religious organization asserts as a defense to a claim under the PWFA that it took the challenged action on the basis of religion and that section 107(b) should apply, the merits of any such asserted defense will therefore be determined on a case-by-case basis consistent with the facts presented and applicable law.

Final Rule, 29096-01, 29146-29147 (internal citation omitted).  Thus, EEOC contends that the PWFA exemption protects religious entities from claims of religious discrimination only.  89 Fed. Reg. at 29,146.

Clearly, EEOC failed to include a broad religious exception in the Final Rule, and, as the *Bishops* Plaintiffs argue, EEOC's interpretation of the PWFA religious exception – inasmuch as it mirrors the religious exception in Title VII, an anti-discrimination statute – does not square with the PWFA.  Where, as here, the *Bishops* Plaintiffs' arguments and declarations supporting their Motion portend protracted investigations and litigation concerning the applicability of religious exceptions, thereby forcing the *Bishops* Plaintiffs to address their religious exceptions on a case-by-case basis, they have shown, at a minimum, an injurious regulatory burden. Under these circumstances, and because (as discussed *supra*) the EEOC has clearly exceeded its authority in including the abortion accommodation mandate in the Final Rule, the Court concludes the *Bishops* Plaintiffs have demonstrated a substantial

likelihood of success on their claims of statutory and constitutional overreach by an administrative agency.

### B.    Substantial Threat of Irreparable Injury

"Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is certainly impending." *Lujan*, 504 U.S. at 565, n.2 (internal quotation marks omitted).  Accordingly, "threatened injury must be certainly impending to constitute injury in fact," and "[a]llegations of possible future injury" are not sufficient.  *Clapper*, 568 U.S. at 1147.  *See also Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S. Ct. 1717, 109 L.Ed.2d 135 (1990).

Both the *States* and *Bishops* Plaintiffs argue that, for the same reasons they have standing to sue, they face a substantial threat of irreparable injury if an injunction against the abortion accommodation mandate of the Final Rule is not issued.  The *States* Plaintiffs point to the thousands of female state employees for which the Final Rule would potentially require the States to make workplace accommodations for elective abortions – accommodations that are not currently provided.[15]  The *States* Plaintiffs argue that the abortion accommodation for purely elective abortions would thus cause irreparable harm to the States in the form of compliance costs, infringement of state sovereignty, and compelled speech.  The *Bishops* Plaintiffs contend the same with respect to compliance costs, religious infringement, and compelled speech.  *See, infra*, pp. 12-13.

---

[15]    *See* Schober Declaration at ¶ 14 [Doc. 17-2, ¶ 14]; Hardwick Declaration at ¶ 9 [Doc. 17-3, ¶ 9].

For the same reasons this Court finds that the *States* and *Bishops* Plaintiffs have standing to challenge the abortion accommodation mandate, it finds that the States will suffer specific and irreparable injuries if the abortion accommodation mandate is not enjoined.  And the June 18, 2024, effective date of the Final Rule means that such potential injuries are immediate.

### C.     Balance of Equities and Public Interest

The parties present important competing interests and equities.  The PWFA, as enacted by Congress, "eliminate[s] discrimination and promote[s] women's health and economic security," H.R. Rep. No. 117-27, at 1, objectives that were bi-partisan and broadly supported by Congress.  EEOC argues that an injunction would interfere with Congress's judgment about how best to achieve those objectives.  But considering the findings made herein – that EOOC has likely exceeded its statutory authority in including an abortion accommodation mandate in the Final Rule – and considering the abortion-related laws and policies promulgated and effected by duly elected representatives of the people of the *States* Plaintiffs, as well as the deeply held religious beliefs of the *Bishops* Plaintiffs, the Court finds that the harm to the *States* Plaintiffs and *Bishops* Plaintiffs of allowing the abortion accommodation mandate to take effect outweighs any harm to the EEOC if the mandate is enjoined.  And, of course, the Court's decision in this matter in no way limits, impedes, or otherwise affects those covered employers who choose to implement employment policies or practices to provide leave or other workplace accommodation for the elective abortions of employees.  The balance of equities and public interest weigh in favor of the Plaintiffs.

<u>CONCLUSION</u>

Considering the foregoing,

IT IS HEREBY ORDERED that the MOTION FOR PRELIMINARY INJUNCTION [Doc. 17], filed by the States of Louisiana and Mississippi, and the MOTION FOR PRELIMINARY INJUNCTION [Doc. 11] filed by the United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, and Catholic University of America are GRANTED IN PART.

IT IS FURTHER ORDERED that this preliminary injunction postpones the effective date of the Final Rule's requirement that covered entities provide accommodation for the elective abortions of employees that are not necessary to treat a medical condition related to pregnancy.[16]  The scope of the injunction shall apply to:

1)      The States of Louisiana and Mississippi and any agency thereof;

2)      Any covered entity under the Final Rule with respect to all employees whose primary duty station is located in Louisiana or Mississippi; and

3)      The *Bishops* Plaintiffs.

The postponement shall remain in effect until final judgment is entered in the consolidated cases, respectively.

---

[16]      To avoid any uncertainty, terminations of pregnancy or abortions stemming from the underlying treatment of a medical condition related to pregnancy are not affected by this preliminary injunction.  Such procedures are clearly "related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4). Covered employers are therefore required to provide accommodation to the extent set forth in the PWFA.

IT IS FURTHER ORDERED that the EEOC is preliminarily enjoined with respect to the above-listed parties from: (i) initiating any investigation into claims that a covered employer has failed to accommodate an elective abortion that is not necessary to treat a medical condition related to pregnancy; and (ii) issuing any Notice of Right to Sue with respect to the same.

THUS, DONE AND SIGNED in Chambers on this 17th day of June 2024.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE