## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

|  |  |
|---|---|
| STATE OF LOUISIANA, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>*Defendant.* | Case No. 2:24-cv-629 |
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *et al.*,<br><br>*Defendants.* | Case No. 2:24-cv-691 |

### DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

I.      LEGAL FRAMEWORK PRIOR TO THE PWFA ...................................................2

II.     THE PREGNANT WORKERS FAIRNESS ACT ...................................................3

        A.      Statutory Framework ...................................................................................3

        B.      EEOC's Rulemaking Implementing the PWFA ...........................................5

III.    PROCEDURAL HISTORY ....................................................................................6

STANDARD OF REVIEW ....................................................................................................6

ARGUMENT .......................................................................................................................7

I.      THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS ...........................7

        A.      Plaintiffs' Injuries Are Highly Speculative ..............................................7

        B.      Plaintiffs' Theories of Injury Fail for Additional Reasons ........................10

                1.      Compliance Costs Do Not Establish Standing ..................................10

                2.      The Final Rule Does Not Interfere with Any State Laws.................12

                3.      The States Have Not Demonstrated Any Speech Injury ...................13

        C.      Plaintiffs Have Not Proven that Their Injuries Are Redressable Through
                This Lawsuit ...............................................................................................14

        D.      Plaintiffs' Claims Are Not Ripe Given Their Fact-Specific Nature ...........15

II.     THE FINAL RULE PROPERLY PROVIDES THAT EMPLOYEES MAY SEEK
        ACCOMMODATIONS FOR ABORTION ................................................................16

        A.      Title VII's Text Encompasses Employment Protections for Abortion, and
                Congress Used the Same Language in the PWFA .......................................16

        B.      The Text of the PWFA Itself Covers Abortions ........................................19

        C.      Materials Outside the PWFA's Text Do Not Change the Analysis .............20

III.    THE PWFA VALIDLY ABROGATES STATE SOVEREIGN IMMUNITY ...................22

IV.     THE FINAL RULE DOES NOT INFRINGE ON STATE SOVEREIGNTY .................24

V.      THE FINAL RULE DOES NOT VIOLATE THE PLAINTIFF STATES' FREE SPEECH RIGHTS ................................................................................26

VI.     THE BISHOPS ARE NOT ENTITLED TO A BLANKET RFRA EXCEPTION ..........29

        A.      The Final Rule Lawfully Adopts a Case-By-Case Approach to RFRA ......................29

        B.      The Court Should Not Grant the Bishops a Blanket RFRA Exemption ..................32

                1.      The Bishops Do Not Demonstrate a Substantial Burden ..............................32

                2.      The Government's Interests are Compelling.......................................................33

                3.      The EEOC Used The Least Restrictive Means Available ..............................34

                4.      Plaintiffs' Free Exercise Claim Fails Alongside their RFRA Claim................34

VII.    THE FINAL RULE CORRECTLY INTERPRETS THE PWFA.........................................35

VIII.   THE BISHOPS' OTHER FIRST AMENDMENT CLAIMS FAIL....................................38

IX.     THE COURT SHOULD NOT GRANT PLAINTIFFS' REQUESTED REMEDIES .....................................................................................................................................42

        A.      Vacatur is Not Appropriate ....................................................................................................42

        B.      Plaintiffs Cannot Demonstrate an Entitlement to Injunctive Relief ..........................44

                1.      Plaintiffs Have Not Established Irreparable Injury ..........................................44

                2.      The Equities and Public Interest Do Not Favor a Permanent Injunction .................................................................................................................45

        C.      If Relief Does Issue, It Should Be Limited ......................................................................46

CONCLUSION..................................................................................................................................................48

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys. v. Gardner,*
   387 U.S. 136 (1967) ...................................................................................................15

*Advantage Media, L.L.C. v. City of Eden Prairie,*
   456 F.3d 793 (8th Cir. 2006) ....................................................................................15

*Air Transp. Ass'n of Am. v. FAA,*
   169 F.3d 1 (D.C. Cir. 1999) ......................................................................................26

*Alden v. Maine,*
   527 U.S. 706 (1999) ...................................................................................................15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
   458 U.S. 592 (1982) ...................................................................................................13

*Alvarado v. Mine Serv., Ltd.,*
   626 F. App'x 66 (5th Cir. 2015) ................................................................................4

*Arizona v. Biden,*
   31 F.4th 469 (6th Cir. 2022) .....................................................................................44

*Ark. Times LP v. Waldrip ex rel. Tr. of Univ. of Ark. Bd. Of Trs.,*
   37 F.4th 1386 (8th Cir. 2022) ...................................................................................28

*Billard v. Charlotte Cath. High Sch.,*
   101 F.4th 316 (4th Cir. 2024) ............................................................................ 36, 37

*Bragdon v. Abbott,*
   524 U.S. 624 (1998) ...................................................................................................18

*Braidwood Management, Inc. v. EEOC,*
   70 F.4th 914 (5th Cir. 2023) ...............................................................................*passim*

*Brown v. Collier,*
   929 F.3d 218 (5th Cir. 2019) ............................................................................. 30, 32

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014) ............................................................................................ 29, 34

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ...................................................................................................43

*California v. EPA,*
   72 F.4th 308 (D.C. Cir. 2023) ..................................................................................25

*California v. Texas*,
  593 U.S. 659 (2021) ....................................................................................................7

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) .........................................43

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ..................................................................................................23

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ......................................................................................8, 10, 12

*Clark v. Martinez*,
  543 U.S. 371 (2005) ..................................................................................................19

*Cline v. Cath. Diocese of Toledo*,
  206 F.3d 651 (6th Cir. 2000) ....................................................................................38

*Consumer Data Indus. Ass'n v. Tex. ex rel Paxton*,
  No. 21-51038, 2023 WL 4744918 (5th Cir. July 25, 2023) ....................................14

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
  91 F.4th 342 (5th Cir. 2024), *petition for cert. filed*, No. 23-1323 (U.S. June 18, 2024) ...................7, 26

*Curay-Cramer v. Ursuline Academy*,
  450 F.3d 130 (3d Cir. 2006) ....................................................................................37

*DeJesus v. Fla. Cent. Credit Union*,
  Case No. 8:17-cv-2502-T-36TGW, 2018 WL 4931817 (M.D. Fla. Oct. 11, 2018) ...........................18

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) ................................................................................................44

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ............................................................................................8, 24

*Doe v. C.A.R.S. Prot. Plus, Inc.*,
  527 F.3d 358 (3d Cir. 2008) ....................................................................................18

*Ducharme v. Crescent City Deja Vu, L.L.C.*,
  406 F. Supp. 3d 548 (E.D. La. 2019) ...........................................................9, 15, 18, 47

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ..................................................................................................44

*EEOC v. Catholic University*,
  83 F.3d 455 (D.C. Cir. 1996) .............................................................................31, 32

*EEOC v. Hous. Funding II, Ltd.*,
  717 F.3d 425 (5th Cir. 2013) .................................................................................20

*EEOC v. Miss. Coll.*,
  626 F.2d 477 (5th Cir. 1980) ........................................................ 33, 36, 38, 39

*EEOC v. Sw. Baptist Theological Seminary*,
  651 F.2d 277 (5th Cir. 1981) .................................................................................40

*Estiverne v. La. State Bar Ass'n*,
  863 F.2d 371 (5th Cir. 1989) .................................................................................26

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) .................................................................................................25

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................................................46

*Fitzpatrick v. Bitzer*,
  427 U.S. 445 (1976) .......................................................................................... 22, 23

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980) .................................................................................................45

*Geduldig v. Aiello*,
  417 U.S. 484 (1974) .................................................................................................19

*Gen. Elec. Co. v. Gilbert*,
  429 U.S. 125 (1976) ..................................................................................... 2, 18, 19

*George v. McDonough*,
  596 U.S. 740 (2022) .................................................................................................17

*Gill v. Whitford*,
  585 U.S. 48 (2018) ................................................................................. 43, 46, 47, 48

*Glass v. Paxton*,
  900 F.3d 233 (5th Cir. 2018) ..................................................................................9

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006) .................................................................................29, 32, 33

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ...................................................................................7, 15, 47

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984) .................................................................................................41

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
  452 U.S. 264 (1981) ................................................................................................25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995) ................................................................................................27

*In re Union Pac. R.R. Emp. Pracs. Litig.,*
  479 F.3d 936 (8th Cir. 2007) ...........................................................................18, 19

*Johanns v. Livestock Mktg. Ass'n,*
  544 U.S. 550 (2005) ................................................................................................27

*Katzenbach v. Morgan,*
  384 U.S. 641 (1966) ..........................................................................................23, 24

*Labrador v. Poe ex rel. Poe,*
  144 S. Ct. 921 (2024) .............................................................................................44

*Lake Carriers' Ass'n v. MacMullan,*
  406 U.S. 498 (1972) ...........................................................................................7, 10

*Laufer v. Mann Hosp., L.L.C.,*
  996 F.3d 269 (5th Cir. 2021) ...................................................................................6

*Lewis v. Casey,*
  518 U.S. 343 (1996) ..........................................................................................43, 46

*Louisiana v. Biden,*
  55 F.4th 1017 (5th Cir. 2022) ................................................................................45

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ...........................................................................................7, 48

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ....................................................................................46, 47, 48

*Maitland v. Univ. of Minn.,*
  260 F.3d 959 (8th Cir. 2001) ...........................................................................23, 24

*Manhattan Cmty. Access Corp. v. Halleck,*
  587 U.S. 802 (2019) ................................................................................................26

*Maryland v. King,*
  567 U.S. 1301 (2012) ..............................................................................................45

*McClure v. Salvation Army,*
  460 F.2d 553 (5th Cir. 1972) ...........................................................................36, 37

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
  966 F.3d 346 (5th Cir. 2020) ................................................................... 39

*Missouri v. Biden*,
  83 F.4th 350 (5th Cir. 2023) ................................................................... 26

*Morgan v. Fletcher*,
  518 F.2d 236 (5th Cir. 1975) ................................................................... 45

*Mtn. States Legal Found. v. Glickman*,
  92 F.3d 1228 (D.C. Cir. 1996) ................................................................ 28

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024) ....................................................................... *passim*

*NAACP v. Hunt*,
  891 F.2d 1555 (11th Cir. 1990) ............................................................... 26

*Nat'l Conf. of Cath. Bishops v. Smith*,
  653 F.2d 535 (D.C. Cir. 1981) .................................................. 9, 10, 18, 31

*Nat'l Lab. Rels. Bd. v. Bell Aerospace Co., Div. of Textron Inc.*,
  416 U.S. 267 (1974) ............................................................ 25, 28, 32, 38

*Nat'l Mining Ass'n v. United Steel Workers*,
  985 F.3d 1309 (11th Cir. 2021) ............................................................... 26

*Nat'l Truck Equip. Ass'n v. NHTSA*,
  711 F.3d 662 (6th Cir. 2013) ................................................................... 26

*Nev. Dep't of Hum. Res. v. Hibbs*,
  538 U.S. 721 (2003) ................................................................... 22, 23, 24

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
  462 U.S. 669 (1983) ............................................................................... 2

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................. 45

*Okpalobi v. Foster*,
  244 F.3d 405 (5th Cir. 2001) ................................................................... 14

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ............................................................................... 9

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) ....................................................................... 39, 40

*Ramming v. United States,*
  281 F.3d 158 (5th Cir. 2001) ........................................................................................6

*Roark & Hardee LP v. City of Austin,*
  522 F.3d 533 (5th Cir. 2008) .......................................................................................27

*Roark v. S. Iron R-1 Sch. Dist.,*
  573 F.3d 556 (8th Cir. 2009) .......................................................................................42

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ....................................................................................................33

*Rumsfeld v. Forum for Acad. & Institutional Rts. (FAIR), Inc.,*
  547 U.S. 47 (2006) ................................................................................................ 27, 41

*Sierra Club v. City of San Antonio,*
  115 F.3d 311 (5th Cir. 1997) .......................................................................................33

*Smith v. City of Jackson,*
  544 U.S. 228 (2005) ....................................................................................................17

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.,*
  41 F.4th 931 (7th Cir. 2022) .......................................................................................37

*Starkman v. Evans,*
  198 F.3d 173 (5th Cir. 1999) .......................................................................................39

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ......................................................................................................12

*Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass.,*
  868 F.2d 473 (1st Cir. 1989) .......................................................................................26

*Sw. Elec. Power Co. v. U.S. EPA,*
  920 F.3d 999 (5th Cir. 2019) .......................................................................................46

*Tagore v. United States,*
  735 F.3d 324 (5th Cir. 2013), *abrogated on other grounds by Groff v. DeJoy*, 600 U.S. 447 (2023) ...........33

*Tandon v. Newsom,*
  593 U.S. 61 (2021) ......................................................................................................35

*Telescope Media Grp. v. Lucero,*
  936 F.3d 740 (8th Cir. 2019) .......................................................................................28

*Tennessee v. Equal Emp. Opportunity Comm'n,*
  ---F. Supp. 3d---, 2024 WL 3012823 (E.D. Ark. June 14, 2024), *appeal filed*,
  No. 24-2249 (8th Cir. June 20, 2024) ....................................................................*passim*

*Tennessee v. Lane,*
    541 U.S. 509 (2004) .................................................................................................. 22, 23

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
    989 F.3d 368 (5th Cir. 2021) ............................................................................................43

*Texas v. Equal Emp. Opportunity Comm'n,*
    933 F.3d 433 (5th Cir. 2019) ............................................................................................42

*Texas v. Garland,*
    ---F. Supp. 3d---, 2024 WL 967838 (N.D. Tex. Feb. 27, 2024), *appeal filed,*
    No. 24-10386 (5th Cir. May 1, 2024) ...............................................................................14

*Toilet Goods Ass'n, Inc. v. Gardner,*
    387 U.S. 158 (1967) .................................................................................................. 15, 16

*Turic v. Holland Hosp., Inc.,*
    85 F.3d 1211 (6th Cir. 1996) ............................................................................................18

*United States v. Texas,*
    599 U.S. 670 (2023) .................................................................................................. 13, 43

*Valentine Props. Assocs., LP v. U.S. Dep't of Hous. & Urb. Dev.,*
    785 F. Supp. 2d 357 (S.D.N.Y. 2011), *aff'd,* 501 F. App'x 16 (2d Cir. 2012) ....................25

*Valley Force Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ........................................................................................................47

*Walker v. Texas Division, Sons of Confederate Veterans, Incorporated,*
    576 U.S. 200 (2015) ........................................................................................................27

*Weathers v. Hous. Methodist Hosp.,*
    ---F.4th---, 2024 WL 4038084 (5th Cir. Sept. 4, 2024) ......................................................4

*West v. Gibson,*
    527 U.S. 212 (1999) ........................................................................................................46

*West Virginia v. EPA,*
    597 U.S. 697 (2022) .................................................................................................. 20, 21

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................................................... 44, 45

*Young v. United Parcel Serv., Inc.,*
    575 U.S. 206 (2015) ..........................................................................................................3

*Younger v. Harris,*
    401 U.S. 37 (1971) ..........................................................................................................45

*Zimmerman v. City of Austin*,
 881 F.3d 378 (5th Cir. 2018) ........................................................................ 9, 13

*Zipes v. Trans World Airlines, Inc.*,
 455 U.S. 385 (1982) ........................................................................................ 4

**FEDERAL STATUTES**

5 U.S.C. § 703 ........................................................................................................ 43

5 U.S.C. § 706 ........................................................................................... 3, 42, 43

42 U.S.C. § 2000e ..................................................................................... 3, 16, 17

42 U.S.C. § 2000e-1 .............................................................................................. 35

42 U.S.C. § 2000e-2 ................................................................................................ 2

42 U.S.C. § 2000e-3 ......................................................................................... 4, 14

42 U.S.C. § 2000e-5 ..................................................................................... *passim*

42 U.S.C. § 2000e-6 .......................................................................... 4, 5, 15, 46

42 U.S.C. § 2000gg .................................................................... 1, 4, 19, 20

42 U.S.C. § 2000gg-1 ................................................................................ 1, 4, 19

42 U.S.C. § 2000gg-2 ..................................................................................... *passim*

42 U.S.C. § 2000gg-3 ........................................................................................ 1, 5

42 U.S.C. § 2000gg-4 ............................................................................................ 22

42 U.S.C. § 2000gg-5 ............................................................................................ 35

42 U.S.C. § 2000gg-6 ............................................................................................ 46

42 U.S.C. § 12102 .................................................................................................... 3

42 U.S.C. § 12112 .................................................................................................... 3

42 U.S.C. § 12203 ............................................................................................. 4, 14

Pub. L. No. 117-328, 136 Stat. 4459 (2022) ................................................... 3

**STATE STATUTES**

La. Rev. Stat. § 40:1061 ............................................................................... 12, 13

Miss. Code Ann. § 41-41-45 ................................................................................................ 12, 13

Miss. Code Ann. § 97-3-3 .........................................................................................................13

**RULES**

Fed. R. Civ. P. 56 .........................................................................................................................6

**REGULATIONS**

29 C.F.R. part 1604, App'x ..................................................................................................... 3, 18

29 C.F.R. § 1601.28 ....................................................................................................................48

29 C.F.R. § 1636.3 ......................................................................................................................19

29 C.F.R. § 1636.8 ......................................................................................................................46

*Implementation of the Pregnant Workers Fairness Act*,
    89 Fed. Reg. 29,096 (Apr. 19, 2024) ...........................................................................*passim*

**OTHER AUTHORITIES**

167 Cong. Rec. H2226 (daily ed. May 12, 2021) ......................................................................21

167 Cong. Rec. H2321 (daily ed. May 14, 2021) ................................................. 21, 22, 23, 33

168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022) ........................................................................21

168 Cong. Rec. S10069-70 (daily ed. Dec. 22, 2022) ..............................................................37

Cmt. EEOC-2023-0004-98384 (Oct. 10, 2023),
    https://perma.cc/HEP8-QMSM .........................................................................................21

EEOC, *Questions and Answers for Respondents on EEOC's Position Statement Procedures*,
    https://perma.cc/L67M-MEM3 ...........................................................................................6

H.R. Conf. Rep. No. 95-1786 (1978) .........................................................................................18

H.R. Rep. No. 95-948 (1978) ................................................................................................ 3, 18

H.R. Rep. No. 117-27 (2021) ...........................................................................................*passim*

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..............................17

## INTRODUCTION

The Pregnant Workers Fairness Act (PWFA) is an anti-discrimination statute that builds on Title VII of the Civil Rights Act of 1964 (Title VII) and other laws to expand workplace protections for employees with pregnancy-related conditions. Specifically, the PWFA requires that covered employers reasonably accommodate an employee's "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions," unless the accommodation "would impose an undue hardship." 42 U.S.C. §§ 2000gg(4); 2000gg-1(1). Pursuant to Congressional direction, the Equal Employment Opportunity Commission (EEOC) issued regulations to implement the PWFA. *See* 42 U.S.C. § 2000gg-3; *Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024) (hereafter "Final Rule").

The Final Rule explains that because Title VII's text has made clear for over four decades that Title VII protects employees who choose to have (or not have) an abortion—and because Congress used the same language from Title VII ("pregnancy, childbirth, or related medical conditions") when it enacted the PWFA to expand Title VII's protections—the PWFA must also be understood as protecting employees who choose to have (or not have) an abortion. *Id.* at 29,099. It also discusses, across twelve pages, the various religion-related and other defenses available to employers and commits to evaluating such defenses on a case-by-case basis, and EEOC's enhanced procedures to consider such defenses. *Id.* at 29,144-55.

Plaintiff States Louisiana and Mississippi ("States" or "Plaintiff States"), and the *USCCB* Plaintiffs (collectively, "Bishop Plaintiffs" or "Bishops"),[1] challenge the Final Rule's coverage of reasonable accommodations related to certain abortions under the APA. The Bishops also challenge the Final Rule's treatment of certain religious defenses under the Religious Freedom Restoration Act (RFRA) and the Constitution. Plaintiffs seek blanket, pre-enforcement exceptions to the Final Rule. The Court should dismiss the Complaint for lack of subject-matter jurisdiction or, alternatively, enter judgment for Defendants for several reasons.

---

[1] These include U.S. Conference of Catholic Bishops, The Society of the Roman Catholic Church of the Diocese of Lake Charles, The Society of the Roman Catholic Church of the Diocese of Lafayette, and The Catholic University of America.

First, Plaintiffs lack standing: their injuries related to challenged abortions are speculative, and they have not proven that the requested relief would redress their purported injuries. Second, Plaintiffs' substantive claims lack merit. The PWFA's text, in relevant part, is identical to Title VII's, which encompasses having (or not having) an abortion; so too, then, does the PWFA. The States also cannot challenge Congress's abrogation of state sovereign immunity, including because such abrogation is not relevant to suits brought by the government. And the Final Rule neither regulates speech nor transgresses federalism principles. It does not compel speech, restrict Plaintiffs from engaging in generalized speech about their beliefs, or conflict with any Plaintiff State law regulating abortion. The Bishops' other challenges likewise fail because they are premised on mischaracterizations of the Final Rule. Finally, Plaintiffs fail to demonstrate irreparable harm or an entitlement to the specific forms of relief they seek. If, nevertheless, this Court grants relief, it should be tailored to the Plaintiffs' claims, limited to the Plaintiffs themselves as employers, and not impinge upon the rights of third parties not before this Court.

## BACKGROUND

## I.    LEGAL FRAMEWORK PRIOR TO THE PWFA

Congress enacted the PWFA to "fill a gap in the existing legal framework," H.R. Rep. No. 117-27, at 10 (2021), which offered only limited protections for workers affected by pregnancy, *see id.* at 10-26. In particular, Congress sought to expand Title VII's pregnancy-related protections for pregnant workers. Under Title VII, employers may not "discriminate against any individual . . . because of such individual's . . . sex[.]"42 U.S.C. § 2000e-2(a)(1). The Supreme Court initially interpreted this prohibition to exclude pregnancy discrimination. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976). Congress promptly responded by enacting the Pregnancy Discrimination Act (PDA), which "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678 (1983). Specifically, Congress clarified that sex-based discrimination encompasses pregnancy discrimination:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated

> the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work[.]

42 U.S.C. § 2000e(k). Congress understood that this "basic language covers decisions by women who chose to terminate their pregnancies." H.R. Rep. No. 95-948, at 7 (1978). But to address concerns that this language would require employers to pay for abortions, *see id.*, Congress included the following:

> This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion[.]

42 U.S.C. § 2000e(k); *see* H.R. Rep. No. 95-948, at 7. Shortly after this amendment, EEOC promulgated guidelines again confirming that the PDA protects employees who have (or do not have) abortions, and requires employers to provide benefits, such as leave, for abortions to the same extent such benefits are afforded for other medical reasons. *See* 29 C.F.R. part 1604, App'x, Questions 34-37. EEOC has maintained this position for over forty years. Even after the PDA, however, Title VII requires accommodations for pregnant employees in only certain circumstances, *see Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015), which Congress concluded creates "an oftentimes insurmountable hurdle." H.R. Rep. No. 117-27, at 16.

The Americans with Disabilities Act (ADA) also establishes some pregnancy-related protections for employees. The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), with discriminatory actions including not making "reasonable accommodations to the known physical or mental limitations" of a qualified employee absent "undue hardship." *Id.* § 12112(b)(5)(A). But even as amended in 2008 to broaden the definition of "disability," *see id.* § 12102(4)(A), the ADA has been construed to exclude many pregnancy-related conditions. *See* H.R. Rep. No. 117-27, at 19-21.

## II. THE PREGNANT WORKERS FAIRNESS ACT

### A. Statutory Framework

To remedy gaps in the existing legal protections, Congress enacted the PWFA as part of the Consolidated Appropriations Act, 2023, *see* Pub. L. No. 117-328, div. II, 136 Stat. 4459, 6084-89 (2022), with an effective date of June 27, 2023, *see id.* § 109, 136 Stat. at 6089.

In general, the PWFA requires covered employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless . . . the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 2000gg-1(1). The PWFA borrows heavily from existing statutes. For example, Congress defined both "reasonable accommodation" and "undue hardship" by reference to the ADA. *See id.* § 2000gg(7). Congress also included anti-retaliation and anti-coercion provisions similar to those found in Title VII and the ADA, which make it unlawful to discriminate against employees who file charges or participate in investigations, or to "coerce, intimidate, threaten, or interfere with any individual['s]" exercise of rights under the statute, *id.* § 2000gg-2(f)(1), (2); *see also id.* §§ 2000e-3(a) (Title VII anti-retaliation), 12203(b) (ADA anti-coercion). The PWFA's definition of employer is likewise the same as Title VII's. *See id.* § 2000gg(2)(B).

The PWFA also incorporates Title VII's remedies and enforcement procedures. *See id.* § 2000gg-2. An individual who believes their rights have been violated must first file a Charge of Discrimination with EEOC within a statutorily defined time from the allegedly unlawful practice. *Id.* § 2000e-5(b). EEOC notifies the employer of the charge within ten days, investigates the charge— which may include soliciting a position statement from the employer—and then determines whether "reasonable cause" exists to believe discrimination occurred. *Id.* If EEOC does not find "reasonable cause" or determines that a defense applies, the charge is dismissed, and the employee may file suit within 90 days of receiving a Notice of Right to Sue. *Id.* § 2000e-5(b), (f)(1). If reasonable cause exists, EEOC will attempt to conciliate the charge; if conciliation fails, EEOC will either file suit against the employer or inform the charging party that they may bring suit.[2] This process is generally the same for State employers, except, if conciliation fails, EEOC refers the matter to the Department of Justice (DOJ) to make its own determination whether to file suit. *See id.* DOJ also has independent authority (regardless of any EEOC referral) to bring suit based on a "pattern or practice" violation. *Id.* § 2000e-

---

[2] The time limits for filing a charge and suit are not jurisdictional and are subject to waiver, estoppel, and equitable tolling. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *Alvarado v. Mine Serv., Ltd.*, 626 F. App'x 66, 69 (5th Cir. 2015); *Weathers v. Hous. Methodist Hosp.*, ---F.4th---, 2024 WL 4038084, at *4 (5th Cir. Sept. 4, 2024).

6(a). The PWFA allows for both injunctive relief and damages, *see id.* § 2000gg-2(a), with limitations on when damages may be awarded. *Id.* § 2000gg-2(g).

### B.    EEOC's Rulemaking Implementing the PWFA

The PWFA directs EEOC to issue implementing regulations. *Id.* § 2000gg-3(a). In its Final Rule, EEOC explained that because the PWFA uses the same statutory language as Title VII— "pregnancy, childbirth, or related medical conditions"—and because the PWFA was intended to fill a gap in the existing Title VII framework, that language in the PWFA should have the same meaning as in Title VII. *See* 89 Fed. Reg. at 29,105-14. And because Title VII's language protects employees who choose to have (or not to have) an abortion, so too does the PWFA. *See id.*; *see also id.* at 29,111 (confirming the PWFA covers both "employee[s] seeking an abortion" and "employees who choose not to have an abortion"). The PWFA's application to abortion, however, is narrow: the Final Rule "does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted"; "does not require any employee to have—or not to have—an abortion"; does not require employers or "taxpayers to pay for any abortions[;] and does not compel health care providers to provide any abortions." *Id.* at 29,104; 29,157. Rather, "any requests for accommodations related to abortion will typically involve the provision of unpaid leave." *Id.* at 29,113.

As for the PWFA's anti-retaliation and anti-coercion provisions, the Final Rule again borrows from the existing Title VII and ADA frameworks. *See id.* at 29,148. For the anti-coercion provision, "the provision does not apply to any and all conduct or statements that an individual finds intimidating; it prohibits only conduct that is reasonably likely to interfere with the exercise or enjoyment of PWFA rights." *Id.* For example, "general statements regarding an employer's mission or religious beliefs [are] not the type of conduct that . . . would be prohibited[.]" *Id.*

Finally, EEOC acknowledged that employers may have defenses available to PWFA charges. *See id.* at 29,146-55. Those defenses include statutory protections such as undue hardship, RFRA, and the PWFA's Rule of Construction relating to religious employers, *id.* at 29,144-48, as well as constitutional protections, such as the First Amendment's ministerial exception, which provides a defense to religious institutions in their employment of individuals who "perform vital religious

duties," *id.* at 29,150. For each defense, EEOC described the general legal framework, then committed to evaluating such defenses "on a case-by-case basis," just as it does under Title VII. *Id.* at 29,145. Moreover, EEOC committed to enhancing its administrative procedures for raising and deciding religious defenses, including allowing employers to request that "EEOC prioritize the consideration of a particular defense that could be dispositive and obviate the need to investigate the merits of a charge." *Id.* at 29,147-48; *see also* EEOC, *Questions and Answers for Respondents on EEOC's Position Statement Procedures*, https://perma.cc/L67M-MEM3.

## III.    PROCEDURAL HISTORY

The States and Bishops filed suit on May 13 and May 24, 2024, respectively. After consolidating the cases and holding a hearing on Plaintiffs' preliminary injunction motions, *see La.*, ECF No. 47 at 6 ("PI Order"), this Court, on June 17, 2024, preliminarily enjoined enforcement of "the Final Rule's requirement that covered entities provide accommodation for the elective abortions of employees that are not necessary to treat a medical condition related to pregnancy" against the Bishop Plaintiffs, the Plaintiff States and their agencies, and "[a]ny covered entity . . . with respect to all employees whose primary duty station is located in Louisiana or Mississippi," *id.* at 31. The Final Rule took effect on June 18, 2024. *See* 89 Fed. Reg. at 29,096. Defendants now file a combined motion to dismiss or, alternatively, for summary judgment.

## STANDARD OF REVIEW

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 271-72 (5th Cir. 2021). "Lack of subject matter jurisdiction may be found" based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). To the extent the Court has subject-matter jurisdiction, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

"Article III requires a plaintiff to show that she has suffered an injury in fact that is 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (quoting *California v. Texas*, 593 U.S. 659, 669 (2021)); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). While this Court previously determined that Plaintiffs were "likely" to demonstrate standing, PI Order at 8, Plaintiffs cannot satisfy the heightened burden at summary judgment of demonstrating "specific facts" supporting each element of standing. *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

### A.    Plaintiffs' Injuries Are Highly Speculative

As an initial matter, Plaintiffs' status as regulated parties does not, without more, establish injury. "[E]very American is subject to a great many regulations . . . [b]ut merely being subject to those regulations, in the abstract, does not create an injury." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 350 (5th Cir. 2024), *petition for cert. filed*, No. 23-1323 (U.S. June 18, 2024). A regulated party must still demonstrate an injury that is "actual or imminent." *Lujan*, 504 U.S. at 560-61; *see Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 507 (1972) (regulated party still required to demonstrate "a justiciable controversy" which "does not exist where compliance with challenged statutes is uncoerced by the risk of their enforcement" (cleaned up)); *Murthy v. Missouri*, 144 S. Ct. 1972, 1985 (2024) (harm must be "certainly impending"). Plaintiffs cannot show any regulatory injury because unless and until an employee requests leave or another abortion-related accommodation in the specific circumstances that Plaintiffs contest,[3] Plaintiffs are under no obligation to undertake any action related to abortion. Similarly, unless and until such a hypothetical request is made, Plaintiffs will never be in a position to potentially run afoul of any legal obligations.

---

[3] The USCCB Plaintiffs describe their religious beliefs in terms of opposition to "direct abortion," which they define as "abortion willed as an end or as a means." USCCB Compl. ¶¶ 80-82, 86. The Plaintiff States do not clearly articulate the scope of their claimed objections, but appear to oppose "elective abortions" occurring within their State that would be "illegal under State law," La. Compl. ¶ 81; *see La.*, ECF No. 21, at 6-7. In this filing, Defendants' use of the word "abortion" is intended to mean the abortions that fit within these categories, unless otherwise specified.

It is also extremely speculative that any such request will be made by a Plaintiff-employee. Plaintiffs have not identified *any* of their thousands of employees who has ever sought an accommodation or leave for an abortion. *See* Defs.' Statement of Material Facts ("SMF") ¶¶ 1-8; *see also* Hudson La. Decl. ¶¶ 9-10; Hudson USCCB Decl. ¶¶ 9-10 (discussing Title VII and PWFA charge data). And Plaintiffs will not suffer any injuries stemming from an asserted duty to accommodate abortions under the Final Rule unless numerous contingencies all occur. Specifically, Plaintiffs' theory requires assuming that (1) one of Plaintiffs' employees would become pregnant; (2) she would decide to obtain an abortion; (3) that abortion would be one to which Plaintiffs object and, as to the States, one which the employee could somehow obtain from a provider willing to violate the law;[4] (4) the employee would need an accommodation for that abortion; (5) the employee would be unable to use existing leave or protections afforded by other statutes to obtain the accommodation; and (6) the employee would disclose and seek an accommodation for that abortion, notwithstanding their employer's known beliefs and their employment at a Catholic institution or their abortion provider's violation of state law. Even then, there are still more contingencies before any enforcement action could be filed: (7) the employee, after being denied an accommodation for the abortion, must file a charge with EEOC; (8) EEOC must reject all of the employer's defenses, including based on the ministerial exception, RFRA, undue hardship,  the rule of construction, and other constitutional claims; (9) EEOC must find reasonable cause exists to believe discrimination occurred and fail to resolve the matter voluntarily; and (10) EEOC must file suit against USCCB or refer a case against a Plaintiff State to DOJ, who is not a defendant here and must independently decide to bring suit.

Courts routinely reject theories of injury that, like these, "rel[y] on a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see Murthy*, 144 S. Ct. at 1986 ("The one-step-removed, anticipatory nature of [plaintiffs'] alleged injuries" fails to satisfy standing.);

---

[4] Even assuming that the States' claimed injury extends as far as objecting to out-of-state abortions, *but see Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 346 (2022) (Kavanaugh, J., concurring), this step would be no less attenuated. The pregnant employee would have to decide to travel out of state for an abortion, have the resources to arrange for that care, and have the means to pay for the abortion and associated travel.

*Tennessee v. Equal Emp. Opportunity Comm'n*, ---F. Supp. 3d---, 2024 WL 3012823, at *4 (E.D. Ark. June 14, 2024) (finding "[t]his many-step series of events [necessary for PWFA enforcement] is certainly possible, but it is not certainly impending"), *appeal filed*, No. 24-2249 (8th Cir. June 20, 2024). That is particularly true when the theory "depends in large part on the actions of third[ ]part[ies]," *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018); *see Glass v. Paxton*, 900 F.3d 233, 240 (5th Cir. 2018), or illegal conduct, *see, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974). *See also Nat'l Conf. of Cath. Bishops v. Smith*, 653 F.2d 535, 540 (D.C. Cir. 1981) (precursor to USCCB lacked standing to challenge abortion coverage in PDA because employees were "likely to be aware of [Catholic] plaintiffs' opposition to abortions [and] they are unlikely, as a consequence of their awareness, to request such benefits"); *Tennessee*, 2024 WL 3012823, at *4 (finding it "particularly unlikely" that state employee would inform employer she "need[s] time off to get an illegal abortion").

The facts here are also unlike those the Fifth Circuit found supported standing in *Braidwood Management, Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023). There, the court found undisputed that Plaintiff was "breaking EEOC guidance." *Id.* at 926. By contrast, the Final Rule does not require that *every* abortion accommodation be granted, but only those that are reasonable, do not impose an undue hardship, and are not subject to other "numerous statutory and constitutional defenses." 89 Fed. Reg. at 29,106; 29,199; 29,144.[5] In other words, if a Plaintiff's employee ever does seek leave or another accommodation for abortion—a proposition that Plaintiffs have failed to show is imminent— depending on the circumstances, that accommodation may well *not* be required by the PWFA. The *Braidwood* Court also found standing based on its determination that EEOC had previously brought an enforcement action against a different company based on "a less violative set of facts." 70 F.4th at 926. Here, by contrast, EEOC has never brought any PWFA enforcement action involving abortion. *See* Lage Decl. ¶¶ 4-5. Moreover, the *Braidwood* plaintiffs had "hired at least one . . . employee in the

---

[5] It is not even clear that Louisiana has a policy disallowing any accommodations potentially covered by the PWFA. The State's Department of Justice asserts that they will not provide accommodations for any "abortion that would be illegal under Louisiana law," where the "accommodation *is not otherwise required by federal or state law*." *La.*, ECF No. 17-1 at 17 (emphasis added); *see* La., ECF No. 17-2, ¶ 14. Both federal law (the PWFA) and Louisiana's state PDA equivalent cover abortion. *See Ducharme v. Crescent City Deja Vu, L.L.C.*, 406 F. Supp. 548, 558 (E.D. La. 2019); *infra* § II.

past, whom they would now be prevented from acting against without running the risk of an enforcement action," 70 F.4th at 932 n.33. Plaintiffs here do not even claim to have a single employee who has ever sought an accommodation or leave related to abortion. *See* SMF ¶¶ 1-8. This is notwithstanding that the PWFA has been in effect for well over a year; the Final Rule has been in effect, in large part, since mid-June 2024; and Title VII has been in effect for decades more.[6]

Plaintiffs' injury is therefore not "certainly impending." *Clapper*, 568 U.S. at 410.

### B.    Plaintiffs' Theories of Injury Fail for Additional Reasons

#### 1.    Compliance Costs Do Not Establish Standing

Because Plaintiffs' injuries are speculative, any purported costs undertaken to comply with the challenged portions of the Final Rule cannot support standing. *See Murthy*, 144 S. Ct. at 1995 (self-censorship did not support standing where "based on their fears of hypothetical future harm that is not certainly impending." (quoting *Clapper*, 568 U.S. at 416)); *Lake Carriers' Ass'n*, 406 U.S. at 507 (no standing "where compliance with challenged statutes is uncoerced by the risk of their enforcement" (cleaned up)); *Tennessee*, 2024 WL 3012823, at *6.

In any event, while this Court previously found, in providing preliminary relief, that the States identified compliance costs to establish injury, *see* PI Order at 9, in fact, the Plaintiff States have not identified any compliance costs attributable to the narrow portion of the Final Rule that they challenge. *See Murthy*, 144 S. Ct. at 1988 ("plaintiffs must demonstrate standing for each claim that they press . . . and for each form of relief they seek"). At most, they identify some generalized alleged costs, such as "costs associated with training hundreds of human relations staff," *La.*, ECF No. 17-3, ¶ 10, and "re-printing policy manuals," *La.*, ECF No 17-2, ¶ 16; *La.*, ECF No. 32-1, ¶ 7. But these

---

[6] To the extent the Bishops attempt to shoehorn a challenge to Title VII based on the contention that EEOC "insert[ed] its nonbinding Title VII interpretation into the PWFA Final rule," USCCB Compl. ¶ 149, they lack standing based on a similar chain of speculative contingencies that would all have to arise before any Title VII enforcement action could be brought for a denial of abortion-related leave. Indeed, another Court determined that the predecessor-entity to the USCCB—which conceded that the PDA encompasses abortion—lacked standing to challenge it. *See Nat'l Conf. of Cath. Bishops*, 653 F.2d at 539-41. Now with the benefit of nearly half a century, the Bishops still have not been able to identify a single employee who has ever requested time off for an abortion under Title VII. *See* SMF ¶¶ 1-4. Thus, the Bishops do not establish imminent injury based on Title VII or EEOC's understanding of its express language.

"implementation cost[s] of altering the current policy *to comply with the Final Rule*," *La.*, ECF No 17-2, ¶ 18 (emphasis added), do not establish any costs specific to the Final Rule's abortion-related provisions. The States would undertake these alleged costs—like updating policies and training staff on the PWFA and Final Rule—regardless of the abortion-related provisions. And they would undertake those costs to provide reasonable accommodations for abortions that they concede are lawful, *see La.*, ECF No 17-2, ¶ 6; *La.*, ECF No 17-3, ¶ 6. Moreover, Plaintiff States already provide leave benefits to their employees and employ human resources staff to administer them. *See, e.g., La.*, ECF No 17-2, ¶¶ 12, 16; *La.*, ECF No 17-3, ¶¶ 8-10; SMF ¶¶ 9-10. They do not claim any additional staffing costs because existing staff are unable to implement the Final Rule (including its abortion-related provisions) consistent with their normal duties, which presumably include administering numerous similar laws. The same issue obtains as to the estimated one-time administrative costs recognized in the Final Rule. *See* PI Order at 9 (citing 89 Fed. Reg. 29,177). Plaintiffs would incur those costs under the PWFA and Final Rule even absent the abortion-related provisions of the Final Rule. Thus, the States cannot claim injury from the narrow portion of the Final Rule that they challenge. *See Tennessee*, 2024 WL 3012823, at *6.

As to the Bishop Plaintiffs, notably no declarants allege that they have actually expended any compliance costs and therefore cannot establish standing on these grounds. *See USCCB*, ECF No. 40-1, ¶ 9 (estimating Final Rule related costs only "were the Diocese to choose to take those actions"); *USCCB*, ECF No. 40-2, ¶ 11 (estimating same "if USCCB were to choose to take all of those actions"). In any event, most of the Bishop Plaintiffs' alleged *potential* costs would extend from the Final Rule and PWFA regardless of abortion, and they do not claim that current staff are unable to handle implementation with existing resources. *See USCCB*, ECF No. 40-1, ¶ 9; *USCCB*, ECF No. 40-2, ¶ 11. Furthermore, to the extent the Bishop Plaintiffs allege potential costs associated with "legal fees" for "consultations with outside counsel about complying with" abortion accommodations under the Final Rule, *USCCB*, ECF No. 40-2, ¶ 12, those conclusory assertions are insufficient. The Bishop Plaintiffs

have not established why, as entities already subject to the abortion-related provisions in Title VII[7] and/or under the Louisiana PDA, they are not already aware of their obligations and defenses. *See* 89 Fed. Reg. at 29,160. Finding standing on such a theory would also enable anyone to manufacture standing by simply consulting with a lawyer. That is not the law. *See Clapper*, 568 U.S. at 402 ("respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm"); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself.").

### 2.    The Final Rule Does Not Interfere with Any State Laws

Plaintiffs have also claimed that the Final Rule injures their "sovereign interest in the power to create and enforce a legal code," and that "being pressured to change state law constitutes an injury for standing purposes." *La.*, ECF No. 17-1 at 18 (citations omitted). *See also* PI Order at 11 (finding standing based on "undermin[ing] their sovereignty and the democratic process"). But this argument depends on Plaintiffs identifying an actual conflict between state law and the Final Rule. None exists. "[T]he PWFA . . . does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted." 89 Fed. Reg. at 29,104. It does not "require[] an employer to pay for an abortion" or "any travel-related expenses for an employee to obtain an abortion" or for "an employer-sponsored health plan to pay for or cover . . . abortion." *Id.* at 29,104; 29,109. Thus, the Final Rule cannot possibly interfere with the enforcement of any State laws governing when abortions may be obtained or prohibiting the use of public funds for abortions. It also operates in an entirely separate sphere from Plaintiffs' abortion laws: the PWFA entitles *pregnant women* to reasonable accommodations (absent undue hardship), while Plaintiffs' cited laws impose liability on *providers who perform* certain abortions. *See* La. Rev. Stat. § 40:1061; Miss. Code Ann. § 41-41-45; SMF ¶¶ 12-13. Nothing in the PWFA or the Final Rule requires practitioners in Louisiana and Mississippi to perform—or for the states to participate in—abortions that are illegal under state law.

---

[7] The Bishop Plaintiffs have not asserted any compliance costs associated with Title VII.

Nor are state declarations of "pro-life policy," *La.*, ECF No. 17-1 at 18, sufficient for standing. State policies providing for "protect[ion of] the right to life of every unborn" and limiting the circumstances where abortions may be obtained, *see* PI Order at 11 (citing La. Rev. Stat. § 40:1061; Miss. Code Ann. §§ 41-41-45; 97-3-3), do not inherently conflict with any aspect of the Final Rule, *see, e.g.*, 89 Fed. Reg. at 29,109 ("[T]his rulemaking does not require abortions or affect the availability of abortion; it simply ensures that employees who choose to have (or not to have) an abortion are able to continue participating in the workforce[.]"). Moreover, where the Supreme Court has recognized a sovereign interest of the sort Plaintiffs posit, it has arisen out of the "power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). Plaintiffs have identified no case supporting the boundless principle for which they advocate—that a purported federal-law conflict with a non-enforceable, generalized statement of state policy can establish injury. *See Tennessee*, 2024 WL 3012823, at *7 ("non-binding policy declarations are not themselves enforceable" and do not show "harm to their power to create and enforce a legal code" (cleaned up)).

### 3.    The States Have Not Demonstrated Any Speech Injury

Lastly, the Plaintiff States have previously claimed that the Final Rule "impinges upon the States' own right to speak and choose their own messaging." *La.*, ECF No. 17-1 at 20. But they still have not identified any "messaging" they currently engage in, or imminently wish to engage in, that is proscribed by the PWFA. *See Zimmerman*, 881 F.3d at 388 (pre-enforcement standing requires the plaintiff to establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute"); *Murthy*, 144 S. Ct. at 1996 (rejecting claimed "sovereign interest in hearing from their citizens on social media," because "[t]he States [had] not identified any specific speakers or topics that they [had] been unable to hear or follow"). Nor can Plaintiffs rely on their State laws as embodying abstract "messages" to argue that a conflict between those messages and federal policies constitutes Article III injury; that type of theory would eviscerate limits on Article III standing and allow States to challenge virtually any federal policy with which they disagree. *See United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

To the extent the Plaintiff States' declarants express concern about liability under the PWFA's

anti-retaliation and anti-coercion provisions, *see, e.g.*, *La.*, ECF No. 17-3, ¶ 12; *La.*, ECF No. 17-2, ¶ 9, they similarly provide no evidence that any anti-abortion "messaging" that would violate the PWFA is currently occurring (or is likely to occur) within State workplaces. That reality is particularly unlikely given that Title VII and the ADA have, for decades, contained similar anti-retaliation and anti-coercion statutory provisions, and neither Plaintiffs nor EEOC has identified any cases arising under those provisions. *See* 89 Fed. Reg. at 29,152; 42 U.S.C. §§ 2000e-3(a), 12203(b). The Final Rule also confirms that general statements about an employer's views on abortion do not constitute coercion under the PWFA. *See* 89 Fed. Reg. at 29,148 ("[T]he making of general statements regarding an employer's mission or religious beliefs is not the type of conduct that the Commission previously has determined would be prohibited by this provision."). Thus, this theory also fails.

### C. Plaintiffs Have Not Proven that Their Injuries Are Redressable Through This Lawsuit

Plaintiffs also lack standing because they have not established that their alleged injuries are redressable through the instant action.

First, any relief entered in this case could not properly extend to private individuals who would retain the ability to initiate lawsuits against Plaintiffs for failing to accommodate abortions under the PWFA itself. *See Murthy*, 144 S. Ct. at 1993. At least two courts have recognized this reality. *See Tennessee*, 2024 WL 3012823, at *4 ("Pausing all or part of the [PWFA] regulation or its enforcement will not . . . prevent an aggrieved employee from filing such a charge, or trying to file one, or eventually asking a court" to enforce "the Act itself [as] requir[ing] State employers to accommodate elective abortions[.]"); *Texas v. Garland*, ---F. Supp. 3d---, 2024 WL 967838, at *52 (N.D. Tex. Feb. 27, 2024) (acknowledging, in challenge to PWFA as a whole, that relief could not "prevent [a private individual] from filing her own PWFA lawsuit against Texas."), *appeal filed*, No. 24-10386 (5th Cir. May 1, 2024). Thus, any relief here would not "reduce the total amount of risk" facing Plaintiffs. *Consumer Data Indus. Ass'n v. Tex. ex rel Paxton*, No. 21-51038, 2023 WL 4744918, at *6 (5th Cir. July 25, 2023); *see Murthy*, 144 S. Ct. at 1993 (finding "redressability problem" where non-parties remain "free to" take allegedly injurious action); *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001) (en banc) (concluding

there is no standing because "[t]he defendants have no authority to prevent a private plaintiff from invoking the statute in a civil suit").

Second, the Plaintiff States have not established that their injuries are necessarily attributable to the Final Rule (or PWFA), as opposed to separate, unchallenged laws like Title VII. *See, e.g.*, *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (no redressability where "unchallenged provisions" would still prohibit plaintiff's desired conduct). Plaintiffs offer leave benefits (including unpaid leave when the employee has exhausted other available leave). *See, e.g.*, *La.*, ECF No. 17-3, ¶ 8; *La.*, ECF No. 17-2, ¶ 12; SMF ¶¶ 9-10. Title VII thus compels them to offer those same benefits to employees affected by pregnancy, childbirth, or related medical conditions who are similar in their ability or inability to work, including leave regarding abortion. *See supra* Background, § I; *infra* § II.A. And Louisiana's PDA analogue requires the same. *Ducharme*, 406 F. Supp. 3d at 557.

Third, and relatedly, relief here would not remove the risk of any government enforcement action against the Plaintiff States under the PWFA, because such suits can only be filed by DOJ, which is not a defendant in this action. *See* 42 U.S.C. §§ 2000gg-2(a)(1), 2000e-5(f)(1). Regardless of any relief against EEOC or the Final Rule, DOJ retains authority to sue Plaintiff States under the PWFA, including based on a "pattern or practice" violation, which DOJ may undertake without any EEOC involvement. *Id.* § 2000e-6. Any injury to the States is thus not redressable by the requested relief. *See Murthy*, 144 S. Ct. at 1993; *Haaland*, 599 U.S. at 291-92.

Finally, the Plaintiff States lack standing to challenge the PWFA's abrogation of State sovereign immunity in particular. The only defendant is a Federal agency that is not authorized to initiate enforcement actions against the States, and, in any event, State sovereign immunity does not apply to suits by the federal government. *See Alden v. Maine*, 527 U.S. 706, 755 (1999) (state sovereign immunity does not extend to suits "by the Federal Government"). Thus, the States cannot assert any injury attributable to the PWFA's abrogation of state sovereign immunity that is redressable in this action.

### D.    Plaintiffs' Claims Are Not Ripe Given Their Fact-Specific Nature

Even if Plaintiffs can overcome the above standing deficiencies, their claims still are not ripe. *See Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 148-49 (1967); *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158,

164 (1967). There is no hardship to declining review, given the abstract nature of Plaintiffs' claimed injuries and their ability to raise the same arguments as defenses, should an enforcement proceeding ever arise. As described above, Plaintiffs here are challenging a hypothetical application of a narrow provision of the Final Rule, which may never be invoked by an employee, let alone be deemed violated in an enforcement action. While the Fifth Circuit rejected a ripeness argument where there was "no more factual detail . . . required to resolve the claims," as proven by the agency's failure to give a single "example of factual development that would be helpful to the court," *Braidwood*, 70 F.4th at 931, here numerous factual issues would be useful—if not essential—to know before evaluating Plaintiffs' actions with regard to a potential PWFA claim. These include the specific accommodation requested; the circumstances of the abortion, including if it was one to which Plaintiffs object; the particulars of the employer's leave policies or, with regard to the Bishops, policies regarding conformance with Catholic tenets; the burdens on the employer of granting the accommodation, including any undue hardship; whether the employee is covered by the ministerial exception; and any allegedly retaliatory or coercive acts. Based on those facts, courts may not need to decide Plaintiffs' claims, or at least the analysis would be substantially easier with concrete information. Thus, Plaintiffs' claims are not ripe.

## II.     THE FINAL RULE PROPERLY PROVIDES THAT EMPLOYEES MAY SEEK ACCOMMODATIONS FOR ABORTION

Plaintiffs challenge the Final Rule's inclusion of abortion as a possible reason for an accommodation. Their arguments ignore Title VII's text, which confirms that the phrase "pregnancy, childbirth, or related medical conditions" includes abortion. By using identical language in the PWFA, Congress made clear that accommodations under the PWFA can cover abortion too. The PWFA's text confirms this interpretation as well.

### A.     Title VII's Text Encompasses Employment Protections for Abortion, and Congress Used the Same Language in the PWFA

Over four decades ago, Congress amended Title VII to clarify that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions[.]" 42 U.S.C. § 2000e(k). In that same subsection, Congress provided that "[t]his subsection shall not require an employer to pay for health insurance benefits for

abortion, *except where* the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion." *Id.* (emphasis added). That latter sentence—and particularly its confirmation that employers *can* be required to pay for abortion in certain medical situations—necessarily means that abortion is subsumed within the first sentence's prohibition of discrimination based on "pregnancy, childbirth, or related medical conditions." Thus, Title VII encompasses the decision of whether or not to have an abortion and, by enacting the PWFA with the purpose of expanding Title VII's protections and using the same phrase as in Title VII, Congress intended for that identical phrase in the PWFA to have the same meaning. *See* 89 Fed. Reg. at 29,104-08; *see also George v. McDonough*, 596 U.S. 740, 746 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it."); *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). This alone confirms abortion is covered by the PWFA.

This Court previously applied a "presumption that Congress's decision <u>not</u> to include any reference to abortion in the PWFA was intentional." PI Order at 19. But that runs counter to the Supreme Court's recognition that "when Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith*, 544 U.S. at 233; Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 323 (2012) ("[W]hen a statute uses the very same terminology as an earlier statute—especially in the very same field, such as securities law or civil-rights law—it is reasonable to believe that the terminology bears a consistent meaning."). Nor does the fact that Congress incorporated the operative language from Title VII by directly replicating it, as opposed to cross-referencing it, merit a different outcome. *See* PI Order at 19. Indeed, it is unsurprising that Congress chose not to incorporate by reference Title VII's definition of "because of" or "on the basis of sex" because doing so would have incorporated sex-based protections unrelated to pregnancy, which are covered by Title VII but beyond the intended scope of the PWFA.

This Court also found that "EEOC rests its argument [that Title VII encompasses abortion] entirely on its own enforcement guidelines on pregnancy discrimination and two pre-*Dobbs* lower court decisions . . . ." *Id.* at 18. In fact, Congress *itself* knowingly defined the phrase "pregnancy, childbirth,

or related medical conditions" to include abortion when it enacted § 2000e(k) over four decades ago. That is explicit in the text and the legislative history. *See* H.R. Conf. Rep. No. 95-1786, at 4 (1978) (PDA's "basic language covers decisions by women who chose to terminate their pregnancies"); H.R. Rep. No. 95-948, at 7 (same). Indeed, the Supreme Court's decision in *Gilbert* recognized that EEOC understood Title VII to extend to abortion *even before the PDA*, *see* 429 U.S. at 140, and the PDA was specifically intended to align Title VII with EEOC's guidelines:

> The [EEOC pre-PDA] guidelines . . . require employers to treat disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefrom as all other temporary disabilities. . . . It is the Committee's view that these guidelines rightly implemented the Title VII prohibition of sex discrimination[.]

H.R. Rep. No. 95-948, at 2 (citation omitted). The Final Rule's statutory analysis is not simply a ratification argument but rooted in the text of Title VII itself.

The case law in support is also far more than just two Circuit decisions. *Every court* to have considered the issue has concluded that Title VII encompasses abortion. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008); *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996); *see also In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 942 (8th Cir. 2007) ("abortion arguably would be 'related to' pregnancy"); *Nat'l Conf. of Cath. Bishops*, 653 F.2d at 537-38 & n.2 (PDA "include[s] elective or optional abortions"); *Ducharme*, 406 F. Supp. 3d at 556, 558 (Louisiana PDA and Title VII both encompass abortion); *DeJesus v. Fla. Cent. Credit Union*, Case No. 8:17-cv-2502-T-36TGW, 2018 WL 4931817, at *3-4 (M.D. Fla. Oct. 11, 2018) (complaint alleging employee was terminated "because of her choice to have an abortion" stated a claim under Title VII). And these judicial decisions are on top of EEOC's own guidance, which has, for decades, defined the phrase "pregnancy, childbirth, or related medical conditions" to include abortion without issue. *See* 29 C.F.R. pt. 1604, App'x, Questions 34-37 (1979); *cf. Bragdon v. Abbott*, 524 U.S. 624, 645 (1998).

Finally, that the PDA and relevant law pre-date *Dobbs* is of no moment. The PDA's, and thus the PWFA's, coverage of abortion is a statutory, not constitutional, protection. Indeed, it was enacted as a *rejection* of the Supreme Court's determination that Title VII did not cover pregnancy-related discrimination because, absent pretext, it was not sex-discrimination under the Constitution. *See*

18

*Gilbert*, 429 U.S. at 135-36 (finding *Geduldig v. Aiello*, 417 U.S. 484 (1974), "precisely in point"). The statutory language and cases that interpret the PDA do not change based on later developments in constitutional law, *see Clark v. Martinez*, 543 U.S. 371, 382 (2005), particularly where they did not purport to rest on constitutional protections for abortion in the first instance.[8]

### B.    The Text of the PWFA Itself Covers Abortions

Even absent the longstanding interpretation of "pregnancy, childbirth, or related medical conditions" from Title VII, the same conclusion obtains under the PWFA itself, as EEOC explained in the Final Rule. While this Court previously determined that "[t]he decision to obtain a purely elective abortion is not undertaken to treat a 'medical condition' related to pregnancy or childbirth," PI Order at 20, the PWFA does not only apply to reasonable accommodations of a "medical condition." It requires reasonable accommodations (absent undue hardship) of "known limitation[s]"—a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4). Individuals who have an abortion are, definitionally, pregnant, 89 Fed. Reg. at 29,107, and thus abortion is necessarily "related to" or "arising out of pregnancy." *See, e.g.*, *In re Union Pac.*, 479 F.3d at 942 ("abortion can only occur when a woman is pregnant"). Thus, if "physical or mental condition[s]," 42 U.S.C. § 2000gg(4), arise out of a procedure that one would need only if pregnant, such as an abortion, those conditions—such as cramping or the need to rest—are limitations subject to the PWFA regardless of how one thinks of the procedure itself and regardless of medical necessity. *See* 29 C.F.R. § 1636.3(a)(2). Indeed, even under the Court's framing, the "known limitation" would not be identified at the procedure level, as the nature of the limitation informs the accommodation needed: the accommodation for physical unavailability (*e.g.*, due to recovery or seeking health care) is typically leave, whereas the accommodation for cramping may be additional breaks.

In any event, even under this Court's view that abortion is a "medical procedure," rather than treatment for related "medical conditions," PI Order at 20; *see* 42 U.S.C. § 2000gg–1(1), the statutory language would still cover it. Even where no medical complication precipitates an abortion, there are

---

[8] For these reasons, EEOC is also entitled to summary judgment to the extent the Bishops suggest a challenge to Title VII's coverage of abortion.

still conditions accompanying it—like cramping, nausea, or needing rest—that constitute "related medical conditions" to pregnancy, including by Plaintiffs' proffered definition. *See, e.g.*, *La.*, ECF No. 17-1 at 9 ("medical" includes "maintenance of health"; "condition" includes "state of health or physical fitness or illness or other medical problem" (cleaned up)); *see also EEOC v. Hous. Funding II, Ltd.*, 717 F.3d 425, 428-29 (5th Cir. 2013) (sources "broadly construe" the term "medical condition").

Two additional features of the statutory scheme confirm that distinguishing between "elective" and "non-elective" procedures is incorrect. First, it would exclude from the PWFA's scope accommodations for regular check-ups during pregnancy, as well as for other procedures, like amniocentesis or ultrasound, which may not be considered medically necessary. That was not Congress's intent. *See* H.R. Rep. No. 117-27, at 29 (PWFA covers "pre-natal appointments"). Second, the PWFA was enacted against the backdrop of the ADA's longstanding rule that "employers often may be required to provide the reasonable accommodation of leave so that an employee can obtain medical treatment." 89 Fed. Reg. at 29,189-90. Especially as the PWFA expressly incorporates the ADA's definition of "reasonable accommodation," 42 U.S.C. § 2000gg(7), the PWFA should likewise be understood to encompass "a medical procedure."

### C.    Materials Outside the PWFA's Text Do Not Change the Analysis

The major questions doctrine is also not implicated here because EEOC was not exercising discretion in deciding what conditions are covered by the PWFA; it was enforcing "policy decisions" made by "Congress itself" in adopting language with a well-established meaning. *West Virginia v. EPA*, 597 U.S. 697, 723, 735 (2022) (doctrine applies to agency interpretations of "ambiguous statutory text" (citations omitted)). Nevertheless, this Court applied the major questions doctrine at the preliminary injunction stage because "abortion has been one of the most important social, religious, and political issues of our time and is a major issue in every federal election." PI Order at 21. But by the Court's standard virtually any regulation that implicates a hot-button or politically controversial topic would fall within the doctrine. *Contra West Virginia*, 597 U.S. at 723 (doctrine applies only in "extraordinary cases"); *Tennessee*, 2024 WL 3012823, at *8 ("[T]he Supreme Court has not said that something is a 'major question' simply because it involves a particularly controversial topic."). In fact, EEOC did not

"claim[] to discover in a long-extant statute an unheralded power" that had "rarely been used in the preceding decades," engage in a "radical or fundamental change to a statutory scheme," or "adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." *West Virginia*, 597 U.S. at 723-24 (citations omitted). Rather, the Final Rule extends Title VII's longstanding coverage of the decision of whether or not have an abortion to a similar statute intended to expand on the protections of Title VII for workers affected by pregnancy-related conditions. It does not "resolve a matter of great political significance, . . . or end an earnest and profound debate across the country," *id.* at 743 (Gorsuch, J., concurring) (citations omitted). The Final Rule recognizes that there may be religious or other exceptions to accommodations, protects employees who choose to have *or not to have* an abortion, and does "not prescribe when, where, or under what circumstances an abortion can be obtained or what procedures may be used." 89 Fed. Reg. at 29,106; 29,112; 29,141.

Finally, Plaintiffs cannot overcome the PWFA's text by relying on legislative history. While this Court suggested that the "legislative history unambiguously confirms that Congress specifically <u>did not</u> intend for the PWFA" to apply to abortion, PI Order at 23, the legislative history is far more equivocal on that point. Multiple members of Congress recognized that the PWFA can encompass accommodations for abortion. *See, e.g.*, H.R. Rep. No. 117-27, at 60 (stating in Minority Report that the statute "could require [an] organization to comply with" a request for "time off to have an abortion procedure . . . as a reasonable accommodation"); 167 Cong. Rec. H2226, H2228-29 (daily ed. May 12, 2021) (statement of Rep. Taylor Greene declining to support PWFA because it covers abortions); 167 Cong. Rec. H2321, H2325 (daily ed. May 14, 2021) (statement of Rep. Letlow expressing same); *see also* 89 Fed. Reg. at 29,110 n.92 (discussing comments from other members supporting Final Rule). The invocation of Senate Sponsor Bob Casey's statements, *see* PI Order at 23, also fails to consider that Senator Casey himself recognized that "'pregnancy, childbirth, and related medical conditions,' . . . has been previously defined to include . . . abortion." Cmt. EEOC-2023-0004-98384 at 2 (Oct. 10, 2023), https://perma.cc/HEP8-QMSM. And consistent with his statements, the Final Rule does not "require employers to provide abortions in violation of State law," 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022) (statement of Sen. Casey).

### III.    THE PWFA VALIDLY ABROGATES STATE SOVEREIGN IMMUNITY

The Plaintiff States suggest, though fail to bring an actual claim, that the Final Rule improperly "abrogates the States' sovereign immunity under the Fourteenth Amendment to establish the abortion-accommodation mandate." *La.* ECF No. 17-1, at 13; *e.g.*, La. Compl. ¶ 62. In fact, the Final Rule did not abrogate state sovereign immunity at all; that determination was made by Congress, in a provision of the PWFA that Plaintiffs do not challenge. *See* 42 U.S.C. § 2000gg–4. But even as to Congress, the States' arguments fail. Congress has "broad power . . . to remedy and to deter violation of rights guaranteed by the Fourteenth Amendment," including by enacting "prophylactic legislation that proscribes facially constitutional conduct." *Tennessee v. Lane*, 541 U.S. 509, 518 (2004) (cleaned up). Congress properly invoked that authority here with respect to private claims for money damages.

Importantly, the States do not challenge the PWFA's abrogation of sovereign immunity generally—*i.e.*, with respect to PWFA violations unrelated to abortion. *E.g.*, La Compl. ¶ 122. That is for good reason: the Supreme Court has twice upheld workplace discrimination and accommodation laws as valid Section 5 legislation. *See Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) (upholding Title VII's abrogation of state sovereign immunity for gender-based discrimination claims); *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 730 (2003) (upholding FMLA's abrogation for the family-care provision, because it seeks to remedy "invalid gender stereotypes in the employment context").

Just like the FMLA provision at issue in *Hibbs*, the PWFA properly remedies unconstitutional sex discrimination by countering gender stereotypes, including stereotypes regarding pregnancy. In enacting the PWFA, Congress reiterated its recognition from over four decades ago that "[t]he assumption that women will become pregnant and leave the labor market is at the core of the sex stereotyping resulting in unfavorable disparate treatment of women in the workplace." H.R. Rep. No. 117-27, at 13. Congress received testimony about this continuing problem, *see* 167 Cong. Rec. H2331, H2338, including that "[i]n the 21st century, sex discrimination against pregnant workers often takes the form of reliance on insidious gender role stereotyping concerning women's place in the home and in the workplace" and "such stereotypes—such as, that motherhood and employment are irreconcilable—force pregnant women to choose between having a child and having a job." 167 Cong.

Rec. H2321, H2338 (daily ed. May 14, 2021) (statement of Rep. Cohen) *Id.* at 2338 (quotation omitted). Despite existing legal protections, these sex stereotypes continued to result in pregnant women being denied accommodations, H.R. Rep. No. 117-27, at 11, 27, including by "state employers [who] continue to participate in and foster unconstitutional sex discrimination, including gender-role stereotyping." 167 Cong. Rec. at H2338; *see id.* at H2338-39 (discussing "[e]vidence of persistent discrimination by state actors against pregnant workers in need of accommodation"). Thus, Congress responded to this "difficult and intractable proble[m]" by enacting the PWFA's targeted, incrementally greater protections for pregnancy-related accommodations, in an effort to further counteract "the pervasive presumption that women are mothers first, and workers second." *Hibbs*, 538 U.S. at 736-37.

The Plaintiff States, unable to dispute this, contended at the preliminary injunction stage that they could excise a specific type of conduct from the general waiver of sovereign immunity—accommodations for abortions—and challenge the waiver only as to that conduct. *See La.*, ECF No. 17-1 at 13. But the Supreme Court has repeatedly recognized that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power[,] even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (quoting *Fitzpatrick,* 427 U.S. at 455); *see Lane*, 541 U.S. at 518; *Katzenbach v. Morgan*, 384 U.S. 641, 648 (1966). Plaintiffs' myopic focus on the appropriateness of certain types of accommodations misunderstands that the proper inquiry is whether the accommodation obligation, on the whole, appropriately serves the problem Congress sought to address. *See, e.g., City of Boerne*, 521 U.S. at 532-33 (considering whether RFRA, as a whole, is "proportion[al] to a supposed remedial or preventive object"); *Maitland v. Univ. of Minn.*, 260 F.3d 959, 963, 965 & n.5 (8th Cir. 2001) (declining to individually "review . . . the 'proportionality and congruity' of remedies" where plaintiff claimed Congress improperly abrogated state immunity "with respect to Title VII sex-discrimination claims brought by men" but not women). Similarly, while Congress must "ha[ve] evidence of a pattern of constitutional violations on the part of the States," *Hibbs*, 538 U.S. at 729, the Court has never imposed a requirement that it identify a pattern of state discrimination for every remedy extended under a

statute, as the Plaintiff States previously suggested, *see La.*, ECF No. 17-1 at 13. *Cf. Katzenbach*, 384 U.S. at 654 n.15 (upholding abrogation in Voting Rights Act's prohibition on English literacy requirements notwithstanding that most states did not maintain any literacy requirements); *Maitland*, 260 F.3d at 965 & n.5. The States do not dispute that the abrogation of sovereign immunity for pregnancy-related accommodations is generally valid, and the inclusion of accommodations related to abortion as one of many remedies does not change that calculus.

In any event, inclusion of abortion-related accommodations is congruent and proportional. Sex stereotyping can infect employer determinations as to abortion-related accommodations just as readily as to other pregnancy-related accommodations. For example, an employer may take adverse action against a woman seeking time off for an abortion in reliance on a constitutionally impermissible view that her proper role in society is to procreate. *Cf. Hibbs*, 538 U.S. at 729 (discussing "the many state laws limiting women's employment opportunities" based in part on a belief that "a woman is, and should remain, the center of home and family life" (citation omitted)). And as described, the abortion-related accommodation obligations are narrow, and further offset by the undue hardship exception as well as the unavailability of damages where the employer "demonstrates good faith efforts, in consultation with the employee . . . , to identify and make a reasonable accommodation[.]" 42 U.S.C. § 2000gg-2(g). The Plaintiff States thus cannot succeed on their challenge.

## IV.    THE FINAL RULE DOES NOT INFRINGE ON STATE SOVEREIGNTY

The States claim that the Final Rule "is destructive of state sovereignty" because it undermines the States' interests in regulating abortion, as recognized in *Dobbs*. *La.*, ECF No 17-1 at 14-15. As an initial matter, the Final Rule does not actually hinder any rights of the states to legislate about abortion. *See supra* § I.B.2; 89 Fed. Reg. at 29,104 ("[T]he PWFA . . . does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted."). And even if it did, nothing in *Dobbs* prevents the Federal Government from legislating in areas that implicate abortion. *See* 597 U.S. at 338 (Kavanaugh, J., concurring) (Court "leaves the issue" of abortion to be resolved "through the democratic process in the States or *Congress*" (emphasis added)). The States make no allegation that the PWFA (let alone the Final Rule) exceeds Congress's enumerated

powers or any other independent limit on Congressional authority; thus, it does not violate federalism principles. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981).

The States previously argued that the Final Rule is arbitrary and capricious because it asserted that it "'has no federalism implications,' and any 'interaction or conflict between PWFA and State laws . . . will be addressed on a case-by-case basis.'" *La.*, ECF No. 17-1 at 15 (quoting 89 Fed. Reg. at 29,122; 29,182); *see also* La. Compl. ¶ 39. To the extent Plaintiff States are disputing EEOC's determinations made pursuant to Executive Order No. 13132, *see* 89 Fed. Reg. at 29,182 (explaining EEOC "reviewed this rule in accordance with Executive Order 13132 regarding federalism and has determined that it does not have 'federalism implications'"), that Executive Order is not privately enforceable. *See California v. EPA*, 72 F.4th 308, 317-18 (D.C. Cir. 2023); *Valentine Props. Assocs., LP v. U.S. Dep't of Hous. & Urb. Dev.*, 785 F. Supp. 2d 357, 368 (S.D.N.Y. 2011), *aff'd*, 501 F. App'x 16 (2d Cir. 2012). Assuming a more generic arbitrary-and-capricious claim, EEOC's discussion of this topic was "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). EEOC rationally responded to comments by stating:

> The Commission does not agree . . . [that the Rule] requires covered entities, including State and local governments, to violate State laws that limit access to abortion, nor does the rule transgress limits of federalism. The rule does not prescribe when, where, or under what circumstances an abortion can be obtained or what procedures may be used.

89 Fed. Reg. at 29,112. EEOC further supported its conclusion by noting that despite Title VII covering abortions "for nearly 45 years . . . comments on this topic did not point to a situation where a State was forced to violate its own laws." *Id.* at 29,113. But "[t]o the extent any such issues arise in connection with the PWFA," EEOC committed to "address[] [them] on a case-by-case basis . . . given the State- and fact-specific nature of these issues." *Id.* Adopting the same case-by-case approach that EEOC has used for decades under Title VII and the ADA was perfectly reasonable. *See id.* at 29,144-54; *see also Nat'l Lab. Rels. Bd. v. Bell Aerospace Co., Div. of Textron Inc.*, 416 U.S. 267, 294 (1974).[9]

---

[9] The Plaintiff States, in a single paragraph of their complaint, suggest that the Final Rule's Economic Analysis is flawed. *See* La. Compl. ¶ 70. Even if such a claim were properly presented, it would fail for

## V.    THE FINAL RULE DOES NOT VIOLATE THE PLAINTIFF STATES' FREE SPEECH RIGHTS

The Plaintiff States claim obliquely that the Rule improperly affects their ability to convey messaging, La. Compl. ¶ 64, and that the Rule is arbitrary and capricious for failing to adequately consider Free Speech interests, *id.* ¶ 69. But Plaintiff States have no First Amendment rights to invoke, as multiple courts of appeals have held. *See, e.g.*, *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 379 (5th Cir. 1989); *NAACP v. Hunt*, 891 F.2d 1555, 1565 (11th Cir. 1990); *Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass.*, 868 F.2d 473, 481 (1st Cir. 1989); *see also Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019) ("The Free Speech Clause of the First Amendment constrains governmental actors and protects private actors."); *see also* PI Order at 25 (recognizing that "the First Amendment does not confer rights on States").

To the extent a state government is able to choose its own speech, *id.* at 25, that ability does not support allowing States to bring affirmative claims against the United States because a Federal policy is allegedly contrary to the States' preferred "messaging." This Court previously relied on the Fifth Circuit's now-vacated holding in *Missouri v. Biden*, 83 F.4th 350, 372 (5th Cir. 2023), for the principle "that the government (state or otherwise) has a 'right' to speak on its own behalf," PI Order at 25 (quoting *Missouri*, 83 F.4th at 372). But the Supreme Court has since concluded that the plaintiffs in *Missouri v. Biden* lacked standing, reversed the judgment of the Fifth Circuit, and remanded for

---

multiple reasons. The Economic Analysis was generated pursuant to Executive Orders, *see* 89 Fed. Reg. at 29,155, that are not privately enforceable, *see* E.O. 12,866 § 10; E.O. 13,563 § 7(d); E.O. 14,094 § 4(c); *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1326-27 (11th Cir. 2021); *Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 670 (6th Cir. 2013); *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999). And, contrary to Plaintiffs' contention, the Economic Analysis did recognize that there may be some costs to states like Plaintiffs but determined that, because state laws were "substantially similar," the "additional costs" would be "minimal." 89 Fed. Reg. at 29,169; *see also id.* at 29,160 (finding compliance activities will be relatively low cost because "employers covered by the PWFA already are covered by Title VII and the ADA" and "will be able to use many of their existing procedures" and "human resources staff"). It also assessed the average costs of providing accommodations, which includes those related to abortion. *See id.* at 29,157.

The Plaintiff States also allege that EEOC's structure violates Article II and Separation of Powers. *See* La. Compl., Count IV. But as Plaintiffs themselves concede, this claim is foreclosed by the Fifth Circuit's decision in *Consumers' Research v. Consumer Product Safety Commission*, 91 F.4th 342 (5th Cir. 2024). *See* La. Compl. ¶ 77 n.19.

further proceedings consistent with the opinion. *See Murthy*, 144 S. Ct. at 1997. As a result, the Fifth Circuit lacked jurisdiction when it decided *Missouri* and its decision thus has no precedential value. *See generally La.*, ECF No. 55 at 7. In any event, the Fifth Circuit's decision in *Missouri v. Biden* does not support granting First Amendment rights to States as abstract entities; in that case there were identified state officials, acting in their official capacities, who had "suffered, and will likely continue to suffer, direct censorship on social media." 83 F.4th at 371. The Plaintiff States fail to identify any such individuals here, or any specific speech that would be at issue.

The Plaintiff States also cite *Walker v. Texas Division, Sons of Confederate Veterans, Incorporated*, 576 U.S. 200 (2015), as suggesting that States may engage in expressive conduct protected by the First Amendment. La. Compl. ¶ 52. But that case involved the distinct "government speech" doctrine, which operates as a shield, preventing private parties from bringing First Amendment challenges to the content of the government entity's own speech. *See Walker*, 576 U.S. at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560 (2005) (describing "government speech" as "not susceptible to First Amendment challenge"). That doctrine is not a sword providing governmental entities with affirmative First Amendment rights to invoke against other governmental entities.

Even if they had First Amendment rights, the Plaintiff States' claims would still fail alongside the Bishops' claims. *See* USCCB Compl. ¶¶ 261-67; *infra* § VIII.4. The Final Rule "regulates conduct, not speech. It affects what [employers] must *do* . . . not what they may or may not *say*." *Rumsfeld v. Forum for Acad. & Institutional Rts. (FAIR), Inc.*, 547 U.S. 47, 60 (2006); *see also id.* at 62 ("[I]t has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part . . . carried out by means of language[.]"); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 550 (5th Cir. 2008) (quoting same). The Final Rule does not require any employer to express any view on abortion to anyone, and there is nothing communicative or "inherently expressive," *FAIR*, 547 U.S. at 66, about an employer granting an accommodation to an employee. *See, e.g., Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 571-72 (1995) ("public accommodations statutes" that "prohibit[] discrimination" "do not, as a general matter,

violate the First . . . Amendment[]"); *see also Telescope Media Grp. v. Lucero*, 936 F.3d 740, 757 (8th Cir. 2019) (similar). As in *FAIR*, "an observer would have no way of knowing [the employer] was expressing [approval or] disapproval of [the employee's actions] without accompanying explanatory speech." *Ark. Times LP v. Waldrip ex rel. Tr. of Univ. of Ark. Bd. Of Trs.*, 37 F.4th 1386, 1392 (8th Cir. 2022). Granting an employee an accommodation thus does not implicate the First Amendment.

The same is true of the Final Rule's provisions related to retaliation and coercion, which fit under the rubric of "antidiscrimination laws that . . . target conduct." *Telescope Media Grp.*, 936 F.3d at 757. The Final Rule makes clear that "the making of general statements regarding an employer's mission or religious beliefs" is not the sort of conduct that EEOC has "determined would be prohibited." 89 Fed. Reg. at 29,148. The anti-coercion "provision does not apply to any and all conduct or statements that an individual finds intimidating; it prohibits only conduct that is reasonably likely to interfere with the exercise or enjoyment of PWFA rights." *Id.* Indeed, the PWFA's anti-retaliation and anti-coercion provisions are the same as those in Title VII and the ADA, respectively, *see id.*, with which employers have complied for decades without First Amendment concerns, *id.* at 29,152.

Finally, the Plaintiff States contend that the Final Rule is arbitrary and capricious for "fail[ure] to meaningfully assess [its] Free Speech . . . implications." La. Compl. ¶ 69. Without First Amendment rights to invoke, however, the Plaintiff States are not in the zone of interests for this challenge. *See Mtn. States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Regardless, EEOC extensively reviewed and responded to comments raising potential First Amendment concerns, *see* 89 Fed. Reg. at 29,144-53, including specifically with respect to Free Speech and the anti-coercion provision. *Id.* at 29,144; 29,148. EEOC further committed to considering any First Amendment defenses on a case-by-case basis and sought to facilitate employers' abilities to raise such defenses. *Id.* at 29,147-48; 29,151-52. There is nothing irrational about that approach, especially for sensitive, fact-bound situations involving issues of speech. *Cf. Bell Aerospace Co.*, 416 U.S. at 294 ("[T]he choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion.").

## VI.    THE BISHOPS ARE NOT ENTITLED TO A BLANKET RFRA EXCEPTION

The Bishops' RFRA claim incorrectly portrays the Final Rule as requiring them to violate their religious beliefs, and EEOC as having already predicted that defenses under RFRA would fail. *See, e.g.*, USCCB Compl. ¶¶ 211-12, 217. To the contrary, EEOC recognizes that for a given case the Bishops may well have a RFRA defense. To that end, the Final Rule does not require accommodations in all circumstances (such as when the accommodation is unreasonable, causes undue hardship, or would implicate religious exceptions), does not purport to resolve any RFRA defenses, and commits to taking such defenses seriously when evaluating them on a fact-specific basis. 89 Fed. Reg. at 29,149. Additionally, EEOC's enhanced procedures allow for expedited review of defenses, including religious ones. The Bishops have not articulated any reason why EEOC's case-by-case adjudication of RFRA defenses itself violates RFRA. For similar reasons, the Bishops' Free Exercise claim also fails.

### A.    The Final Rule Lawfully Adopts a Case-by-Case Approach to RFRA

The Final Rule applies across the country's employers, to a large variety of entities, and makes clear it is not actually deciding or pre-judging any RFRA claims. *Id.* at 29,148-49 ("[T]he Commission will carefully consider these matters, analyzing RFRA defenses to claims of discrimination on a case-by-case basis."). The Final Rule's commitment to addressing religious objections on a case-by-case basis is wholly consistent with RFRA, and makes plain that the Rule does not infringe on the Bishops' religious freedoms. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006) ("*O Centro*"), 546 U.S. at 436 (affirming the "feasibility of case-by-case consideration of religious exemptions to generally applicable rules").

Such an approach renders this case fundamentally dissimilar to cases in which the courts concluded that the challenged agency policy *actually required* plaintiffs to do something that violated their religious beliefs. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014); *Braidwood*, 70 F.4th at 929 (noting "admissions from the EEOC that Braidwood's current practices violate Title VII"). Here, in contrast, the Bishops have not been "forc[ed]" to "choose between two untenable alternatives: either (1) violate [the law] and obey their convictions, or (2) obey [the law] and violate their convictions." PI Order at 16 (quoting *Braidwood*, 70 F.4th at 937). Unlike in *Braidwood*, for example,

EEOC does not claim that the Bishops' policies facially violate the PWFA, given the availability of religious and other exceptions under the Final Rule. And the Final Rule does not *per se* require the Bishops (or any employer) to grant accommodations as to which they have a religious objection (or that otherwise pose an undue hardship).

The Bishops fail to grapple with EEOC's commitment to evaluate RFRA (and other defenses) "consistent with the facts presented and applicable law." 89 Fed. Reg. at 29,147. Plaintiffs do not provide any reason such a case-by-case approach to evaluating RFRA would itself violate RFRA. *See Brown v. Collier*, 929 F.3d 218, 230 (5th Cir. 2019) ("[W]hether the government action or regulation in question imposes a substantial burden on an adherent's religious exercise requires a case-by-case fact-specific inquiry."). They do not assert that participating in the case-by-case process itself burdens their religious observance, or that the case-by-case process is inadequate to protect their rights. Nor could they. EEOC's charge process is a non-adversarial, administrative proceeding that results in no penalties for an employer, and EEOC "take[s] great care in evaluating [any] asserted religious or other defense(s)." 89 Fed. Reg. at 29,147 (cleaned up). For example, as the Final Rule explains, using EEOC's enhanced procedures, employers can raise religious (or other) defenses at any stage of the process, request prioritization of such defenses, and "easily inform [EEOC] of a potential defense" via an online portal. *Id.* at 29,147-48. And EEOC is committed to "resolv[ing] the charge based on the information submitted in support of asserted defenses, including religious defenses, in order to minimize the burden on the employer and the charging party." *Id.* at 29,148.

The nature of the PWFA framework also hindered EEOC's ability to adopt an alternative approach. Whether an accommodation is covered by the PWFA, is "reasonable," and is not an undue hardship are all based on the specific circumstances at issue. *See, e.g.*, *id.* at 29,100; 29,122; 29,125. Similarly, whether a specific accommodation substantially burdens an employer's religious views will depend on the relevant details. *See id.* at 29,153 ("[T]he specific facts and circumstances in a given situation may affect whether the employer objects to an employee's actions on religious grounds."); *see also* USCCB Compl. ¶ 5 (specifying, for example, that the Bishops oppose only certain activities, including certain types of abortion, as "violative of their religious beliefs"). Therefore, even a blanket

exception for religious objections would still require a determination of whether the specific accommodation at issue implicates a religious employer's religious beliefs. EEOC cannot say, "in the abstract, in the absence of a concrete factual context," whether a particular accommodation would fall under an undue hardship, RFRA, or other exception. 89 Fed. Reg. at 29,147.

Other structural barriers also prevent EEOC from addressing religious concerns earlier in the process. For one, because EEOC has no investigatory authority until a charge of discrimination is filed, "[t]he PWFA does not provide a mechanism for [EEOC] to provide legally binding responses to employer inquiries about the potential applicability of religious or other defenses before th[at] point." *Id.* Similarly, "[c]reating a per se rule that an employer's beliefs automatically and always create an undue hardship would be fundamentally inconsistent with [the PWFA and ADA's statutory] requirement that undue hardship be assessed as a defense on a case-by-case basis, and would therefore be inconsistent with the PWFA." *Id.* at 29,153.

The Bishops have failed to show that application of the case-by-case approach would itself violate RFRA, or that it imposes added regulatory burden and compliance costs. *Cf.* PI Order at 16. As described above, it is entirely hypothetical whether any EEOC charge will ever materialize against a Bishop Plaintiff regarding an accommodation to which they object. *See supra* § I; *Nat'l Conf. of Cath. Bishops*, 653 F.2d at 540 ("employees of . . . two religious organizations are as likely to be aware of plaintiffs' opposition to abortions as they are unlikely, as a consequence of their awareness, to request such benefits"). Nor is it clear that participation in the charge process—where under EEOC's enhanced procedures, religious defenses may be raised and considered as a threshold matter—imposes any additional burdens on them. Indeed, even if EEOC could have granted an advance exception for religious entities as to accommodations that violate their religious views, such a framework would still necessitate use of the charge process; nothing would prevent an employee from filing a charge, which EEOC would be required to consider, *see* 42 U.S.C. § 2000e-5(b); 2000gg-2(a). *EEOC v. Catholic University*, 83 F.3d 455, 466 (D.C. Cir. 1996), highlighted in the Court's PI Order, is not to the contrary; while that case did involve a more protracted charge process and litigation, the conduct at issue in that case pre-dated both RFRA's enactment and EEOC's adoption of enhanced procedures to raise

religious defenses early in the process. The plaintiff failed to raise a RFRA defense until the case reached the D.C. Circuit. *Id.* at 468. That factual situation is fundamentally dissimilar to one the Bishops claim they might confront, where they can raise RFRA and other defenses at their earliest convenience, especially in light of EEOC's enhanced procedures for considering religious and other defenses, discussed above.

Moreover, the Final Rule's approach to RFRA and other religious defenses was not arbitrary and capricious. *See* La. Compl. ¶ 69; USCCB Compl. ¶¶ 196, 199. EEOC extensively reviewed and responded to comments raising potential First Amendment concerns, *see* 89 Fed. Reg. at 29,144-53, including with respect to the religious employer exception and the anti-coercion provision. *Id.* at 29,144; 29,148. EEOC committed to considering First Amendment defenses on a case-by-case basis and sought to facilitate employers' abilities to raise such defenses. *Id.* at 29,147-48; 29,151-52. There is nothing arbitrary or capricious about that approach, especially for fact-bound situations involving issues of speech and religion. *See O Centro*, 546 U.S. at 436; *cf. Bell Aerospace Co.*, 416 U.S. at 294.

The Final Rule's case-by-case approaches thus both address the Bishops' concerns and adhere to RFRA's demand for "a case-by-case, fact-specific inquiry." *Brown*, 929 F.3d at 230 (citation omitted); *see also O Centro*, 546 U.S. at 430, 436; 89 Fed. Reg. at 29,148-49.

## B.    The Court Should Not Grant the Bishops a Blanket RFRA Exemption

Even if some additional RFRA analysis were necessary beyond upholding the Final Rule's case-by-case approach, Plaintiffs are not entitled to the expansive relief they seek—*i.e.*, a preemptive declaration that they will always prevail under RFRA. *See, e.g.*, USCCB Compl., Prayer for Relief, ¶ d.

### 1.    The Bishops Do Not Demonstrate a Substantial Burden

The Bishops do not demonstrate that their religious exercise is substantially burdened in all circumstances. USCCB Compl. ¶ 5 (objecting only to certain actions as "violative of their religious beliefs"). For example, Plaintiffs do not object to all abortions, *id.*, and the USCCB further objects only to "*knowingly* accommodat[ing]" the abortions they oppose, *USCCB*, ECF No. 11-5, at ¶ 42 (emphasis added); *see also id.* ¶¶ 37-38. Moreover, the Bishops do not assert that they have undertaken any past efforts to verify that employees do not use available leave (like sick leave) to obtain abortions,

which may raise questions about whether the PWFA's requirements would necessarily burden their sincere religious exercise. *Cf. Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013), *abrogated on other grounds by Groff v. DeJoy*, 600 U.S. 447 (2023).

The Bishops cannot mend these defects by alleging that the Final Rule violates their Free Speech rights. *E.g.*, USCCB Compl. ¶¶ 265-67. They fail to identify any speech they claim must be altered. Regardless, the Final Rule does not restrict the Bishops' abortion-related speech; it only prohibits retaliation and coercion, similar to Title VII and the ADA. *See infra* § VIII.4. Thus, the Bishops cannot demonstrate a substantial burden inherent in the Final Rule.

## 2.    The Government's Interests are Compelling

While, in the ordinary course, the burden of showing a compelling interest falls on the Government, *e.g.*, *O Centro*, 546 U.S. at 428-29, here, the Bishops cannot obtain a blanket exemption without demonstrating that the Government will *never* have a compelling interest in ensuring that an employee receives an accommodation to which they object, or that less restrictive means are *always* available.

As this Court recognized in its preliminary injunction order, and contrary to the Bishops' allegations, *see* USCCB Compl. ¶¶ 215, 217, the Government presents important interests and equities in these cases, including "eliminat[ing] discrimination and promot[ing] women's health and economic security." PI Order at 30 (quoting H.R. Rep. No. 117-27, at 1). The Government's compelling interests also include ensuring that qualified employees can remain in the workforce while receiving health care, including abortions, which may be needed for health- or life-saving reasons, *see* 89 Fed. Reg. at 29,103-04 n.57; *cf. Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997), and in eradicating workplace discrimination and "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984); *see also EEOC v. Miss. Coll.*, 626 F.2d 477, 488 (5th Cir. 1980); 167 Cong. Rec. at H2338 (PWFA targets "sex discrimination against pregnant workers [which] often takes the form of reliance on insidious gender role stereotyping concerning women's place in the home and in the workplace"); *id.* at H2331; H.R. Rep. No. 117-27, at 13. Through the PWFA,

Congress sought to "promote the economic well-being of working mothers and their families" by mitigating the "severe economic consequences" that can result from a refusal to provide a reasonable accommodation. H.R. Rep. No. 117-27, at 5, 25.

Plaintiffs therefore err in arguing that the Government can *never* establish a compelling interest. To be sure, "the government's compelling interest in purportedly eradicating sex discrimination [is not] a trump card against every RFRA claim." *Braidwood*, 70 F.4th at 939. By the same token, however, Plaintiffs cannot claim that, regardless of fact or circumstance, they will always prevail under RFRA. *See, e.g.*, *id.* at 938 (agreeing with "the inapplicability of deciding RFRA claims class-wide").

### 3.    The EEOC Used The Least Restrictive Means Available

Finally, the Final Rule uses the least restrictive means to address these compelling interests. Indeed, given the nature of the PWFA framework and the fact that accommodations are to be provided by employers, not the government, it is not clear what any alternative approach in the Final Rule could look like. *See supra* § VI.A. Accommodations like leave from work can only be extended by employers, so EEOC "lacks other means of achieving its desired goal." *Hobby Lobby*, 573 U.S. at 728. Other options that courts have deemed relevant in some cases, such as the government taking on certain costs, *id.* at 730, would not ensure that individuals can manage pregnancy- or childbirth-related conditions without suffering workplace penalties, or while receiving accommodations, like leave, that necessarily come from the employer. Indeed, it is notable that the Bishops suggest no alternative approaches that would ensure the Government's compelling interests are fulfilled. *E.g.*, USCCB Compl. ¶ 236. And the rule is narrowly tailored in providing that employers do not have to provide accommodations that cause undue hardship, employers are not required to pay for an abortion or provide paid leave to an employee seeking one, and employers may request that the agency prioritize a determination on their religious defenses. *See* 89 Fed. Reg. at 29,104; 29,148. Plaintiffs should therefore not be granted a blanket RFRA exemption.

### 4.    Plaintiffs' Free Exercise Claim Fails Alongside their RFRA Claim

Plaintiffs bring a tag-along Free Exercise claim, arguing that the Final Rule is subject to strict scrutiny. *E.g.*, USCCB Compl. ¶¶ 221-38. But the Final Rule is "a neutral law of general applicability,"

34

89 Fed. Reg. at 29,151, and neither the PWFA nor the Final Rule treats "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). All of the Final Rule's secular exemptions, such as undue hardship, apply at least equally to religious organizations. In any event, even if strict scrutiny applied, Plaintiffs are not entitled to a categorical exemption for all the reasons discussed above.

## VII.    THE FINAL RULE CORRECTLY INTERPRETS THE PWFA

The Bishops also challenge the Final Rule's interpretation of the PWFA's rule of construction, § 107(b), codified at 42 U.S.C. § 2000gg-5(b), seeking to make it a blanket exception. Section 107(b) incorporates Title VII's religious employer exception (42 U.S.C. § 2000e-1(a)) as a Rule of Construction. The relevant portion of Title VII, § 702, provides that "[Title VII] shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [entity] of its activities." 42 U.S.C. § 2000e-1(a). As a threshold matter, to the extent the Court grants the Bishops relief under RFRA, there is no need to consider this additional claim, which requests the same (or lesser) relief.  But if the Court does reach this claim, it should be found meritless. Although the Bishops contend that EEOC "interprets the PWFA and Title VII religious exemptions to apply only to claims of religious discrimination," USCCB Compl. ¶ 174, this assertion is incorrect. The Final Rule is clear that § 107(b) may be invoked as a response to any PWFA charge of discrimination, and that those claims and defenses will be considered on a case-by-case basis—just as has been done with Title VII's religious employer exception. Additionally, Plaintiffs provide no reason why case-by-case consideration of the § 107(b) defense is inappropriate.

As an initial matter, Plaintiffs' narrow focus on § 107(b) ignores that the Final Rule includes multiple defenses that pertain to religious employers. This includes the First Amendment's ministerial exception and undue hardship, both of which may well apply to entities like the Bishop Plaintiffs. *See* 89 Fed. Reg. at 29,150 (such exception would "likely apply" where "a religious school instructor employed by the Catholic Church as a Catechist" is denied an accommodation "because the teacher is pregnant but not married"); *id.* at 29,154 (undue hardship applies where "granting a particular

reasonable accommodation would 'fundamentally alter the nature of the business'"). Many of the same facts that might implicate § 107(b) could result in successful defenses under the ministerial exception and/or undue hardship, which may resolve a case without needing to reach a § 107(b) defense. *Cf. Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 327-29 (4th Cir. 2024) (deciding case based on the ministerial exception rather than a wide-ranging claim under § 702). Plaintiffs have not specifically identified any employees they allege are outside the ministerial exception, nor have they alleged that EEOC would reject their undue hardship defense. Thus, Plaintiffs cannot establish that the Final Rule's interpretation of § 107(b) fails to protect them.

The Bishops additionally misconstrue what the Final Rule says about § 107(b). Although the Bishops contend that EEOC "has repeatedly taken an unlawfully narrow interpretation of religious liberty protections, including the PWFA and Title VII religious exemption," Plaintiffs provide no support for this interpretation. USCCB Compl. ¶ 199; *see also id.* ¶¶ 66-67 (asserting that EEOC claims the exemption bars only religious discrimination claims); *id.* ¶¶ 163-71. Indeed, as the Final Rule makes clear, entities are free to invoke religion as a defense to any claims of discrimination under the PWFA:

> If a qualifying religious organization asserts as a defense to a claim under the PWFA that it took the challenged action on the basis of religion and that section 107(b) should apply, the merits of any such asserted defense will therefore be determined on a case-by-case basis consistent with the facts presented and applicable law.

89 Fed. Reg. at 29,147. Moreover, the Bishops fail to explain how this language in the Final Rule is fundamentally different from prior EEOC guidance on Title VII, which they previously *embraced* as reflecting a proper approach. *See USCCB*, ECF No. 1-3, at 14-15.

The Bishops now contend that "Congress meant to allow religious exemptions from pregnancy-accommodation claims," and that the exception in Title VII and the PWFA protects religious employers from *any* Title VII or PWFA claim. *See* USCCB Compl. at 2; *see also id.* ¶¶ 172, 176. But Fifth Circuit precedent does not support the Bishops' argument. *See Miss. Coll.*, 626 F.2d at 484-86 & n.10 (explaining that even if an employer can permissibly "recruit only among Baptist colleges" for religious reasons, the employer may not "recruit only among Baptist Colleges that are predominantly white as opposed to all Baptist colleges"); *McClure v. Salvation Army*, 460 F.2d 553, 558

(5th Cir. 1972); *see also* 89 Fed. Reg. at 29,147 n.239 (collecting cases). As the Fourth Circuit recently recognized, "[n]o federal appellate court in the country has embraced the . . . argument that Title VII permits religiously motivated sex discrimination by religious organizations." *Billard*, 101 F.4th at 328. And even Plaintiffs' cited authority recognizes that several courts have rejected a broad interpretation of Title VII's religious employer exception. *See, e.g.*, *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring). Nor is *Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 132 (3d Cir. 2006) to the contrary. *See* PI Order at 27. Indeed, in coming to its decision in that case, the Third Circuit noted that "many claims of discrimination against a religious employer under Title VII will not raise serious constitutional questions," and that "there are circumstances in which Congress' intention to apply Title VII to religious employers is less clear." *Curay-Cramer*, 450 F.3d at 139, 141.[10]

Certainly it is not unlawful—or arbitrary or capricious—for EEOC, in a Final Rule with nationwide effect, to implement a case-by-case approach for deciding § 107(b) defenses, rather than adopt a categorical legal position that no federal appellate court has endorsed and several have rejected.[11] That is particularly true in the context of the PWFA, given that Congress itself refused to adopt such a categorical rule regarding accommodations that would violate a religious entity's beliefs. *See* 168 Cong. Rec. S10069-70 (daily ed. Dec. 22, 2022) (rejecting an amendment that would have provided that the PWFA "not be construed to require a religious entity . . . to make an accommodation that would violate the entity's religion"). As under Title VII, EEOC explicitly does not pre-judge any religious employer's application for the exception under any specific set of facts. 89 Fed. Reg. at

---

[10] With regard to the specific facts presented in *Curay-Cramer*, the court was weighing claims of comparative treatment of men and women by the employer in situations it found not "truly comparable." 450 F.3d at 140-41. The Third Circuit went on to note that the case before them was "distinguish[ed] . . . from [a case] in which a plaintiff avers that truly comparable employees were treated differently following substantially similar conduct," suggesting that some claims of sex discrimination by religious employers could be considered by the court. *Id.* at 141. The comparative questions at the heart of *Curay-Cramer* are not at issue in the cases before this Court.

[11] Indeed, Congress used the same language as in Title VII, and EEOC is interpreting that language as it would under Title VII.

29,146-47 ("the merits of any such asserted defense will . . . be determined on a case-by-case basis consistent with the facts presented and applicable law").

Even accepting *arguendo* Plaintiffs' arguments regarding the breadth of § 107(b), EEOC would still need to adopt a case-by-case, fact-specific approach for evaluating whether the challenged employer conduct was genuinely based on religion. *See Miss. Coll.*, 626 F.2d at 484-86 & nn.10-11 (remanding for factual finding about whether hiring decision was based on religion or based on impermissible characteristic); *see also Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000) (describing applicability of exception as "primarily a factual battle"). The Final Rule does not limit the defenses that Plaintiffs may raise, nor does it pre-judge them; thus, it lawfully implements § 107(b) through a case-by-case approach. *Cf. Bell Aerospace Co.*, 416 U.S. at 294.[12] Finally, Plaintiffs' invocation of constitutional avoidance is meritless. *See* USCCB Compl. ¶ 177. It is difficult to see what constitutional issue requires avoidance, given that the Fifth Circuit has already confirmed that Title VII's religious employer exception, which the PWFA incorporates as a Rule of Construction, may be applied consistent with the First Amendment, *Miss. Coll.*, 626 F.2d at 486-89. Additionally, the Final Rule recognizes the possibility that employers may qualify for the ministerial exception and other First Amendment protections. *See, e.g., infra* § VIII. Regardless, EEOC's case-by-case approach does not require unconstitutional entanglement in internal religious affairs; to the contrary, that approach allows EEOC to ensure that it does not improperly wade into such matters unless necessitated by an actual charge. Thus, the Final Rule lawfully implements § 107(b), and EEOC's case-by-case approach for evaluating these issues does not inherently raise constitutional concerns.

## VIII.  THE BISHOPS' OTHER FIRST AMENDMENT CLAIMS FAIL

In addition to their claims pertaining to RFRA, free exercise, and the rule of construction, the Bishops' Complaint includes claims alleging that the Final Rule violates the church autonomy doctrine (Count VII); the ministerial exception (Count VIII); rights of expressive association (Count IX); and

---

[12] The Bishops are incorrect that § 107(b) would be meaningless if it were limited to religious discrimination. *See, e.g.*, 89 Fed. Reg. at 29,146 n.230. Regardless, the Final Rule does not pre-judge any defense, including the scope of § 107(b).

free speech (Count X). *See* USCCB Compl. ¶¶ 240-68. As an initial matter, there is likely no need for this Court to address these claims. To the extent the Court grants Plaintiffs relief against the Final Rule under RFRA, these additional claims request the same (or lesser) relief. And to the extent the Court rules in EEOC's favor—either because the Final Rule's case-by-case evaluation does not substantially burden Plaintiffs' religious exercise, or because it advances a compelling governmental interest through the least restrictive means—that same analysis would likewise foreclose these additional claims. In any event, each of these additional claims fails on its own terms.

**1.** Regarding the church autonomy doctrine, the Bishop Plaintiffs do not (and cannot) point to anything in the Final Rule that is an allegedly incorrect statement or application of that doctrine. To the contrary, the Final Rule confirms that EEOC "will 'take great care' in evaluating the asserted religious or other defense(s)" raised by employers, 89 Fed. Reg. at 29,147, and "when evaluating a religious employer's RFRA defense or any other religious defense, the Commission will consider the Establishment Clause implications as part of its case-by-case analysis." *Id.* at 29,151. EEOC's commitment to seriously evaluate every religion defense raised—including church autonomy defenses—was not arbitrary and capricious.

Nor is there anything in Supreme Court or Fifth Circuit case law compelling EEOC to adopt a different approach. The Supreme Court has recognized "[t]he independence of religious institutions in matters of 'faith and doctrine,'" as well as "internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). But that "does not mean that religious institutions enjoy a general immunity from secular laws[.]" *Id.*; *see also, e.g.*, *Starkman v. Evans*, 198 F.3d 173, 177 (5th Cir. 1999) (stating that "religious institutions are generally bound by the ADA and other employment discrimination laws," and thus "a church secretary or janitor may advance an ADA claim if he or she is discharged because of a disability"); *Miss. Coll.*, 626 F.2d at 487 (rejecting First Amendment defense raised by religious institution when "in the factual context before us, the application of Title VII to the College could have only a minimal impact upon the College's religion based practices"); *cf. McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 348 (5th Cir. 2020) (foreclosing judicial review only over "claims that require resolution

of 'strictly and purely ecclesiastical' questions"). Moreover, the Final Rule states clearly that the ministerial exception will be followed; that exception helps protect church autonomy.

Here, the record does not demonstrate that in *every* conceivable circumstance application of the Final Rule to the Bishops would result in a violation of church autonomy. Such a showing would be impossible since, as discussed above, the Final Rule itself leaves open the possibility that accommodations may not be required due to the ministerial exception, undue hardship, RFRA, or other defenses. Thus, Plaintiffs cannot demonstrate their entitlement to a categorical, *per se* exemption from the Final Rule's requirements based on the church autonomy doctrine. *Cf. EEOC v. Sw. Baptist Theological Seminary*, 651 F.2d 277, 287 (5th Cir. 1981) ("Neither the Supreme Court nor this court has held that the employment relationship between a church and all of its employees is a matter of purely ecclesiastical concern."). Instead, the church autonomy defense would necessarily need to be addressed on a fact- and case-specific basis, which is precisely the approach the Final Rule adopts.

**2.** A similar analysis applies with respect to the Bishops' claim regarding the ministerial exception. The Final Rule acknowledges that "the Supreme Court has recognized a ministerial exception, derived from the religion clauses of the First Amendment, which may provide an affirmative defense to an otherwise cognizable claim of a certain category of employees under certain anti-discrimination laws, including the PWFA." 89 Fed. Reg. at 29,150. And the Final Rule expressly recognizes that a Catholic educational institution could likely invoke the ministerial exception to deny an accommodation to an instructor employed as a Catechist who is pregnant but not married. *Id.*

Again, the Bishops do not identify any specific defect or misstatement in the Final Rule's analysis. Nor do the Bishops argue that the ministerial exception should apply to all of their employees. *See* PI Oral Arg. Tr. at 9:18-10:1 (stating that the ministerial exception would be an available defense "for some of our employees"). Thus, there was nothing unlawful or arbitrary about EEOC electing to address that exception on a case-by-case basis, consistent with applicable law. *See* 89 Fed. Reg. at 29,150; *see also Our Lady of Guadalupe*, 591 U.S. at 758.

**3.** As for expressive association, the Final Rule again expressly allows employers to raise such defenses: "[S]hould the responding employer raise constitutional expressive association concerns as a

defense to the charge during the charge process, the Commission will evaluate each claim on a case-by-case basis[.]" *Id.* at 29,153. The Bishops do not identify anything unlawful or irrational about the Final Rule's treatment of these issues.

Indeed, the Bishops wholly ignore that the Supreme Court has previously held that employment discrimination laws like Title VII do not violate employers' associational rights. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (allowing Title VII claim against law firm, noting that "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections"). And nothing in the current record demonstrates how granting a confidential accommodation to a requesting employee would impair the Bishops' ability to publicly communicate their preferred message regarding abortion. *Cf. FAIR*, 547 U.S. at 69-70.

**4.** Finally, the Bishops' free speech claim also fails. As discussed above, none of the Plaintiffs here have demonstrated that they currently engage in speech, or intend to engage in speech, that would plausibly run afoul of the PWFA's anti-coercion and anti-retaliation provisions—which have existed in similar form under Title VII and the ADA for decades without any apparent First Amendment concerns. *See* 89 Fed. Reg. at 29,152. Indeed, the Final Rule makes plain that the type of speech described by the Bishops does not violate the PWFA. *Compare, e.g.*, USCCB Compl. ¶ 263 ("Plaintiffs also advocate regarding their beliefs on matters such as abortion and make clear that they discourage individuals from choosing to obtain an abortion."), *with* 89 Fed. Reg. at 29,142 ("[T]he making of general statements regarding an employer's mission or religious beliefs is not the type of conduct that the Commission previously has determined would be prohibited by this provision."). And to the extent the Bishops' purported speech is really just their unwillingness to grant particular types of accommodations, that is conduct that can lawfully be regulated, not expressive speech protected by the First Amendment. *See FAIR*, 547 U.S. at 62.

Moreover, the Bishops' claim is founded on a false premise—that "the Final Rule includes no exception for protected speech." USSCB Compl. ¶ 265. To the contrary, the Final Rule is again explicit that EEOC is willing to consider employers' free speech defenses on a case-by-case basis: "[S]hould

the Commission receive a charge alleging coercion or retaliation, and should the responding employer raise constitutional concerns as a defense to the charge during the administrative charge process, the Commission will evaluate each claim on a case-by-case basis under the process it has outlined above." 89 Fed. Reg. at 29,152. This approach was not unlawful or irrational, particularly given the absence of free speech concerns raised in connection with similar provisions in Title VII and the ADA. *See id.*

In sum, there is likely no need for the Court to consider these claims. Regardless, the claims fail both for all the reasons why Plaintiffs' RFRA claim fails, as well as on their own terms.

## IX.    THE COURT SHOULD NOT GRANT PLAINTIFFS' REQUESTED REMEDIES

Plaintiffs would have the Court expend every resource at its disposal to remedy their alleged harm: vacatur, an injunction, and declaratory relief. *See* La. Compl. ¶ 82; USCCB Compl. at 55-56. But such action would be an unusual departure from the law. *E.g.*, *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 451 (5th Cir. 2019) ("Ample precedent establishes that we should not exercise our discretion to extend declaratory relief when a challenged law or policy no longer affects the plaintiff."); *Roark v. S. Iron R-1 Sch. Dist.*, 573 F.3d 556, 562 (8th Cir. 2009) (vacating "superfluous" declaratory relief as abuse of discretion). While Defendants maintain that any remedy here would be inappropriate, if the Court disagrees, it should limit Plaintiffs' remedy to one form of relief that is tailored to the actual challenge before it.

### A.    Vacatur is Not Appropriate

The States request that this Court "[v]acate and set aside the Final Rule as unlawful under 5 U.S.C. § 706," while the Bishops request that this Court "[v]acate the Final Rule's inclusion of abortion." La. Compl., Prayer ¶ e; USCCB Compl., Prayer ¶ g. Neither request is appropriate.

As to the States' request, Plaintiffs err in contending that the APA, in § 706(2), requires vacatur of the Final Rule at all, let alone on a nationwide basis.[13] To begin with, nationwide vacatur of the entire rule would be inconsistent with Article III and equitable principles limiting federal court remedies. Under Article III, a court's constitutionally prescribed role is to vindicate the individual

---

[13] Section 706(1) focuses on compelling agency action "unlawfully withheld or unreasonably delayed," which no party alleges is at issue in these actions.

rights of the people appearing before it,", and "[a] plaintiff's remedy" accordingly "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018); *see also Texas*, 599 U.S. at 694 (Gorsuch, J., concurring in the judgment) ("[T]he 'judicial Power' [in U.S. Const. art. III, § 2] is the power to decide cases for parties, not questions for everyone." (cleaned up)).

Thus, judicial relief is "limited to the inadequacy that produced [the plaintiffs'] injury in fact." *Whitford*, 585 U.S. at 68; *see also Lewis v. Casey*, 518 U.S. 343, 357-58 (1996) (plaintiff lacked standing to challenge, and court lacked power to enjoin, practices that "ha[d] not been found to have harmed any plaintiff in this lawsuit"). Moreover, principles of equity prohibit remedies that are "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Accordingly, any injury the Plaintiff States themselves have experienced due to the Final Rule marks the outer limit of any relief they may be afforded. *Whitford*, 585 U.S. at 66, 72-73. Nationwide relief—especially as to the entire rule—would be improper.

Nothing in the text of Section 706 expressly authorizes any departure from those principles. The APA itself does not reference vacatur, providing instead for more traditional equitable remedies like injunctions, 5 U.S.C. § 703. And there is little indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions," *id.* § 706(2); *see United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action"). Moreover, even assuming the APA authorizes vacatur in some form, this Circuit's precedents have made clear that vacatur is not a mandatory remedy. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding without contradiction from any member of the court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy . . . is appropriate to effectuate" the judgment), *aff'd*, 602 U.S. 406 (2024); *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). In light of the traditional equitable principles generally restricting relief beyond the parties, the APA is not properly read to require vacatur—much less universal vacatur—of a challenged action.

The Plaintiffs' prayer would also raise practical problems. Vacatur "upset[s] the bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring). Reading § 706(2) to authorize hundreds of individual district judges around the Nation to grant nationwide relief in every APA case would perpetuate all of the well-catalogued problems with overbroad universal remedies. *See, e.g., Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 921-28 (2024) (Mem) (Gorsuch, J., concurring). The instant case starkly illustrates those problems, because, at least two other lawsuits challenging the Final Rule have been filed in other United States District Courts.[14] Among other legal and practical problems, vacatur could intrude into the province of other federal judges in the country to adjudicate the cases and controversies before them, and deprive the judicial system of the benefits that accrue when different courts grapple with complex legal questions in a careful, considered dialogue. *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Mem) (Gorsuch, J., concurring).[15]

### B.    Plaintiffs Cannot Demonstrate an Entitlement to Injunctive Relief

Plaintiffs fail to establish that the relevant factors favor entry of the injunctive relief they seek, *i.e.* as to abortion accommodations. An injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In addition to showing a likelihood of success on the merits, Plaintiffs must demonstrate "an irreparable injury," that the balance of hardships favor relief, and "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### 1.    Plaintiffs Have Not Established Irreparable Injury

Plaintiffs have failed to demonstrate that they have suffered an irreparable injury requiring the

---

[14] *See The Catholic Benefits Ass'n, et al. v. Burrows, et al.*, No. 1:24-cv-00142-DMT-CRH (D.N.D. filed July 24, 2024); *Tennessee, et al. v. EEOC*, No. 2:24-cv-0084-DPM (E.D. Ark. filed Apr. 25, 2024) (in which the court held that state plaintiffs lacked standing to bring the types of challenges the States raise here).
[15] Indeed, even the Bishop Plaintiffs recognize that only partial vacatur would be appropriate. *See* USCCB Compl., Prayer ¶ g. However, the Bishops' request to vacate the "Final Rule's inclusion of abortion" goes beyond the Bishops' asserted religious objections, which are only to certain categories of abortion, and only apply to the Bishops. *See supra* n.3.

permanent injunctive relief they seek. As discussed *supra* § I.A, all of Plaintiffs' claimed injuries are speculative at best. *See Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (irreparable harm "must be more than 'speculative'"). Plaintiffs have not established that they have actually altered their conduct or incurred compliance costs of "more than de minimis harm," *id.* at 1035, to comply with the portions of the rule they seek to enjoin. The potential harms they posit cannot not materialize until after an employee seeks, is denied, and files a charge regarding an abortion-related accommodation. And even then, Plaintiffs could still avoid liability by raising their defenses in that proceeding and in any subsequent enforcement action, should one arise—possibilities that independently foreclose irreparable injury. *See Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975); *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980); *see also Younger v. Harris*, 401 U.S. 37, 46 (1971) ("Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable'[.]").

### 2.    The Equities and Public Interest Do Not Favor a Permanent Injunction

The balance of harms and weighing the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). As just discussed, Plaintiffs' claimed injuries are hypothetical and, if any investigation or enforcement action were undertaken against them, they would have an opportunity to raise the same challenges and defenses as they do in this case to avoid liability.

On the other side of the balance, entry of an injunction would severely harm both the Government and members of the public who require accommodations. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). And an injunction would interfere with Congress's judgment about how best to achieve the PWFA's purposes of "eliminat[ing] discrimination and promot[ing] women's health and economic security." H.R. Rep. No. 117-27, at 1. Those purposes are compelling governmental interests, yet Plaintiffs seek to disable EEOC from pursuing them.

45

Enjoining the Final Rule or EEOC's administrative procedures could also have negative effects on Plaintiffs, employers and employees within the Plaintiff States, and the judiciary by "forc[ing] into court matters that the EEOC might otherwise have resolved," and "preventing earlier resolution" of employees' charges, thereby "increas[ing] the burdens of both time and expense." *West v. Gibson*, 527 U.S. 212, 219 (1999). At a minimum, this type of relief will confuse and delay private individuals' efforts to pursue their rights under the PWFA.[16]

### C.    If Relief Does Issue, It Should Be Limited

If the Court disagrees with the above, any remedy must be no broader than necessary to remedy any demonstrated irreparable harms of the Plaintiffs in this case. *See Whitford*, 585 U.S. at 73; *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *supra* § IX.A. This is especially true because the PWFA and the Final Rule contain severability clauses. *See* 42 U.S.C. § 2000gg-6; 29 C.F.R. § 1636.8. These principles require that the Court limit relief in at least three respects.

First, as this Court determined at the preliminary injunction stage, any relief should only extend to the narrow portion of the rule the Court finds unlawful, if any. *See* PI Order at 32 (preliminarily enjoining Final Rule only as to "abortion that is not necessary to treat a medical condition related to pregnancy."); *Lewis.*, 518 U.S. at 357 (relief should be "be limited to the inadequacy that produced the injury in fact"); *Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only portions of the final rule it found "unlawful").

Second, any relief should apply only to the Parties. As the Supreme Court recently cautioned, a plaintiff generally has no cognizable Article III interest in interfering with an agency's regulation of third parties. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 374 (2024) (explaining that, "[u]nder Article III of the Constitution, a plaintiff's desire to make a drug less available *for others* does not establish standing to sue."). An injunction (or vacatur) reaching beyond the parties would thus exceed

---

[16] This is especially concerning because such relief will affect employers and employees even though the Court would not, as a matter of law, necessarily have jurisdiction over the employees' PWFA claims. *See* 42 U.S.C. § 2000gg-2(a) (adopting the procedures in 42 U.S.C. § 2000e-5, including § 2000e-5(f)(3), which requires claims to be brought in the federal district court in which the allegedly unlawful employment practice occurred).

the Court's Article III authority.

Limiting relief to only the Parties necessarily includes that Plaintiff-States should only receive relief in their capacities as employers, rather than relief flowing to *all* PWFA-covered entities within those States. While the Court extended preliminary relief to covered entities "with respect to all employees whose primary duty station is located in Louisiana or Mississippi," PI Order at 31, Defendants respectfully maintain that such private, unknown entities who are not before this Court are not the proper subject of any relief. *See, e.g., Whitford*, 585 U.S. at 73; *Madsen*, 512 U.S. at 765; *cf. Valley Force Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) ("plaintiff . . . cannot rest his claim to relief on the legal rights or interests of third parties"). The States lack standing to seek relief on behalf of private entities. *See Haaland*, 599 U.S. at 294-95 (State cannot bring claims "on behalf of [their] citizens because a State does not have standing as *parens patriae* to bring an action against the Federal Government." (cleaned up)). Any purported injury to "[t]he people of Louisiana and Mississippi . . . [who] have chosen to enact legislation and promote public policy that is antithetical to the directives of the abortion accommodation mandate," PI Order at 25, merely recasts purported sovereign injuries as a broad injury to the citizenry that would also not be actionable under the *parens patriae* doctrine. *See Murthy*, 144 S. Ct. at 1996-97. And the Plaintiff States have not established any other purported injuries, let alone irreparable injuries, directly suffered by private entities with employees in Louisiana or Mississippi. Nor can the States claim that the conduct required of private employers conflicts with their interests; this Court recognized as much in noting that State law and the preliminary-injunction decision do not preclude private employers from voluntarily granting accommodations for elective abortions. *See* PI Order at 30; *see also Ducharme,* 406 F. Supp. 3d at 556 (Louisiana law prohibits "adverse employment actions" based on "abortion").

Third, any relief should not prohibit EEOC from complying with its statutory duty to issue notice of right to sue letters (NRTS) to employees, even if the agency is prohibited from investigating certain claims. *See* 42 U.S.C. § 2000e-5(b), (f)(1). As an initial matter, Plaintiffs' complaints nowhere challenge or seek relief against the specific provision of the PWFA requiring EEOC to issue NRTS letters. To the extent this Court's preliminary injunction, restraining issuance of NRTS, sought to

hinder private parties' abilities to bring private suits against their employers, such aim would run counter to the Supreme Court's mandate that non-parties should not "be obliged to honor an incidental legal determination [that a] suit produced." *Murthy*, 144 S. Ct. at 1995 (quoting *Lujan*, 504 U.S. at 569); *see also Whitford*, 585 U.S. at 73; *Madsen*, 512 U.S. at 765. Enjoining NRTS letters also would not achieve that purpose, because employees would still be able to assert equitable bases for waiver of the NRTS requirement. *See supra* n.2 (discussing non-jurisdictional nature of requirement). In fact, all parties would be worse off. Without the 90-day statutory limitations period for suit triggered by issuance of the NRTS, *see* 42 U.S.C §§ 2000e-5(f)(1), 2000gg–2; 29 C.F.R. § 1601.28, employers would suffer uncertainty about whether and when employees might sue and could be subject to litigation for claims that would have otherwise long expired. Employees would be similarly confused about their rights under the statute. And both parties, and courts, would be furthered burdened by having to litigate the applicability of equitable exceptions. This Court should avoid triggering such administrative confusion and costs.

These limits describe the maximum relief theoretically available, but the proper approach would be to grant Defendants' motion, deny Plaintiffs' cross-motion, and dismiss the case entirely.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss, or, in the alternative, grant summary judgment in Defendants' favor and dismiss this case.


Dated: October 10, 2024                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

                                           EMILY B. NESTLER
                                           Assistant Branch Director

                                           DANIEL SCHWEI
                                           Special Counsel

                                           */s/ Laura B. Bakst*
                                           LAURA B. BAKST (D.C. Bar #1782054)
                                           ALEXANDRA WIDAS (D.C. Bar #1645372)

Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-3183
Facsimile: (202) 616-8470
Email: laura.b.bakst@usdoj.gov

*Counsel for Defendant*