**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

| | |
|---|---|
| THE STATE OF LOUISIANA, et al., | No. 2:24-cv-629-DCJ-TPL |
| *Plaintiffs,* | Judge David C. Joseph |
| v. | Magistrate Judge Thomas P. LeBlanc |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| *Defendant.* | |

**************************************************************************

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, et al., | No. 2:24-cv-691-DCJ-TPL |
| *Plaintiffs,* | Judge David C. Joseph |
| v. | Magistrate Judge Thomas P. LeBlanc |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al., | |
| *Defendants.* | |

**BISHOPS PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS .......................................... 2

    A. The PWFA expands protections for pregnant workers. ...................................... 2

    B.  The PWFA excludes abortion. ............................................................................ 2

    C.  EEOC mandates abortion accommodation in the Final Rule. ............................ 3

    D.  EEOC's actions burden the Bishops and their religious beliefs. ........................ 5

    E.  The Bishops file suit to protect their religious beliefs. ...................................... 7

LEGAL STANDARD ................................................................................................ 7

ARGUMENT .............................................................................................................. 8

    I.   The Final Rule violates the APA because it exceeds EEOC's statutory authority under the PWFA by mandating abortion accommodations (Count I). ................... 8

        A.  Traditional tools of statutory construction foreclose EEOC's mandate. ..................... 8

        B.  EEOC's interpretation violates the major questions doctrine. ................... 13

    II.  EEOC's interpretation of the PWFA and Title VII religious exemptions violates the APA (Count III). ............................................................................. 17

        A.  EEOC contradicts the text of the PWFA and Title VII religious exemptions. ........... 17

        B.  EEOC's interpretation violates the constitutional avoidance canon. ........................ 20

    III.  EEOC's requirements violate the church autonomy doctrine (Count VII). ..................... 21

        A.  The church autonomy doctrine protects internal church governance........................ 21

        B.  EEOC is violating the church autonomy doctrine..................................... 22

    IV.  EEOC's requirements violate RFRA (Count V)............................................. 27

    V.   EEOC's requirements violate the Free Exercise Clause (Count VI). ............... 31

    VI.  EEOC's requirements violate the Free Speech Clause (Counts IX and X)..................... 33

i

VII. A permanent injunction is warranted...................................................................................35

CONCLUSION.................................................................................................................................35

CERTIFICATE OF COMPLIANCE........................................................................................37

CERTIFICATE OF SERVICE .................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
 600 U.S. 570 (2023) ................................................................................30, 33

*Ala. Ass'n of Realtors v. HHS*,
 594 U.S. 758 (2021) ................................................................................15

*Ali v. Stephens*,
 822 F.3d 776 (5th Cir. 2016) ..................................................................30, 31

*Bear Creek Bible Church v. EEOC*,
 571 F. Supp. 3d 571 (N.D. Tex. 2021) ........................................... *passim*

*Biden v. Nebraska*,
 143 S. Ct. 2355 (2023) ........................................................... 13, 16-17

*Billard v. Charlotte Catholic High Sch.*,
 101 F.4th 316 (4th Cir. 2024) ..................................................16, 18, 21

*Bostock v. Clayton County*,
 590 U.S. 644 (2020) ................................................................................29

*Boy Scouts of Am. v. Dale*,
 530 U.S. 640 (2000) ................................................................................33, 34

*Boy Scouts of Am. v. Wyman*,
 335 F.3d 80 (2d Cir. 2003) ....................................................................34

*BP P.L.C. v. Mayor & City Council of Balt.*,
 141 S. Ct. 1532 (2021) ........................................................... 11-12

*Braidwood Mgmt. v. EEOC*,
 70 F.4th 914 (5th Cir. 2023) ...................................................... *passim*

*Bryce v. Episcopal Church*,
 289 F.3d 648 (10th Cir. 2002) ..................................................22, 23, 24

*BST Holdings, LLC v. OSHA*,
 17 F.4th 604 (5th Cir. 2021) ..................................................................14

*Burlington N. & Santa Fe Ry. Co. v. White*,
 548 U.S. 53 (2006) ..................................................................................13

*Burwell v. Hobby Lobby Stores,*
    573 U.S. 682 (2014) ............................................................................................ *passim*

*Butler v. St. Stanislaus Kostka Catholic Academy,*
    609 F. Supp. 3d 184 (E.D.N.Y. 2022) ................................................................23

*Carroll Coll. v. NLRB,*
    558 F.3d 568 (D.C. Cir. 2009) ...........................................................................25

*Carson v. Makin,*
    596 U.S. 767 (2022) ............................................................................................26

*Catholic Benefits Ass'n v. Burrows,*
    --- F. Supp. 3d ---, 2024 WL 4315021 (D. N.D. Sept. 23, 2024) ...............28, 29, 31

*Chisom v. Roemer,*
    501 U.S. 380 (1991) ............................................................................................11

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ..............................................................................23

*Cochran v. SEC,*
    20 F.4th 194 (5th Cir. 2021) .................................................................................8

*Combs v. Cent. Tex. Ann. Conf.,*
    173 F.3d 343 (5th Cir. 1999) ..............................................................................27

*Conlon v. InterVarsity Christian Fellowship,*
    777 F.3d 829 (6th Cir. 2015) ..............................................................................16

*Cooper/T. Smith Stevedoring Co. v. Liuzza,*
    293 F.3d 741 (5th Cir. 2002) ..............................................................................20

*Corp. of Presiding Bishop v. Amos,*
    483 U.S. 327 (1987) ......................................................................................23, 27

*Crown Castle Fiber v. City of Pasadena,*
    76 F.4th 425 (5th Cir. 2023) ...............................................................................35

*Curay-Cramer v. Ursuline Acad.,*
    450 F.3d 130 (3d Cir. 2006) ..........................................................................18, 21

*Darren Patterson Christian Acad. v. Roy,*
    699 F. Supp. 3d 1163 (D. Colo. 2023) ...............................................................34

*Demkovich v. St. Andrew the Apostle Parish,*
    3 F.4th 968 (7th Cir. 2021) .................................................................................25

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022)........................................................................................14

*Doe v. C.A.R.S. Prot. Plus*,
    527 F.3d 358 (3d Cir. 2008)..........................................................................12

*Duquesne Univ. v. NLRB*,
    947 F.3d 824 (D.C. Cir. 2020)..................................................................25, 27

*EEOC v. Catholic Univ. of Am.*,
    83 F.3d 455 (D.C. Cir. 1996) ...............................................................26-27, 29

*EEOC v. Houston Funding II, Ltd.*,
    717 F.3d 425 (5th Cir. 2013) ...........................................................................9

*EEOC v. Miss. Coll.*,
    626 F.2d 477 (5th Cir. 1980) .........................................................................18

*Emp. Div. v. Smith*,
    494 U.S. 872 (1990)........................................................................................32

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..................................................................................13, 15

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
    82 F.4th 664 (9th Cir. 2023) ......................................................................31, 32

*Fischer v. United States*,
    144 S. Ct. 2176 (2024)...............................................................................10-11

*Fitzgerald v. Roncalli High Sch.*,
    73 F.4th 529 (7th Cir. 2023) .........................................................................18

*Flynn v. Distinctive Home Care*,
    812 F.3d 422 (5th Cir. 2016) .........................................................................13

*Franciscan All. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ...............................................................27, 28, 35

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)......................................................................15, 30, 31, 32

*Garrick v. Moody Bible Inst.*,
    412 F. Supp. 3d 859 (N.D. Ill. 2019) .............................................................23

*Gonzales v. O Centro*,
    546 U.S. 418 (2006)........................................................................................30

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ..........................................................................................14, 15

*Hall v. Baptist Mem'l Health Care Corp.*,
    215 F.3d 618 (6th Cir. 2000) ...................................................................................21

*Headley v. Church of Scientology Int'l*,
    687 F.3d 1173 (9th Cir. 2012) .................................................................................23

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ...........................................................................................27, 30

*Hosanna-Tabor v. EEOC*,
    565 U.S. 171 (2012) .............................................................................22, 25, 26, 33

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ..................................................................................................20

*Kedroff v. St. Nicholas Cathedral*,
    344 U.S. 94 (1952) ......................................................................................... 24-25, 27

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ..................................................................................................34

*Krauel v. Iowa Methodist Med. Ctr.*,
    95 F.3d 674 (8th Cir. 1996) ......................................................................................4

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) .............................................................................21, 28

*Lee v. Sixth Mount Zion Baptist Church*,
    903 F.3d 113 (3d Cir. 2018) ....................................................................................16

*Little v. Wuerl*,
    929 F.2d 944 (3d Cir. 1991) ....................................................................................21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ........................................................................................ *passim*

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ..................................................................................8, 11, 14

*Louisiana v. EEOC*,
    705 F. Supp. 3d 643 (W.D. La. 2024) .......................................................... *passim*

*Louisiana v. EPA*,
    712 F. Supp. 3d 820 (W.D. La. 2024) ..................................................................15

*Louisiana v. U.S. Dep't of Educ.*,
--- F. Supp. 3d ---, 2024 WL 2978786 (W.D. La. June 13, 2024) ..........................................14

*Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*,
11 F.4th 345 (5th Cir. 2021) .........................................................................................7

*McAllen Grace Brethren Church v. Salazar*,
764 F.3d 465 (5th Cir. 2014) ..................................................................29, 30, 31

*McClure v. Salvation Army*,
460 F.2d 553 (5th Cir. 1972) ....................................................................................27

*McDonald v. Longley*,
4 F.4th 229 (5th Cir. 2021) .......................................................................................35

*NFIB v. Dep't of Labor*,
595 U.S. 109 (2022)....................................................................................................15

*NIFLA v. Becerra*,
585 U.S. 755 (2018)....................................................................................................34

*NLRB v. Catholic Bishop*,
440 U.S. 490 (1979).............................................................................................20, 26

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020)........................................................................................... *passim*

*Our Lady's Inn v. City of St. Louis*,
349 F. Supp. 3d 805 (E.D. Mo. 2018)........................................................................34

*Planned Parenthood v. Casey*,
505 U.S. 833 (1992)......................................................................................................9

*Presbyterian Church v. Mary Elizabeth Blue Hull Presbyterian Church*,
393 U.S. 440 (1969)....................................................................................................16

*Priests for Life v. HHS*,
7 F. Supp. 3d 88 (D.D.C. 2013) ................................................................................34

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)......................................................................................................15

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001)........................................................................................35

*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976)........................................................................................22, 23, 25

*Siwe v. Holder,*
    742 F.3d 603 (5th Cir. 2014) ...........................................................................13

*Skrzypczak v. Roman Catholic Diocese of Tulsa,*
    611 F.3d 1238 (10th Cir. 2010) .......................................................................25

*Slattery v. Hochul,*
    61 F.4th 278 (2d Cir. 2023) .............................................................................34

*Starkey v. Roman Catholic Archdiocese of Indianapolis,*
    41 F.4th 931 (7th Cir. 2022) ......................................................................18, 19

*Tandon v. Newsom,*
    593 U.S. 61 (2021).............................................................................................32

*Tennessee v. EEOC,*
    --- F. Supp. 3d ---, 2024 WL 3012823 (E.D. Ark. June 14, 2024) ...........................9

*Texas v. Becerra,*
    89 F.4th 529 (5th Cir. 2024) ............................................................................12

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001)............................................................................................20

*Turic v. Holland Hosp.,*
    85 F.3d 1211 (6th Cir. 1996) ...........................................................................12

*Turtle Island Foods v. Strain,*
    65 F.4th 211 (5th Cir. 2023) ............................................................................20

*U.S. Navy SEALs 1-26 v. Biden,*
    578 F. Supp. 3d 822 (N.D. Tex. 2022) .............................................................32

*In re Union Pac. R.R. Emp. Pracs. Litig.,*
    479 F.3d 936 (8th Cir. 2007) .............................................................................4

*United States v. Hamilton,*
    46 F.4th 389 (5th Cir. 2022) ............................................................................21

*United States v. Koutsostamatis,*
    956 F.3d 301 (5th Cir. 2020) ...........................................................................12

*VanDerStok v. Garland,*
    86 F.4th 179 (5th Cir. 2023) ........................................................................8, 20

*Ware v. La. Dep't of Corr.,*
    866 F.3d 263 (5th Cir. 2017) ...........................................................................30

*Watson v. Jones*,
 80 U.S. (13 Wall.) 679 (1872) .......................................................................17, 22

*West Virginia v. EPA*,
 597 U.S. 697 (2022)........................................................................13, 14, 15, 16

*Westbrook v. Penley*,
 231 S.W.3d 389 (Tex. 2007).......................................................................25

*Whole Woman's Health v. Smith*,
 896 F.3d 362 (5th Cir. 2018) ............................................................16, 20, 21, 27

*Wilkins v. United States*,
 598 U.S. 152 (2023)...................................................................................12

*Williams v. Taylor*,
 529 U.S. 362 (2000)...................................................................................19

*Youth 71Five Ministries v. Williams*,
 No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024) ....................................32

**Statutes**

5 U.S.C. § 706 ...............................................................................................8

42 U.S.C. § 238n ...........................................................................................16

42 U.S.C. § 300a-7 ........................................................................................16

42 U.S.C. § 2000bb-1 ....................................................................................27

42 U.S.C. § 2000e ................................................................................. *passim*

42 U.S.C. § 2000e-1 ...............................................................................2, 17, 19, 30

42 U.S.C. § 2000e-2 .......................................................................................30

42 U.S.C. § 2000e-5 .......................................................................................27

42 U.S.C. § 2000gg .................................................................................2, 8, 9

42 U.S.C. § 2000gg-1 .............................................................................2, 8, 13

42 U.S.C. § 2000gg-2 ................................................................................2, 28

42 U.S.C. § 2000gg-3 ......................................................................................3

42 U.S.C. § 2000gg-5 ...............................................................................2, 5, 17

42 U.S.C. § 18023 .................................................................................................16

42 U.S.C. § 18113 .................................................................................................16

2023 Consolidated Appropriations Act, Pub. L. No. 117-328,
    136 Stat. 4459 (2022).......................................................................................16

**Regulations**

29 C.F.R. § 1636.3 ............................................................................................4, 28

34 C.F.R. § 106.12 ...............................................................................................31

45 C.F.R. § 92.302 ...............................................................................................31

**Other Authorities**

88 Fed. Reg. 54,714 (Aug. 11, 2023)....................................................................3

89 Fed. Reg. 29,096 (Apr. 19, 2024) .......................................................... *passim*

89 Fed. Reg. 37,522 (May 6, 2024) .....................................................................31

Joe Burkuras, *Catholic University Fires Professor Who Hosted 'Abortion Doula'
    in Class*, Catholic News Agency (Jan. 30, 2024) ..................................................34

Catechism of the Catholic Church .........................................................................6

Richard Carlson, *The Small Firm Exemption*, 80 St. John's L. Rev. 1197 (2006)......................30

Fed. R. Civ. P. 56 ...................................................................................................7

H.R. 1065, 117th Cong. (2021)..............................................................................2

Pamela S. Karlan & George Rutherglen, *Disabilities, Discrimination, and
    Reasonable Accommodation*, 46 Duke L.J. 1 (1996)............................................13

*Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied
    Health* (7th ed. 2003) ...........................................................................................9

Michael W. McConnell, *The Ninth Amendment in Light of Text and History*, 2010
    Cato Sup. Ct. Rev. 13............................................................................................15

*New Oxford Am. Dictionary* (Online ed. 2015) ...................................................9

S. 1486, 117th Cong. (2021)...................................................................................2

*Stedman's Medical Dictionary* (Online ed. 2021) ...............................................9

**INTRODUCTION**

EEOC agrees the relevant facts have not changed since this Court ruled for the Bishops in June. Nor has anything changed in the law since this Court denied EEOC's motion for reconsideration. Thus, this case remains a "textbook case of a federal administrative agency exceeding its statutory authority." EEOC's abortion-accommodation mandate should be set aside and the burdens EEOC has imposed on the Bishops' religious beliefs enjoined—this time, permanently.

Indeed, the correctness of that result is now even clearer. The now-produced Administrative Record confirms that not a single congressional supporter of the Pregnant Workers Fairness Act said that the Act covered abortion. Another federal court has enjoined the Final Rule's application to Catholic employers. And, as shown below, additional legal grounds amply support enjoining EEOC's "semantic gymnastics" and "disingenuous" legal arguments.

Moreover, EEOC's own actions show it does not believe protecting the Bishops threatens anything of importance. It's been 115 days since this Court entered an injunction over the protestations of EEOC and its amici that "millions" of employees would be harmed. But EEOC has not even appealed, much less sought a stay of the injunction pending an appeal. That's a far cry from the federal government's conduct in other cases implicating interests it actually finds compelling.

Federal agencies have increasingly abused their authority to pick unnecessary fights with religious groups over issues that—until recently—have rightly been viewed as archetypal sensitive religious matters protected by the First Amendment. *See, e.g., Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 664-74 (2020). EEOC's actions here are among the worst of the lot. Not only does EEOC purport to require the Catholic Church to support things like abortion within the Church's own ministries, EEOC also refashions the speech, policies, practices, and even "atmosphere" of Catholic ministries into its own image. That kind of extraordinary and pervasive entanglement is unconstitutional and should be enjoined.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The PWFA expands protections for pregnant workers.

Congress passed the PWFA to expand protections for pregnant women in the workplace. The PWFA requires a "covered" employer to provide a reasonable accommodation to an employee with a "known limitation," meaning a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(2), (4); *id.* § 2000gg-1(1). The statute bars employers from denying employment opportunities or taking adverse employment action based on pregnancy accommodations. *Id.* § 2000gg-1(2)-(5). It also prohibits retaliating against an employee who advocates for an accommodation or interfering with an employee's exercise of her statutory right to an accommodation. *Id.* § 2000gg-2(f)(1)-(2).

The PWFA incorporates some of Title VII's provisions, including its remedies and enforcement provisions. *Id.* § 2000gg-2(a). EEOC and private parties may sue private employers for alleged violations, and EEOC has all investigative and enforcement powers available to it under Title VII.

The PWFA also incorporates Title VII's religious exemption. *Id.* § 2000gg-5(b). Title VII exempts religious employers from any application of Title VII concerning "the employment of individuals of a particular religion." *Id.* § 2000e-1(a). Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j).

### B. The PWFA excludes abortion.

In 2021, the House and Senate advanced bipartisan bills that became the PWFA. They required employers to accommodate known limitations related to a worker's pregnancy, childbirth, or related medical conditions, and they tasked EEOC with issuing regulations "provid[ing] examples" of such accommodations. H.R. 1065, 117th Cong. § 4 (2021); S. 1486, 117th Cong. § 4 (2021).

The bills did not cover abortion. The Final Rule's Administrative Record contains not a single legislative supporter claiming that the PWFA included abortion. *See* EEOC_136197-844.[1] To the contrary, "lawmakers from both sides of the aisle expressly stated that the PWFA does not address abortion." *Louisiana v. EEOC*, 705 F. Supp. 3d 643, 660 (W.D. La. 2024). Lead Senate sponsor

---

[1]    Citations to "EEOC_xxxxxx" refer to the Bates numbers in the Administrative Record. *See* ECF 71-2.

Democratic Senator Bob Casey stated "for the record" that EEOC "could not—could not—issue any regulation that requires abortion leave." EEOC_136753. Republican Senator Bill Cassidy, PWFA's other lead sponsor, likewise "reject[ed] the characterization that [the PWFA] would do anything to promote abortion." *Id.*; *see also* EEOC_136839 (similar).

The PWFA's supporters stressed that the law was narrow, simple, bipartisan, and uncontroversial. Originating Committee Chair Senator Patty Murray emphasized PWFA supporters were not "asking for much," and that the law was "very simple": "Give pregnant workers a break, give them a seat, and give them a hand. … I can't think of a more commonsense, less controversial bill[.]" EEOC_136752. She described the PWFA as "a fundamentally bipartisan bill" whose purpose was "to provide basic, common sense" accommodations for women "looking forward to welcoming a new family member." Blomberg Decl. ¶ 2, Ex. 1 at 1. Senator Casey agreed, emphasizing that the PWFA is "very straightforward" and "very simple," just a "commonsense bill" that has "broad, bipartisan support" from "over 200 advocacy groups from all parts of the ideological spectrum." EEOC_136839-40.

## C. EEOC mandates abortion accommodation in the Final Rule.

In August of 2023, EEOC issued a Notice of Proposed Rulemaking that proposed mandating abortion accommodations. 88 Fed. Reg. 54,714 (Aug. 11, 2023); 42 U.S.C. § 2000gg-3(a) (granting rulemaking authority). More than 54,000 commenters opposed this mandate, *see* 89 Fed. Reg. 29,096, 29,104 (Apr. 19, 2024), including Plaintiffs United States Conference of Catholic Bishops (USCCB) and The Catholic University of America (CUA), EEOC_043901. And in a letter delivered to EEOC, Senate co-sponsor Cassidy stated that the Final Rule "ignored the statute and substituted its views on abortion for those of Congress." Blomberg Decl. ¶ 3, Ex. 2 at 1. But by a 3 to 2 vote, EEOC issued a Final Rule codifying the mandate. 89 Fed. Reg. 29,096; EEOC_138360.

The Final Rule concedes the "lack of an explicit mention of abortion in the PWFA." 89 Fed. Reg. at 29,111. But the statute nevertheless requires abortion accommodations, the Final Rule says, because abortion is a "medical condition" related to pregnancy or childbirth. *Id.* at 29,183, 29,186 (citing 42 U.S.C. § 2000gg-1(1)). To support this view, the Final Rule asserts Congress intended

to adopt EEOC's interpretation of a 1970s amendment to Title VII known as the Pregnancy Discrimination Act (PDA). 89 Fed. Reg. at 29,106; *accord id.* at 29,191 n.23. But the PDA provision isn't from an accommodation statute and wasn't among the Title VII provisions Congress incorporated into the PWFA. And the PDA's terms are more expansive, since they "include, but are not limited to" pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000e(k).

In addition to abortion, the Final Rule requires accommodation for contraception and "fertility treatment," such as in vitro fertilization (IVF) and surrogacy. 89 Fed. Reg. at 29,183. Despite its reliance on the PDA to cover abortion, the Final Rule acknowledges that courts have rejected the idea that the PDA covers contraception and infertility treatment. *Id.* at 29,102-03 (citing *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674 (8th Cir. 1996) (infertility); *In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936 (8th Cir. 2007) (contraception)). The Final Rule further acknowledges the religious objections of many employers to accommodating such matters, 89 Fed. Reg. at 29,144, 29,149—particularly when doing so knowingly, as the PWFA's "known limitation" criteria requires, *id.* at 29,097, 29,184 (29 C.F.R. § 1636.3(h)(2)).

The Final Rule also requires that the PWFA's retaliation and coercion provisions "be interpreted broadly" to cover anything that "might have dissuaded a reasonable worker" from seeking an abortion, IVF, surrogacy, contraception, or sterilization accommodation. *Id.* at 29,215; *accord id.* at 29,214-18. Employers may be liable unless their "ordinary workplace policies or practices" pose no obstacle to such accommodations. *Id.* at 29,199. To that end, employers cannot "issu[e] a policy or requirement that purports to limit an employee's rights to invoke PWFA protections." *Id.* at 29,216. EEOC indicated that speech opposing such accommodations in employers' "statements regarding religious beliefs," "mission statements," or "code[s] of conduct" can be illegal. *Id.* at 29,141-42 & n.201. Employers cannot "indicat[e]" that these accommodations may yield adverse employment action, or otherwise do or say things that might be understood to "harass" an applicant, employee, or former employee for seeking such an accommodation—even if the alleged actions did not "actually … deter[ ]" them. *Id.* at 29,216. Nor can employers say or do things that are deemed "to coerce, intimidate, threaten, harass, or interfere with any individual"

supporting such accommodations. *Id.* at 29,188. And to ensure that no "discriminatory work … atmosphere" exists, employers must monitor "unwelcome, critical" employee speech against these accommodations. *Id.* at 29,214, 29,218.

Finally, the Final Rule addresses an employer's religious defenses, which EEOC says it will evaluate on a "case-by-case" basis. *Id.* at 29,147-53. For the PWFA's religious exemption, 42 U.S.C. § 2000gg-5(b), the Final Rule adopted a limited interpretation that protects only against PWFA claims of religious discrimination—a class of claims that is not authorized by the PWFA. 89 Fed. Reg. at 29,146-47 & n.239. And as for the Religious Freedom Restoration Act (RFRA), the Free Exercise Clause, the Free Speech Clause, and the protection for expressive association, the Final Rule predicted these defenses would fail. In EEOC's view, this is because its rule never "infringes on any covered entity's freedom of speech," "expressive association," or free exercise of religion, and—even if strict scrutiny were required—would pass review because it "serve[s] a compelling governmental interest." *Id.* at 29,147-49, 29,151-53; *accord* ECF 29 at 22-24.

In sum, the Final Rule requires religious employers to knowingly accommodate employees' abortions, infertility treatments, surrogacy, contraception, and sterilization; prohibits taking adverse action against employees for requesting such accommodations, for advocating for others to receive them, or for "oppos[ing]" employer refusals to accommodate them; and threatens liability on employers whose speech or acts may "intimidate, threaten, harass, or interfere with any individual" supporting such accommodations. 89 Fed. Reg. at 29,188. In EEOC's view, these requirements are rooted in the PWFA and, in large part, Title VII. *Id.* at 29,106, 29,102-03; ECF 29 at 1-3. And the Final Rule either eliminates or prejudges as meritless the legal defenses available to religious employers. 89 Fed. Reg. at 29,146-49, 29,151-53; ECF 29 at 19, 23-24.

Commissioner Andrea Lucas issued a dissent, arguing that EEOC had engaged in "linguistic gymnastics" to depart from the statute's plain meaning. *See* Blomberg Decl. ¶ 4, Ex. 3 at 16.

**D. EEOC's actions burden the Bishops and their religious beliefs.**

Plaintiffs are the Diocese of Lake Charles, the Diocese of Lafayette, CUA, and USCCB (collectively, the Bishops). The Dioceses serve the Catholics and communities of southwestern

Louisiana and Acadiana, where Catholics have resided since the mid-1750s. Fontenot Decl. ¶ 5. CUA was papally chartered in 1887 and is "the national university of the Catholic Church in the United States" that is "committed to being a comprehensive Catholic institution of higher education that is faithful to the teachings of the Church." Brown Decl. ¶¶ 6-7. USCCB is an association of the bishops in the Catholic Church in the United States whose "mission is to support the ministry of bishops with an emphasis on evangelization." Ridderhoff Decl. ¶¶ 8, 13.

The Bishops follow the doctrine of the Catholic Church, which teaches that all people, including the preborn, are created in the image and likeness of God and are thus imbued with inviolable human dignity. Kunkel Decl. ¶¶ 10-11; Brown Decl. ¶¶ 15-16; Caraway Decl. ¶¶ 6-7; Fontenot Decl. ¶¶ 6-7. The Church further teaches that "direct abortion, that is, abortion willed as an end or as a means, always constitutes a grave moral disorder, since it is the deliberate killing of an innocent human being." Kunkel Decl. ¶ 16. The Church forbids the faithful from in any way supporting or encouraging direct abortion or being complicit in the actions of those who do. Kunkel Decl. ¶¶ 14-22; Catechism of the Catholic Church §§ 2270-71. The Church also believes that use of contraception, direct sterilization, and artificial reproductive technologies such as IVF and surrogacy violate human dignity and the sanctity of marriage. Kunkel Decl. ¶¶ 23-29.

The Bishops follow these religious teachings and do not allow their employees (and in particular, in the case of CUA, their faculty) to speak and act in ways that conflict with the application of those beliefs within their ministries, such as by advocating in favor of abortion in the workplace. Kunkel Decl. ¶¶ 54-56; Ridderhoff Decl. ¶ 28-35; Brown Decl. ¶¶ 26-31; Caraway Decl. ¶¶ 10-15; Fontenot Decl. ¶¶ 10-15. But the Final Rule pressures the Bishops to knowingly accommodate employees or faculty even where such accommodations are contrary to the Bishops' sincerely held religious beliefs. Ridderhoff Decl. ¶¶ 28-36; Brown Decl. ¶¶ 26-32; Caraway Decl. ¶¶ 10-16; Fontenot Decl. ¶¶ 10-16. It also prohibits the Bishops from taking adverse actions against employees or faculty that advocate for these types of accommodations, even where such actions are required by the Bishops' beliefs. Ridderhoff Decl. ¶¶ 28-36; Brown Decl. ¶¶ 26-32; Caraway Decl. ¶¶ 10-16; Fontenot Decl. ¶¶ 10-16. Further, the Final Rule pressures the Bishops

6

to change their religious speech by replacing their current policies and practices opposing objectionable accommodations or advocacy to (1) affirm a willingness to accommodate such conduct and speech, (2) prohibit any potentially "unwelcome" or "critical" workplace discussions opposing them, and (3) avoid "interfer[ing] with" "any individual['s]" exercise of the Final Rule's accommodation-related rights. 89 Fed. Reg. at 29,215-16; 29,218; 29,141-42 & n.201; 29,188.

### E.  The Bishops file suit to protect their religious beliefs.

On May 22, 2024, the Bishops sued and sought a preliminary injunction, which this Court granted after consolidating the case with *Louisiana v. EEOC*, No. 2:24-cv-629. *Louisiana*, 705 F. Supp. 3d at 651. After recognizing the Bishops' and States' standing, *id.* at 654-57, the Court summarily rejected EEOC's abortion-accommodation reading of the PWFA as "semantic gymnastics" and "a textbook case of a federal administrative agency exceeding its statutory authority" that violated the major-questions doctrine. *Id.* at 658-61. The Court also found that EEOC had "failed to include a broad religious exception in the Final Rule," which "d[id] not square with the PWFA" and left the Bishops exposed to "protracted investigations and litigation." *Id.* at 662-63. Accordingly, the Court postponed the effective date of the abortion-accommodation mandate's application to the Bishops, the States, and certain other employers within the States, and preliminarily enjoined EEOC from taking steps to enforce it against Plaintiffs. *Id.* at 664.

The parties agreed that they could proceed to file dispositive motions without discovery, which this Court then ordered. ECF 66 at 2. The Bishops now move for partial summary judgment on Counts I, III, V-VII, and IX-X in their complaint.

### LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the "issues before the court are pure questions of law, summary judgment is appropriate." *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (cleaned up).

The APA requires courts to "hold unlawful and set aside" agency actions that are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory … authority," or "short of statutory right." 5 U.S.C. § 706.

## ARGUMENT

**I.    The Final Rule violates the APA because it exceeds EEOC's statutory authority under the PWFA by mandating abortion accommodations (Count I).**

**A.    Traditional tools of statutory construction foreclose EEOC's mandate.**

The APA "codifies" an "unremarkable, yet elemental proposition": it is "the responsibility of the court to decide whether the law means what the agency says," applying "no deferen[ce]" to the agency's view. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024). Even where a statute delegates some rulemaking authority, courts have an independent duty to "ensur[e] that the agency acts within" the scope of that authority. *Id.* at 2273. "How do we know when an agency has exceeded its statutory authority? Simple: the plain language of the statute tells us so." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 1390 (2024). Here, the "traditional tools of statutory construction," *Loper Bright,* 144 S. Ct. at 2266—including PWFA's plain text, canons of construction, and the legislative record—make clear that the Final Rule violates the APA because it was promulgated in excess of EEOC's authority under the PWFA.

***Text***. The analysis "start[s], of course, with the statutory text." *Cochran v. SEC*, 20 F.4th 194, 200 (5th Cir. 2021) (en banc). Here, the PWFA "does not contain the word 'abortion' even once." *Louisiana*, 705 F. Supp. 3d at 657. Instead, it requires employers to accommodate "known limitations related to … pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1(1). And these "known limitation[s]" must themselves be "physical or mental condition[s]." *Id.* § 2000gg(4). Thus, the PWFA requires accommodation for "physical or mental conditions" arising from "pregnancy, childbirth, or related medical conditions."

Using "plain-meaning analysis," abortion does not "treat a 'medical condition' related to pregnancy or childbirth." *Louisiana*, 705 F. Supp. 3d at 658.; *see also* 89 Fed. Reg. at 29,183 (including "abortion" in definition of "other related medical condition," not "pregnancy" or

"childbirth"). The term "medical" generally references "the diagnosis and treatment of disease and the maintenance of health." *EEOC v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 n.4 (5th Cir. 2013) (quoting *Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health* (7th ed. 2003)); *see* "Medical," *New Oxford Am. Dictionary* (Online ed. 2015) ("the treatment of illness and injuries"). And the ordinary meaning of "condition" is a "state of health or physical fitness" or "illness or other medical problem." *New Oxford Am. Dictionary* (Online ed. 2015); *see Houston Funding II*, 717 F.3d at 428-29 & n.4 (similar, and noting that a pregnancy-related "condition" under Title VII is a "physiological" state that is "initiated by pregnancy and concludes sometime thereafter").

Direct abortion, by stark contrast, is a "procedure," *Louisiana*, 705 F. Supp. 3d at 658, *Planned Parenthood v. Casey*, 505 U.S. 833, 845 (1992), and one performed voluntarily, not for "medical" justifications. *See* "Elective abortion," *Stedman's Medical Dictionary* (Online ed. 2021) ("an abortion without medical justification"). It is not a "physiological" state or a "treatment of disease," since pregnancy is not a disease. And abortion "treats" the "condition of being pregnant" only by ending it. 89 Fed. Reg. at 29,107. To argue otherwise "amount[s] to little more than semantic gymnastics." *Louisiana*, 705 F. Supp. 3d at 658; *accord Tennessee v. EEOC*, --- F. Supp. 3d ---, 2024 WL 3012823, at *10 (E.D. Ark. June 14, 2024) (plaintiffs "have the better argument on the text" because "[a]bortion doesn't fit into the ordinary meaning of condition").

Nor can a direct abortion be treated as the equivalent of involuntary miscarriage or stillbirth, as EEOC asserts. *See* 89 Fed. Reg. at 29,107, 29,183. Unlike abortion, the tragic outcomes of miscarriage and stillbirth that unintentionally occur during some pregnancies *are* a "physiological" state that is related to the nonviable pregnancy itself and are often accompanied by "physical or mental condition[s]" that may require treatment, 42 U.S.C. § 2000gg(4). Those conditions "relate[ ] to, [are] affected by, or aris[e] out of" the unviable pregnancy itself, not a voluntary external procedure. EEOC's rationale that direct abortion should be covered because it can cause "medical conditions" such as "needing to recover" from the procedure, ECF 29 at 15-16, fails for

the same reason—even assuming recovery time is sometimes covered for other conditions, abortion stands in a category of one because it terminates, rather than treats, pregnancy.

Next, the Final Rule contends that because the PWFA includes "childbirth," it must cover *any* pregnancy "outcome," including abortion. 89 Fed. Reg. at 29,107. But Congress named only one pregnancy outcome—childbirth—and didn't broaden that category. This means that an outcome other than childbirth must be a "medical condition" related to either "pregnancy" or "childbirth."

Finally, EEOC points to what it calls "medically recommended" abortions, which it claims would not be covered if the Bishops' interpretation prevails. ECF 29 at 14-15. As an initial matter, EEOC overstates the scope of this already vanishingly small category. Some procedures that have the unintentional and undesired effect of ending pregnancy, such as removing a fallopian tube to treat ectopic pregnancy, are not abortions—medically or morally. Kunkel Decl. ¶ 20. And procedures for other medical conditions that likewise result in the unintended death of the child, such as for uterine cancer, aren't related to pregnancy (other than temporally). *Id.* But even EEOC's justification for actual abortions that are purportedly "medically recommended" also fails on its own terms. The Rule broadly mandates abortion accommodations regardless of the underlying reason, and abortion remains a "procedure," regardless of why it is performed. And if abortion is a procedure, then the PWFA is not implicated. *Louisiana*, 705 F. Supp. 3d at 658.

And even if a "law designed to ensure healthy pregnancies for America's working mothers" that fails to mention abortion "even once" *could* be read to require coverage in narrow cases where direct abortion occurs for allegedly medical reasons, *Louisiana*, 705 F. Supp. 3d at 657, 659, it only highlights the need to fix EEOC's gutting of the PWFA's religious defenses. *Infra* pp. 17-21. Otherwise, those like the Bishops, who have sincere religious objections to moral complicity in all forms of direct abortion—regardless of underlying cause—will be left unprotected and forced between noncompliance and violating their religious beliefs.

The ejusdem generis canon leads to the same result as the plain text. That canon holds that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it." *Fischer v. United States*, 144 S. Ct. 2176, 2184

(2024) (cleaned up). Applying the canon allows "a general phrase [to] be given a more focused meaning by the terms linked to it," ensuring that the phrase is not interpreted so broadly that it covers conduct "so unlike the examples that the [statute] provided that it would be implausible to assume those activities were prohibited[.]" *Id.* Here, the general term "related medical condition[ ]" refers to conditions like "pregnancy" and "childbirth," which are fundamentally *dis*similar from a procedure that *ends* a healthy pregnancy and *eliminates* the possibility of childbirth.

**Legislative intent.** PWFA's legislative history "only underscores [its] plain meaning." *Loper Bright*, 144 S. Ct. at 2262. EEOC failed to find a single example of a single congressional supporter saying even once that the PWFA imposes an abortion-accommodation mandate, and the Administrative Record is bereft of any such examples. For good reason: the bill's sponsors said that any "abortion-related mandates" would be "contrary to the intent of Congress," and EEOC "could not—could not" apply the statute to sweep in abortion. *Louisiana*, 705 F. Supp. 3d at 660 (citing statements from Sens. Casey, Daines, and Cassidy). *See also* EEOC_136752 (statement of Sen. Murray); *see also supra* pp. 2-3. This legislative history "unambiguously confirms that Congress specifically *did not* intend for the PWFA to require employers to accommodate abortion." *Louisiana*, 705 F. Supp. 3d at 660; *see also Chisom v. Roemer*, 501 U.S. 380, 396 & n.23 (1991).

**EEOC's claims.** Rather than relying on PWFA's own text, EEOC's argument rests on a syllogism based entirely on congressional intent: (1) "pregnancy, childbirth, and related medical conditions" in the PDA covers abortion; (2) the PWFA uses that phrase; (3) the PWFA covers abortion. That syllogism falls flat for multiple reasons.

First, EEOC argues that a handful of lower-court cases and its own nonbinding guidance on the PDA show the PDA "settled" the understanding that "related medical condition" includes abortion, 89 Fed. Reg. at 29,105 & n.65, 29,106, 29,191 & n.26. Not so.

Start with the court opinions. Even assuming EEOC's cases were correctly decided or, more dubiously still, that they survive *Dobbs*, "EEOC's 'smattering of lower court opinions' … hardly qualifies as a judicial consensus 'so broad and unquestioned that we must presume Congress knew of and endorsed it.'" *Louisiana*, 705 F. Supp. 3d at 660 (quoting *BP P.L.C. v. Mayor & City Council*

*of Balt.*, 141 S. Ct. 1532, 1541 (2021)); *see also Wilkins v. United States*, 598 U.S. 152, 165 (2023) ("[T]he Government's handful of lower court opinions [cannot] stand in for a ruling of [the Supreme] Court."). EEOC cannot "ignore clear statutory language on the ground that other courts have." *BP*, 141 S. Ct. at 1541. And that is particularly true here, where the underlying decisions invoke the now-repudiated constitutional right to abortion. *See Texas v. Becerra*, 89 F.4th 529, 541 (5th Cir. 2024); *Louisiana*, 705 F. Supp. 3d at 660 ("[O]ne judicial opinion this Court can presume Congress was aware of when it passed the PWFA was the *Dobbs* decision.").

EEOC's allegedly "longstanding" nonbinding guidance interpreting the PDA to cover abortion doesn't help either. 89 Fed. Reg. at 29,106 & n.66. EEOC has failed to cite a single instance in which it has taken independent enforcement action under this guidance, despite the argument being raised repeatedly at the preliminary-injunction stage. *See, e.g.*, ECF 11-1 at 12; ECF 67-1 at 80:6-7; *see also, e.g.*, 89 Fed. Reg. 29,191 & n.26 ("settled" meaning established by, among other cases, *Doe v. C.A.R.S. Prot. Plus,* 527 F.3d 358 (3d Cir. 2008); (plaintiff proceeding without EEOC); *Turic v. Holland Hosp.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (same)). It is hard to see how guidance that EEOC has never relied upon "settle[s]" anything, let alone how it can be used to misinterpret the *PWFA*, a stand-alone statute distinct from Title VII. Though that would be true in every case, it is especially true here, where the guidance has no basis in PWFA's text.

Second, even setting aside EEOC's spurious evidence of a settled consensus, its syllogism ignores determinative differences between the PDA—an anti-discrimination statute—and the PWFA—an accommodation statute. "Text should never be divorced from context." *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020). Here, context makes a difference. As Commissioner Lucas explained, there is a "logical" and "significant" contextual "distinction between antidiscrimination and accommodation requirements." Blomberg Decl. Ex. 3 at 12 n.13. Whereas anti-discrimination statutes impose a negative duty on employers, an accommodation statute positively "requires the employer to treat a particular employee or applicant more favorably than others." *Id.* The two statutes thus "address different problems in different ways," *id.*, meaning EEOC can't just assume that terms in the PDA's antidiscrimination and the PWFA's

accommodations provisions mean the same thing. *See also* Pamela S. Karlan & George Rutherglen, *Disabilities, Discrimination, and Reasonable Accommodation*, 46 Duke L.J. 1, 3 (1996) (distinguishing discrimination and accommodation laws).

That's doubly true because the statutes use different language. The PDA's terms "*include, but are not limited to* … pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k) (emphasis added). The PWFA lacks this expansive language. And, unlike the PDA, the PWFA narrows its coverage to "known limitations." 42 U.S.C. § 2000gg-1(1). Since the PDA sweeps more broadly than the PWFA, it's safe to follow the "presum[ption] that, where words differ as they differ here, Congress acts intentionally and purposely"—especially because "the two provisions differ … in purpose as well." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62-63 (2006) (cleaned up).

Finally, though Congress incorporated provisions of Title VII and the ADA into the PWFA "when it wish[ed] to do so," *Siwe v. Holder*, 742 F.3d 603, 608-09 (5th Cir. 2014), "the PWFA does not incorporate Title VII's amended pregnancy provision," *Louisiana*, 705 F. Supp. 3d at 658. That choice reflects the statutes' differing purposes and must be respected. *Flynn v. Distinctive Home Care*, 812 F.3d 422, 427-28 (5th Cir. 2016).

## B. EEOC's interpretation violates the major questions doctrine.

EEOC's interpretation also founders because of the major questions doctrine. That doctrine prevents agencies from asserting "highly consequential power," *West Virginia v. EPA*, 597 U.S. 697, 724 (2022), in areas of vast "political significance," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), without "clear congressional authorization," *West Virginia*, 597 U.S. at 723; *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023).

To apply the doctrine, courts examine in "context" the "history and the breadth of the authority that the agency has asserted and the economic and political significance of that assertion" to ensure that Congress indeed "meant to confer the power the agency has asserted." *West Virginia*, 597 U.S. at 721 (cleaned up). Relevant context includes "the nature of the question presented," *id*, and

whether it "has been the subject of an earnest and profound debate across the country," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (cleaned up); *West Virginia*, 597 U.S. at 732.

This means that even if the PWFA's text and legislative history were somehow inconclusive (they aren't), EEOC's claim would still fail because EEOC has attempted to assert power over an issue of vast "political significance" without "clear congressional authorization." *West Virginia*, 597 U.S. at 721, 23; *see also Loper Bright*, 144 S. Ct. at 2268 (courts must "police … boundaries of [agency] delegations"). The Final Rule "squarely implicates" the major questions doctrine, *Louisiana*, 705 F. Supp. 3d at 659, in at least two ways.

First, as a general matter, "abortion has been one of the most important social, religious, and political issues of our time" since *Roe*, "and is a major issue in every federal election." *Louisiana*, 705 F. Supp. 3d at 659; *see also, e.g., Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 229, 269 (2022); Blomberg Decl. ¶ 5, Ex. 4 at 2 (32% state they would only vote for a candidate who shared their views on abortion). It ignores reality to think that Congress would delegate the authority to mandate an abortion accommodation on workplaces employing over 100 million Americans in anything but the clearest of terms. *See Gonzales*, 546 U.S. at 267 (national debate "makes the oblique form of the claimed delegation all the more suspect"); *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021) (similar); *Louisiana v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2024 WL 2978786, at *13 (W.D. La. June 13, 2024) (rule that would "determine whether biological males that identify as female are allowed in female bathrooms and locker rooms" and "will affect every public elementary school, middle school, high school, and college in the United States" raises a question "of vast political significance"). But despite repeated invitations, "EEOC [is] unable to point to any language in the PWFA empowering it to mandate" the abortion accommodation, *Louisiana*, 705 F. Supp. 3d at 660, let alone "clear" authorization.

Second, the abortion accommodation mandate implicates another independent major question—religious exercise. The Final Rule has serious free exercise ramifications to those who sincerely object to the practice of abortion, which itself triggers the doctrine.

Requiring clear authorization from Congress before imposing religious burdens comports with the historical judicial protection for natural rights like religious liberty. Both before and at the Founding, courts used "equitable interpretation … which entails the narrow construction of statutes so as to avoid violations of natural rights." Michael W. McConnell, *The Ninth Amendment in Light of Text and History*, 2010 Cato Sup. Ct. Rev. 13, 18. This approach meant that "natural rights control in the absence of sufficiently explicit positive law to the contrary," which can be viewed "as a clear statement rule for abrogating" natural rights. *Id.* (emphasis omitted). Moreover, the Supreme Court has also recognized that the major questions doctrine applies when Congress asserts broad authority over areas enjoying a "unique place in American history and society," *Brown & Williamson*, 529 U.S. at 159, of which this nation's "first freedom" is a preeminent example. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 23 (2020) (Gorsuch, J., concurring); *Fulton v. City of Philadelphia*, 593 U.S. 522, 572-77 (2021) (Alito, J., concurring) (recounting the "long, rich, and complex history" of the "right to religious liberty").

Applying the doctrine here also comports with the Supreme Court's use of the doctrine to protect other structural constitutional values. The Supreme Court has stated that the doctrine safeguards "separation of powers principles" by ensuring that agencies exercise "only those powers given to them by Congress." *West Virginia*, 597 U.S. at 723; *see also NFIB v. Dep't of Labor*, 595 U.S. 109, 122 (2022) (Gorsuch, J., concurring) (doctrine ensures agencies follow their "obligation" to "act consistently with the Constitution's separation of powers"). It also protects against violations of the principles of federalism. *See, e.g.*, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (applying major questions doctrine to prevent Congress from "intrud[ing] into an area that is the particular domain of state law"); *Gonzales*, 546 U.S. at 249, 269-70 (Controlled Substances Act did not clearly authorize the Attorney General to supplant the states' traditional police powers over the regulation of medicine with respect to the "political and moral debate" surrounding physician-assisted suicide); *Louisiana v. EPA*, 712 F. Supp. 3d 820, 863 (W.D. La. 2024) (applying major questions doctrine to invalidate EPA's interpretation of Title VI that "invade[d] the purview of the State's domain").

Enforcing the proper boundaries between church and state protect similar structural principles. The Fifth Circuit has recognized—in a case where abortion providers sought intrusive and entangling discovery into the Catholic bishops' internal deliberations on abortion—that the First Amendment places "structural" limitations on the power of the state to interfere in such religious matters. *Whole Woman's Health v. Smith*, 896 F.3d 362, 366, 373 (5th Cir. 2018). The Fourth Circuit reaffirmed that position, finding that like the "separation of powers," the Religion Clauses are a matter of "constitutional structure," "confin[ing] the state and its civil courts to their proper roles." *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024).[2] State intrusion in religious affairs "plainly jeopardize[s]" this limitation, both "inhibiting the free development of religious doctrine" and entwining "secular interests in matters of purely ecclesiastical concern." *Presbyterian Church v. Mary Elizabeth Blue Hull Presbyterian Church*, 393 U.S. 440, 449 (1969).

These principles apply with particular clarity here, since the Final Rule directly impinges on free exercise interests of well-known national importance and sensitivity. *See, e.g.*, *Little Sisters*, 591 U.S. at 669-70 (cataloguing the "spate of similar lawsuits" nationwide regarding, *inter alia*, abortifacients); *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 724 (2014) (HHS could not "[a]rrogat[e] the authority to provide a binding national answer to [the] religious and philosophical question" of when a religious employer is morally complicit in abortion).[3]

Thus, EEOC cannot pass a rule with such "staggering" ramifications for the First Amendment—dragging religious objectors before civil courts and agencies in intrusive and entangling litigation over their religious beliefs and undermining their ability to live out those beliefs through their unique missions—without a clear statement from Congress. *Biden*, 143 S. Ct.

---

[2]    *Accord Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015) (church autonomy rights are a "structural limitation imposed on the government"); *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (citing *Conlon*, agreeing rights are "rooted in constitutional limits on judicial authority").

[3]    The litany of other federal legislation concerning religious and moral objections to abortion provides further context "as to the manner in which Congress" regulates abortion, *West Virginia*, 597 U.S. at 722-23, and shows how obvious it is that Congress did not grant EEOC *carte blanche* to superimpose an abortion requirement onto the PWFA, *see, e.g.*, 42 U.S.C. § 300a-7(c)(1), (d) (Church Amendments); 42 U.S.C. § 238n(a), (c)(2) (Coates-Snow Amendment); 2023 Consolidated Appropriations Act, Pub. L. No. 117-328, tit. 5, § 507(d)(1), 136 Stat. 4459, 4908-09 (2022) (Weldon Amendment); 42 U.S.C. §§ 18113, 18023(a)(1), (b)(1)(A), (b)(4) (Affordable Care Act).

at 2373; *see also Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 729, 733 (1872) (noting the Religion Clauses protect the church from dissident members using "secular courts" for leverage in religious disputes as well as the state from entanglement in matters beyond its jurisdiction or competence). Because the Final Rule imposes "profound burdens" on free exercise without a clear delegation from Congress, it cannot stand. *Biden*, 143 S. Ct. at 2374-75.

## II. EEOC's interpretation of the PWFA and Title VII religious exemptions violates the APA (Count III).

EEOC also unlawfully narrowed the PWFA and Title VII religious exemptions, taking the view that both protect only against claims for religious-based discrimination. 89 Fed. Reg. at 29,146-47 & n.239. That conclusion is not only wrong, it is also absurd in the PWFA context because the PWFA does not even authorize religious-discrimination claims. EEOC's interpretation thus renders the PWFA's exemption entirely meaningless, applying only to *nonexistent* claims.

### A. EEOC contradicts the text of the PWFA and Title VII religious exemptions.

"[T]he PWFA directly incorporates Title VII's religious exemption and makes the entire PWFA 'subject to' the exemption." *Louisiana*, 705 F. Supp. 3d at 662 (citing 42 U.S.C. § 2000gg-5(b)). Title VII's exemption states: "This *subchapter* shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a) (emphasis added). It further defines "religion" to mean "*all aspects* of religious *observance and practice*, as well as belief." *Id.* § 2000e(j) (emphases added). "Title VII thus exempts religious entities from the requirements of the entire 'subchapter'—*e.g.*, all of Title VII, not merely one category of claims—protecting religious employers from *any* Title VII claim if an employer made an employment decision based on an individual's particular religious belief, observance, or practice." *Louisiana*, 705 F. Supp. 3d at 662.

The PWFA incorporates these principles wholesale into its own religious exemption. 42 U.S.C. § 2000gg-5(b). Therefore, as with Title VII, a religious employer does not have to provide accommodations under the PWFA where doing so would require accommodation of employee beliefs, observances, or practices that conflict with the employer's religion. That exemption applies

categorically, without necessarily requiring case-by-case adjudication. And that's exactly how the Fifth Circuit has applied it, barring a Title VII sex-discrimination investigation where a religious employer "applied its policy of preferring Baptists over non-Baptists." *EEOC v. Miss. Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980). Thus, the religious exemption would "preclude any investigation by the EEOC" of a "sex discrimination claim" if the Baptist college "made the challenged employment decision on the basis of an individual's religion." *Id.* at 485-86.

Other courts agree. In *Curay-Cramer v. Ursuline Academy*, a Catholic school dismissed a teacher for engaging in pro-abortion advocacy in violation of Catholic teaching. 450 F.3d 130, 132 (3d Cir. 2006). The teacher sued under Title VII for sex discrimination, alleging the school treated her worse than similarly situated male teachers. *Id.* But the Third Circuit rejected her claim, explaining that "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Id.* at 141. Because the school had "offer[ed] a religious justification" for its decision—violation of Catholic teaching—her claim was barred, even though she claimed sex, not religious, discrimination. *Id.* at 141-42. Similarly, *Bear Creek Bible Church v. EEOC* held that "[t]he plain text of [the religious] exemption" bars sex-discrimination claims "when [a religious employer] refuses to employ an individual because of sexual orientation or gender expression, based on religious observance, practice, or belief." 571 F. Supp. 3d 571, 591 (N.D. Tex. 2021).

Several federal appellate judges have recently reached the same conclusion. Judge Easterbrook stated that "when [an employment] decision is founded on religious beliefs, then all of Title VII drops out." *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 946 (7th Cir. 2022). Judge Brennan likewise reasoned that "'individuals of a particular religion' means individuals whose beliefs, observances, or practices align with the employer's religious expectations." *Fitzgerald v. Roncalli High Sch.*, 73 F.4th 529, 535 (7th Cir. 2023). Agreeing, Judge King determined that the most "straightforward reading" of the religious exemption barred a sex-discrimination claim based on beliefs about marriage. *Billard*, 101 F.4th at 335.

18

This understanding is reinforced by the "alien" exemption, which is listed alongside the religious exemption in 42 U.S.C. Section 2000e-1(a). This exemption is introduced with the same language: "[t]his subchapter shall not apply to an employer *with respect to the employment of aliens outside any State*[.]" *Id.* (emphasis added). If EEOC were correct about the religious exemption's limited scope, the alien exemption should have a similar limitation (*e.g.* claims of race or national-origin discrimination). But courts have found that language "mean[s] what it says: *none* of Title VII's substantive rules applies to aliens covered by § 702(a)." *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring); *accord Bear Creek*, 571 F. Supp. 3d at 591.

Indeed, even *EEOC* previously agreed, noting in enforcement guidance that "the exemption allows religious organizations to prefer to employ individuals who share their religion, defined not by the self-identified religious affiliation of the employee, but broadly by the employer's religious observances, practices, and beliefs." *See* EEOC_135086. And it used the facts of *Curay-Cramer* as an example, stating that Title VII's religious organization exemption "bars adjudication of the sex discrimination claim" in such a case because it "preserves the religious school's ability to maintain a community composed of individuals faithful to its doctrinal practices." EEOC_135087.

But, contradicting its own guidance, precedent, and the plain text of the law, EEOC and its Final Rule now take a different tack. "EEOC contends that the PWFA exemption [and Title VII's exemption] protects religious entities from claims of religious discrimination only." *Louisiana*, 705 F. Supp. 3d at 662 (citing 89 Fed. Reg. at 29,146-47). This "fail[ure] to include a broad religious exception in the Final Rule … does not square with the PWFA," nor with Title VII's exemption, which the PWFA's religious exemption "mirrors." *Id.*

Though that conclusion is plain enough under Title VII, it stands out in stark relief when applied in the PWFA context, which does not even make religious-based claims cognizable in the first place. Thus, EEOC's interpretation of the PWFA violates the "cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute," *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted), as well as the

admonition that courts cannot "render as meaningless the language of the statute." *Cooper/T. Smith Stevedoring Co. v. Liuzza*, 293 F.3d 741, 746 (5th Cir. 2002).

Because statutes should be interpreted to avoid rendering entire sections as void, *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001), and because the Final Rule's religious exemption "clearly conflicts with the plain language" of the PWFA and Title VII, it "constitutes unlawful agency action" and must be set aside, *VanDerStok*, 86 F.4th at 190.

**B.  EEOC's interpretation violates the constitutional avoidance canon.**

Even if the religious exemptions were ambiguous (they aren't), rejecting EEOC's reading would be required to avoid the unconstitutional entanglement and intrusion into religious entities' autonomy over internal religious affairs. "Under the constitutional-avoidance canon, … a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *see also Turtle Island Foods v. Strain*, 65 F.4th 211, 219 (5th Cir. 2023).

Thus, for instance, *NLRB v. Catholic Bishop* held that the NLRB couldn't order Catholic schools to collectively bargain with "lay teachers" given the "serious constitutional questions" that would follow. 440 U.S. 490, 494-95, 501 (1979). Otherwise, in schools where employment practices are governed by "religious creeds," civil adjudication would "necessarily involve inquiry" into "the school's religious mission," and the "very process of inquiry" could itself "impinge on rights guaranteed by the Religion Clauses." *Id.* at 502.

So too here. EEOC's atextual interpretation of the statutory religious exemptions would create several serious First Amendment problems detailed below—violating the "principle of church autonomy" by intruding into church hiring practices, internal employment policies, and religious speech, as well as entangling church and state through extensive investigations into religious disputes. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020); *Whole Woman's Health*, 896 F.3d at 373 (Civil courts may not intrude upon the "private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs.").

This should come as no surprise. Congress's religious exemptions are "legislative applications of the church-autonomy doctrine," *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013), which merely "recogni[ze] … the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions," *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 623-24 (6th Cir. 2000). Inevitably, "serious constitutional questions" arise when a court probes "a religious employer's religious mission or the plausibility of its religious justification for an employment decision." *Curay-Cramer*, 450 F.3d at 139-41. Indeed, it is for this reason that the Third Circuit found sex-discrimination claims barred by Title VII's religious exemption. *Id*. at 137-39 (relying on *Catholic Bishop* and concluding that inquiry into "violations of Church doctrine" would "violate the First Amendment"). Thus, given "the constitutional concerns that would be raised by a contrary interpretation," courts have repeatedly "read the exemption broadly" to allow religious employers "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *accord Curay-Cramer*, 450 F.3d at 137-39; *Hall*, 215 F.3d at 623-24.

The statutory exemptions are "constitutionally inspired, implementing the First Amendment's command to avoid 'intrusive inquiry into religious belief.'" *Billard*, 101 F.4th at 329. EEOC's entangling construction eviscerates that inspiration and invites "a hoard of constitutional problems." *United States v. Hamilton*, 46 F.4th 389, 398 n.3 (5th Cir. 2022). It must be rejected.

## III.  EEOC's requirements violate the church autonomy doctrine (Count VII).

Chief among the "hoard" is EEOC's violation of the church autonomy doctrine, which prohibits the state from intruding upon the "private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs." *Whole Woman's Health*, 896 F.3d at 373. The Final Rule and EEOC's enforcement position do just that.

### A.  The church autonomy doctrine protects internal church governance.

The First Amendment's "principle of church autonomy" safeguards "the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady*, 591 U.S. at 737, 747. For government to "dictate

or even to influence such matters" would "obviously violate the free exercise of religion" and "constitute one of the central attributes of an establishment of religion." *Id.* at 746. This "broad principle," *id.* at 747, "lies at the foundation of our political principles," *Watson*, 80 (13 Wall.) at 728, and has since the Founding set a "scrupulous policy" against "political interference with religious affairs," *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 182-88 (2012).

One "component of this autonomy" safeguards the relationship between a religious organization and its ministers. *Our Lady*, 591 U.S. at 746. But the "general principle of church autonomy" sweeps further, *id.* at 747, protecting religious institutions whenever they "mak[e] decisions regarding their own internal affairs," such as "matters of faith, doctrine, church governance, and polity," *Bryce v. Episcopal Church*, 289 F.3d 648, 655 (10th Cir. 2002). This broader protection "limit[s] the role" of the government "in the resolution of religious controversies," even those "that incidentally affect civil rights." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976). As a rule, then, religious institutions have "independence in matters of faith and doctrine" and in "closely linked matters of internal government" that are "essential to the institution's central mission." *Our Lady*, 591 U.S. at 746-47.

**B. EEOC is violating the church autonomy doctrine.**

EEOC's requirements violate the church autonomy doctrine four times over. First, the rule forces the Bishops to retain employees who violate their faith. Second, it forces the Bishops to change their own religious speech and the speech of their employees about sensitive matters of faith and doctrine. Third, it forces the Bishops to knowingly accommodate conduct their faith forbids and subjects them to pervasive governmental scrutiny to accomplish that goal. Fourth, and relatedly, it forces the Bishops to endure unconstitutionally intrusive and entangling investigations into religious matters. All of these intrusions undermine the Bishops' independence over internal governance regarding fidelity to their religious mission.

***Employment Decisions***. EEOC and its Final Rule compel the Bishops to retain employees who openly contradict their religious teachings in the workplace. For instance, the Final Rule forbids the Bishops from taking any adverse actions against employees who request abortion

22

accommodations and prohibits discriminating against an employee "based on" the "decision[ ] to have … an abortion." 89 Fed. Reg. at 29,106, 29,112, 29,187. That is unconstitutional.

As with the Title VII and PWFA statutory exemptions, courts have concluded that "[w]hen a church makes a personnel decision based on religious doctrine," the "broader church autonomy doctrine" protects that decision from governmental second-guessing. *Bryce*, 289 F.3d at 658 n.2, 660. Thus, the Tenth Circuit held in *Bryce* that a church employee's suit under Title VII for opposing her same-sex union was barred by church autonomy because the church's "personnel decision" was "rooted in religious belief." *Id.* at 657-58. And in *Butler v. St. Stanislaus Kostka Catholic Academy*, the court held that the "long recognized … church autonomy doctrine" barred a Title VII claim over a religious employment decision. 609 F. Supp. 3d 184, 198 204 (E.D.N.Y. 2022); *accord Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871-73 (N.D. Ill. 2019) (applying "principle of religious autonomy" to dismiss challenge to religious employment decision).

That result makes sense. There are few issues more "closely linked" to "internal government" and a church's "central mission" than ensuring its representatives do not openly undermine its faith. *Our Lady*, 591 U.S. at 746-47. The issue is foundational. Making sure that "only those committed to [the church's] mission should conduct" its activities is the "means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). If a religious group must "accept as members those who engage in … conduct" that violates the group's core beliefs, that "would cause the group as it currently identifies itself to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006). Thus, "[b]eing forced to employ someone to represent the [Bishops] who behaves in a manner directly violative of [their] convictions" obviously "inhibits the practice of [their] beliefs." *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 938 (5th Cir. 2023).

A religious group has the right to decide that an employee has failed to meet "the standard of morals required of [him]," *Milivojevich*, 426 U.S. at 714, and "to stop associating with someone who … do[es] not act in accordance with church doctrine," *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012). EEOC is violating this right.

***Internal Religious Expression***. EEOC also bans any policy that "purports to limit an employee's rights to invoke PWFA protections." 89 Fed. Reg. at 29,216; *see id.* at 29,199. Even "statements regarding religious beliefs," "mission statements," and "code[s] of conduct" must be sanitized of speech that might "dissuade" an employee from requesting an accommodation covered by the Final Rule. *Id.* at 29,141-42 & n.201, 29,215-16. And, as noted above, to ensure that no "discriminatory work … atmosphere" exists, the Bishops must monitor and punish "unwelcome, critical" employee speech against matters such as abortion. *Id.* at 29,214, 29,218.

None of this can be squared with church autonomy, which broadly safeguards the "rights of the church to discuss church doctrine and policy freely." *Bryce*, 289 F.3d at 658. "The First Amendment outlaws" "any attempt by government to dictate or even to influence such matters." *Our Lady*, 591 U.S. at 746. Yet the Final Rule dictates that the Bishops accommodate messages they would otherwise exclude, change their religious speech, and censor the expressive "atmosphere" among their employees. By regulating "internal church dialogue" about sensitive "religious topics," the Final Rule violates "the church autonomy doctrine." *Bryce*, 289 F.3d at 659.

***Employment Accommodations***. EEOC also uses the Final Rule to give itself sweeping power to make the Bishops knowingly accommodate actions that violate core teachings of the Church. *See* 89 Fed. Reg. at 29,183; Kunkel Decl. ¶¶ 7-22. EEOC "broadly" interprets its authority over "PWFA accommodations," allowing it to regulate everything from the "atmosphere" of the Church's internal ministry to the Bishops' "ordinary workplace policies or practices" to anything else that "might" possibly "dissuade[ ] a reasonable worker" from seeking or advocating in favor of (for instance) abortion. 89 Fed. Reg. at 29,199, 29,215-16. EEOC thus asserts power to control the day-to-day operations of the Church. That violates church autonomy in three ways.

*First*, the Bishops, not the EEOC, control the "atmosphere" and operations of the Church. And it should go without saying that forcing *the Bishops themselves* to knowingly violate the faith *within their own ministries* directly implicates issues of "internal government" that are "essential to the [Bishops'] central mission." *Our Lady*, 591 U.S. at 746-47. Government cannot compel "conformity" in matters of internal governance by "legislative fiat." *Kedroff v. St. Nicholas*

*Cathedral*, 344 U.S. 94, 107-08 (1952). Nor can EEOC by administrative edict. Imposing a "penalty on the Church" for making protected governance decisions is "prohibited by the First Amendment," *Hosanna-Tabor*, 565 U.S. at 194, not least because it "clearly ha[s] a 'chilling effect'" on "inherently religious function[s]," *Westbrook v. Penley*, 231 S.W.3d 389, 400 (Tex. 2007). EEOC's ham-fisted attempt to refashion both federal law and the Church into its own image blatantly crosses the constitutional lines Congress has meticulously avoided by writing broad religious exemptions into statutes such as Title VII and the PWFA.

*Second*, EEOC's overreach places the entirety of the Bishops' ministries—including their "atmosphere" and "ordinary workplace policies [and] practices"—under ongoing, pervasive scrutiny. Government cannot possibly engage in such surveillance "without engaging in a searching and therefore impermissible inquiry" into internal religious affairs. *Milivojevich*, 426 U.S. at 723. That's why the Religion Clauses have long barred laws that "allowed the [government] to consider all aspects of a religious [group's] organization and function that it deem[s] relevant," *Carroll Coll. v. NLRB*, 558 F.3d 568, 572 (D.C. Cir. 2009) (cleaned up), or that permitted government to sift "nearly everything that goes on" in a religious entity, *Duquesne Univ. v. NLRB*, 947 F.3d 824, 829 (D.C. Cir. 2020) (collecting cases); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 980-81 (7th Cir. 2021) (en banc) (barring hostile work environment claims by ministers because of pervasive intrusion into religious workplace).

Indeed, if it is unconstitutionally entangling for the government to broadly regulate the secular "terms and conditions of employment" even for employees who *follow* the Church's beliefs, *Duquesne*, 947 F.3d at 829, then it follows *a fortiori* that EEOC cannot regulate *fundamentally religious* terms and conditions for employees who *reject* the Church's beliefs within a religious workplace. After all, a "religious organization shapes its faith and mission through its work environment," and the kind of extensive oversight EEOC seeks here "interfere[s] with [the Bishops'] internal governance," *Demkovich*, 3 F.4th at 980-81, and causes "gross substantive and procedural entanglement with the Church's core functions, its polity, and its autonomy," *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1245 (10th Cir. 2010).

*Third*, the Final Rule requires the government to weigh the Church's religious beliefs and its mission to determine if a requested accommodation imposes an "undue hardship." 89 Fed. Reg. at 29,153-54, 29,205. EEOC could have acknowledged that using federal law to coerce religious employers into violating their sincere religious beliefs was a per se undue hardship, which is a straightforward path to avoiding entanglement. But EEOC expressly rejected that option in favor of one in which EEOC, civil courts, and juries must assess whether an acknowledged religious hardship is "undue" based on "individualized evidence." *Id.* at 29,154. And whether that religious hardship is "undue" turns in part on whether the accommodation "would fundamentally alter the nature or operation of the [organization]." *Id.*

That analysis leads to precisely the kinds of entangling inquiries Justices Alito and Kagan warned about in *Hosanna-Tabor*. 565 U.S. at 205-06. The "credibility" of the claim of hardship would require "assess[ing] … the importance that the [church]" actually "attaches to" the issue. *Id*. at 205. And to evaluate that, the jury would need to hear from "witnesses to testify about the importance and priority of the religious [decision] in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission." *Id.* at 205-06. The "mere adjudication of such questions would pose grave problems for religious autonomy." *Id.*; *Carson v. Makin*, 596 U.S. 767, 787 (2022) ("scrutinizing … how a religious [group] pursues its [religious] mission" threatens unconstitutional "state entanglement with religion").

***Entangling Investigations***. Indeed, because the "very process of inquiry" into matters of religious belief and governance can violate the First Amendment, *Catholic Bishop*, 440 U.S. at 502, the kinds of "protracted investigations and litigation" required by the Final Rule are themselves barred by the Constitution, *Louisiana*, 705 F. Supp. 3d at 662-63.

Far from respecting its constitutional boundaries, EEOC purports to permanently subject the Bishops to "case-by-case" intrusion, 89 Fed. Reg. at 29,145-51—guaranteeing years of "litigation [and] bureaucratic entanglement" that will "cause[ ] a significant diversion of … time and resources" and will "inevitably affect" how the ministries choose to carry out their religious

missions. *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996). Such "investigation and review" of sensitive religious "practices and decisions" can "cause the State to intrude upon matters of church administration and government," which "produce[s] by its coercive effect the very opposite" of the "separation of church and State." *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972); *accord Combs v. Cent. Tex. Ann. Conf.*, 173 F.3d 343, 350 (5th Cir. 1999) ("investigating" some religious decisions "necessarily intrude[s] into church governance in a manner that [is] inherently coercive," which "is enough to bar the involvement of the civil courts").

This entangling, time-consuming, and intrusive "case-by-case" scheme only "empowers certain … groups to harass, impose disastrous costs on, and uniquely burden religious organizations." *Whole Woman's Health*, 896 F.3d at 373-74 (protecting bishops against discovery that would interfere with "their internal organizational autonomy"); *Duquesne*, 947 F.3d at 835 (such a "'case-by-case' inquiry" causes entanglement and can "'chill[] religious activity'" (quoting *Amos*, 483 U.S. at 343-44 (Brennan, J., concurring)). And all it takes to trigger the litigation machinery is a *single* EEOC Commissioner who wishes to investigate the Bishops. *See* 42 U.S.C. § 2000e-5(b). The church autonomy doctrine is meant to prevent this sort of church-state entanglement. *See, e.g.*, *Kedroff*, 344 U.S. at 116; *McClure*, 460 F.2d at 560.

**IV. EEOC's requirements violate RFRA (Count V).**

RFRA provides "very broad protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 352, 356 (2015). Under RFRA, the federal government may not "substantially burden a person's exercise of religion" unless that burden is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). RFRA must be construed "in favor of a broad protection of religious exercise" to the "maximum extent" possible. *Hobby Lobby*, 573 U.S. at 696 & n.5. RFRA has repeatedly protected religious employers from very similar federal regulatory mandates regarding abortion, contraception, and sterilization. *See id.*, *accord Little Sisters*, 591 U.S. at 664-74 (chronicling nationwide litigation objecting to contraception mandate); *Franciscan All. v. Becerra*, 47 F.4th 368, 371 (5th Cir. 2022) (upholding injunction against rule requiring healthcare facilities perform abortions). And because the Bishops' religious beliefs are

27

substantially burdened by EEOC's requirements, EEOC must show *both* a compelling interest justifying the burden *and* that the burden is the least restrictive means of serving that interest. Failing to show either is fatal. EEOC fails both.

**Substantial Burden.** EEOC does not dispute the sincerity of the Catholic Church's beliefs on matters such as abortion and contraception. And EEOC's Final Rule and enforcement position burdens the Bishops' exercise of those beliefs by forcing them to "choose between two untenable alternatives": knowingly accommodate actions or advocacy contrary to their religious beliefs within their ministries, or risk both significant liability and years-long expensive and entangling litigation by both the EEOC and private parties. *Braidwood*, 70 F.4th at 937; *see* 42 U.S.C. § 2000gg-2(a) (remedies); 29 C.F.R. § 1636.3(h)(2) (notification requirement); *see* Brown Decl. ¶¶ 26-32; Caraway Decl. ¶¶ 11-16; Fontenot Decl. ¶¶ 10-16; Ridderhoff Decl. ¶¶ 27-36.

This establishes a substantial burden. *Catholic Benefits Ass'n v. Burrows*, --- F. Supp. 3d ---, 2024 WL 4315021, at *7-8 (D. N.D. Sept. 23, 2024) (*CBA*) (finding Final Rule imposed substantial burden). "Being forced to employ someone to represent [a] company who behaves in a manner directly violative of the company's convictions is a substantial burden," as is being forced to "broadly change" its "employment policies" and "tacitly endorse" behavior "it sees as sinful." *Braidwood*, 70 F.4th at 938; *see also Korte*, 735 F.3d at 683 ("[L]ittle doubt" that forced "complicit[y] in a grave moral wrong" is a substantial burden); *Hobby Lobby*, 573 U.S. at 724-25 (similar); *Little Sisters*, 591 U.S. at 693 (Alito, J., concurring) (similar).

This burden accrues immediately, despite EEOC's oft-rejected attempts to delay contending with RFRA by claiming it will apply a "case-by-case" approach to religious defenses. 89 Fed. Reg. at 29,149; *Franciscan All.*, 47 F.4th at 377 ("promise to 'comply with [RFRA]'" inadequate). The Bishops must "comply wholeheartedly with the [rule] [they] see[ ] as sinful" *now* to avoid potential liability, *Braidwood*, 70 F.4th at 938, and EEOC has "steadfastly refused to promise" that it will not enforce its interpretation of federal law against them. *Louisiana*, 705 F. Supp. 3d at 656 (quoting *Franciscan All.*, 47 F.4th at 377). EEOC and its amici fought even a brief delay of the mandate. *See* ECF 29 at 24-25; ECF 51 at 8-9; ECF 34-1 at 20.

Further, the inquiry EEOC requires here would itself be a substantial burden, subjecting the Bishops to years of entangling investigation and litigation about their religious beliefs and mission. *Supra* pp. 26-27. Indeed, EEOC has previously violated CUA's First Amendment rights via an intrusive "two-year investigation" into a nun's Title VII claims, which imposed such "bureaucratic entanglement" as forcing CUA officials to be "deposed, interrogated, and haled into court" on religious matters. *Catholic Univ.*, 83 F.3d at 467. There, "EEOC's attempt to enforce Title VII … both burden[ed] Catholic University's right of free exercise and excessively entangle[d] the Government in religion." *Id.* EEOC's approach here repeats the same mistakes.

**Compelling Interest.** Because the Bishops have demonstrated a substantial burden, the burden shifts to EEOC to prove that its actions further an interest "of the highest order." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014). "'[G]eneral statements of its interests' are not sufficient"; EEOC must demonstrate how the interests are compelling as applied "to the person whose sincere exercise of religion is being seriously impaired." *Id.*

EEOC fails this test. Its sole attempt in the Final Rule to establish a compelling interest merely asserts that "[n]ondiscrimination laws and policies have been found to serve a compelling governmental interest." 89 Fed. Reg. at 29,148. This cursory dodge flunks the basic terms of RFRA scrutiny: the asserted interest is not specific to the Bishops but instead reflects the kind of "[g]eneral statements" that fail as a matter of course. *McAllen*, 764 F.3d at 472; *accord CBA*, 2024 WL 4315021, at *8 (finding no compelling interest).

Nor is there any underlying interest in an abortion-accommodation mandate. Not a single legislator—not one—claimed from the congressional floor that such an interest lay dormant in the PWFA's proposed text. *See* EEOC_136723-844. To the contrary, the PWFA's sponsors repeatedly *denied* they were imposing an abortion mandate. A denied interest is not a compelling one. *Little Sisters*, 591 U.S. at 697 (Alito, J., concurring) ("[I]f Congress thought that there was a compelling need" at issue, "why didn't Congress mandate that [provision] in the [law] itself?").

Further, *Bostock* itself states that RFRA "supersede[s] Title VII's [antidiscrimination] commands in appropriate cases." *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020). As the

Fifth Circuit has noted, *Bostock*'s "qualification would be a nullity if the government's compelling interest in purportedly eradicating sex discrimination were a trump card against every RFRA claim." *Braidwood*, 70 F.4th at 939. But it is not a nullity. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 590-92 (2023) (however "compelling" an antidiscrimination interest might be, it cannot be invoked to run roughshod over "the demands of the Constitution.").

Finally, EEOC "leaves appreciable damage to [its] supposedly vital interest unprohibited," which shows that the "government's claimed interest isn't actually so compelling after all." *Ware v. La. Dep't of Corr.,* 866 F.3d 263, 269 (5th Cir. 2017). For instance, the law exempts employers with less than 15 employees, leaving about 80 percent of private employers and millions of employees uncovered. 89 Fed. Reg. at 29,151; *see* Blomberg Decl. ¶ 6, Ex. 5 at 1-2; Richard Carlson, *The Small Firm Exemption*, 80 St. John's L. Rev. 1197, 1198-99, 1199 n.14 (2006). Similarly, EEOC broadly exempts *any* employer facing an "undue hardship" from complying with the Final Rule. 89 Fed. Reg. at 29,205. The government cannot excuse small employers and those with cost objections while also claiming "that its non-discrimination policies can brook no departures" for the Bishops. *Fulton*, 593 U.S. at 542; *accord Bear Creek*, 571 F. Supp. 3d at 613. The point only grows clearer in light of numerous other exceptions to EEOC's enforcement position. *See* 42 U.S.C. §§ 2000e, 2000e-1; 2000e-2 (allowing exemptions based on, *inter alia*, occupational qualifications, private-membership status, and employment of aliens).

***Least Restrictive Means.*** EEOC also cannot show it has used the "least restrictive means" of achieving its interests. *Gonzales v. O Centro*, 546 U.S. 418, 423 (2006). This element requires EEOC to prove "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Hobby Lobby*, 573 U.S. at 728. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 574 U.S. at 365. The government must also show—with "*actual evidence*, not just conjecture," *McAllen*, 764 F.3d at 476—"that it considered the claimant's proposed alternatives," and that "those alternatives are ineffective," *Ali v. Stephens*, 822 F.3d 776, 786 (5th Cir. 2016).

A consequence of EEOC's *post hoc* attempt to hide abortion in a pregnancy statute and to eviscerate the PWFA's religious exemption is that Congress never actually evaluated whether there were less-restrictive ways to accomplish the objectives EEOC claims Congress had all along. To the contrary: Congress didn't intend to burden religion at all, so it didn't justify any such burden.

EEOC claims that its "case-by-case" approach to religious defenses is the least restrictive means. But EEOC could enforce federal law as written by Congress, leaving out abortion and giving full scope to statutory religious exemptions. Or it could use the Department of Education's Title IX approach, where employers can voluntarily submit requests for assurances of exemption. 34 C.F.R. § 106.12(b). Or it could follow HHS's adoption of presumptive safe harbors for religious objectors to similar federal regulatory mandates. *See* 45 C.F.R. § 92.302; 89 Fed. Reg. 37,522, 37,657 (May 6, 2024). Or it could look to federal agencies' failed attempts to force religious employers to violate their beliefs, which eventually concluded after over a decade of nationwide litigation by exempting such objectors outright. *See Little Sisters*, 591 U.S. at 663. *Braidwood* itself identified such frameworks as plausible less restrictive alternatives. 70 F.4th at 940 n.59.

The existence of such alternatives, combined with the lack of evidence that EEOC even considered them (much less proved them ineffective), means EEOC again flunks RFRA's "heavy burden." *McAllen*, 764 F.3d at 475-76; *see also Hobby Lobby*, 573 U.S. at 730 (existence of alternative shows failure of tailoring); *Ali*, 822 F.3d at 786 (agency must show it "considered the claimant's proposed alternatives"); *see* 89 Fed. Reg. 29,149 (response to comments regarding RFRA); *accord CBA*, 2024 WL 4315021, at *8-9 (finding insufficient tailoring).

## V.  EEOC's requirements violate the Free Exercise Clause (Count VI).

EEOC violates "bedrock" Free Exercise rights in two distinct ways. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (*FCA*).

First, a policy that burdens religion while reserving discretion for the government "to decide which reasons for not complying with the policy are worthy of solicitude" must satisfy strict scrutiny. *Fulton*, 593 U.S. at 537. EEOC admits that it reserves discretion to make "case-by-case" decisions on whether accommodating a particular employee or particular situation is an "undue

hardship" that can be denied. 89 Fed. Reg. at 29,205. And, as noted above, EEOC performs this "individualized assessment" for religious objectors as well. *Id.* at 29,153. But this is precisely the "case-by-case analysis" that "is antithetical to a generally applicable policy." *FCA*, 82 F.4th at 688; *see also U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 838 (N.D. Tex. 2022) (policy's allowance of "individualized assessment of the reasons" for non-compliance means "favoritism is built into the mandate" and is not generally applicable). It allows EEOC to decide both whether dollars-and-cents interests are compelling enough to exempt a secular employer, and whether an employer's religious belief is sufficiently important in EEOC's eyes to warrant its solicitude on an entirely discretionary basis. Allowing "exemptions based on the circumstances underlying each application" triggers strict scrutiny. *Fulton,* 593 U.S. at 534.

Second, if a law "treat[s] *any* comparable secular activity more favorably than religious exercise," it again must pass strict scrutiny. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *accord FCA*, 82 F.4th at 688. But here, for instance, EEOC exempts any secular employer who can show an "undue hardship" and *all* employers with less than 15 employers from its mandate, exempting about 80 percent of private employers and leaving millions of employees uncovered. *Supra* pp. 30. Because EEOC chose to treat such secular interests more favorably than religious objections to abortion for "no apparent reason other than administrative convenience," EEOC must satisfy strict scrutiny. *Bear Creek*, 571 F. Supp. 3d at 613 (EEOC interpretation of Title VII burdening religion subject to strict scrutiny because, *inter alia*, it exempted employers with fewer than 15 employees); *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842, at *3 (9th Cir. Aug. 8, 2024) (protecting religious hiring policies against anti-discrimination rules).

Finally, even without the discretion and discrimination addressed in *Fulton* and *Tandon*, the Free Exercise Clause requires strict scrutiny whenever government "imposes a substantial burden on religious exercise" like the burden here. *See Fulton*, 593 U.S. at 614 (Alito, J., concurring).[4]

Having triggered strict scrutiny, EEOC fails it for the reasons identified above under RFRA.

---

[4]    Plaintiffs recognize that this argument is barred by *Employment Division v. Smith*, 494 U.S. 872, 879 (1990), and preserve it here for appeal.

## VI. EEOC's requirements violate the Free Speech Clause (Counts IX and X).

EEOC's requirements violate the Free Speech Clause in two ways: (1) compelling the Bishops to associate with employees whose conduct and speech undermines the Bishops' religious expression and (2) restricting the Bishops' religious speech and compelling them to facilitate contrary messages of which they disapprove.

*Expressive Association*. EEOC's mandate violates the right of "expressive association." *303 Creative*, 600 U.S. at 586. "[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of" those activities. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (same) (internal quotation marks omitted). This freedom of association "plainly presupposes a freedom not to associate," and thus prevents an expressive association from being "forc[ed] … to accept members it does not desire." *Id.* at 648.

A group's associational rights are burdened when it 1) "engage[s] in some form of expression"; and 2) when the forced association would "significantly affect [its] ability to advocate" for its viewpoints. *Id.* at 648, 650. And a court must "give deference to [the] association's assertions regarding the nature of its expression" and its "view of what would impair [that] expression." *Id.* at 653. EEOC's requirements burden the Bishops' expressive association rights.

First, "[r]eligious groups" like those led by the Bishops are "the archetype of associations formed for expressive purposes," since their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring). It is "indisputable that an association that seeks to transmit … a system of values engages in expressive activity." *Dale*, 530 U.S. at 650. That applies to the Bishops. *See, e.g.*, Kunkel Decl. ¶¶ 47-53; Brown Decl. ¶¶ 18, 22-31.

Second, forced association with individuals who promote violating Catholic teachings would significantly impair the Bishops' collective expression of the Catholic Church's beliefs. That's why the Bishops do not allow speech or conduct encouraging such practices from their employees or faculty. In the past academic year, for example, CUA terminated classroom instructors who had instructed students regarding abortion in a manner which it determined did not align with CUA's

33

mission and identity. Brown Decl. ¶ 29; *see also* Joe Burkuras, *Catholic University Fires Professor Who Hosted 'Abortion Doula' in Class,* Catholic News Agency (Jan. 30, 2024), https://perma.cc/TS3U-ZZ4D. EEOC's mandate "forces the [Bishops] to send a message" that they accept violations of Catholic faith "as a legitimate form of behavior." *Dale*, 530 U.S. at 653; *see also Slattery v. Hochul*, 61 F.4th 278, 288-91 (2d Cir. 2023) (anti-discrimination law that barred pregnancy center from declining to hire employees' "whose actions suggest that they believe the opposite of the message it is trying to convey" violated associational rights).[5] EEOC's requirements thus burden the Bishops' rights to expressive association.

**Free Speech.** EEOC's mandate violates the Bishops' free speech rights by censoring their religious speech within their ministries and by compelling them to permit messages that violate their beliefs. Both compelled speech and compelled silence are "presumptively unconstitutional." *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018). This is particularly true for religious speech, since "the Free Speech Clause provides overlapping protection for expressive religious activities" that, along with the Free Exercise Clause, "doubly protects religious speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022); *accord Darren Patterson*, 699 F. Supp. 3d at 1187 (funding program's anti-discrimination provisions impermissibly compelled speech).

EEOC's requirements violate these protections. The Final Rule states that it "broadly" prohibits anything that "might have dissuaded a reasonable worker" from seeking accommodations, including "interfer[ing]" in a request, "issuing a policy or requirement that purports to limit" seeking accommodations, or disciplining an employee for "assist[ing] a coworker in requesting" accommodation. 89 Fed. Reg. at 29,214-18. The Rule also bars "unwelcome, critical comments." *Id.* at 29,218. These provisions prohibit the Bishops from informing applicants and employees of their current employment policies and beliefs regarding, for example, abortion accommodations. They also limit the Bishops' ability to encourage workers to make decisions consistent with

---

[5]    *See also Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 89, 91 (2d Cir. 2003); *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1184 (D. Colo. 2023); *Bear Creek*, 571 F. Supp. 3d at 614-16; *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 822 (E.D. Mo. 2018); *Priests for Life v. HHS*, 7 F. Supp. 3d 88, 109 (D.D.C. 2013).

Catholic teaching and prohibit the Bishops from counseling employees against violating those teachings. *See* Blomberg Decl. ¶ 7, Ex. 6 at 47 (EEOC guidance that religious speech "attempt[ing] to persuade another employee of the correctness of his beliefs" can constitute harassment); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.) ("There is no categorical 'harassment exception'" to the First Amendment.). All this infringes the Bishops' speech.

Because EEOC is burdening the Bishops' right to expressive association and free speech, that burden must be narrowly tailored to serve a compelling government interest. *McDonald v. Longley*, 4 F.4th 229, 246 (5th Cir. 2021). As shown above, *see supra* pp. 29-31, it doesn't come close.

## VII. A permanent injunction is warranted.

A party is entitled to a permanent injunction when it establishes (1) "actual success on the merits," (2) "irreparable harm," (3) "that the balance of equities tips in" its "favor," and (4) "that an injunction is in the public interest." *Crown Castle Fiber v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023). All the factors point the same way: "[T]he loss of First Amendment freedoms, for even minimal periods of time[,] unquestionably constitutes irreparable injury," vindicating those "freedoms" is "always in the public interest," and the balance of harms "weighs heavily" in "favor" of the First Amendment. *McDonald*, 4 F.4th at 255; *accord Franciscan All.*, 47 F.4th at 380 ("[T]he loss of freedoms guaranteed by the First Amendment … and RFRA … constitute per se irreparable harm."). Forcing the Bishops to "endorse non-conforming religious behavior for any period" cannot be remedied with damages after the fact and therefore constitutes irreparable harm. *Braidwood*, 70 F.4th at 932 n.33. And EEOC suffers "no harm at all" when an unconstitutional law is enjoined. *McDonald*, 4 F.4th at 255.

## CONCLUSION

The Court should grant summary judgment and a permanent injunction.

Respectfully submitted,

Jonathan Berry
  (W.D. La. Temporary Bar No. 918121)
James R. Conde
  (W.D. La. Temporary Bar No. 918116)
Boyden Gray PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
Phone: (202) 955-0620
Fax: (202) 955-0621
jberry@boydengray.com

/s/ Daniel H. Blomberg
Daniel H. Blomberg
  (W.D. La. Temporary Bar No. 918117)
*Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
  (LA Bar No. 38852)
Laura Wolk Slavis
  (W.D. La. Temporary Bar No. 918118)
Andrea R. Butler
  (W.D. La. Temporary Bar No. 918119)
Jordan T. Varberg
  (W.D. La. Temporary Bar No. 918120)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Phone: (202) 955-0095
Fax: (202) 955-0090
dblomberg@becketlaw.org

*Counsel for Bishops Plaintiffs*

Dated: October 10, 2024

36

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limitations of Local Rule 7.8 and requirements of Local

Rule 56.1, as modified by this Court's September 16, 2024 Order. ECF 74.

/s/ Daniel H. Blomberg
Daniel H. Blomberg
  (W.D. La. Temporary Bar No. 918117)
  *Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
  (LA Bar No. 38852)

Dated: October 10, 2024

### CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2024, the foregoing was served on counsel for all parties via the Court's CM/ECF system.

/s/ Daniel H. Blomberg
Daniel H. Blomberg
 (W.D. La. Temporary Bar No. 918117)
 *Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
 (LA Bar No. 38852)

Dated: October 10, 2024