**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

| | |
|---|---|
| THE STATE OF LOUISIANA, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>*Defendant.* | No. 2:24-cv-629-DCJ-TPL<br><br>Judge David C. Joseph<br><br>Magistrate Judge Thomas P. LeBlanc |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al.,<br><br>*Defendants.* | No. 2:24-cv-691-DCJ-TPL<br><br>Judge David C. Joseph<br><br>Magistrate Judge Thomas P. LeBlanc |

**BISHOPS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.................................................................................................... iii

INTRODUCTION ..................................................................................................................1

LEGAL STANDARD ............................................................................................................2

ARGUMENT .........................................................................................................................2

    I.   This Court has Article III Jurisdiction Over the Bishops' Claims. ...................................2

        A.  The Bishops have Article III standing and their claims are ripe. ..................................2

        B.  EEOC's contrary arguments are meritless...................................................................5

    II.   The Final Rule violates the APA because it exceeds EEOC's statutory authority under the PWFA by mandating abortion accommodations (Count I)...............9

        A.  Traditional tools of statutory construction foreclose EEOC's mandate. ......................9

        B.  EEOC's interpretation violates the major questions doctrine. .................................12

    III.  EEOC's interpretation of the PWFA and Title VII religious exemptions violates the APA (Count III). ...........................................................................................14

        A.  EEOC interprets the religious exemptions into a nullity...........................................15

        B.  EEOC's interpretation of the religious exemptions creates church-state entanglement...........................................................................................18

        C.  This Court should decide the scope of the religious exemptions. .............................19

    IV. EEOC's requirements violate the Religion Clauses (Count VII and VIII). ......................21

        A.  The Final Rule violates the broader church autonomy doctrine.................................22

        B.  The Final Rule unlawfully narrows the ministerial exception....................................23

        C.  Case-by-case intrusion does not eliminate the church autonomy problems. ..............24

    V.   EEOC did not meet its RFRA obligations (Count V). ....................................................25

    VI.  EEOC's requirements violate the Free Exercise Clause (Count VI)...............................30

    VII. EEOC's requirements violate the Free Speech Clause (Counts IX and X)......................31

    VIII. The typical remedies are necessary and appropriate here...............................................33

CONCLUSION..................................................................................................35

CERTIFICATE OF COMPLIANCE....................................................................37

CERTIFICATE OF SERVICE ...........................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021)..............................................................................................13

*Ali v. Stephens*,
822 F.3d 776 (5th Cir. 2016) ...............................................................................29

*Bear Creek Bible Church v. EEOC*,
571 F. Supp. 3d 571 (N.D. Tex. 2021) ............................................................29, 30

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)...................................................................................... 13-14

*Billard v. Charlotte Catholic High Sch.*,
101 F.4th 316 (4th Cir. 2024) ..............................................................................13

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)..........................................................................................31, 32

*Braidwood Mgmt. v. EEOC*,
70 F.4th 914 (5th Cir. 2023) ....................................................................... *passim*

*Bridas SAPIC v. Gov't of Turkm.*,
345 F.3d 347 (5th Cir. 2003) ..................................................................................7

*Bryce v. Episcopal Church in the Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002) .....................................................................21, 22, 23

*BST Holdings v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ................................................................................13

*Burlington N. & Santa Fe Ry. v. White*,
548 U.S. 53 (2006)................................................................................................11

*Burwell v. Hobby Lobby Stores*,
573 U.S. 682 (2014)........................................................................................26, 27, 29

*Butler v. St. Stanislaus Kostka Catholic Acad.*,
609 F. Supp. 3d 184 (E.D.N.Y. 2022) ................................................................19, 22

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) .................................................................................34,

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir. 2023) ...............................................................................34

*Catholic Benefits Ass'n v. Burrows*,
    ---F. Supp. 3d.---, 2024 WL 4315021 (D.N.D. Sept. 23, 2024) (*CBA*) ..........................*passim*

*Chamber of Com. v. SEC*,
    88 F.4th 1115 (5th Cir. 2023) ............................................................................33

*Combs v. Cent. Tex. Ann. Conf.*,
    173 F.3d 343 (5th Cir. 1999) .............................................................................23

*Consumer Data Indus. v. Texas*,
    2023 WL 4744918 (5th Cir. July 25, 2023)..............................................................8

*Contender Farms v. USDA*,
    779 F.3d 258 (5th Cir. 2015) ..............................................................................3

*Crown Castle Fiber v. City of Pasadena*,
    76 F.4th 425 (5th Cir. 2023) .............................................................................35

*Curay-Cramer v. Ursuline Acad.*,
    450 F.3d 130 (3d Cir. 2006).................................................................... 16-17,  19

*Data Mktg. P'ship v. D.O.L.*,
    45 F.4th 846 (5th Cir. 2022) .............................................................................34

*Demkovich v. St. Andrew the Apostle Par.*,
    3 F.4th 968 (7th Cir. 2021) ...............................................................................24

*Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)........................................................................................35

*EEOC v. Catholic Univ. of Am.*,
    83 F.3d 455 (D.C. Cir. 1996) ..................................................................19, 25, 28

*EEOC v. Miss. Coll.*,
    626 F.2d 477 (5th Cir. 1980) ...................................................................... 16-17

*EEOC v. Roman Catholic Diocese of Raleigh*,
    213 F.3d 795 (4th Cir. 2000) ............................................................................24

*FCA v. SJUSD*
    82 F.4th 664 (9th Cir. 2023)..............................................................................30

*FCA v. District of Columbia*,
    --- F. Supp. 3d ---, 2024 WL 3400104 (D.D.C. July 11, 2024) ..............................28

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ................................................................................... 13

*Franciscan All. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) .......................................................... 4, 26, 35

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021) ........................................................................ 29, 30, 31

*Garrick v. Moody Bible Inst.*,
    412 F. Supp. 3d 859 (N.D. Ill. 2019) ................................................... 22

*George v. McDonough*,
    596 U.S. 740 (2022) ................................................................................. 11

*Gonzales v. O Centro*,
    546 U.S. 418 (2006) ................................................................................. 29

*Hall v. Baptist Mem'l Health Care*,
    215 F.3d 618 (6th Cir. 2000) ............................................................... 19

*Hines v. Pardue*,
    117 F.4th 769 (5th Cir. 2024) ............................................................. 33

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) ................................................................................... 32

*Hosanna-Tabor v. EEOC*,
    565 U.S. 171 (2012) ...................................................... 21, 24,  31, 32

*Kemp v. United States*,
    596 U.S. 528 (2022) ........................................................................... 11, 12

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ................................................................................. 28

*Koenke v. Saint Joseph's Univ.*,
    2021 WL 75778 (E.D. Pa. Jan. 8, 2021) ........................................... 24

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ...................................................... 18, 26, 27

*Leal v. Becerra*,
    2022 WL 2981427 (5th Cir. July 27, 2022) .......................................... 9

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ...................................................................... *passim*

*Little v. Wuerl,*
    929 F.2d 944 (3d Cir. 1991) .................................................................. 18-19

*Loffman v. Cal. Dep't of Educ.,*
    --- F.4th ----, 2024 WL 4586970 (9th Cir. Oct. 28, 2024) ................................ 29-30

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ...........................................................................9, 21

*Louisiana v. EEOC,*
    705 F. Supp. 3d 643 (W.D. La. 2024) .......................................................... *passim*

*Louisiana v. EEOC,*
    2024 WL 4016381 (W.D. La. Aug. 13, 2024) .........................................................8

*Louisiana v. U.S. Dep't of Educ.,*
    --- F. Supp. 3d ----, 2024 WL 2978786 (W.D. La. June 13, 2024) ...........................13

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .....................................................................................3

*Mance v. Sessions,*
    896 F.3d 699 (5th Cir. 2018) ......................................................................28

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ......................................................................21

*McAllen Grace Brethren Church v. Salazar,*
    764 F.3d 465 (5th Cir. 2014) ...................................................................28, 29

*McClure v. Salvation Army,*
    460 F.2d 553 (5th Cir. 1972) ...............................................................17, 23, 25

*McDonald v. Longley,*
    4 F.4th 229 (5th Cir. 2021) .......................................................................33

*Murthy v. Missouri,*
    603 U.S. 43 (2024) .....................................................................................8

*NCCB v. Smith,*
    653 F.2d 535 (D.C. Cir. 1981) ...............................................................6, 7, 12

*NIFLA v. Becerra,*
    585 U.S. 755 (2018) ..................................................................................32

*Nken v. Holder,*
    556 U.S. 418 (2009) ..................................................................................35

*NLRB v. Catholic Bishop*,
  440 U.S. 490 (1979)...........................................................................................25

*Okpalobi v. Foster*,
  244 F.3d 405 (5th Cir. 2001) ............................................................................8

*Opulent Life Church v. City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) ..........................................................................35

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020)............................................................................... 21, 23-24

*Ramming v. United States*,
  281 F.3d 158 (5th Cir. 2001) ............................................................................2

*Rest. L. Ctr. v. D.O.L.*,
  --- F.4th ---, 2024 WL 4609380 (5th Cir. Aug. 23, 2024) ..................................34

*Richardson v. United Methodist Church S.C.*,
  2024 WL 1172779 (D.S.C. Mar. 19, 2024) ........................................................24

*Sanchez v. R.G.L.*,
  761 F.3d 495 (5th Cir. 2014) ............................................................................4

*Seattle Pac. Univ. v. Ferguson*,
  104 F.4th 50 (9th Cir. 2024) ..........................................................................3, 4

*SEIU v. City of Houston*,
  595 F.3d 588 (5th Cir. 2010) ..........................................................................33

*Shaliehsabou v. Hebrew Home of Greater Washington*,
  363 F.3d 299 (4th Cir. 2004) ..........................................................................24

*Sisters of Mercy v. Becerra*,
  55 F.4th 583 (8th Cir. 2022) ....................................................................3, 4, 26

*Skrzypczak v. Roman Catholic Diocese of Tulsa*,
  611 F.3d 1238 (10th Cir. 2010) ......................................................................24

*Speech First v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ............................................................................3

*Starkey v. Roman Catholic Archdiocese*,
  41 F.4th 931 (7th Cir. 2022) ......................................................................17, 20

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)..........................................................................................34

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................................................ 4, 9

*Tagore v. United States*,
    735 F.3d 324 (5th Cir. 2013) ................................................................................ 27

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ............................................................................................ 30, 31

*Telescope Media v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) ................................................................................ 33

*Texas Association of Manufacturers v. C.P.S.C.*,
    989 F.3d 368 (5th Cir. 2021) ................................................................................ 34

*Texas v. Garland*,
    719 F. Supp. 3d 521 (N.D. Tex. 2024) .............................................................. 4, 8

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .................................................................................. 4

*Union Gospel Mission of Yakima v. Ferguson*,
    2024 WL 4660918 (E.D. Wash. Nov. 1, 2024) ............................................ 29, 30

*In re Union Pac. R.R. Emp.Pracs. Litig.*,
    479 F.3d 936 (8th Cir. 2007) ................................................................................ 12

*United States v. Scroggins*,
    599 F.3d 433 (5th Cir. 2010) ................................................................................ 30

*Ware v. La. Dep't of Corr.*,
    866 F.3d 263 (5th Cir. 2017) ........................................................................ 28-29

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1872) .............................................................................. 14

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ........................................................................................ 12, 13

*Whole Woman's Health v. Smith*,
    896 F.3d 362 (5th Cir. 2018) ................................................................ 13, 18, 19

*Wilkins v. United States*,
    598 U.S. 152 (2023) ........................................................................................ 11-12

**Statutes**

5 U.S.C. § 706 ............................................................................................ 19, 21, 34

42 U.S.C. § 2000bb-1 .................................................................................................20, 26

42 U.S.C. § 2000bb-3 ........................................................................................................28

42 U.S.C. § 2000e-1 ............................................................................................................5

42 U.S.C. § 2000e-2 ............................................................................................................5

42 U.S.C. § 2000e-5 ............................................................................................................6

42 U.S.C. § 2000gg ........................................................................................................9-10

42 U.S.C. § 2000gg-1 .................................................................................................7, 9-10

42 U.S.C. § 2000gg-5 ........................................................................................................14

**Regulations**

29 C.F.R. § 1636.3 ............................................................................................................10

89 Fed. Reg. 29,096 (Apr. 19, 2024) ......................................................................... *passim*

**Other Authorities**

168 Cong. Rec. E1361-62 (daily ed. Dec. 27, 2022) .....................................................18

*Amniocentesis*, Mayo Clinic ...........................................................................................10

Fed. R. Civ. P. 56 ...............................................................................................................2

*Innovative pregnancy care*, Mayo Clinic........................................................................10

Local Rule 56.1 ...................................................................................................................2

Michael W. McConnell, *The Ninth Amendment in Light of Text and History*, 2010
       Cato Sup. Ct. Rev. 13..............................................................................................13

## INTRODUCTION

Nothing in the law has changed since this Court entered a preliminary injunction for the Bishops in June or denied reconsideration in August. That fact is evident enough on its face, but it is confirmed multiple times over by EEOC's brief, which does little more than offer up legal arguments already rejected by this Court. EEOC's retread arguments provide no basis to disturb this Court's prior rulings, and certainly fall far short of demonstrating any entitlement to summary judgment. Indeed, if anything, EEOC tips its hand that even it realizes the weakness of its arguments, pleading with the Court not to reach the statutory religious exemptions or any constitutional defense should it rule for the Bishops. Thus, as in June (and August), this case remains a "textbook case of a federal administrative agency exceeding its statutory authority."

Rather than confronting this Court's legal conclusions, not to mention all the contrary precedent and undisputed evidence, EEOC continues to insist that the Bishops lack standing. But the Bishops remain directly regulated by the abortion accommodation mandate and face the chilling of their constitutional rights. EEOC repeats its "semantic gymnastics" interpretation of the PWFA to cover abortion and to read the explicit religious exemption out of the statute. And when it comes to any available religious defenses, EEOC makes it clear once again that it has every intention of stacking the deck in favor of narrow interpretations that will subject the Bishops to unconstitutionally entangling investigations, litigation, and ultimately liability.

None of this finds any footing in either the Constitution or the PWFA. Rather, it places EEOC within a long line of agency actions that have needlessly forced religious employers to litigate sensitive First Amendment issues that clearly fall outside statutory delegations and could have been handled through more narrowly tailored regulations. *See, e.g., Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 664-74 (2020). And EEOC's sweeping, first-of-its-kind abortion accommodation mandate provides a particularly egregious example. By forcing religious employers to accommodate "known" requests for abortion by its employees and to drastically alter the speech and policies pivotal to shaping their ministries, EEOC seeks to conscript religious employers like the Bishops into violating their deeply held and millennia-old

1

religious beliefs—all without a shred of authorization from the statute itself. EEOC's thin summary judgment arguments cannot overcome this reality, and their motion should be denied.[1]

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). EEOC's motion to dismiss can be granted "only if it appears certain that the [Bishops] cannot prove any set of facts" that would entitle them to relief. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

## ARGUMENT

### I. This Court has Article III Jurisdiction Over the Bishops' Claims.

#### A. The Bishops have Article III standing and their claims are ripe.

EEOC largely repeats standing arguments already rejected by this Court and gives this Court no reason to reach a different result now. *See also Catholic Benefits Ass'n v. Burrows*, ---F. Supp. 3d.---, 2024 WL 431521, at *4-6 (D.N.D. Sept. 23, 2024) (*CBA*) (agreeing with this Court's analysis in parallel PWFA suit). Because of EEOC's Final Rule and enforcement position, the Bishops readily show that they "have suffered" both regulatory and constitutional "injury" that is "fairly traceable to the defendant's allegedly unlawful conduct" and is "likely to be redressed by the requested relief." *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 924 (5th Cir. 2023). Their claims are ripe and ready for resolution.

*Injury*. On regulatory burden, as this Court has correctly found, "[i]f, in a suit challenging the legality of government action, the plaintiff is himself an object of the action, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Louisiana v. EEOC*, 705 F. Supp. 3d 643, 652 (W.D. La. 2024)

---

[1]    The Bishops incorporate the statement of undisputed facts from their motion. ECF 77-1 at 2-7. Any undisputed material facts EEOC wished to include needed to similarly be "contain[ed]" in its "memorandum," LR 56.1(2), not a separate filing (*see* ECF 75-2), and within its 50-page limit. *Compare* ECF 74 *with* ECF 75-1 (48-page memorandum) *an*d ECF 75-2 (3-page statement). The Bishops are not required to respond to a filing that violates local rules. The Bishops note, however, that, as listed in EEOC's filing, Facts 1-4 are immaterial and irrelevant to the legal issues; Facts 14-17 and 21 are factually inaccurate in whole or in part; and Facts 18-20 are true. ECF 75-2 at 1-4. To the extent the Court would benefit from a more detailed response, the Bishops respectfully request leave to file a short separate brief addressing EEOC's improper and overlength filing.

(citing *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019)); *accord Contender Farms v. USDA*, 779 F.3d 258, 264 (5th Cir. 2015). That remains true at summary judgment just as much as when seeking preliminary relief, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992), and it is undisputedly the case here: the Bishops are objects of the Rule, have not adopted certain policies required by the Rule, and would (as the Rule concedes, 89 Fed. Reg. 29,096, 29,175-77 (Apr. 19, 2024)) face compliance burdens. *See, e.g.*, Ridderhoff.Resp.Decl. ¶¶ 37-40; Brown.Resp.Decl. ¶¶ 32-36; Caraway.Resp.Decl. ¶¶ 16-24; Fontenot.Resp.Decl. ¶¶ 16-19. Thus, as this Court has already determined, regulatory burden demonstrates the Bishops' standing. *Louisiana*, 705 F. Supp. 3d at 652; *accord CBA*, 2024 WL 4315021, at *4.

The Bishops also claim constitutional injuries, which separately demonstrate pre-enforcement standing. The Bishops must show an "intention to engage in a course of conduct arguably affected with a constitutional interest"; that conduct is "arguably proscribed, or at least arguably regulated" by EEOC; and the "threat of future enforcement … is substantial." *Speech First v. Fenves*, 979 F.3d 319, 330-32 (5th Cir. 2020). Here, the Bishops' religiously motivated employment policies and speech are "plainly affected with First Amendment interests," and EEOC doesn't claim otherwise. *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 59 (9th Cir. 2024); *accord Speech First*, 979 F.3d at 330; *Sisters of Mercy v. Becerra*, 55 F.4th 583, 603 (8th Cir. 2022) (regulation's chill on "religious beliefs" creates injury); *CBA*, 2024 WL 4315021, at *6; *see also* Kunkel.Resp.Decl. ¶¶ 54-56; Ridderhoff.Resp.Decl. ¶¶ 28-35; Brown.Resp.Decl. ¶¶ 26-31; Caraway.Resp.Decl. ¶¶ 10-15; Fontenot.Resp.Decl. ¶¶ 10-15. The Bishops are "at least arguably regulated" by the Final Rule, which mandates that they do and say things that violate their beliefs. *Braidwood*, 70 F.4th at 925. And courts must "*assume* a substantial threat of future enforcement absent compelling contrary evidence" in "pre-enforcement challenges to recently enacted" law. *Speech First*, 979 F.3d at 335. EEOC fails to provide any evidence of nonenforcement, and its heavy "reliance on its case-by-case standard constitutes 'a concession that it may' seek enforcement." *CBA*, 2024 WL 4315021, at *4 (citing *Franciscan All. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022)).

*Traceability*: EEOC no longer argues that the Bishops' injury cannot be traced to EEOC's actions. Nor could it, since EEOC's interpretation of the PWFA and its enforcement through the Final Rule have created the regulatory and constitutional burdens placed on the Bishops.

*Redressability*. The Bishops' claims are also redressable. To establish redressability, "a plaintiff need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (cleaned up); *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (ruling "need only alleviate some of the [plaintiff's] asserted harms"). Courts have repeatedly found that, even where government and private parties may both enforce a challenged statute, injuries flowing from governmental action are redressable because "the burdens from [governmental] investigations and lawsuits would be lessened, if not eliminated." *Texas v. Garland*, 719 F. Supp. 3d 521, 558 (N.D. Tex. 2024) (PWFA challenge); *accord Seattle Pac. Univ.*, 104 F.4th at 63.

Nor could it be otherwise. The Supreme Court has clearly stated that dual enforcement only "*bolster*[*s*]" the threat of injury. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (emphasis added). To hold that a court could not redress injuries flowing from dual-enforcement schemes would render pre-enforcement challenges categorically unavailable, a result contrary to both logic and the law. *See, e.g.*, *Franciscan All.*, 47 F.4th at 379-80 (party had standing for injunction where statute could be enforced by HHS and private parties); *Sisters of Mercy*, 55 F.4th at 606-07 (party had standing for injunction to prevent EEOC from enforcing its interpretation of Title VII); *CBA*, 2024 WL 4315021, at *6 (rejecting similar argument in PWFA challenge). Here, relief from the EEOC's interpretation of the PWFA and its enforcement through the Final Rule would provide complete redress against any EEOC-initiated investigation or enforcement action. It would also make it far less likely that private plaintiffs could obtain any relief.

*Ripeness*. Finally, even assuming "prudential ripeness" exists separate from standing, the Bishops' claims are ripe. *Braidwood*, 70 F.4th at 930 & n.28 (noting "overlap between Article III standing requirements and the ripeness analysis."). Indeed, as the parties themselves agreed when dispensing with discovery, the Bishops' claims "need[ ] no further factual development" before

being considered. *Id.* at 930. And the Bishops will suffer "hardship" if review is delayed. *Id.*

**B. EEOC's contrary arguments are meritless.**

EEOC's retread arguments fail for the same reasons they did the first and second time around. EEOC ignores this Court's conclusions and provides no reason to disturb them now.

*Injury*. EEOC repeats its arguments that the Bishops cannot establish standing through regulatory burden. *See* Defs. Memo. ISO MTD or MSJ, ECF 75-1 at 10 (Def.MSJ.); Defs. Memo. Opp. Mtn. for Prelim. Inj., ECF 29 at 9-10 (Def.PI.Resp.). Breezing past this Court's contrary holding, EEOC's only response is to argue that because the Bishops have not undertaken such costs yet, they cannot use them to establish standing. Def.MSJ.12. Aside from being unsupported by any citation, this argument ignores reality: the Bishops have been protected by an injunction since the day the Final Rule went into effect, and have been saved thus far from choosing between the "untenable alternatives" of "violat[ing] [the Final Rule] and obey[ing] their convictions" and "obey[ing] [the Final Rule] and violat[ing] their convictions." *Louisiana*, 705 F. Supp. 3d at 656 (citing *Braidwood*, 70 F.4th at 937). And EEOC completely ignores the Bishops' constitutional injuries, which independently suffice to establish standing.

Next, and again ignoring this Court's findings, EEOC repeats for the third time its "catalogue[ ]" of "a laundry list of hypothetical scenarios" that it believes renders the Bishops' injury speculative. *Louisiana*, 705 F. Supp. 3d at 655; *see* Def.MSJ.8-9; ECF 62-1 at 4-5; Def.PI.Resp.6-9. But that argument is foreclosed by *Braidwood*, which determined that placing a plaintiff in the "untenable" position of complying either with the law or with its religious beliefs "constitutes injury." *Louisiana*, 705 F. Supp. 3d at 656; *CBA*, 2024 WL 4315021, at *5 (agreeing).

In response, EEOC says the PWFA is different because, unlike the Guidance at issue in *Braidwood*, the Bishops' can avail themselves of "numerous statutory and constitutional defenses." Def.MSJ.9. But of course, Title VII, which was at issue in *Braidwood*, is subject to the exact same First Amendment and RFRA challenges as the PWFA, as well as its own statutory defenses—such as the religious exemption and the BFOQ defense. 42 U.S.C. §§ 2000e-1(a), 2000e-2(e). EEOC's protests ring hollow, given that just two weeks ago it filed a brief in the Ninth Circuit vehemently

arguing such defenses are meritless. Amicus Br. for EEOC at 9, 17-22, *McMahon v. World Vision*, No. 24-3259 (9th Cir. Oct. 28, 2024), ECF No. 78.1, https://perma.cc/8DQD-UBEU. And EEOC's approach to the Bishops' RFRA defenses (*see infra* at 25-26) indicates it rejects them. If the *Braidwood* plaintiffs had standing to challenge nonbinding guidance, then certainly the Bishops have standing to challenge a Final Rule carrying the force of law.

EEOC then repeats its claim that "unless and until an employee requests leave or another abortion-related accommodation," the Bishops "will never be in a position to potentially run afoul of any legal obligations." Def.MSJ.7; *see* ECF 62-1 at 5-6. In essence, EEOC contends that compliance with federal law is voluntary (until EEOC determines it isn't), and that the Bishops have no *ex ante* obligation to ensure that their employment practices and policies are compliant with the very regulations and statutes EEOC enforces. This Court should reject EEOC's bizarre contention: had the Final Rule not been enjoined as to the Bishops, they would immediately have been faced with the choice of amending their employment policies and altering their workplace speech or facing PWFA liability. There is nothing speculative about that injury. This is especially so given that—as the Bishops have explained and EEOC has ignored—an EEOC Commissioner can independently bring a charge against the Bishops without waiting for an aggrieved employee to file a charge. 42 U.S.C. § 2000e-5(b); 89 Fed. Reg. at 29,147; *see* ECF 40 at 2; ECF 67 at 7.[2]

Finally, EEOC reaches back to *NCCB v. Smith* to argue that a court has found a lack of standing under the Pregnancy Discrimination Act (PDA) based on an allegedly similar chain of contingencies. Def.MSJ.9, 10 & n.5 (citing 653 F.2d 535 (D.C. Cir. 1981)). Putting aside that *Smith* long predates binding modern pre-enforcement standing jurisprudence, EEOC neglects to mention that the court found that the EEOC's "chang[ing]" (and non-binding) position with respect to religious groups was "far from definite," filled with "inconsistencies," "in a state of confusion" in "disarray," and suffered from apparent "constitutional problems." *Smith*, 653 F.2d at 541. This

---

[2]    Similarly, it doesn't matter that no PWFA charge has been filed against the Bishops. Def.MSJ.8. How could it be otherwise? The Bishops have been protected from enforcement of the Final Rule—the source of the abortion accommodation mandate—since the day it became effective.

vacillation led to the conclusion that "it would be most imprudent for this court to interject itself, until the EEOC decides what the PDA requires" and "issues a definitive interpretation." *Id*.

*Smith* is thus a far cry from this case, where the EEOC has made clear in a Final Rule carrying the force of law that its abortion requirements apply to religious organizations, that it disfavors any religious defense, and that it intends a full enforcement of its interpretation. Moreover, whereas in *Smith*—or any PDA case—it may have been possible for the court to state that "we can only speculate on how the plaintiffs would find out that a woman was claiming a day of sick leave for an abortion rather than for a minor respiratory ailment," *id.* at 540, the PWFA removes that speculation altogether through its requirement that accommodation requests be based on "known limitations," 42 U.S.C. § 2000gg-1(1). *Smith* accordingly highlights why EEOC is mistaken.[3]

**Redressability**. Here, too, EEOC simply repeats its already-rejected arguments that the Bishops' injuries are not redressable because private parties can still enforce the PWFA even if EEOC is precluded from doing so. Def.MSJ.14-15; *see* Def.PI.Resp.10-11; ECF 51 at 5-6; ECF 62-1 at 5. But as already stated, this conclusion ignores case law and would nullify pre-enforcement standing. The idea that it would not "reduce the total amount of risk" to the Bishops to permanently enjoin the nation's preeminent enforcer of employment law from taking enforcement action against the Bishops simply does not pass the straight-face test. Def.MSJ.14. And in any event, as this Court has already recognized, private parties need the help of the EEOC before they can enforce the PWFA. *Louisiana*, 705 F. Supp. 3d at 664. A permanent injunction that enjoins EEOC from issuing notice-of-rights letters (just like the preliminary injunction did, *id.*) would ordinarily prevent private enforcement actions from going forward, *see* ECF 52 at 2, and would accordingly properly stand in the way of *both* governmental *and* private enforcement.

---

[3]    In a footnote, EEOC relies on the same speculation arguments to assert that the Bishops have no standing to challenge its interpretation of Title VII in Count II of their Complaint. Def.MSJ.10 n.6 (describing Count II). By being raised only in a footnote, this argument is waived. *Bridas SAPIC v. Gov't of Turkm.*, 345 F.3d 347, 356 n.7 (5th Cir. 2003); *see also* Def.MSJ.19 n.8 (one-sentence footnote seeking summary judgment on Bishops' Title VII argument waived for same reason). Further, Count II claims EEOC violated the APA by attempting to use the Final Rule to issue binding regulations under *Title VII*, even though Congress had expressly and solely limited EEOC's rulemaking authority to *the PWFA*. ECF 1 ¶ 149. So even if EEOC hadn't waived the issue, its failure to address that obvious violation of the APA would supply sufficient reason to deny it judgment on Count II. *See also* States.MSJ.21-22.

Perhaps this is why EEOC cites no binding case supporting its position. It misrepresents *Texas v. Garland* and *Consumer Data Industry* as holding that inability to enjoin private individuals precludes redressability, when in fact both cases held the precise opposite. *See Garland*, 719 F. Supp. 3d at 558; *Consumer Data Indus. v. Texas*, 2023 WL 4744918, at *6 (5th Cir. July 25, 2023) (redressability met because "[w]hile it is true that an injunction directed to the Texas Attorney General would not in itself preclude consumers from seeking relief under §§ 20.08 and 20.09, it would reduce the total amount of risk and liability that CDIA's members face by failing to comply with § 20.05(a)(5)."). And *Okpalobi v. Foster* is irrelevant, since the statute at issue there could not be enforced by the government defendants. 244 F.3d 405, 427 (5th Cir. 2001) (en banc).

Similarly, the facts of *Murthy v. Missouri*, 603 U.S. 43 (2024), bear no resemblance to this case, as this Court previously ruled, *Louisiana v. EEOC*, 2024 WL 4016381, at *2 (W.D. La. Aug. 13, 2024). Neither the government actors nor the social media companies in *Murthy* threatened enforcement under a duly enacted statute, regulation, or any other rule with the force of law. In other words, *Murthy*'s governmental actors were acting entirely in their discretion, and could decide to stop enforcing that policy at any point. But here, EEOC claims to be acting under a statutory *and* regulatory directive in enforcing its interpretation of the newly enacted PWFA against regulated parties like the Bishops. Enforcement of a binding statute by the agency charged specifically with its enforcement is not the type of "conjectur[al]" "injury that results from the independent action of some third party" with which *Murthy* is concerned. 603 U.S. at 57, 72.

EEOC now also contends that the PWFA injuries are not redressable because the Bishops' policies are independently barred by either the Louisiana or federal PDA. Def.MSJ.11-12, 14. But even assuming the unproven proposition that Louisiana's PDA imposes analogous obligations as the PWFA, not all the Bishops are subject to that statute, and only "one party must demonstrate Article III standing for each claim for relief." *Little Sisters*, 591 U.S. at 674 n.6; *see* Ridderhoff.Resp.Decl. ¶ 20; Brown.Resp.Decl. ¶ 5 (USCCB and CUA located in Washington, D.C.). As for the federal PDA, EEOC has acknowledged that "Congress enacted the PWFA to 'fill a gap in the existing legal framework,' which offered only limited protections for workers affected

by pregnancy," and that the PDA's narrow scope "creates 'an oftentimes insurmountable hurdle'" for pregnant workers who cannot find the necessary male comparator to bring their claim. Def.MSJ.2-3 (citation omitted); Def.PI.Resp.2-3. That explains why EEOC has nowhere contended that the PDA "independently causes" all of the same "injury" or "harm" that the Bishops claim flow from the abortion accommodation mandate. *Leal v. Becerra*, 2022 WL 2981427, at *2 (5th Cir. July 27, 2022). Because EEOC provides nothing but its *ipse dixit* to contend that the PDA independently bars all of the conduct challenged under the Final Rule (and that proper male comparators exist in all those scenarios), it has failed to defeat the Bishops' standing.

**Ripeness**. EEOC finishes its tour of already-rejected justiciability arguments by again contending that the Bishops' injury fails to satisfy the Supreme Court's "prudential ripeness" test. Def.MSJ.15-16. Setting aside that the "continuing vitality" of this test has been called into question, *Driehaus*, 573 U.S. at 167, EEOC's argument boils down to restating that the Bishops' claim is abstract because they could later avail themselves of "numerous statutory and constitutional defenses," Def.MSJ.9. The same was true in *Braidwood*, where the Fifth Circuit held the claims "need[ed] no further factual development," 70 F.4th at 930. So too here.

## II. The Final Rule violates the APA because it exceeds EEOC's statutory authority under the PWFA by mandating abortion accommodations (Count I).

### A. Traditional tools of statutory construction foreclose EEOC's mandate.

This Court already concluded that abortion plainly lies outside the PWFA's scope and to claim otherwise amounts to little more than "semantic gymnastics." *Louisiana*, 705 F. Supp. 3d at 658. As with standing, EEOC rests its contrary conclusion on arguments this Court has rejected as a matter of law. EEOC's rehashed contentions do nothing to disturb this Court's conclusions. Rather, the "traditional tools of statutory construction," *Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2244, 2266 (2024)—including PWFA's plain text, canons of construction, and the legislative record— confirm that the Final Rule violates the APA because it exceeds EEOC's statutory authority.

**Text**. The PWFA requires accommodations for "known limitation[s]" caused by "physical or mental condition[s]" arising from "pregnancy, childbirth, or related medical conditions." 42 U.S.C.

§ 2000gg-1(1), 2000gg(4). Abortion is not mentioned in the statute "even once," which is no surprise since it is a "procedure," not a "condition." *Louisiana*, 705 F. Supp. 3d at 657-58.

At the preliminary-injunction stage, EEOC tellingly abandoned the Final Rule's position of defining abortion is a "medical condition," Def.PI.Resp.14-16, and it continues to provide no defense for this about-face, Def.MSJ.19. *See also* 89 Fed. Reg. at 29,183; 29 C.F.R. § 1636.3(b) (defining "related medical conditions" to include "abortion"). This abandonment was wise as a textual matter—characterizing abortion as a "medical condition" ignores the plain meaning of the word "condition" and the *ejusdem generis* canon of construction—but undermines its defense of the Final Rule. *See* Bishops' Memo. ISO MSJ, ECF 77-1 at 8-9, 10-11 (USCCB.MSJ.).

As it unsuccessfully did this summer, EEOC instead argues that abortion is covered because *abortion* can cause "physical or medical condition[s]" such as "cramping or the need to rest." Def.MSJ.19-20; *see* Def.PI.Resp.15. EEOC asserts "those conditions are limitations subject to the PWFA regardless of" whether one "thinks" of abortion as a procedure (which it is) or a condition (which it is not). Def.MSJ.19; *see* Def.PI.Resp.15. This new theory suggests *every* procedure accompanied by "the need to rest" that occurs during pregnancy is covered. Nothing in the PWFA suggests such a sweeping scope. And even if it did, abortion still would stand in an inapplicable category of its own since it terminates, rather than treats, pregnancy.

EEOC then repeats its red herrings, claiming that the Bishops' view of the Rule would not cover accommodations for "regular check-ups," ultrasound, and amniocentesis. Def.MSJ.20; *see* Def.PI.Resp.16. But as the Bishops explained—and EEOC does not refute—such checkups are either directly treating "pregnancy" or they screen for, identify, or treat "related medical conditions" to pregnancy, including high blood pressure, morning sickness, back pain, and "emotional changes." *Innovative pregnancy care*, Mayo Clinic, https://perma.cc/SZ3X-JLDJ. Those checkups can include ultrasound and other screening tools like amniocentesis which likewise ensure a healthy pregnancy and childbirth. *Amniocentesis*, Mayo Clinic, https://perma.cc/LB9F-5CAC. While these conditions arise from pregnancy—and their treatment is fully consistent with the PWFA's purpose—abortion does not.

*Legislative intent*. EEOC's justification for its sweeping interpretation of the PWFA again starts with (and relies primarily upon) language from the wrong statute (the PDA), not the PWFA. Def.MSJ.16-19; Def.PI.Resp.12-14. EEOC's legislative-intent argument is no better this time.

As at the preliminary-injunction stage, EEOC's entire argument rests on the premise that Title VII, as amended by the PDA, elevated "pregnancy, childbirth, or related medical conditions" to a "term of art" that was "transplanted" to the PWFA, which "alone confirms abortion is covered by the PWFA." Def.MSJ.17; *see* Def.PI.Resp.12-13. But the case it cites, *George v. McDonough*, says that establishing a term of art takes not "a few stray [court] decisions," but a "mountain" of "regulatory authority" that "captures 'the state of [a] body of law.'" 596 U.S. 740, 749-50 (2022). The "thin stuff" EEOC supplies here, *id.* at 749, falls far short of establishing that the PDA's purported "meaning was 'well-settled' before the [alleged] transplantation," *Kemp v. United States*, 596 U.S. 528, 539 (2022). This court has already concluded as much, *Louisiana*, 705 F. Supp. 3d at 658, and EEOC provides no response, Def.MSJ.17.

Next, EEOC contends that the two phrases have the same meaning because the statutes have "similar purposes." Def.MSJ.17. Yet in the next breath, EEOC concedes that the PWFA could not incorporate Title VII's definition of pregnancy "because doing so would have incorporated sex-based protections unrelated to pregnancy, which are … beyond the intended scope of the PWFA." *Id.* Precisely. Whereas the PDA is an anti-discrimination statute covering sex-based discrimination, the PWFA is an accommodation statute focused on pregnancy. As Commissioner Lucas explained, there is a "significant … distinction between antidiscrimination and accommodation requirements," which "address different problems in different ways." ECF 77-2 at 12 n.13. EEOC can't just assume that the PDA and the PWFA mean the same thing. USCCB.MSJ.13; *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 62-63 (2006) (recognizing that statutory meaning was not identical because of differences between anti-discrimination and anti-retaliation provisions).

Then, and yet again, Def.MSJ.18, EEOC cites the same "smattering of lower court opinions" already rejected by this Court, *Louisiana*, 705 F. Supp. 3d at 660 (quoting *BP v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1541 (2021)), and has no response to precedent stating that "the

Government's handful of lower court opinions [cannot] stand in for a ruling of [the Supreme] Court" on the meaning of a statute. *Wilkins v. United States*, 598 U.S. 152, 165 (2023).[4]

Finally, EEOC's nonbinding guidance interpreting the PDA to cover abortion "for decades" doesn't help either. Def.MSJ.18. Once again, EEOC fails to cite a single enforcement action taken under this guidance, despite the argument being raised repeatedly. *See, e.g.*, Bishops' Memo. ISO Mot. for Prelim. Inj., ECF 11-1 at 12 (USCCB.PI.); ECF 67-1 at 80:6-7. EEOC cannot explain how guidance it has never relied upon "settle[s]" anything, let alone how it can be used to misinterpret a distinct statute containing no textual basis for the guidance. *Kemp*, 596 U.S. at 539.

And, as this Court has recognized, *PWFA* legislative history "unambiguously confirms that Congress specifically did not intend for the PWFA to require employers to accommodate abortion." *Louisiana*, 705 F. Supp. 3d at 660. EEOC still cannot find a single example of a *supporter*, rather than an *opponent*, saying once during congressional debates that the PWFA imposes an abortion-accommodation mandate. *See* Def.MSJ.21. It thus cannot explain away supporters' repeated contrary statements or provide any reason to disturb this Court's conclusion.

**B.  EEOC's interpretation violates the major questions doctrine.**

EEOC's evasion of the major questions doctrine also fails. *Id.* at 20-21. That doctrine prevents agencies from asserting "highly consequential power" in areas of vast "political significance" without "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 721, 724 (2022).

EEOC complains this Court was wrong to conclude that the Final Rule "squarely implicates" the major questions doctrine, *Louisiana*, 705 F. Supp. 3d at 659, because "by the Court's standard virtually any regulation that implicates a hot-button or politically controversial topic would fall within the doctrine," Def.MSJ.20. Hardly. Agencies are free to regulate on issues of vast "political significance," so long as they have "clear congressional authorization." *West Virginia*, 597 U.S. at 721, 723. But where, as here, such authorization is lacking, courts have freely applied the doctrine

---

[4]    EEOC points to dicta from two other decisions to claim that its purported consensus rests on "far more than just two Circuit decisions." Def.MSJ.18. But *In re Union Pacific Railroad Employment Practices Litigation*, dealt exclusively with "whether contraception is 'related to' pregnancy for PDA purposes," and merely noted in dicta that abortion "*arguably*" is covered. 479 F.3d 936, 941-42 (8th Cir. 2007) (emphasis added). And *NCCB v. Smith* focused exclusively on justiciability and not the substantive scope of the PDA. 653 F.2d at 537 n.3.

to "hot-button" regulations. *Louisiana*, 705 F. Supp. 3d at 659 (citing *West Virginia*, 597 U.S. at 729 (coal-generated power)).[5] As with these cases, "EEOC [is] unable to point to any language in the PWFA empowering it to mandate" abortion accommodation, *Id.* at 660, "let alone 'clear congressional authorization,'" *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023).

Moreover, EEOC's argument wholly ignores the fact that, as the Bishops have repeatedly explained and EEOC again refuses to address, the Final Rule does not merely regulate the "hot-button" issue of abortion generally, though that alone is enough to trigger major-questions scrutiny. Rather, the Final Rule also does violence to both Religion Clauses, which is itself a separate major-questions violation. USCCB.PI.14-15; ECF 52 at 4-5; ECF 67-1 at 46:2-14. Just as the major questions doctrine protects structural constitutional principles like separation of powers, *West Virginia*, 597 U.S. at 723, and federalism, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021), it also safeguards the Religion Clauses' "structural" limitations on the power of the state to interfere in the internal religious governance of the church, *Whole Woman's Health v. Smith*, 896 F.3d 362, 366, 373 (5th Cir. 2018); *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024) (Like the "separation of powers," the Religion Clauses are a matter of "constitutional structure," "confin[ing] the state and its civil courts to their proper roles."). If Congress wished to give EEOC the authority to conscript churches into providing abortion accommodations within their own ministries in stark disobedience to millennia of unbroken church teaching, it needed to do so in the clearest of terms. *See* Michael W. McConnell, *The Ninth Amendment in Light of Text and History*, 2010 Cato Sup. Ct. Rev. 13, 18 (explaining that courts have historically looked for "clear statement[s]" in statutes before "abrogating" natural rights).

EEOC's rule has "staggering" ramifications for the First Amendment—dragging religious objectors before civil courts and agencies in intrusive and entangling litigation over sensitive religious beliefs and undermining their ability to live out those beliefs through their unique

---

[5]    *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 123 (2000) (regulation and banning of tobacco)); *see also, e.g.*, *Biden*, 143 S. Ct. at 2374-75 (student loan forgiveness); *BST Holdings v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021) (vaccine mandate); *Louisiana v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 2978786, at *13 (W.D. La. June 13, 2024) (rule allowing "biological males" into "female bathrooms and locker rooms").

missions. *Biden*, 143 S. Ct. at 2373; *see also Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 729, 733 (1872) (protecting the church from dissident members using "secular courts" for leverage in religious disputes as well as the state from entanglement in matters beyond its authority or competence). Because the Final Rule imposes "profound burdens" on free exercise without a clear delegation from Congress, it cannot stand. *Biden*, 143 S. Ct. at 2374-75.

In a last-ditch effort, EEOC claims no major questions exist because it simply applied its longstanding Title VII guidance to a new statute. Def.MSJ.21. But even accepting all of EEOC's dubious Title VII propositions, this claim fails. Unlike its nonbinding Title VII guidance—which has never been invoked, and *could not* be invoked to carry the force of law—EEOC's Final Rule for the first time imposes binding obligations on millions of Americans to either accommodate abortion or face liability. *See* ECF 67-1 at 80-81. EEOC cannot simply wave away these differences, which refute its argument that the Final Rule works no "radical" change. Def.MSJ.21.

## III. EEOC's interpretation of the PWFA and Title VII religious exemptions violates the APA (Count III).

Just as the major questions doctrine forbids dramatic federal *mandates* that usurp Congress's authority, the APA bars dramatic *deprivations* of statutory rights that were explicitly *granted* by Congress. Both are simple matters of statutory construction: Congress did *not* mandate abortion accommodation, but it *did* grant a real religious exemption. EEOC got both sides of the coin wrong.

As previously explained, EEOC has blatantly violated the APA by unlawfully narrowing the PWFA and Title VII religious exemptions. *See* USCCB.PI.15-20; USCCB.MSJ.17-21. The PWFA incorporates Title VII's religious exemption, which, as this Court has recognized, "protect[s] religious employers from *any* Title VII claim"—and "not merely one category of claims"—where "an employer made an employment decision based on an individual's particular religious belief, observance, or practice." *Louisiana*, 705 F. Supp. 3d at 662. By incorporating this provision wholesale, 42 U.S.C. § 2000gg-5(b), the PWFA thus exempts religious employers from all PWFA claims when they make employment decisions based on religious beliefs, observances, or practices. USCCB.MSJ.17-19. "But," as this Court noted, "the Final Rule takes a narrower view

of Section 107(b)," namely, "that the PWFA exemption protects religious entities from claims of religious discrimination only." *Louisiana*, 705 F. Supp. 3d at 662. And as this Court has explained, that "narrower view" is wrong. *Id.*; *see also* USCCB.MSJ.19-20. For these reasons, the Bishops are entitled to a judgment that both rejects EEOC's narrow view and finds that the religious exemptions exempt the Bishops from Title VII and PWFA claims, no matter how styled, when their challenged employment actions were made based on religion. *See* USCCB.MSJ.19-20.

EEOC responds by: (1) trying to obfuscate EEOC's narrow legal view on the scope of the religious exemption while attacking the Bishops' as wrong, Def.MSJ.35-37; (2) ignoring the church-state entanglement that its narrow reading guarantees, *id.* at 30, 35, 38; and (3) urging this Court not to say anything about the exemptions, *id.* at 35-36. None of these dodges are persuasive.

**A.  EEOC interprets the religious exemptions into a nullity.**

EEOC first protests that the Court was "incorrect" to suggest that the Final Rule "interprets the PWFA and Title VII religious exemptions to apply only to claims of religious discrimination." *Id.* at 35. But this Court had it right: The Final Rule's diluted version of the "PWFA exemption protects religious entities from claims of religious discrimination only," making it "[c]lear[ ]" that "EEOC failed to include a broad religious exception in the Final Rule." *Louisiana*, 705 F. Supp. 3d at 662. As the Final Rule puts it, the Title VII exemption—which is incorporated into the PWFA—applies to claims of "discrimination on the basis of religion," not to claims of "discrimination on the basis of race, color, sex, and national origin." 89 Fed. Reg. at 29,146. And the Final Rule goes to great lengths to justify this interpretation, citing cases that it claims support its narrow view, invoking a portion of the Federal Register that adopts that view, and criticizing judicial opinions supporting the Bishops. *Id.* at 29,147 n.239. The implication is clear: In EEOC's view, if an employee brings a claim other than religious discrimination under Title VII, the exemption doesn't apply.

Nor is EEOC's interpretation anything new; instead, it's consistent with its other recent pronouncements on the scope of Title VII's exemption. In *Braidwood*, EEOC previewed what it would adopt in the Final Rule, disagreeing that the exemption "permits not only 'religious discrimination' but also 'other forms of discrimination under Title VII, so long as the employment

decision was rooted in religious beliefs.'" Appellees Br. at 54 n.6, *Braidwood*, 70 F.4th 914 (No. 22-10145), 2022 WL 4078965. It sang the same tune *earlier in this litigation*, when it represented that it "[c]ertainly" rejects the Bishop's "legal position" on the scope of the exemptions and sees its view as "correctly interpret[ing] the PWFA[ ]," Def.PI.Resp.17, 19 (initial caps removed). And as noted above, shortly after filing its brief to this Court, EEOC told the Ninth Circuit that it rejects the position that the Bishops press here, arguing at length for its narrow religious-discrimination-only view. Amicus Br. for EEOC at 10, 16, 17, *McMahon v. World Vision*, *supra* at 6 (arguing exemption "does not apply to sex-discrimination claims," including "religiously motivated sex discrimination"; rejecting view that PWFA's incorporation of Title VII's exemption shows it "appl[ies] to more than religious discrimination"). This makes it hard to understand why EEOC now accuses the Bishops—and this Court—of misunderstanding EEOC's position. Def.MSJ.35.

Perhaps recognizing that its flip-flopping might be seen in a dim light, EEOC eventually pivots to a full-throated defense of its narrow legal position. It suggests that no "federal appellate court" has "embraced" the Bishops' "broad interpretation," that some cases reject it, and that Congress "refused to adopt" it. Def.MSJ.36-38. Thus, EEOC's motion leaves no doubt that it interprets the exemptions to apply only to religious-discrimination claims—just like it represented to the Fifth and Ninth Circuits, stressed earlier in this litigation, and codified in the Final Rule.

Nor, for reasons already explained, is EEOC's cramped interpretation correct. *See* USCCB.PI.15-20; USCCB.MSJ.17-21. It makes no sense in the context of a pregnancy-accommodation statute like the PWFA, which does not recognize religious-discrimination claims—meaning that the exemption would exempt nothing.

It also cannot be squared with the cases that this Court cited in agreeing with the Bishops' reading of the exemptions. *See Louisiana*, 705 F. Supp. 3d at 662 (citing *EEOC v. Miss. Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980); *Curay-Cramer v. Ursuline Acad.*, 450 F.3d 130, 132 (3d Cir. 2006); and *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 591 (N.D. Tex. 2021)). EEOC tries to get out from under these precedents, but only by straw-manning the Bishops' interpretation of the religious exemptions. Both *Mississippi College* and *Curay-Cramer* barred Title VII sex-

discrimination claims where the underlying employment decision had "a religious justification." *Curay-Cramer*, 450 F.3d at 141-42; *see Miss. Coll.*, 626 F.2d at 485-86. For example, in *Mississippi College*, the Fifth Circuit barred a Title VII sex-discrimination investigation where a religious employer "applied its policy of preferring Baptists over non-Baptists." 626 F.2d at 485-86. Thus, according to the Fifth Circuit, the religious exemption would "preclude any investigation by the EEOC" of a "sex discrimination claim" if the Baptist college "made the challenged employment decision on the basis of an individual's religion." *Id.*

True, *Mississippi College* and *Curay-Cramer* make the unsurprising observation that religious employers cannot intentionally discriminate based solely on race or sex. *See* Def.MSJ.36-37 & n.10; *Miss. Coll.*, 626 F.2d at 485 n.10; *Curay-Cramer*, 450 F.3d at 141-42.[6] But that is consistent with the proper reading of the religious exemptions, which apply only when the employment decision was motivated by *religion*. This is why EEOC is wrong to suggest that the Bishops ask for a "blanket exception." Def.MSJ.35. "It is by no means the case that all claims of gender discrimination against religious employers are impermissible"; rather, the exemption applies only where "a religious employer … offer[s] a religious justification for an adverse employment action." *Curay-Cramer*, 450 F.3d at 142.[7] This distinction makes sense. Where a Catholic employer's "adherence to Roman Catholic doctrine produces a form of sex discrimination," that "does not make the action less religiously based." *Starkey v. Roman Catholic Archdiocese*, 41 F.4th 931, 947 (7th Cir. 2022) (Easterbrook, J., concurring). And because this adherence "is founded on religious beliefs," the exemption applies and "all of Title VII drops out." *Id.* at 946.

---

[6]    Tellingly, EEOC itself has previously used the facts of *Curay-Cramer* as an example of the *correct* application of the religious exemption to protect against "adjudication of … sex-discrimination claim[s]." *See* EEOC_135087.

[7]    For the same reason, *McClure v. Salvation Army* doesn't support EEOC's narrow reading. Def.MSJ.36-37 (relying on *McClure*). *McClure* correctly recognizes that when the employer's decision is not based on religious considerations, but is instead based exclusively "on … race, color, sex or national origin," the religious exemption does not apply. 460 F.2d 553, 558 (5th Cir. 1972). Because *McClure* determined that *even inquiring* into the basis of a ministerial employment decision was unconstitutional, *id.* at 560, the question of whether the Salvation Army had a religious motivation was never at issue. But for non-ministers, motivation matters. USCCB.MSJ.21-23. A religious motivation is protected by both the religious exemption and the Religion Clauses; a non-religious one isn't. *Id.* at 17-18, 21-23.

EEOC doesn't meaningfully respond to the point that its narrow reading renders the exemption meaningless. Def.MSJ.38 n.12. Instead of explaining how that's wrong, EEOC gestures to a nonresponsive provision of the Final Rule, which cites legislative history. *See id.* (citing 89 Fed. Reg. at 29,146 n.230, which cites, *inter alia*, 168 Cong. Rec. E1361-62 (daily ed. Dec. 27, 2022) (statement of Rep. Robert C. Scott)). But these breadcrumbs only show that EEOC has rendered the exemption meaningless. In a cited floor statement *opposing* inclusion of a religious exemption, Representative Scott correctly pointed out that if the religious exemption applies only to claims of religious discrimination, then "[i]t is unclear what the inclusion of [the exemption] means in a bill that is meant to require pregnancy-related accommodations." 168 Cong. Rec. at E1362.

EEOC also tries to suggest that all the Final Rule does is "implement a case-by-case approach for deciding [religious exemption] defenses," while promising not to "pre-judge any religious employer's application for the exception." Def.MSJ.37; *see* 89 Fed. Reg. at 29,147. That promise is illusory. The Final Rule absolutely "pre-judge[s]" the religious exemption—it limits it to PWFA claims that do not exist. In other words: Even if a religious employer may "appl[y]" to EEOC for a religious exemption, it only has a chance at receiving one if the charge makes a claim of religious discrimination. Because religious discrimination claims cannot be brought under the PWFA in the first place, EEOC's "case-by-case approach" to the religious exemption is a rigged deck.

### B. EEOC's interpretation of the religious exemptions creates church-state entanglement.

EEOC next tries to deny that its view leads to "unconstitutional entanglement." Def.MSJ.38. But by pairing an abortion accommodation mandate with the evisceration of statutory religious exemptions, EEOC creates several entanglement problems. These include enmeshing the state in church hiring practices, employment policies, religious speech, and religious disputes. *See infra* at 21-25. Government can't intrude on this "private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs." *Whole Woman's Health*, 896 F.3d at 373.

To avoid this, Congress wrote broad religious exemptions into Title VII and the PWFA. These exemptions are "legislative applications" of the First Amendment's "church-autonomy doctrine," *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013), which allow religious employers "to employ

only persons whose beliefs and conduct are consistent with the employer's religious precepts," *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991). And courts "read the exemption broadly" to avoid the "constitutional concerns that would be raised by a contrary interpretation." *Id.*; *Curay-Cramer*, 450 F.3d at 137-39; *Hall v. Baptist Mem'l Health Care*, 215 F.3d 618, 623-24 (6th Cir. 2000).

Of course, some evaluation can be permissible to assess whether the employer is telling the truth when it says it made an employment decision based on religion. Def.MSJ.38. But this sort of inquiry is "limited" and does not necessarily pose entanglement concerns. *Curay-Cramer*, 450 F.3d at 139 (courts may "conduct a 'limited inquiry' into whether … the proffered non-discriminatory reason" was "the actual reason"); *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 200 (E.D.N.Y. 2022) (such "inquiries are constrained, to some degree, by the First Amendment"). And it's a far cry from the intrusive entanglement here. By giving the Bishops an exemption that is "short of statutory right," 5 U.S.C. § 706(2)(C), EEOC has exposed the Bishops to entangling "case-by-case" investigations and litigation, Def.MSJ.35, that will "inevitably affect" how they choose to carry out their religious missions. *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996); *Whole Woman's Health*, 896 F.3d at 373-74 (protecting bishops against discovery that would interfere with "their internal organizational autonomy").

That pressure, it seems, is the point. EEOC insists that religious employers with undisputed religious motivations for their actions endure years of intrusive investigation and litigation, inevitably pressuring those who cannot afford the proceedings to give up. And for those who can slog through, EEOC then argues that the exemption doesn't protect their religious motivation in the first place. The Court should reject this heads-we-win, tails-you-lose position.

**C. This Court should decide the scope of the religious exemptions.**

Anticipating (a second) defeat, EEOC tellingly retreats to an argument that the Court should ignore the scope of the religious exemptions altogether. It argues that there may be *other* religious-liberty defenses that the Bishops might rely on in future disputes. Def.MSJ.35-36 (discussing undue-hardship defense and ministerial exception). And if the Court finds that RFRA applies some

limits to the Final Rule, EEOC says, it should refuse to find that the religious exemptions places *other* ones. *Id.* at 35. This Court should decline these obvious dodges.

To begin, it's unclear *how* this Court could avoid ruling on the religious exemptions, given that both the Bishops *and EEOC* seek summary judgment on this count. *See* Def.MSJ.35-38; USCCB.MSJ.17-21; ECF 75-6 (proposed order). Further, there are no genuinely disputed material facts; the scope of the exemptions is directly raised in Count III; the Court ruled for the Bishops on this count in its preliminary injunction order; and the count is briefed in both parties' motions.

EEOC argues that because there *might* be *other* defenses that the Bishops can raise in *future* "case-by-case" proceedings, the Bishops somehow "cannot establish that the Final Rule's interpretation of § 107(b) fails to protect them." Def.MSJ.35-36. But the whole point is that "the Final Rule's interpretation" *does* "fail[ ] to protect" the Bishops—in fact, it renders the religious exemption meaningless. *Id.* Even if there are cases in which *different* protections "may well apply"—such as undue hardship or the ministerial exception, *id.*—this does not render unharmful the categorical deprivation of a statutory right that *does* apply.

Nor could the Court refuse to address the religious exemptions if it finds that RFRA also applies. The religious exemptions do not, as EEOC suggests, provide "the same (or lesser) relief" as RFRA. *Id.* at 35. The relief is different in kind—and stronger. Under the religious exemptions, if the Bishops can show that their challenged decision was based on religion, the dispute is over, and "all of Title VII drops out." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). But under RFRA, the Bishops must show a religious motivation *and* that their religious exercise would be substantially burdened, *and* then defeat the opponent's attempt to justify the burden under strict scrutiny. 42 U.S.C. § 2000bb-1. In other words, RFRA and the religious exemptions provide different scopes of protections, and one cannot substitute for the other. Indeed, as a practical matter, resolving the religious exemptions is logically antecedent to RFRA analysis—how can EEOC have employed the least restrictive means to serve a governmental interest if the exemption means there is no interest at all? Accepting EEOC's position to the contrary would (once again) eviscerate the PWFA's religious exemption, this time by treating it as surplusage duplicative of RFRA.

In the end, EEOC's argument is ultimately just the latest attempt to "usurp[ ]" the power of a coordinate branch of government—this time, that of *this Court*. *Louisiana*, 705 F. Supp. 3d at 660 (Final Rule "usurps the role of Congress"). Congress entrusted EEOC with passing binding rules to implement the PWFA—and it has breached that trust by *violating* the PWFA in numerous ways, including by denying religious employers the exemption Congress supplied. In every case, but especially one of "statutory and constitutional overreach," *id.* at 663, "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). That is why the APA says that when an agency unlawfully "short[ens]" a "statutory right," the Court "shall"—not may—"set [it] aside." 5 U.S.C. § 706(2)(C); *see Loper Bright*, 144 S. Ct. at 2263. Undeterred, EEOC urges this Court to leave in place an illegal regulation simply because the agency has also violated another federal statute, RFRA. That approach would stand the APA—and judicial review itself—on its head.

## IV.  EEOC's requirements violate the Religion Clauses (Count VII and VIII).

The Religion Clauses protect the "principle of church autonomy," which guarantees religious groups "independence in matters of faith and doctrine and in closely linked matters of internal government," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020); USCCB.MSJ.21-22. One "component" of church autonomy is the ministerial exception, which bars government interference in personnel decisions concerning ministers, *Our Lady*, 591 U.S. at 746-47, even when a religious organization offers no "religious reason" for its decision, *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 192, 194 (2012). The "broader" church autonomy doctrine, however, bars civil interference where there *is* a sincere religious reason for an employment decision—including one involving a non-minister. *See, e.g.*, *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655-58, 658 n.2 (10th Cir. 2002). Under this doctrine, religious institutions are protected whenever they make religious "decisions regarding their own internal affairs," such as on "matters of faith, doctrine, church governance, and polity." *Id.* at 655. The Final Rule violates both the broader church autonomy doctrine and its component ministerial exception. *See* USCCB.MSJ.22-27. Accordingly, the Court should not dismiss Count VII or VIII.

### A. The Final Rule violates the broader church autonomy doctrine.

The Final Rule violates the broader church autonomy doctrine in at least four ways. *See id.* First, it forces the Bishops to retain employees who violate their faith. *Id.* at 22-23. Second, it forces the Bishops to alter their religious speech. *Id.* at 24. Third, it forces the Bishops to knowingly accommodate conduct their faith forbids, subjecting their day-to-day operations to federal control. *Id.* at 24-26. And fourth, it forces the Bishops to endure entangling investigations into religious matters. *Id.* at 26-27. EEOC fails to address any of these problems. Instead, as with the religious exemption, EEOC spends most of its time tilting at windmills. Def.MSJ.39-40.

For starters, rather than confront church autonomy head on, EEOC veers into hyperbolic misdirection, claiming the Bishops are arguing for "a general immunity from secular laws" and a "categorical, *per se* exemption from the Final Rule's requirements" or from any other "employment discrimination laws" for "all" their employees. *Id.* Not remotely so. The Bishops are not concerned with "every conceivable" application of the PWFA, *id.* at 40—a law they supported before EEOC twisted it, EEOC_043902-03—nor do they seek complete immunity from the laws they comply with on a daily basis without religious objection.[8]

The issue here is simpler. As courts have long explained, the church autonomy doctrine protects employment "decisions regarding … matters of faith, doctrine, church governance, and polity." *Bryce*, 289 F.3d at 655; *accord Butler*, 609 F. Supp. 3d at 199-204; *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871 (N.D. Ill. 2019). This means that EEOC cannot misuse employment discrimination laws to penalize employment decisions grounded in such religious matters.

But that is exactly what the Final Rule does. Under its requirements, the Bishops must reorder their religious ministries and knowingly accommodate what they believe is sinful—or else expose themselves to intrusive investigations and penalties. USCCB.MSJ.24-25. They must change their religious employment policies, suppress their religious speech, and retain religious dissenters—or else face governmental and private enforcement. *Id.* at 22-24. *Those* are the *specific* intrusions on the Bishops' religious governance and faith—and *they* are what violates church autonomy.

---

[8]    Citations to "EEOC_xxxxxx" refer to the Bates numbers in the Administrative Record. *See* ECF 71-2.

In another misdirection, EEOC again argues that relief under RFRA should preclude judgment under church autonomy because it supposedly provides "the same (or lesser) relief." Def.MSJ.39. As with the religious exemption, this is false. Like the religious exemption, the church autonomy doctrine does not provide the government with the opportunity to meet strict scrutiny. Once the government intrudes on religious faith, doctrine, or governance, it has violated the First Amendment, full stop. *See Bryce*, 289 F.3d at 655-60. Similarly, assessing EEOC's claimed interest under RFRA first requires determining if the Constitution even allows the government to oversee how the Bishops run their ministries' internal religious affairs regarding abortion. This Court should grant summary judgment to the Bishops on their church autonomy claims.

**B.  The Final Rule unlawfully narrows the ministerial exception.**

The Court should not dismiss the Bishops' ministerial exception count. *See* ECF 1 at 51-52 (Count VIII). Rather than heeding the ministerial exception's full protections, the Final Rule narrows them, expressly "declin[ing]" to confirm "that the exception bars all PWFA claims for qualifying ministerial employees." 89 Fed. Reg. at 29,150. That is unsurprising: EEOC has long argued that the ministerial exception actually does *not* apply to employment claims intruding into the conditions of ministerial employment. *See* EEOC Pet. for Reh'g, *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795 (4th Cir. 2000) (No. 99-1860), https://perma.cc/JL9Z-VB2L (arguing that claims "of alleged discrimination in working conditions" and "on-going discrimination in working conditions" do not "implicate" the "rationale" of the ministerial exception that such "claims are viable even if [a] … position is viewed as 'ministerial'"). Thus, EEOC's institutional view, reflected in both the Final Rule and prior litigation, is that ministers may sue their religious employers over the conditions of their employment relationship.

That is wrong. The government is broadly "bound to stay out of employment disputes" between ministers and religious groups. *Our Lady*, 591 U.S. at 746; *see also Combs v. Cent. Tex. Ann. Conf.*, 173 F.3d 343, 350-51 (5th Cir. 1999) (churches are "free from Title VII's restrictions" as to ministers); *McClure*, 460 F.2d at 560-61 (similar). This includes conditions-of-employment claims, since the ministerial exception recognizes "the authority" not only "to select" and

23

"remove" a minister, but also to "supervise." *Our Lady*, 591 U.S. at 747. After all, "[i]t would be incongruous if the independence of religious organizations mattered only at the beginning (hiring) and the end (firing) of the ministerial relationship, and not in between (work environment)." *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 979 (7th Cir. 2021) (en banc).[9]

The ministerial exception therefore bars *all* PWFA claims by ministers against their employers. The Final Rule expressly refuses to acknowledge this, 89 Fed. Reg. at 29,150, and thus denies the Bishops the full protection of the ministerial exception. Count VIII should not be dismissed.

### C.  Case-by-case intrusion does not eliminate the church autonomy problems.

EEOC's violations do not fall away just because of its parchment promise to "take great care" in evaluating religious defenses "on a fact- and case-specific basis." Def.MSJ.39-40.

As an initial matter, that's not credible. Take this case, where EEOC has fought tooth and nail to deny the Bishops a religious exemption, arguing that protecting their longstanding religious practices threatens "severe[ ] harm" on "millions" of Americans, and even now suggesting that the Catholic Church is insincere in its opposition to abortion. Def.PI.Resp.24; Def.MSJ.32.

EEOC's record in other cases has been no better. In *Hosanna-Tabor*, EEOC took the "untenable" and "remarkable" position that "the Religion Clauses have nothing to say about a religious organization's freedom to select its own ministers"—which the Supreme Court rejected 9-0. 565 U.S. at 189. Unbowed, EEOC later sought to dramatically restrict the doctrine to protect only the "choice of ecclesiastical leaders," leaving out (for instance) teachers of religion at a religious school—only to have that view squarely rejected by the Supreme Court. Amicus Br. for EEOC at *8, *Biel v. St. James Sch.*, 911 F.3d 603 (9th Cir. 2018) (No. 17-55180), 2017 WL 4411748; *see Our Lady*, 591 U.S. at 756. Other examples of EEOC's hostility to meritorious religious claims abound. *See, e.g.*, *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 802 (4th Cir. 2000) (rejecting EEOC's "fallacy" that leading religious music is "merely secular");

---

[9]     *See also Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1245 (10th Cir. 2010) (barring hostile-work-environment claims); *Shaliehsabou v. Hebrew Home*, 363 F.3d 299, 305-09 (4th Cir. 2004) (wage-and-hour claim); *Richardson v. United Methodist Church*, 2024 WL 1172779, at *3 (D.S.C. Mar. 19, 2024) (hostile-work-environment claim); *Koenke v. Saint Joseph's Univ.*, 2021 WL 75778, at *3 (E.D. Pa. Jan. 8, 2021) (same).

*Braidwood*, 70 F.4th at 939 (rejecting EEOC's argument that the government's interest in avoiding "sexual orientation or gender identity" discrimination is so "compelling" that it "overrides religious liberty in all cases").

More broadly, EEOC's argument misses the point. The Final Rule violates church autonomy *here and now*—for example, by forcing the Bishops to change their religious policies on abortion and accommodate matters that violate the faith. USCCB.MSJ.24-26. Indeed, EEOC "broadly" interprets its authority over "PWFA accommodations," allowing it to regulate everything from the "atmosphere" of the Church's internal ministry to the Bishops' "ordinary workplace policies or practices" to anything else that "might" possibly "dissuade[ ] a reasonable worker" from seeking or advocating in favor of abortion. 89 Fed. Reg. at 29,199, 29,214-16. These here-and-now harms aren't solved by promising to "care[fully]" evaluate First Amendment defenses in future cases, nor by pointing out that the Bishops might raise other defenses in future disputes. Def.MSJ.39.

Because the "very process of inquiry" into matters of religious belief and governance can violate the First Amendment, *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979), the kinds of "protracted," case-by-case "investigations and litigation" required by the Final Rule offend the Constitution, *Louisiana*, 705 F. Supp. 3d at 662-63. Federal "investigation and review" of sensitive religious "practices and decisions" can "cause the State to intrude upon matters of church administration and government," which "produce[s] by its coercive effect the very opposite" of the "separation of church and State." *McClure*, 460 F.2d at 560. Indeed, as this Court has noted, *Louisiana*, 705 F. Supp. 3d at 656, EEOC has *already* engaged in this kind of violation against Plaintiff CUA via an intrusive "two-year investigation" into a nun's Title VII claims, which imposed such "bureaucratic entanglement" as forcing school officials to be "deposed, interrogated, and haled into court" on religious matters. *Catholic Univ.*, 83 F.3d at 467. The church autonomy doctrine prevents this sort of entanglement.

## V.   EEOC did not meet its RFRA obligations (Count V).

EEOC's requirements that the Bishops accommodate practices and speech which they believe are immoral violates RFRA. EEOC's contrary arguments rest on fundamental misunderstandings

of both RFRA's scope and EEOC's obligations to protect religious liberty in the promulgation of its regulations. The Bishops' RFRA claim should not be dismissed.

Initially, EEOC insists that the Bishops' RFRA claims can only be adjudicated on a case-by-case basis. Def.MSJ.29-32. But this contradicts a long line of precedents finding RFRA violations in nearly identical contexts. *See Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (2014); *Little Sisters*, 591 U.S. at 664-74 (chronicling nationwide litigation against contraception mandate); *Franciscan All.*, 47 F.4th at 371 (upholding injunction against rule requiring healthcare facilities perform abortions). And, as this Court has already recognized and EEOC tellingly fails to mention, the Fifth Circuit in *Braidwood* specifically rejected EEOC's argument that a RFRA claim cannot be decided on pre-enforcement review. *Louisiana*, 705 F. Supp. 3d at 656 (citing *Braidwood*, 70 F.4th at 937). So have other cases. *Franciscan All.*, 47 F.4th at 377; *Hobby Lobby*, 573 U.S. at 736; *Sisters of Mercy*, 55 F.4th at 593; *Korte*, 735 F.3d at 687; *CBA*, 2024 WL 4315021, at *9. Just as in these cases, EEOC's "euphemistic phrasing," *Braidwood*, 70 F.4th at 938, "promise to 'comply'" with RFRA in the future, *Franciscan All.*, 47 F.4th at 377, or "commit[ment] to" "expedited review" and "taking [RFRA] defenses seriously," Def.MSJ.29, does not save EEOC from complying with RFRA now.[10]

Confronted with this binding precedent, EEOC identifies no court that has agreed with its position. Nor could it. RFRA grants the Bishops the ability to challenge the substantial burden on their religious beliefs *now*, 42 U.S.C. § 2000bb-1(c), not after they've already been violated.

With this underbrush cleared, it becomes equally obvious that the Final Rule violates RFRA. Under RFRA, the federal government may not "substantially burden a person's exercise of religion" unless it is the "least restrictive means" furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). RFRA's protections must be construed to protect free exercise to the "maximum extent" possible. *Hobby Lobby*, 573 U.S. at 696 & n.5.

---

[10]    The "availability of religious and other exceptions under the Final Rule" and the purported "barriers" preventing EEOC from addressing religious concerns also don't distinguish *Braidwood*. Def.MSJ.30-31.

**Substantial Burden.** As this Court has already found, EEOC's Final Rule and enforcement position burdens the Bishops' religious beliefs by forcing them to "choose between two untenable alternatives": knowingly accommodate actions or advocacy contrary to their religious beliefs, or risk both significant liability and years-long expensive and entangling litigation by both the EEOC and private parties. *Louisiana*, 705 F. Supp. 3d at 656 (citing *Braidwood*, 70 F.4th at 937). This amounts to a substantial burden under RFRA. *see CBA*, 2024 WL 4315021, at *7-8 (Final Rule imposes substantial burden); *Braidwood*, 70 F.4th at 938; *Korte*, 735 F.3d at 683; *Hobby Lobby*, 573 U.S. at 724-25 (similar); *Little Sisters*, 591 U.S. at 693 (Alito, J., concurring). EEOC's attempts to sweep away this Court's holding hold no merit.

First, EEOC argues that the Bishops' objections to accommodating abortions are insincere because they "do not object to all abortions." Def.MSJ.32. This outlandish suggestion flies in the face of the uncontradicted testimony explaining the Catholic Church's (well-known and millennia-old) categorical objections to any procedure that intentionally targets and ends a preborn life. *See, e.g.*, Kunkel.Resp.Decl. ¶¶ 10-20, 38-41; *id.* Ex. 1 at 18-19; *id.* Ex. 2 at 2-3. EEOC's attempts to twist the Bishops' beliefs only prefigure how EEOC intends to enforce its purported "commit[ment]" to "take[ ] great care" that religious defenses are treated seriously. Def.MSJ.29-30; see also *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013) (requiring "a light touch" or "judicial shyness" for sincerity inquiries). EEOC then repeats its argument that the Bishops' objections are insincere because the Bishops' haven't previously pried into employees' private medical information. Def.MSJ.32-33. But as explained, this canard willfully ignores that, unlike pre-existing statutes, the Final Rule requires employees to alert employers to "known" accommodation needs. 89 Fed. Reg. 29,192-93.

Next, EEOC asserts the Bishops do not claim tardy, after-the-fact case-by-case consideration of their religious objections violates RFRA. Def.MSJ.30. Wrong again. *See* USCCB.MSJ.29; *Louisiana*, 705 F. Supp. 3d at 656 (discussing the "legitimate fear of prosecution in light of EEOC's

27

demonstrated violations of Catholic University's religious exemptions in *EEOC v. Catholic Univ.*, 83 F.3d 455, 466 (D.C. Cir. 1996)"); *id.* at 663 (acknowledging this argument).[11]

**Compelling Interest.** Nor has EEOC shown that its actions further an interest "of the highest order," which it must do with respect "to the person whose sincere exercise of religion is being seriously impaired," *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014).

Congress identified no compelling interest regarding abortion because it did not allow the PWFA to cover abortion. And the Final Rule only broadly asserts that "[n]ondiscrimination laws and policies have been found to serve a compelling governmental interest," without any attempt to tailor that interest to religious objections, much less the Bishops. 89 Fed. Reg. at 29,148.[12] Such abstract interests reflect the kind of "[g]eneral statements" that fail as a matter of course under RFRA. *McAllen*, 764 F.3d at 472; *accord CBA*, 2024 WL 4315021, at *8 (no compelling interest). Nor are such amorphous claims "sufficiently measurable to permit judicial [review]." *FCA v. District of Columbia*, --- F. Supp. 3d ---, 2024 WL 3400104, at *8 (D.D.C. July 11, 2024) (quoting *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023)).

In any event, EEOC has not established that its asserted interest is an "actual problem" in need of solving. *Mance v. Sessions*, 896 F.3d 699, 705 (5th Cir. 2018). The administrative record does not show a problematic pattern of violations regarding abortion or other practices such as contraception the PWFA was intended to remedy. Nor does EEOC grapple with the fact that, because its accommodation requirements leave about 80 percent of private employers and millions of employees uncovered, 89 Fed. Reg. at 29,151; *see* USCCB.MSJ.30 (collecting data), as well as *any* employer facing an "undue hardship," 89 Fed. Reg. at 29,205, the Final Rule "leaves

---

[11]    EEOC blames CUA for EEOC's own illegal actions in *Catholic University*, arguing the timing of RFRA's enactment meant CUA could only "invent a RFRA defense" on appeal. Def.MSJ.31-32. But the First Amendment, which EEOC violated, was enacted before the 1990s. And EEOC's argument highlights its failure to appreciate that RFRA requires it to "implement[ ]" "all federal law" to avoid RFRA violations. 42 U.S.C. § 2000bb-3(a).

[12]    In its motion, EEOC purports to find a newly asserted interest in removing economic barriers to women in the workplace. Def.MSJ.33. As an interest "invented *post hoc* in response to litigation," this "[g]overnment justification[ ] for interfering with First Amendment rights" cannot save the Final Rule. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) ("Government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation.") (cleaned up). But even if it were properly raised, it fails for the same reasons that EEOC's generalized non-discrimination interests do.

appreciable damage to [its] supposedly vital interest unprohibited," meaning its "claimed interest isn't actually so compelling after all," *Ware v. La. Dep't of Corr.,* 866 F.3d 263, 269 (5th Cir. 2017); *Union Gospel Mission of Yakima v. Ferguson*, 2024 WL 4660918, at *3 (E.D. Wash. Nov. 1, 2024) (anti-discrimination statute's small-employer exemption "likely undermines the statute's stated interest"); *Bear Creek*, 571 F. Supp. 3d at 613 (same). EEOC never explains why it can excuse small employers, those with cost objections, and even nightclubs who don't want to turn up the lights, Def.PI.Resp.18, while claiming "that its non-discrimination policies can brook no departures" for the Bishops. *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021).

Instead, EEOC reveals its misunderstanding of RFRA again, claiming—without citation—that it's the Bishops' burden to show that the government *never* has a compelling interest and that there are *always* less restrictive means available. Def.MSJ.33. Binding precedent says otherwise. *See Hobby Lobby*, 573 U.S. at 726 (RFRA "requires *the Government* to demonstrate" its asserted interest is compelling as to "the particular claimant whose sincere exercise of religion is being substantially burdened"); *Braidwood,* 70 F.4th at (holding "EEOC fail[ed] to carry its burden" to show a compelling government interest).

***Least Restrictive Means.*** Even if EEOC could show a compelling interest, its summary judgment request would still fail because it cannot meet its burden to show that it has used the "least restrictive means" of achieving that interest. *Gonzales v. O Centro*, 546 U.S. 418, 423 (2006).

As the Bishops' have repeatedly explained, other agencies have implemented procedures for advance assurances of exemptions or presumptive safe harbors for religious objectors while protecting nearly identical asserted interests. *See* USCCB.PI.22-23; USCCB.MSJ.31. Rather than explaining why "those alternatives are ineffective," *Ali v. Stephens*, 822 F.3d 776, 786 (5th Cir. 2016), let alone doing so with "*actual evidence*, not just conjecture," *McAllen*, 764 F.3d at 476, EEOC falsely claims that the Bishops "suggest no alternative approaches," Def.MSJ.34. This, too, dooms EEOC's arguments. *See Loffman v. Cal. Dep't of Educ.*, --- F.4th ---, 2024 WL 4586970, at

*18 (9th Cir. Oct. 28, 2024) (state law didn't use least-restrictive means where it failed to consider more narrowly tailored federal regulations addressing the same interest).[13]

## VI.  EEOC's requirements violate the Free Exercise Clause (Count VI).

EEOC burdens the Bishops' free exercise rights because its accommodation requirements are not generally applicable in two distinct ways. First, the Final Rule burdens religion while reserving discretion for the government "to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537. Indeed, EEOC concedes this discretion, both with respect to "undue hardship," 89 Fed. Reg. at 29,205, and religious objectors, *id.* at 29,153. This is precisely the "case-by-case analysis" that "is antithetical to a generally applicable policy." *FCA v. SJUSD*, 82 F.4th 664, 688 (9th Cir. 2023) (en banc); USCCB.MSJ.31-32.

Second, EEOC's requirements treat "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *FCA*, 82 F.4th at 688. EEOC exempts any employer who can show an "undue hardship" and *all* employers with less than 15 employees from its mandate. *See supra* at 28-29. And EEOC chose to treat such interests better than religious ones for "no apparent reason other than administrative convenience." *Bear Creek*, 571 F. Supp. 3d at 613; *see also* USCCB.MSJ.31-32; *Union Gospel Mission*, 2024 WL 4660918, at *3-4.

EEOC's only response is to argue that the Final Rule's secular exemptions "apply at least equally to religious organizations." Def.MSJ.35. But the same was true of the exceptions at issue in both *Fulton,* 593 U.S. at 536-37, and *Tandon*, 593 U.S. at 65 (Kagan, J., dissenting). The

---

[13]    EEOC does not appear to seek summary judgment on Count IV, which alleges that EEOC violated the APA by treating religious defenses arbitrarily and capriciously. *See* ECF 1 at 42-45. EEOC's short, conclusory paragraph asserting that "the Final Rule's approach to RFRA and other religious defenses was not arbitrary and capricious," Def.MSJ.32, is not enough to preserve the issue. *See, e.g.*, *United States v. Scroggins*, 599 F.3d 433, 447 (5th Cir. 2010) (argument waived where it "appear[ed] as an afterthought" and was not briefed "in any depth"). Regardless, Count IV should not be dismissed. Nor could it be without first resolving whether EEOC adequately assessed the meaning of the PWFA's religious exemption. *Supra* at 15-19. Moreover, federal agencies have tried many times—and failed after protracted litigation—to force religious employers to support practices such as abortion and contraception which they find immoral. *See supra* at 26; *Little Sisters*, 591 U.S. at 663. Yet here, EEOC forged ahead, giving short shrift to the exact same religious concerns, as well as those raised by more than 54,000 objectors in response to the proposed rule. *See* 89 Fed. Reg. 29,104, 29,149. In doing so, EEOC ignored its affirmative obligation to comply with RFRA and the available methods of doing so raised by commenters and in response to other agency mandates. *See Little Sisters*, 591 U.S. at 691 (Alito, J., concurring) (federal agencies "are obligated to" promulgate rules "in a manner that complies with RFRA"). As such, EEOC has "fail[ed] to consider an important aspect of the problem." *Id.* at 682.

question is *why* a secular activity is treated more favorably than religious exercise. *See Tandon*, 593 U.S. at 63 (government must explain why it cannot treat religious activity the same as excepted secular activity). Here EEOC has made no attempt to show why administrative convenience and cost concerns compel exceptions while the Bishops' sincere religious beliefs do not. The rule therefore must (but ultimately cannot) pass strict scrutiny. *Supra* pp.at 28-29.

## VII.  EEOC's requirements violate the Free Speech Clause (Counts IX and X).

*Expressive Association*. A group's associational rights are burdened when (1) it "engage[s] in some form of expression"; and (2) forced association would "significantly affect" its expression. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 650 (2000). EEOC flunks both prongs.

First, "[r]eligious groups" are "the archetype of associations formed for expressive purposes," since their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring). It is "indisputable that an association that seeks to transmit … a system of values engages in expressive activity." *Dale*, 530 U.S. at 650. The Bishops engage in such activity, including by expecting their employees to uphold and exemplify their "Catholic identity and mission" as a part of expressing the Church's religious message. *See* Brown.Resp.Decl. ¶¶ 18, 22-31; Ridderhoff.Resp.Decl. ¶¶ 30-34; Caraway.Resp.Decl. ¶¶ 10-14; Fontenot.Resp.Decl. ¶¶ 10-14; Kunkel.Resp.Decl. ¶¶ 47-53.

Second, forced association with those who promote violating Catholic teachings would significantly impair the Bishops' collective expression of the Church's beliefs. That's why the Bishops do not allow such speech or conduct from their employees or faculty. Brown.Resp.Decl. ¶ 31; Ridderhoff.Resp.Decl. ¶ 35; Caraway.Resp.Decl. ¶ 15; Fontenot.Resp.Decl. ¶ 15. But the Final Rule prevents the Bishops from requiring such public alignment from their employees. For example, the Rule prohibits the Bishops from disciplining or disassociating from employees that encourage coworkers to use abortion accommodations. *See* 89 Fed. Reg. 29,188 (adverse action against "individual having aided or encouraged" an accommodation request under the rule prohibited). This "force[s] the [Bishops] to send a message" that they accept violations of Catholic faith "as a legitimate form of behavior." *Dale*, 530 U.S. at 653.

EEOC offers two responses, both wrong. First, it claims *Hishon v. King & Spalding* carved an employment-law exception into the First Amendment. Def.MSJ.41 (citing 467 U.S. 69, 78 (1984)). But *Hishon* merely *applied* standard associational analysis to an employment-law claim, holding that the defendant hadn't shown that its "ideas and beliefs" would be "inhibited." 467 U.S. at 78. That's why the U.S. Solicitor General—speaking for EEOC—represented to the Supreme Court in *Hosanna-Tabor* that expressive association defenses *can* bar employment claims. 565 U.S. at 189. Numerous other courts have agreed. USCCB.MSJ.34 n.5 (collecting cases).

Second, EEOC claims that the Final Rule and its enforcement position does not infringe on the Bishops' expressive association rights because "granting a confidential accommodation to a requesting employee" does not "impair the Bishops' ability to publicly communicate their preferred message regarding abortion." Def.MSJ.41. This insistence on hidden hypocrisy within the Bishops' own ministries reflects the kind of solicitude the Bishops can expect from EEOC for its religious beliefs. It also fails to account for the provisions and examples in the Final Rule specifically dissuading employers from "issuing a policy" against accommodation of practices such as abortion, informing applicants they do not accommodate such practices, or otherwise making clear that they have religious objections that will not allow them to accommodate such practices. *See* 89 Fed. Reg. at 29,216; *see also* USCCB.MSJ.34-35 (explaining provisions in Final Rule prohibiting speech and expression). EEOC cannot avoid the Bishops' expressive association claims by ignoring the scope of the Final Rule's own requirements.

***Free Speech.*** EEOC also violates the Bishops' free speech rights by both compelling speech and compelling silence, *see* USCCB.MSJ.34-35, which is "presumptively unconstitutional." *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018). EEOC does nothing to upset that presumption.

Indeed, the Final Rule confirms it restricts protected speech. While EEOC relies heavily on the assertion that "general statements" about an employer's "religious beliefs" are not prohibited, Def.MSJ.28, 41 (quoting 89 Fed. Reg. at 29,142), it fails to acknowledge the Rule clarifies that whether "statements regarding religious beliefs of an employer, or statements in employee handbook" are permissible "will depend on the language of the statement," 89 Fed. Reg. at 29,141.

This is the type of content-based regulation that "exacts a penalty on the basis of the content of speech." *Telescope Media v. Lucero*, 936 F.3d 740, 753 (8th Cir. 2019) (cleaned up); *SEIU v. City of Houston*, 595 F.3d 588, 602 (5th Cir. 2010) (regulation not content-neutral if enforcement "require[s] looking behind the simple fact that speech is occurring" to substance of speech).

Likewise, EEOC's attempt to paint the Bishops' religious policies as mere conduct and not speech fails. The government's labeling "an act 'speech' or 'conduct' (or 'actions') does not make it speech or conduct for First Amendment analysis." *See Hines v. Pardue*, 117 F.4th 769, 777 (5th Cir. 2024). And EEOC agrees that the anti-coercion provision "prohibits ... conduct that is reasonably likely to interfere with the exercise or enjoyment of PWFA rights," Def.MSJ.28 (emphasis added), directly admitting that the provision bars the Bishops from taking action (in word or deed) to protect their religious mission. EEOC eventually gets around to saying as much outright, conceding this case involves "issues of speech and religion." *Id.* at 32.

Finally, EEOC's claim that "the Final Rule does not require any employer to express any view on abortion to anyone," Def.MSJ.27, is wrong. The Final Rule requires *every* covered employer to communicate to virtually *everyone*—both employees and potential applicants—that it is willing to accommodate practices such as abortion. And the employer *cannot* express the view that it believes such practices to be so immoral that it will not accommodate them. *See* 89 Fed. Reg. at 29,214-18.

These burdens mean the Final Rule must be narrowly tailored to a compelling interest. *McDonald v. Longley*, 4 F.4th 229, 246 (5th Cir. 2021). As shown above (*supra* at 28-29), it isn't.

**VIII. The typical remedies are necessary and appropriate here.**

Under "default" APA principles, the Bishops are entitled to vacatur of the illegal abortion-accommodation mandate. *Chamber of Com. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023). They are also entitled to a permanent injunction against (1) EEOC's enforcement of an abortion-accommodation mandate via the PWFA statute, and (2) EEOC's use of the Final Rule, PWFA, or Title VII to infringe on the Bishops' religious employment practices. EEOC erroneously seeks to cast these traditional remedies as overreach. Def.MSJ.42-48. The requested relief is reasonable, appropriate, and necessary to protect the Bishops' rights.

***Vacatur***. Lost among EEOC's many citations to concurring opinions is the Fifth Circuit's "default rule": "When an agency action is … not in accordance with law, … vacatur is the appropriate remedy." *Rest. L. Ctr. v. D.O.L.*, --- F.4th ---, 2024 WL 4609380, at *11 (5th Cir. Aug. 23, 2024) (quotation marks omitted). That rule makes sense: Section 706 states that courts "shall … set aside agency action … found to be … not in accordance with law." 5 U.S.C. § 706(2)(A). "Under prevailing precedent, § 706 … empowers courts to 'set aside'—*i.e.*, formally nullify and revoke—an unlawful agency action." *Data Mktg. P'ship v. D.O.L.*, 45 F.4th 846, 859 (5th Cir. 2022) (quotation marks omitted).[14] Nor should the Court accept EEOC's self-serving invitation to limit vacatur "only to the Parties." Def.MSJ.46. "[T]he scope of ultimate relief under Section 706 … is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).

Ignoring this precedent, EEOC posits that vacatur "reaching beyond the parties would … exceed the Court's Article III authority." Def.MSJ.46-47. "That is a remarkable view of the judicial role—remarkably wrong." *SFFA*, 600 U.S. at 230. Not content to stop at "usurp[ing] the role of Congress" by rewriting the PWFA, *Louisiana*, 705 F. Supp. 3d at 660, EEOC now deigns to suggest that *this Court* lacks power to impose the APA's most basic remedy, *see* Def.MSJ.37. But as the Fifth Circuit has recognized, the APA does not work that way. *See Career Colls.*, 98 F.4th at 255. EEOC's "protests against nationwide relief are incoherent in light of its use of the Rule to prescribe uniform federal standards." *Id.*

***Injunctive Relief.*** EEOC argues injunctive relief is "superfluous" and its factors unsatisfied. Def.MSJ.42, 44-46. Neither is true. Vacatur would eliminate only the Final Rule's abortion-accommodation mandate and its narrow construction of the religious exemption. ECF 77 at 2-3. But vacatur does not fully protect the Bishops' religious rights or prevent enforcement under the statute, making a permanent injunction necessary. *See* ECF 77 at 2-3; USCCB.MSJ.17-35.

---

[14]  *Cargill v. Garland* is not to the contrary. 57 F.4th 447 (5th Cir. 2023), *aff'd,* 602 U.S. 406 (2024). The parties there didn't brief remedies, so the court recited the "default rule" of "vacatur" and remanded for the district court to address them. *Id.* at 472. Nor is *Texas Association of Manufacturers v. C.P.S.C.* applicable, where the agency initially failed "to substantiate its decision" but could do so on remand. 989 F.3d 368, 389 (5th Cir. 2021).

The Bishops are entitled to a permanent injunction because they have shown "actual success on the merits," "irreparable harm," "that the balance of equities tips in" their "favor," and "that an injunction is in the public interest." *Crown Castle Fiber v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023); *Louisiana*, 705 F. Supp. 3d at 663-64 (holding last three factors favored Bishops).

EEOC recycles its argument that the Bishops' "claimed injuries are speculative." Def.MSJ.45. But the law is clear: "the loss of freedoms guaranteed by the First Amendment … and RFRA … constitute per se irreparable harm." *Franciscan All.*, 47 F.4th at 380; *Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). These harms do not just evaporate because the Bishops might "avoid liability by raising their defenses" later. Def.MSJ.45. Otherwise, virtually every First Amendment injunction would be barred. But that's not the law. *Franciscan All.*, 47 F.4th at 380.

The final two factors also favor the Bishops. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Since the Bishops have succeeded on the merits, Defendants must "present powerful evidence of harm[s] to [their] interests." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012). But "injunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 298 (cleaned up). Defendants lose only the ability to enforce a misinterpretation of the PWFA and illegally penalize the Bishops' religious beliefs. Neither are "compelling government interests." Def.MSJ.45. And an injunction would *effectuate*, rather than "interfere with Congress's judgment about how best to achieve the PWFA's purposes," *id.*, because Congress expressly declined to cover abortion and chose to grant a religious exemption in the PWFA.

***Right-to-Sue Letters***. This Court already enjoined EEOC from investigating and "issuing any Notice of Right to Sue" with respect to abortion accommodations. *Louisiana*, 705 F. Supp. 3d at 664. EEOC offers no persuasive reason for the Court to reverse itself. Def.MSJ.47-48. The speculative possibility that private plaintiffs might raise "equitable bases for waiver of the NRTS requirement" has no bearing on the appropriate scope of injunctive relief. *Id.*

## CONCLUSION

The Court should deny Defendants' motion and grant the Bishops' cross-motion.

Respectfully submitted,

/s/ Daniel H. Blomberg

Jonathan Berry                          Daniel H. Blomberg
  (W.D. La. Temporary Bar No. 918121)      (W.D. La. Temporary Bar No. 918117)
James R. Conde                  *Trial Attorney*
  (W.D. La. Temporary Bar No. 918116)  /s/ Michael J. O'Brien
Boyden Gray PLLC               Michael J. O'Brien
800 Connecticut Ave. NW, Suite 900     (LA Bar No. 38852)
Washington, DC 20006           Laura Wolk Slavis
Phone: (202) 955-0620           (W.D. La. Temporary Bar No. 918118)
Fax: (202) 955-0621            Andrea R. Butler
jberry@boydengray.com          (W.D. La. Temporary Bar No. 918119)
                         Jordan T. Varberg
                         (W.D. La. Temporary Bar No. 918120)
                        The Becket Fund for Religious Liberty
                        1919 Pennsylvania Ave. NW, Suite 400
                        Washington, DC 20006
                        Phone: (202) 955-0095
                        Fax: (202) 955-0090
                        dblomberg@becketlaw.org

*Counsel for Bishops Plaintiffs*

Dated: November 12, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limitations of Local Rule 7.8, as modified by this Court's

September 16, 2024 Order, *see* ECF 74, and with the requirements of Local Rule 56.2.

/s/ Daniel H. Blomberg
Daniel H. Blomberg
  (W.D. La. Temporary Bar No. 918117)
  *Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
  (LA Bar No. 38852)

Dated: November 12, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2024, the foregoing was served on counsel for all parties via the Court's CM/ECF system.

/s/ Daniel H. Blomberg

Daniel H. Blomberg
 (W.D. La. Temporary Bar No. 918117)
 *Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
 (LA Bar No. 38852)

Dated: November 12, 2024