# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

UNITED STATES CONFERENCE OF
CATHOLIC BISHOPS, et al.,

*Plaintiffs,*

v.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, et al.,

*Defendants.*

No. 2:24-cv-691-DCJ-TPL

Judge David C. Joseph

Magistrate Judge Thomas P. LeBlanc

---

**BISHOPS PLAINTIFFS' MEMORANDUM IN SUPPORT OF
RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT
INJUNCTION OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................................... iii

INTRODUCTION ...............................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ..............................................2

    A. The PWFA expands protections for pregnant workers. ....................................2

    B.  EEOC issues a Final Rule implementing the PWFA. ......................................2

    C.  EEOC's actions burden the Bishops and their religious beliefs. ........................4

    D.  The Bishops file suit to protect their religious beliefs. ...................................5

LEGAL STANDARD ............................................................................................7

ARGUMENT ......................................................................................................7

    I.   This Court has jurisdiction over the Bishops' claims here...............................7

    II.  EEOC's interpretation of the PWFA and Title VII religious exemptions
       to the religious objections here violates the APA. ........................................11

        A.  EEOC contradicts the text of the PWFA and Title VII religious exemptions.............11

        B.  EEOC's interpretation violates the major questions doctrine and the
            constitutional avoidance canon. .......................................................13

    III. EEOC's requirements violate the church autonomy doctrine here....................15

        A.  The church autonomy doctrine protects internal church governance. ..................16

        B.  EEOC is violating the church autonomy doctrine. ......................................16

    IV. EEOC's requirements violate RFRA here....................................................21

    V.  EEOC's requirements violate the Free Exercise Clause here. ..........................26

    VI. EEOC's requirements violate the Free Speech Clause here. ...........................27

    VII. A permanent injunction, or in the alternative a preliminary injunction,
        is warranted. ..............................................................................29

CONCLUSION...................................................................................................30

CERTIFICATE OF COMPLIANCE.......................................................................32

CERTIFICATE OF SERVICE ...............................................................................33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023)..................................................................................25, 27

*Ali v. Stephens*,
   822 F.3d 776 (5th Cir. 2016) ...............................................................25

*Bear Creek Bible Church v. EEOC*,
   571 F. Supp. 3d 571 (N.D. Tex. 2021) ..................................... *passim*

*Biden v. Nebraska*,
   600 U.S. 477 (2023)..................................................................................14

*Billard v. Charlotte Catholic High Sch.*,
   101 F.4th 316 (4th Cir. 2024) ......................................................12, 15

*Bostock v. Clayton County*,
   590 U.S. 644 (2020)..................................................................................24

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000)..................................................................................27, 28

*Boy Scouts of Am. v. Wyman*,
   335 F.3d 80 (2d Cir. 2003)......................................................................28, 29

*Braidwood Mgmt. v. EEOC*,
   70 F.4th 914 (5th Cir. 2023) ............................................................. *passim*

*Bryce v. Episcopal Church*,
   289 F.3d 648 (10th Cir. 2002) ......................................................16, 17, 18

*Burwell v. Hobby Lobby Stores*,
   573 U.S. 682 (2014)..............................................................8, 22, 23, 25

*Butler v. St. Stanislaus Kostka Catholic Academy*,
   609 F. Supp. 3d 184 (E.D.N.Y. 2022) ..................................................17

*Carroll Coll. v. NLRB*,
   558 F.3d 568 (D.C. Cir. 2009) ...............................................................19

*Carson v. Makin*,
   596 U.S. 767 (2022)..................................................................................20

*Catholic Benefits Ass'n v. Burrows*,
   732 F. Supp. 3d 1014 (D.N.D. 2024) ........................................................8, 24, 26

*Catholic Benefits Ass'n v. Lucas*,
   No. 1:24-cv-142, 2025 WL 1144768 (D.N.D. Apr. 15, 2025) ...................... *passim*

*Christian Legal Soc'y v. Walker*,
   453 F.3d 853 (7th Cir. 2006) ...................................................................... 17-18

*Combs v. Cent. Tex. Ann. Conf.*,
   173 F.3d 343 (5th Cir. 1999) .................................................................................21

*Cooper/T. Smith Stevedoring Co. v. Liuzza*,
   293 F.3d 741 (5th Cir. 2002) .................................................................................13

*Corp. of Presiding Bishop v. Amos*,
   483 U.S. 327 (1987) ...................................................................................... 17, 21

*Crown Castle Fiber v. City of Pasadena*,
   76 F.4th 425 (5th Cir. 2023) ..................................................................... 29-30

*Curay-Cramer v. Ursuline Academy*,
   450 F.3d 130 (3d Cir. 2006) ........................................................................ 12, 15

*Darren Patterson Christian Acad. v. Roy*,
   699 F. Supp. 3d 1163 (D. Colo. 2023) ......................................................... 28, 29

*Demkovich v. St. Andrew the Apostle Parish*,
   3 F.4th 968 (7th Cir. 2021) ......................................................................... 19, 20

*Dr. James Dobson Family Inst. v. Kennedy*,
   No. 4:24-cv-986 (N.D. Tex. Aug. 8, 2025) .................................................. *passim*

*Duquesne Univ. v. NLRB*,
   947 F.3d 824 (D.C. Cir. 2020) ..................................................................... 19, 21

*EEOC v. Catholic Univ. of Am.*,
   83 F.3d 455 (D.C. Cir. 1996) ....................................................................... 21, 24

*EEOC v. Miss. Coll.*,
   626 F.2d 477 (5th Cir. 1980) ....................................................................... 11-12

*Employment Division v. Smith*,
   494 U.S. 872 (1990) .............................................................................................27

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .............................................................................................14

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
  82 F.4th 664 (9th Cir. 2023) ...........................................................................26, 27

*Fitzgerald v. Roncalli High Sch.*,
  73 F.4th 529 (7th Cir. 2023) ...................................................................................12

*In re Fort Worth Chamber of Com.*,
  100 F.4th 528 (5th Cir. 2024) ..................................................................................1

*Franciscan All. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) ........................................................................ *passim*

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021)...............................................................................14, 25, 26, 27

*Garrick v. Moody Bible Inst.*,
  412 F. Supp. 3d 859 (N.D. Ill. 2019) .....................................................................17

*Gonzales v. O Centro*,
  546 U.S. 418 (2006).................................................................................................25

*Hall v. Baptist Mem'l Health Care Corp.*,
  215 F.3d 618 (6th Cir. 2000) ..................................................................................15

*Holt v. Hobbs*,
  574 U.S. 352 (2015)...........................................................................................22, 25

*Hosanna-Tabor v. EEOC*,
  565 U.S. 171 (2012)...............................................................................16, 19, 20, 28

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018).................................................................................................14

*Kedroff v. St. Nicholas Cathedral*,
  344 U.S. 94 (1952)......................................................................................16, 19, 21

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022).................................................................................................29

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) ............................................................................15, 23

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020)..................................................................................... *passim*

*Little v. Wuerl*,
  929 F.2d 944 (3d Cir. 1991).....................................................................................15

*Louisiana v. EEOC*,
    705 F. Supp. 3d 643 (W.D. La. 2024)................................................................ *passim*

*Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*,
    11 F.4th 345 (5th Cir. 2021) ........................................................................7

*McAllen Grace Brethren Church v. Salazar*,
    764 F.3d 465 (5th Cir. 2014) ..............................................................24, 25, 26

*McClure v. Salvation Army*,
    460 F.2d 553 (5th Cir. 1972) ...........................................................................21

*McDonald v. Longley*,
    4 F.4th 229 (5th Cir. 2021) .........................................................................29, 30

*NIFLA v. Becerra*,
    585 U.S. 755 (2018).........................................................................................29

*NLRB v. Catholic Bishop*,
    440 U.S. 490 (1979).........................................................................14, 20-21

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020).................................................................................. *passim*

*Our Lady's Inn v. City of St. Louis*,
    349 F. Supp. 3d 805 (E.D. Mo. 2018)...................................................................

*Pennsylvania v. Trump*,
    --- F. Supp. 3d ---, 2025 WL 2349798 (E.D. Pa. Aug. 13, 2025) ...........................10

*Priests for Life v. HHS*,
    7 F. Supp. 3d 88 (D.D.C. 2013) .........................................................................2

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)...........................................................................................14

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001)..............................................................................29

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976).....................................................................................16, 19

*Skrzypczak v. Roman Catholic Diocese of Tulsa*,
    611 F.3d 1238 (10th Cir. 2010) .........................................................................20

*Slattery v. Hochul*,
    61 F.4th 278 (2d Cir. 2023) ..............................................................................28

*Speech First v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ...................................................................8

*Sprint Commc'ns v. Jacobs,*
    571 U.S. 69 (2013) ...............................................................................10

*Stanley M. Herzog Found. v. EEOC,*
    --- F. Supp. 3d ---, 2025 WL 1734470 (W.D. Mo. Mar. 18, 2025) ................. *passim*

*Starkey v. Roman Catholic Archdiocese of Indianapolis,*
    41 F.4th 931 (7th Cir. 2022) ...........................................................12, 13

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ...............................................................................27

*Tennessee v. EEOC,*
    129 F.4th 452 (8th Cir. 2025) ................................................................8

*Texas v. EEOC,*
    No. 2:24-cv-173, 2025 WL 1414332 (N.D. Tex. May 15, 2025) ...........................9

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) ...............................................................................13

*U.S. Navy SEALs 1-26 v. Biden,*
    578 F. Supp. 3d 822 (N.D. Tex. 2022) .....................................................26

*United States v. Hamilton,*
    46 F.4th 389 (5th Cir. 2022) ................................................................15

*Ware v. La. Dep't of Corr.,*
    866 F.3d 263 (5th Cir. 2017) ................................................................25

*Watson v. Jones,*
    80 U.S. (13 Wall.) 679 (1872) ..............................................................16

*West Virginia v. EPA,*
    597 U.S. 697 (2022) .............................................................................14

*Westbrook v. Penley,*
    231 S.W.3d 389 (Tex. 2007) ..................................................................19

*Whole Woman's Health v. Smith,*
    896 F.3d 362 (5th Cir. 2018) .........................................................15-16, 21

*Williams v. Taylor,*
    529 U.S. 362 (2000) .............................................................................13

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................30

**Statutes**

5 U.S.C. § 706...........................................................................................7, 13

42 U.S.C. § 2000bb-1.....................................................................................22

42 U.S.C. § 2000e.............................................................................2, 11, 25

42 U.S.C. § 2000e-1........................................................................... *passim*

42 U.S.C. § 2000e-2.......................................................................................25

42 U.S.C. § 2000e-5.......................................................................................21

42 U.S.C. § 2000gg...........................................................................................2

42 U.S.C. § 2000gg-1.......................................................................................2

42 U.S.C. § 2000gg-2...............................................................................2, 23

42 U.S.C. § 2000gg-3.......................................................................................2

42 U.S.C. § 2000gg-5.................................................................................2, 11

42 U.S.C. § 18116...........................................................................................10

**Other Authorities**

29 C.F.R. § 1636.3.....................................................................................3, 23

34 C.F.R. § 106.12..........................................................................................26

45 C.F.R. § 92.302..........................................................................................26

81 Fed. Reg. 31,376 (May 18, 2016)............................................................10

87 Fed. Reg. 47,824 (Aug. 4, 2022)..............................................................10

88 Fed. Reg. 54,714 (Aug. 11, 2023).............................................................2

89 Fed. Reg. 29,096 (Apr. 19, 2024)................................................. *passim*

89 Fed. Reg. 37,522 (May 6, 2024)...............................................................26

Richard Carlson, *The Small Firm Exemption and the Single Employer Doctrine in Employment Discrimination Law*, 80 ST. JOHN'S L. REV. 1197 (2006) ...............................25

## INTRODUCTION

For the first time in our nation's history, federal law has imposed a mandate requiring Catholic ministries to broadly accommodate contraception, sterilization, and fertility treatments such as IVF and surrogacy.[1] The Bishops cannot comply with any of these requirements without violating their religious beliefs. The religious exemption to the Pregnant Workers Fairness Act, the Religious Freedom Restoration Act, and the First Amendment all bar EEOC's Final Rule making the Bishops' exercise of their religious beliefs illegal.

The Bishops need protection from the Final Rule. While this Court vacated the part of the Final Rule requiring the Bishops to accommodate purely elective abortions, it declined to address the Bishops' objections to the rest of EEOC's expansive mandates. This means that the Bishops—unlike every other religious ministry in the country to challenge EEOC's mandates in federal court—remain subject to a legal requirement prohibiting their religious exercise even after part of EEOC's rule has been vacated.

Federal agencies have increasingly abused their authority to pick unnecessary fights with religious groups over issues like contraception that—until recently—have rightly been viewed as archetypally sensitive religious matters protected by the First Amendment. *See, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 664-74 (2020). EEOC's Final Rule here is among the worst of the lot. Not only does the Final Rule purport to require the Catholic Church to support contraception, fertility treatments, sterilization, and surrogacy within the Church's own ministries, the Final Rule also refashions the speech, policies, practices, and even "atmosphere" of Catholic ministries into its own image. That kind of extraordinary and pervasive entanglement is unconstitutional and should be enjoined.

---

[1] The Final Rule also required accommodations for abortions. The Bishops have appealed Counts I, III, V, and VII as they pertain to this abortion-accommodation mandate to the Fifth Circuit, and they are therefore not before this Court. *See* Mot. for Inj. Pending Appeal at 4, 13-21, *U.S. Conf. of Catholic Bishops v. EEOC*, No. 25-30398 (5th Cir. July 21, 2025), Dkt. No. 11-1; *In re Fort Worth Chamber of Com.*, 100 F.4th 528, 536 (5th Cir. 2024) ("A notice of appeal from an appealable order divests the district court of jurisdiction over aspects of the case on appeal."). Further, all of the abortion-accommodation mandate has been temporarily enjoined by the Fifth Circuit. ECF 132. The Bishops respectfully reserve the right to renew their request for summary judgment as to any portion of those claims that are remanded back to this Court following the ongoing proceedings in the Fifth Circuit.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.  The PWFA expands protections for pregnant workers.

The PWFA expands protections for pregnant women in the workplace. It requires a "covered" employer to reasonably accommodate an employee with a "known limitation," meaning a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(2), (4); *id.* § 2000gg-1(1). The statute bars employers from denying employment opportunities or taking adverse employment action based on pregnancy accommodations. *Id.* § 2000gg-1(2)-(5). It also prohibits retaliating against an employee who advocates for an accommodation or interfering with an employee's exercise of her statutory right to an accommodation. *Id.* § 2000gg-2(f)(1)-(2). The PWFA incorporates some of Title VII's provisions, including its remedies and enforcement provisions. *Id.* § 2000gg-2(a).

The PWFA also incorporates Title VII's religious exemption. *Id.* § 2000gg-5(b). Title VII exempts religious employers from any application of Title VII concerning "the employment of individuals of a particular religion." *Id.* § 2000e-1(a). Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j).

### B.  EEOC issues a Final Rule implementing the PWFA.

EEOC's Notice of Proposed Rulemaking contemplated mandating accommodations for contraception, sterilization, and fertility treatments such as IVF and surrogacy. 88 Fed. Reg. 54,714, 54,720 (Aug. 11, 2023); 42 U.S.C. § 2000gg-3(a) (granting rulemaking authority). More than 54,000 commenters opposed the rule. 89 Fed. Reg. 29,096, 29,104 (Apr. 19, 2024). Plaintiffs United States Conference of Catholic Bishops (USCCB) and The Catholic University of America (CUA) objected specifically to the requirements to accommodate IVF, surrogacy, artificial contraception, and sterilization in violation of Catholic teaching. EEOC_043901-21.[2] But by a 3 to 2 vote, EEOC issued a Final Rule codifying these mandates. 89 Fed. Reg. at 29,096, 29,183; EEOC_138360.

---

[2]    Citations to "EEOC_xxxxxx" refer to the Bates numbers in the Administrative Record. *See* ECF 71-2.

The Final Rule acknowledges the religious objections of many employers to knowingly accommodating such matters. 89 Fed. Reg. at 29,144, 29,149; *see also id.* at 29,097, 29,183-84 (29 C.F.R. § 1636.3(h)(2)). Nevertheless, the Final Rule requires that the PWFA's retaliation and coercion provisions "be interpreted broadly" to cover anything that "might have dissuaded a reasonable worker" from seeking, *inter alia*, IVF, surrogacy, contraception, or sterilization accommodations. *Id.* at 29,215; *accord id.* at 29,214-18. Employers may be liable unless their "ordinary workplace policies or practices" pose no obstacle to such accommodations. *Id.* at 29,199. To that end, employers cannot "issu[e] a policy or requirement that purports to limit an employee's rights to invoke PWFA protections." *Id.* at 29,216. EEOC indicated that speech opposing such accommodations in employers' "statements regarding religious beliefs," "mission statements," or "code[s] of conduct" can be illegal. *Id.* at 29,141-42 & n.201. Employers cannot "indicat[e]" that these accommodations may yield adverse employment action or otherwise do or say things that might be understood to "harass" an applicant, employee, or former employee for seeking such an accommodation—even if the alleged actions did not "actually … deter[ ]" them. *Id.* at 29,216. Nor can employers say or do things that are deemed "to coerce, intimidate, threaten, harass, or interfere with any individual" supporting such accommodations. *Id.* at 29,188. And to ensure that no "discriminatory work … atmosphere" exists, employers must monitor "unwelcome, critical" employee speech against accommodations. *Id.* at 29,214, 29,218. EEOC sees these requirements as rooted in the PWFA and, in large part, Title VII. *Id.* at 29,106, 29,102-03; ECF 29 at 1-3.

Finally, the Final Rule said EEOC will evaluate religious defenses on a "case-by-case" basis. 89 Fed. Reg. at 29,147-53. The Final Rule narrowed the PWFA's religious exemption to barring only claims of religious discrimination—a class of claims that is not authorized by the PWFA. *Id.* at 29,146-47 & n.239. And as for the Religious Freedom Restoration Act (RFRA) and the First Amendment, the Final Rule predicted these defenses would fail because, in EEOC's view, the rule never "infringes on any covered entity's freedom of speech," "expressive association," or free exercise of religion, and would pass review because it "serve[s] a compelling governmental interest." *Id.* at 29,147-49, 29,151-53; *accord* ECF 29 at 22-24.

## C. EEOC's actions burden the Bishops and their religious beliefs.

Plaintiffs are the Diocese of Lake Charles, the Diocese of Lafayette, CUA, and USCCB (collectively, the Bishops). The Dioceses serve the Catholics and communities of southwestern Louisiana and Acadiana, where Catholics have resided since the mid-1750s. ECF 83-4 (hereafter "Fontenot Decl.") ¶ 5. CUA was papally chartered in 1887 and is "the national university of the Catholic Church in the United States" that is "committed to being a comprehensive Catholic institution of higher education that is faithful to the teachings of the Church." ECF 90-2 (hereafter "Brown Decl.") ¶¶ 6-7. USCCB is an association of the bishops in the Catholic Church in the United States whose "mission is to support the ministry of bishops with an emphasis on evangelization." ECF 83-5 (hereafter "Ridderhoff Decl.") ¶¶ 8, 13.

The Bishops follow the doctrine of the Catholic Church, which teaches that all people, including the preborn, are created in the image and likeness of God and are thus imbued with inviolable human dignity. ECF 83-3 (hereafter "Kunkel Decl.") ¶¶ 10-11; Brown Decl. ¶¶ 15-16; ECF 83-2 (hereafter "Caraway Decl.") ¶¶ 6-7; Fontenot Decl. ¶¶ 6-7. The Church believes contraception, sterilization, and fertility treatments such as IVF and surrogacy "compromise the dignity of the preborn child, the dignity of marriage, or both." Kunkel Decl. ¶¶ 23-24. For instance, IVF and surrogacy violate the right of the child "to be the fruit of the specific act of the conjugal love of his parents" and "the right to be respected as a person from the moment of his conception." *Id.* ¶ 24. The Church considers directly participating in or knowingly cooperating with these practices to be "morally unacceptable." *Id.* ¶¶ 24, 28. "For similar reasons, the Catholic Church also teaches that contraception and sterilization, both of which seek to eliminate the procreative aspect of the conjugal act completely—are intrinsic evils." *Id.* ¶ 29. These practices "frustrate[ ] [God the Creator's] design which constitutes the norm of marriage, and contradicts the will of the Author of life." *Id.* The Church thus rejects the use of either contraception or sterilization. *Id.*

The Bishops follow these religious teachings and do not allow their employees (and in particular, in the case of CUA, their faculty) to speak or act in ways that conflict with the application of those beliefs within their ministries, such as by advocating in favor of objectionable

practices in the workplace. *Id.* ¶¶ 54-56; Ridderhoff Decl. ¶¶ 28-35; Brown Decl. ¶¶ 26-31; Caraway Decl. ¶¶ 10-15; Fontenot Decl. ¶¶ 10-15. But the Final Rule pressures the Bishops to knowingly accommodate employees or faculty even where such accommodations are contrary to the Bishops' sincerely held religious beliefs. Ridderhoff Decl. ¶¶ 28-36; Brown Decl. ¶¶ 26-32; Caraway Decl. ¶¶ 10-16; Fontenot Decl. ¶¶ 10-16. It also prohibits the Bishops from taking adverse actions against employees or faculty that advocate for these types of accommodations, even where such actions are required by the Bishops' beliefs. Ridderhoff Decl. ¶¶ 28-36; Brown Decl. ¶¶ 26-32; Caraway Decl. ¶¶ 10-16; Fontenot Decl. ¶¶ 10-16. Further, the Final Rule pressures the Bishops to change their religious speech by replacing their current policies and practices opposing objectionable accommodations or advocacy to (1) affirm a willingness to accommodate such conduct and speech, (2) prohibit any potentially "unwelcome" or "critical" workplace discussions opposing them, and (3) avoid "interfer[ing] with" "any individual['s]" exercise of the Final Rule's accommodation-related rights. 89 Fed. Reg. at 29,215-16, 29,218, 29,141-42 & n.201, 29,188.

**D. The Bishops file suit to protect their religious beliefs.**

On May 22, 2024, the Bishops sued, claiming not only that the Final Rule's abortion-accommodation mandate exceeded EEOC's authority, but also that the other mandates to accommodate "in vitro fertilization[,] surrogacy[,] artificial contraception[,] and direct sterilization [were] violative of their religious beliefs" and their rights under the First Amendment, RFRA, and the PWFA's religious exemption. *See* ECF 1 ¶ 5; *see also id.* ¶¶ 65-68, 77-83, 121-27, 205-08. After consolidating the case with *Louisiana v. EEOC*, No. 2:24-cv-629, this court preliminarily enjoined the Final Rule's abortion-accommodation mandate because it exceeded EEOC's authority under the PWFA. *Louisiana v. EEOC*, 705 F. Supp. 3d 643, 658-61 (W.D. La. 2024). In the section of its order addressing likelihood of success, the Court also found that EEOC had "failed to include a broad religious exception in the Final Rule," which "d[id] not square with the PWFA" and left the Bishops exposed to "protracted investigations and litigation." *Id.* at 662-63. The Court thus

"conclude[d] the *Bishops* Plaintiffs have demonstrated a substantial likelihood of success on their claims of statutory and constitutional overreach." *Id.* at 663.

The Bishops negotiated a prompt dispositive briefing schedule that concluded by December 10, 2024, without delay for discovery. ECF 64, 66. After defeating EEOC's motion for reconsideration, ECF 69, the Bishops sought summary judgment on their claims that, *inter alia*, EEOC's interpretation of the PWFA and its Final Rule to impose a mandate to accommodate contraception, sterilization, and artificial fertilization violated the PWFA's statutory religious exemption (Count III), the First Amendment (Counts VI, VII, IX, and X), and RFRA (Count V). ECF 77. Briefing concluded as scheduled, without extensions, on December 10. ECF 90.

On May 21, 2025, this Court granted the Bishops' motion in part. It vacated the Final Rule's abortion mandate as to "purely elective" abortions but rejected the Bishops' argument that the PWFA does not require accommodation for any direct abortions. ECF 113 at 38-40. Instead, the Court ruled that employers were "required to provide accommodation" for "abortions stemming from the underlying treatment of a medical condition related to pregnancy" under the text of the PWFA itself. ECF 114 at 3 n.1. The Court "decline[d]" to address whether the Bishops were entitled to an exemption to this supposed statutory requirement under the PWFA's religious exemption, the First Amendment, or RFRA. ECF 113 at 35 & n.23. And the Court "decline[d] to address" whether the Bishops were entitled to injunctive relief regarding the Final Rule's requirement that they accommodate other practices that violate their religious beliefs, such as infertility treatments like IVF, contraception, and sterilization. *See id.* at 31 & n.19.

The opinion set a status conference to discuss the Bishops' remaining claims for June 17, 2025. *Id.* at 40. There, the Bishops explained their ongoing need for relief and this Court subsequently ordered another round of briefing. ECF 119. The Bishops then appealed this Court's May 21, 2025 Order, ECF 124, and sought an injunction pending appeal before this Court and the Fifth Circuit regarding the abortion-accommodation mandate, ECF 125. The Fifth Circuit granted an administrative stay pertaining to footnote 1 of this Court's May 21, 2025 Order, and this Court

stayed its consideration of the motion for injunction pending appeal until resolution by the Fifth Circuit. ECF 132 at 2, 4.

Pursuant to this Court's briefing schedule, ECF 119, the Bishops now renew their motion for partial summary judgment on Counts III, V-VII, and IX-X in their complaint as they relate to contraception, sterilization, and/or artificial reproductive technologies such as in vitro fertilization and surrogacy. The Bishops further request that, if the Court is not prepared to issue summary judgment regarding these claims, it alternatively grant a preliminary injunction while a final resolution is pending.

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the "issues before the court are pure questions of law, summary judgment is appropriate." *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (cleaned up).

The APA requires courts to "hold unlawful and set aside" agency actions that are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory … authority," or "short of statutory right." 5 U.S.C. § 706.

## ARGUMENT

## I.  This Court has jurisdiction over the Bishops' claims here.

The Bishops have standing for all the claims remaining before this Court. This Court has found that the Bishops have standing to challenge the Final Rule because "they must take steps to begin complying with the Final Rule—including changing their employment policies and practices, and training employees regarding the new policies and practices—to avoid noncompliance, which could subject them to open-ended liability, investigations, and litigation." ECF 113 at 21. And this Court rightly recognized that binding precedent dictates that the Bishops have standing based on the imminent threats to their religious exercise. *See* ECF 53 at 14-16 *and* ECF 113 at 21-23 (quoting both *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 926-27 (5th Cir. 2023) and *Franciscan All. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022)). The Bishops must "choose either to restrict their

religious practices or to risk potential penalties," and they "have a legitimate fear of prosecution, chilling their rights." *Braidwood*, 70 F.4th at 926-27. As the Eighth Circuit recognized in reversing the standing determination of a lower court in a different PWFA challenge, *Tennessee v. EEOC*, 129 F.4th 452, 458 (8th Cir. 2025), such immediate compliance burdens give the Bishops standing for all their remaining claims, which seek to protect their religious exercise.

Nor would it matter, as EEOC has argued, if the Bishops "identify no employee who has sought an accommodation … or who has filed an EEOC charge for the denial of such [a] request" or if EEOC hasn't brought "enforcement actions" against similar employers. *See* ECF 53 at 14-16 *and* ECF 113 at 21-22. "The Fifth Circuit rejected the same argument by the EEOC in *Braidwood*," as did this Court at the preliminary-injunction and summary-judgment stages. *See* ECF 53 at 14 *and* ECF 113 at 22; *see also Speech First v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (courts must "assume a credible threat of prosecution in the absence of compelling contrary evidence" in "pre-enforcement challenges to recently enacted" law). Similarly, EEOC's persistent claim that the Bishops cannot have pre-enforcement standing because of the "fact-intensive" nature of the religious exemption, RFRA, and the First Amendment "is coy at best," *Braidwood*, 70 F.4th at 926-27; if anything, "EEOC's reliance on its case-by-case standard constitutes 'a concession that it may' seek enforcement." *Catholic Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014, 1022 (D.N.D. 2024) ("*CBA I*") (quoting *Franciscan All.*, 47 F.4th at 376). To hold otherwise not only directly contravenes *Braidwood* but also means the Supreme Court was wrong that it had jurisdiction in *Hobby Lobby* or any of the other pre-enforcement contraception mandate cases dealing with similar religious objections to regulatory requirements. *See Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696-98, 704 (2014); *Little Sisters*, 591 U.S. at 664-74. And it would conflict with the only other district courts to have addressed the issue, which have asserted jurisdiction over materially identical challenges. *See Catholic Benefits Ass'n v. Lucas*, No. 1:24-cv-142, 2025 WL 1144768, at *2-3 (D.N.D. Apr. 15, 2025) ("*CBA II*"); *Stanley M. Herzog Found. v. EEOC*, --- F. Supp. 3d ---, 2025 WL 1734470, at *6 (W.D. Mo. Mar. 18, 2025); Order at 4, 10-14, *Dr. James Dobson Family Inst. v. Kennedy*, No. 4:24-cv-986 (N.D. Tex. Aug. 8, 2025), ECF 35 ("*Dobson*").

Nor should the Court delay in deciding these issues because of "the recent change in the administration and resulting statement of Andrea Lucas" and the possibility that EEOC's position regarding the abortion-accommodation mandate might change. ECF 113 at 33-34 & n.23. Even assuming such a change to the abortion requirements were imminent—and, even now, six months after EEOC first suggested change was coming, ECF 100, EEOC still lacks a quorum to even *begin the process* of making a change—it wouldn't affect the Bishops' objections to accommodating contraception, fertility treatments like IVF, or sterilization. The Court should promptly close this gap and protect the Bishops' statutory and constitutional rights.

EEOC's contention that the Court should wait to rule on these issues until the agency can issue a new rule has been rejected by every other court to consider this issue. *CBA II*, 2025 WL 1144768, at *3-4; *Herzog Found.*, 2025 WL 1734470, at *9; *cf. Texas v. EEOC*, No. 2:24-cv-173, 2025 WL 1414332, at *15 (N.D. Tex. May 15, 2025) (rejecting similar argument). It is also a one-way ticket to years of litigation and delay while the Bishops are forced to "fight for the ability to continue in their noble work without violating their sincerely held religious beliefs." *Little Sisters*, 591 U.S. at 687. In the meantime, the Bishops remain subject to legal pressures such as accruing liability, investigations that can be initiated by Commissioner charges, and lawsuits by private parties. *See* 89 Fed. Reg. at 29,215-16; *Texas v. EEOC*, 2025 WL 1414332, at *15 (finding that commissioners' charges supported standing).

The plight of other religious entities faced with similar agency actions demonstrates the point. Since 2013, the Little Sisters of the Poor have been fighting for their right to care for the elderly poor without needing to provide contraception coverage, as the federal government tried to force them to do through the Affordable Care Act's contraceptive mandate. *See Little Sisters*, 591 U.S. at 668. The contraceptive mandate is "a product of agency regulation." *Id.* at 663. And after years of litigation, the Supreme Court ruled that RFRA requires an exemption for multiple religious claimants, including the Little Sisters. *See id.* at 668-70 (detailing multiple lawsuits reaching the Supreme Court). HHS then issued new rules that provided a more robust religious exemption, only for those new rules to be vacated by the lower courts. *See id.* at 671-74. The Supreme Court had

to intervene again, this time upholding the regulatory exemptions. *See id.* at 687. Because the Supreme Court's opinion considered only a few of the challenges brought against the religious exemption, the challenge returned to the lower courts where it languished for five years while HHS considered whether to repeal the religious exemption. *See Pennsylvania v. Trump*, --- F. Supp. 3d ---, 2025 WL 2349798, at *9-10 (E.D. Pa. Aug. 13, 2025). When HHS ultimately chose to keep the exemption in place, the Eastern District of Pennsylvania revived the case and (again) vacated the exemption, but this time on different grounds than the first time around. *See id.* at *24-26. After 12 years of litigation—and two trips to the Supreme Court—the Little Sisters are *still* fighting to secure their religious liberty.

A similar situation arose after HHS imposed a "transgender mandate" that required doctors, nurses, and hospitals to perform gender-transition procedures even if doing so would violate their sincere religious beliefs. 81 Fed. Reg. 31,376 (May 18, 2016). HHS refused to fully incorporate Title IX's religious exemption, despite Congress' choice to expressly adopt the whole of Title IX's relevant language into the ACA. *See* 42 U.S.C. § 18116(a). When the Christian Medical and Dental Associations challenged the mandate, they spent six years bouncing between the district court and the Fifth Circuit because HHS issued new regulations and argued that the new regulations mooted CMDA's challenge to the original regulations. *See Franciscan All.*, 47 F.4th at 372-74. The Fifth Circuit eventually held that RFRA required an exemption. *Id.* at 376-80. And even then, HHS did not relent, issuing proposed regulations that would reimpose the transgender mandate regardless of an entity's religious beliefs. *See* 87 Fed. Reg. 47,824 (Aug. 4, 2022).

As these cases demonstrate, there is no guarantee that EEOC will change its regulations. Nor is there any guarantee that the changes will sufficiently protect the Bishops' religious beliefs. What is guaranteed is that relying on EEOC to correct its errors will result in years of unnecessary and unconstitutional delay. And every day this case drags on, the Bishops accrue additional liability for adhering to their faith.

This court's "obligation" to "decide" cases is "virtually unflagging." *Sprint Commc'ns v. Jacobs*, 571 U.S. 69, 77 (2013). Particularly where, as here, there is irreparable harm to the

Bishops' First Amendment rights, the Court should rule on the Bishops' claims quickly, rather than subjecting the Bishops to another "legal odyssey" while they wait for their rights to be vindicated. *Little Sisters*, 591 U.S. at 704 (Alito, J., concurring).

## II. EEOC's interpretation of the PWFA and Title VII religious exemptions to the religious objections here violates the APA.

EEOC unlawfully narrowed the PWFA religious exemption, taking the view that it protects only against claims for religious-based discrimination. 89 Fed. Reg. at 29,146-47 & n.239. That interpretation is absurd. Because the PWFA does not authorize religious-discrimination claims, EEOC's view renders the exemption meaningless, applying only to *nonexistent* claims.

### A. EEOC contradicts the text of the PWFA and Title VII religious exemptions.

"[T]he PWFA directly incorporates Title VII's religious exemption and makes the entire PWFA 'subject to' the exemption." *Louisiana*, 705 F. Supp. 3d at 662 (citing 42 U.S.C. § 2000gg-5(b)). Title VII's exemption states: "This *subchapter* shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a) (emphasis added). It further defines "religion" to mean "*all aspects* of religious *observance and practice*, as well as belief." *Id.* § 2000e(j) (emphases added). "Title VII thus exempts religious entities from the requirements of the entire 'subchapter'—*e.g.*, all of Title VII, not merely one category of claims—protecting religious employers from *any* Title VII claim if an employer made an employment decision based on an individual's particular religious belief, observance, or practice." *Louisiana*, 705 F. Supp. 3d at 662.

The PWFA incorporates these principles wholesale into its own religious exemption. 42 U.S.C. § 2000gg-5(b). Therefore, as with Title VII, a religious employer does not have to provide accommodations under the PWFA where doing so would require accommodation of employee beliefs, observances, or practices that conflict with the employer's religion. That exemption applies categorically, without necessarily requiring case-by-case adjudication. And that's exactly how the Fifth Circuit has applied it, barring a Title VII sex-discrimination investigation where a religious employer "applied its policy of preferring Baptists over non-Baptists." *EEOC v. Miss. Coll.*, 626

F.2d 477, 485-86 (5th Cir. 1980). Thus, the religious exemption would "preclude any investigation by the EEOC" of a "sex discrimination claim" if the Baptist college "made the challenged employment decision on the basis of an individual's religion." *Id.* at 485-86.

Other courts agree. In *Curay-Cramer v. Ursuline Academy*, a Catholic school dismissed a teacher for engaging in pro-abortion advocacy in violation of Catholic teaching. 450 F.3d 130, 132 (3d Cir. 2006). The teacher sued under Title VII for sex discrimination, alleging the school treated her worse than similarly situated male teachers. *Id.* But the Third Circuit rejected her claim, explaining that "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Id.* at 141. Because the school had "offer[ed] a religious justification" for its decision—violation of Catholic teaching—her claim was barred, even though she claimed sex, not religious, discrimination. *Id.* at 141-42. Similarly, *Bear Creek Bible Church v. EEOC* held that "[t]he plain text of [the religious] exemption" bars sex-discrimination claims "when [a religious employer] refuses to employ an individual because of sexual orientation or gender expression, based on religious observance, practice, or belief." 571 F. Supp. 3d 571, 591 (N.D. Tex. 2021).

Several federal appellate judges have recently reached the same conclusion. Judge Easterbrook stated that "when [an employment] decision is founded on religious beliefs, then all of Title VII drops out." *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 946 (7th Cir. 2022). Judge Brennan likewise reasoned that "'individuals of a particular religion' means individuals whose beliefs, observances, or practices align with the employer's religious expectations." *Fitzgerald v. Roncalli High Sch.*, 73 F.4th 529, 535 (7th Cir. 2023). Agreeing, Judge King determined that the most "straightforward reading" of the religious exemption barred a sex-discrimination claim based on beliefs about marriage. *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 335 (4th Cir. 2024).

This understanding is reinforced by the "alien[ ]" exemption, which is listed alongside the religious exemption in 42 U.S.C. § 2000e-1(a). This exemption is introduced with the same language: "[t]his subchapter shall not apply to an employer *with respect to the employment of*

*aliens outside any State*[.]" 42 U.S.C. § 2000e-1(a) (emphasis added). If EEOC were correct about the religious exemption's limited scope, the alien exemption should have a similar limitation (*e.g.* claims of race or national-origin discrimination). But courts have found that language "mean[s] what it says: *none* of Title VII's substantive rules applies to aliens covered by § 702(a)." *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring); *accord Bear Creek*, 571 F. Supp. 3d at 591.

Contradicting its own guidance and the plain text of the law, EEOC and its Final Rule now take a different tack. "EEOC contends that the PWFA exemption [and Title VII's exemption] protects religious entities from claims of religious discrimination only." *Louisiana*, 705 F. Supp. 3d at 662 (citing 89 Fed. Reg. at 29,146-47). This "fail[ure] to include a broad religious exception in the Final Rule … does not square with the PWFA," nor with Title VII's exemption, which the PWFA's religious exemption "mirrors." *Id.*

Though that conclusion is plain enough under Title VII, it stands out in stark relief when applied in the PWFA context, which has nothing to do with religious-based claims in the first place. Thus, EEOC's interpretation of the PWFA violates the "cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute," *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted), as well as the admonition that courts cannot "render as meaningless the language of the statute." *Cooper/T. Smith Stevedoring Co. v. Liuzza*, 293 F.3d 741, 746 (5th Cir. 2002).

Because statutes should be interpreted to avoid rendering entire sections as void, *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001), and because the Final Rule's religious exemption conflicts with the plain language of the PWFA and Title VII, it constitutes "unlawful … agency action" and must be "set aside," 5 U.S.C. § 706(2).

**B. EEOC's interpretation violates the major questions doctrine and the constitutional avoidance canon.**

EEOC's absurd interpretation of the PWFA violates both the major questions doctrine and the constitutional avoidance canon.

First, the major questions doctrine prevents agencies from asserting "highly consequential power," *West Virginia v. EPA*, 597 U.S. 697, 724 (2022), in areas of vast "political significance," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), without "clear congressional authorization," *West Virginia*, 597 U.S. at 723; *see also Biden v. Nebraska*, 600 U.S. 477, 502-06 (2023). This applies to issues like a contraception mandate, which has sparked a litany of fierce court cases, *see Little Sisters*, 591 U.S. at 668-74 (summarizing history of contraceptive mandate), and religious exercise, which enjoys a unique and significant place in this nation's history as its "first freedom," *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 23 (2020) (Gorsuch, J., concurring). *See Fulton v. City of Philadelphia*, 593 U.S. 522, 572-77 (2021) (Alito, J., concurring) (recounting the "long, rich, and complex history" of the "right to religious liberty"). Here, EEOC's brazen choice to replace Congress's judgment with its own in a highly consequential matter requires rejecting its interpretation of the PWFA's religious exemption.

Second, the constitutional avoidance canon requires rejecting EEOC's reading to avoid the unconstitutional entanglement and intrusion into religious entities' autonomy over internal religious affairs. "Under the constitutional-avoidance canon, … a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

Thus, for instance, *NLRB v. Catholic Bishop* held that the NLRB couldn't order Catholic schools to collectively bargain with "lay teachers" given the "serious constitutional questions" that would follow. 440 U.S. 490, 494-95, 501 (1979). Otherwise, in schools where employment practices are governed by "religious creeds," civil adjudication would "necessarily involve inquiry" into "the school's religious mission," and the "very process of inquiry" could itself "impinge on rights guaranteed by the Religion Clauses." *Id.* at 502.

So too here. EEOC's atextual interpretation of the statutory religious exemptions would create several serious First Amendment problems detailed below—violating the "principle of church autonomy" by intruding into church hiring practices, internal employment policies, and religious speech, as well as entangling church and state through extensive investigations into religious

14

disputes. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020); *Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018) (Civil courts may not intrude upon the "private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs.").

This should come as no surprise. Congress's religious exemptions are "legislative applications of the church-autonomy doctrine," *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013), which merely "recogni[ze] … the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions," *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 623-24 (6th Cir. 2000). Inevitably, "serious constitutional questions" arise when a court probes "a religious employer's religious mission or the plausibility of its religious justification for an employment decision." *Curay-Cramer*, 450 F.3d at 139-41. Indeed, it is for this reason that the Third Circuit found sex-discrimination claims barred by Title VII's religious exemption. *Id*. at 137-39 (relying on *Catholic Bishop* and concluding that inquiry into "violations of Church doctrine" would "violate the First Amendment"). Thus, given "the constitutional concerns that would be raised by a contrary interpretation," courts have repeatedly "read the exemption broadly" to allow religious employers "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *accord Curay-Cramer*, 450 F.3d at 137-39; *Hall*, 215 F.3d at 623-24.

The statutory exemptions are "constitutionally inspired, implementing the First Amendment's command to avoid 'intrusive inquiry into religious belief.'" *Billard*, 101 F.4th at 329. EEOC's entangling construction eviscerates that inspiration and invites "a hoard of constitutional problems." *United States v. Hamilton*, 46 F.4th 389, 398 n.3 (5th Cir. 2022). It must be rejected under both the major questions doctrine and the constitutional avoidance canon.

## III.  EEOC's requirements violate the church autonomy doctrine here.

Chief among the "hoard of constitutional problems" is EEOC's violation of the church autonomy doctrine, which prohibits the state from intruding upon the "private sphere within which

religious bodies are free to govern themselves in accordance with their own beliefs." *Whole Woman's Health*, 896 F.3d at 373. The Final Rule and EEOC's enforcement position do just that.

### A. The church autonomy doctrine protects internal church governance.

The First Amendment's "principle of church autonomy" safeguards "the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady*, 591 U.S. at 737, 747 (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)). For government to "dictate or even to influence such matters" would "obviously violate the free exercise of religion" and "constitute one of the central attributes of an establishment of religion." *Id.* at 746. This "broad principle," *id.* at 747, "lies at the foundation of our political principles," *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728 (1872), and has since the Founding set a "scrupulous policy" against "political interference with religious affairs," *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 182-88 (2012).

One "component of this autonomy" safeguards the relationship between a religious organization and its ministers. *Our Lady*, 591 U.S. at 746. But the "general principle of church autonomy" sweeps further, *id.* at 747, protecting religious institutions whenever they "mak[e] decisions regarding their own internal affairs," such as "matters of faith, doctrine, church governance, and polity," *Bryce v. Episcopal Church*, 289 F.3d 648, 655 (10th Cir. 2002). This broader protection "limit[s] the role" of the government "in the resolution of religious controversies," even those "that incidentally affect civil rights." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976). As a rule, then, religious institutions have "independence in matters of faith and doctrine" and in "closely linked matters of internal government" that are "essential to the institution's central mission." *Our Lady*, 591 U.S. at 746-47.

### B. EEOC is violating the church autonomy doctrine.

EEOC's requirements violate the church autonomy doctrine four times over. First, the rule forces the Bishops to retain employees who violate their faith. Second, it forces the Bishops to change their own religious speech and the speech of their employees about sensitive matters of faith and doctrine. Third, it forces the Bishops to knowingly accommodate conduct their faith

forbids and subjects them to pervasive governmental scrutiny to accomplish that goal. Fourth, and relatedly, it forces the Bishops to endure unconstitutionally intrusive and entangling investigations into religious matters. All of these intrusions undermine the Bishops' independence over internal governance regarding fidelity to their religious mission.

*Employment Decisions*. EEOC and its Final Rule compel the Bishops to retain employees who openly contradict their religious teachings in the workplace. For instance, the Final Rule forbids the Bishops from taking any adverse actions against employees who request accommodations to receive fertility treatments and prohibits discriminating against an employee "based on" the "decision[ ] to have" other treatments to which the Bishops object on religious grounds. 89 Fed. Reg. at 29,106, 29,112, 29,187. That is unconstitutional.

As with the Title VII and PWFA statutory exemptions, courts have concluded that "[w]hen a church makes a personnel decision based on religious doctrine," the "broader church autonomy doctrine" protects that decision from governmental second-guessing. *Bryce*, 289 F.3d at 658 n.2, 660. Thus, the Tenth Circuit held in *Bryce* that a church employee's suit under Title VII for opposing her same-sex union was barred by church autonomy because the church's "personnel decision" was "rooted in religious belief." *Id.* at 657-58. And in *Butler v. St. Stanislaus Kostka Catholic Academy*, the court held that the "long recognized … church autonomy doctrine" barred a Title VII claim over a religious employment decision. 609 F. Supp. 3d 184, 198, 204 (E.D.N.Y. 2022); *accord Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871-73 (N.D. Ill. 2019) (applying "principle of religious autonomy" to dismiss challenge to religious employment decision).

That result makes sense. There are few issues more "closely linked" to "internal government" and a church's "central mission" than ensuring its representatives do not openly undermine its faith. *Our Lady*, 591 U.S. at 746-47. The issue is foundational. Making sure that "only those committed to [the church's] mission should conduct" its activities is the "means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). If a religious group must "accept as members those who engage in … conduct" that violates the group's core beliefs, that "would cause the group as it currently

17

identifies itself to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006). Thus, "[b]eing forced to employ someone to represent the [Bishops] who behaves in a manner directly violative of [their] convictions" obviously "inhibits the practice of [their] beliefs." *Braidwood*, 70 F.4th at 938.

***Internal Religious Expression***. EEOC also bans any policy that "purports to limit an employee's rights to invoke PWFA protections." 89 Fed. Reg. at 29,216; *see id.* at 29,199. Even "statements regarding religious beliefs," "mission statements," and "code[s] of conduct" must be sanitized of speech that might "dissuade" an employee from requesting an accommodation. *Id.* at 29,141-42 & n.201, 29,215-16. And, as noted above, to ensure that no "discriminatory work … atmosphere" exists, the Bishops must monitor and punish "unwelcome, critical" employee speech against matters such as contraception, sterilization, or IVF. *Id.* at 29,214, 29,218.

None of this can be squared with church autonomy, which broadly safeguards the "rights of the church to discuss church doctrine and policy freely." *Bryce*, 289 F.3d at 658. "The First Amendment outlaws" "any attempt by government to dictate or even to influence such matters." *Our Lady*, 591 U.S. at 746. Yet the Final Rule dictates that the Bishops accommodate messages they would otherwise exclude, change their religious speech, and censor the expressive "atmosphere" among their employees. By regulating "internal church dialogue" about sensitive "religious topics," the Final Rule violates "the church autonomy doctrine." *Bryce*, 289 F.3d at 659.

***Employment Accommodations***. EEOC also uses the Final Rule to give itself sweeping power to make the Bishops knowingly accommodate actions that violate core teachings of the Church. *See* 89 Fed. Reg. at 29,183; Kunkel Decl. ¶¶ 7-22. EEOC "broadly" interprets its authority over "PWFA accommodations," allowing it to regulate everything from the "atmosphere" of the Church's internal ministry to the Bishops' "ordinary workplace policies or practices" to anything else that "might" possibly "dissuade[ ] a reasonable worker" from seeking or advocating in favor of (for instance) contraception. 89 Fed. Reg. at 29,199, 29,215-16. EEOC thus asserts power to control the day-to-day operations of the Church. That violates church autonomy in three ways.

*First*, the Bishops, not the EEOC, control the "atmosphere" and operations of the Church. And it should go without saying that forcing *the Bishops themselves* to knowingly violate the faith *within their own ministries* directly implicates issues of "internal government" that are "essential to the [Bishops'] central mission." *Our Lady*, 591 U.S. at 746-47. Government cannot compel "conformity" in matters of internal governance by "legislative fiat." *Kedroff*, 344 U.S. at 107-08. Nor can EEOC by administrative edict. Imposing a "penalty on the Church" for making protected governance decisions is "prohibited by the First Amendment," *Hosanna-Tabor*, 565 U.S. at 194, not least because it "clearly ha[s] a 'chilling effect'" on "inherently religious function[s]," *Westbrook v. Penley*, 231 S.W.3d 389, 400 (Tex. 2007). EEOC's ham-fisted attempt to refashion both federal law and the Church into its own image blatantly crosses the constitutional lines Congress has meticulously avoided by writing broad religious exemptions into statutes such as Title VII and the PWFA.

*Second*, EEOC's overreach places the entirety of the Bishops' ministries—including their "atmosphere" and "ordinary workplace policies [and] practices"—under ongoing, pervasive scrutiny. Government cannot possibly engage in such surveillance "without engaging in a searching and therefore impermissible inquiry" into internal religious affairs. *Milivojevich*, 426 U.S. at 723. That's why the Religion Clauses have long barred laws that "allowed the [government] to consider all aspects of a religious [group's] organization and function that it deem[s] relevant," *Carroll Coll. v. NLRB*, 558 F.3d 568, 572 (D.C. Cir. 2009) (cleaned up), or that permitted government to sift "nearly everything that goes on" in a religious entity, *Duquesne Univ. v. NLRB*, 947 F.3d 824, 829 (D.C. Cir. 2020) (collecting cases); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 980-81 (7th Cir. 2021) (en banc) (barring hostile work environment claims by ministers because of pervasive intrusion into religious workplace).

Indeed, if it is unconstitutionally entangling for the government to broadly regulate the secular "terms and conditions of employment" even for employees who *follow* the Church's beliefs, *Duquesne*, 947 F.3d at 829, then it follows *a fortiori* that EEOC cannot regulate *fundamentally religious* terms and conditions for employees who *reject* the Church's beliefs within a religious

workplace. After all, a "religious organization shapes its faith and mission through its work environment," and the kind of extensive oversight EEOC seeks here "interfere[s] with [the Bishops'] internal governance," *Demkovich*, 3 F.4th at 980-81, and causes "gross substantive and procedural entanglement with the Church's core functions, its polity, and its autonomy," *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1245 (10th Cir. 2010).

*Third*, the Final Rule requires the government to weigh the Church's religious beliefs and its mission to determine if a requested accommodation imposes an "undue hardship." 89 Fed. Reg. at 29,153-54, 29,205. EEOC could have acknowledged that using federal law to coerce religious employers into violating their sincere religious beliefs was a per se undue hardship, which is a straightforward path to avoiding entanglement. But EEOC expressly rejected that option in favor of one in which EEOC, civil courts, and juries must assess whether an acknowledged religious hardship is "undue" based on "individualized evidence." *Id.* at 29,154. And whether that religious hardship is "undue" turns in part on whether the accommodation "would fundamentally alter the nature or operation of the [organization]." *Id.*

That analysis leads to precisely the kinds of entangling inquiries Justices Alito and Kagan warned about in *Hosanna-Tabor*. 565 U.S. at 205-06. The "credibility" of the claim of hardship would require "assess[ing] … the importance that the [church]" actually "attaches to" the issue. *Id*. at 205. And to evaluate that, the jury would need to hear from "witnesses to testify about the importance and priority of the religious [decision] in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission." *Id.* at 205-06. The "mere adjudication of such questions would pose grave problems for religious autonomy." *Id.*; *Carson v. Makin*, 596 U.S. 767, 787 (2022) ("scrutinizing … how a religious [group] pursues its [religious] mission" threatens unconstitutional "state entanglement with religion").

***Entangling Investigations***. Indeed, because the "very process of inquiry" into matters of religious belief and governance can violate the First Amendment, *Catholic Bishop*, 440 U.S. at

502, the kinds of "protracted investigations and litigation" required by the Final Rule are themselves barred, *Louisiana*, 705 F. Supp. 3d at 662-63.

Far from respecting its constitutional boundaries, EEOC purports to permanently subject the Bishops to "case-by-case" intrusion, 89 Fed. Reg. at 29,145-51—guaranteeing years of "litigation [and] bureaucratic entanglement" that will "cause[ ] a significant diversion of … time and resources" and will "inevitably affect" how the ministries choose to carry out their religious missions. *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996). Such "investigation and review" of sensitive religious "practices and decisions" can "cause the State to intrude upon matters of church administration and government," which "produce[s] by its coercive effect the very opposite" of the "separation of church and State." *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972); *accord Combs v. Cent. Tex. Ann. Conf.*, 173 F.3d 343, 350 (5th Cir. 1999) ("investigating" some religious decisions "necessarily intrude[s] into church governance in a manner that [is] inherently coercive," which "is enough to bar the involvement of the civil courts").

This entangling, time-consuming, and intrusive "case-by-case" scheme only "empowers certain … groups to harass, impose disastrous costs on, and uniquely burden religious organizations." *Whole Woman's Health*, 896 F.3d at 373-74 (protecting bishops against discovery that would interfere with "their internal organizational autonomy"); *Duquesne*, 947 F.3d at 835 (such a "'case-by-case' inquiry" causes entanglement and can "'chill[ ] religious activity'" (quoting *Amos*, 483 U.S. at 343-44 (Brennan, J., concurring)). And all it takes to trigger the litigation machinery is a *single* EEOC Commissioner who wishes to investigate the Bishops. *See* 42 U.S.C. § 2000e-5(b). The church autonomy doctrine is meant to prevent this sort of church-state entanglement. *See, e.g.*, *Kedroff*, 344 U.S. at 116; *McClure*, 460 F.2d at 560.

**IV. EEOC's requirements violate RFRA here.**

RFRA is an alternate route capable of providing the Bishops complete relief, and the Bishops are entitled to permanent relief on this claim. The Bishops object under RFRA to accommodating contraception, sterilization, and artificial reproduction technology such as IVF and surrogacy.

A pre-enforcement RFRA exemption is a standard remedy for religious objectors like the Bishops when federal regulatory action threatens their religious exercise. Indeed, all three federal district courts that have considered RFRA claims materially identical to the Bishops' claim have broadly protected religious objectors from EEOC's requirements to accommodate any of the practices to which they have religious objections. *See CBA II*, 2025 WL 1144768, at *4 (enjoining accommodation requirements for "abortion or infertility treatments that are contrary to the Catholic faith"); *Herzog Found.*, 2025 WL 1734470, at *14 (enjoining accommodation requirements "that would require [the plaintiff] to accommodate abortions that are contrary to its sincere religious beliefs"); *Dobson* at 15-24. And the Supreme Court and the Fifth Circuit routinely enjoin agencies under RFRA from mandating religious employers to support contraception and sterilization. *See Hobby Lobby*, 573 U.S. at 696-98, 704, 736 (2014) (affirming injunction for objections to contraception and sterilization); *Little Sisters of the Poor*, 591 U.S. at 664-74 (2020) (chronicling nationwide objections to contraception mandate); *Franciscan All.*, 47 F.4th at 371 (upholding injunction against rule requiring healthcare facilities to perform abortions).

The merits of the Bishops' claim are equally clear. RFRA provides "very broad protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 352, 356 (2015). The federal government may not "substantially burden a person's exercise of religion" unless that burden is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). RFRA must be construed "in favor of a broad protection of religious exercise" to the "maximum extent" possible. *Hobby Lobby*, 573 U.S. at 696 & n.5. Because the Bishops' religious beliefs are substantially burdened, EEOC must show *both* a compelling interest justifying the burden *and* that the burden is the least restrictive means of serving that interest. EEOC can't show either.

***Substantial Burden.*** EEOC does not dispute the sincerity of the Catholic Church's beliefs on matters such as contraception and IVF. And EEOC's Final Rule and enforcement position burdens the Bishops' exercise of those beliefs by forcing them to "choose between two untenable alternatives": knowingly accommodate actions or advocacy contrary to their religious beliefs within their ministries, or risk both significant liability and years-long expensive and entangling

22

litigation by both the EEOC and private parties. *Braidwood*, 70 F.4th at 937; *see* 42 U.S.C. § 2000gg-2(a) (remedies); 29 C.F.R. § 1636.3(h)(2) (notification requirement); *see* Brown Decl. ¶¶ 26-32; Caraway Decl. ¶¶ 11-16; Fontenot Decl. ¶¶ 10-16; Ridderhoff Decl. ¶¶ 27-36.

This establishes a substantial burden. *See CBA II*, 2025 WL 1144768, at \*4 (granting permanent injunction on RFRA grounds); *Herzog Found.*, 2025 WL 1734470, at \*10-11 (same); *Dobson* at 15-24 (same). "Being forced to employ someone to represent [a] company who behaves in a manner directly violative of the company's convictions is a substantial burden," as is being forced to "broadly change" its "employment policies" and "tacitly endorse" behavior "it sees as sinful." *Braidwood*, 70 F.4th at 938; *see also Korte*, 735 F.3d at 683 ("[L]ittle doubt" that forced "complicit[y] in a grave moral wrong" is a substantial burden); *Hobby Lobby*, 573 U.S. at 724-25 (similar); *Little Sisters*, 591 U.S. at 693 (Alito, J., concurring) (similar).

This burden accrues immediately, despite EEOC's oft-rejected attempts to delay contending with RFRA by claiming it will apply a "case-by-case" approach to religious defenses. 89 Fed. Reg. at 29,149; *Franciscan All.*, 47 F.4th at 377 ("promise to 'comply with [RFRA]'" inadequate); *see also Herzog Found.*, 2025 WL 1734470, at \*11 (rejecting "EEOC's contention that religious entities can assert religious defenses at a later point"). That's too little, too late. The Final Rule requires the Bishops, by law, to *immediately* change their religious policies on contraception, sterilization, and artificial reproductive technologies to avoid non-compliance. If, for instance, a church gets an IVF accommodation request tomorrow, it must right then assess its response against the exposure to liability caused by the plain terms of the Final Rule. By the time EEOC begins a "case-by-case" review of an employee's (or Commissioner's) charge, the church will have *already* accrued the risk of liability. And the situation is even worse, because even without an accommodation request, houses of worship nationwide are already on the hook if their policies or speech or "atmosphere" "dissuade[ ]" a job applicant or employee from seeking an accommodation. 89 Fed. Reg. at 29,214-15. Thus, The Bishops must "comply wholeheartedly with the [rule] [they] see[ ] as sinful" *now* to avoid potential liability. *Braidwood*, 70 F.4th at 938.

Further, the inquiry EEOC requires here would itself be a substantial burden, subjecting the Bishops to years of entangling investigation and litigation about their religious beliefs and mission. *Supra* pp. 20-21. Indeed, EEOC has previously violated CUA's First Amendment rights via an intrusive "two-year investigation" into a nun's Title VII claims, which imposed such "bureaucratic entanglement" as forcing CUA officials to be "deposed, interrogated, and haled into court" on religious matters. *Catholic Univ.*, 83 F.3d at 467. There, "EEOC's attempt to enforce Title VII … both burden[ed] Catholic University's right of free exercise and excessively entangle[d] the Government in religion." *Id.* EEOC's approach here repeats the same mistakes.

**Compelling Interest.** Because the Bishops have demonstrated a substantial burden, EEOC must prove that its actions further an interest "of the highest order." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014). "'[G]eneral statements of its interests' are not sufficient"; EEOC must demonstrate how the interests are compelling as applied "to the person whose sincere exercise of religion is being seriously impaired." *Id.*

EEOC fails this test. Its sole attempt in the Final Rule to establish a compelling interest merely asserts that "[n]ondiscrimination laws and policies have been found to serve a compelling governmental interest." 89 Fed. Reg. at 29,148. As every other court to have considered the question in similar PWFA litigation has concluded, this cursory dodge flunks the basic terms of RFRA scrutiny: the asserted interest is not specific to the Bishops but instead reflects the kind of "[g]eneral statements" that fail as a matter of course. *McAllen*, 764 F.3d at 472; *see CBA I*, 732 F. Supp. 3d at 1026-27 (finding no compelling interest); *Herzog Found.*, 2025 WL 1734470 at *11 (EEOC failed to show "that this specific exemption to this particular religious claimant would result in a hinderance [sic]" to its interests); *Dobson* at 18. And this is true as to reproductive practices such as IVF and contraception. *See, e.g.*, *CBA II*, 2025 WL 1144768 at *4.

Further, *Bostock* itself states that RFRA "supersede[s] Title VII's [antidiscrimination] commands in appropriate cases." *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020). As the Fifth Circuit has noted, *Bostock*'s "qualification would be a nullity if the government's compelling interest in purportedly eradicating sex discrimination were a trump card against every RFRA

24

claim." *Braidwood*, 70 F.4th at 939. But it is not a nullity. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 590-92 (2023) (however "compelling" an antidiscrimination interest might be, it cannot be invoked to run roughshod over "the demands of the Constitution").

Finally, EEOC "leaves appreciable damage to [its] supposedly vital interest unprohibited," which shows that the "government's claimed interest isn't actually so compelling after all." *Ware v. La. Dep't of Corr.,* 866 F.3d 263, 269 (5th Cir. 2017). For instance, the law exempts employers with less than 15 employees, leaving about 80 percent of private employers and millions of employees uncovered. 89 Fed. Reg. at 29,151; *see* ECF 77-2 (hereafter "Blomberg Decl.") ¶ 6, Ex. 5 at 1-2; Richard Carlson, *The Small Firm Exemption and the Single Employer Doctrine in Employment Discrimination Law*, 80 Sᴛ. Jᴏʜɴ's L. Rᴇᴠ. 1197, 1198-99, 1199 n.14 (2006). Similarly, EEOC broadly exempts *any* employer facing an "undue hardship" from complying with the Final Rule. 89 Fed. Reg. at 29,205. The government cannot excuse small employers and those with cost objections while also claiming "that its non-discrimination policies can brook no departures" for the Bishops. *Fulton*, 593 U.S. at 542; *accord Bear Creek*, 571 F. Supp. 3d at 613. The point only grows clearer in light of numerous other exceptions to EEOC's enforcement position. *See* 42 U.S.C. §§ 2000e, 2000e-1, 2000e-2 (allowing exemptions based on, *inter alia*, occupational qualifications, private-membership status, and employment of aliens).

***Least Restrictive Means.*** EEOC also cannot show it has used the "least restrictive means" of achieving its interests. *Gonzales v. O Centro*, 546 U.S. 418, 423 (2006). This element requires EEOC to prove "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Hobby Lobby*, 573 U.S. at 728. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 574 U.S. at 365. The government must also show—with "*actual evidence*, not just conjecture," *McAllen*, 764 F.3d at 476—"that it considered the claimant's proposed alternatives," and that "those alternatives are ineffective," *Ali v. Stephens*, 822 F.3d 776, 786 (5th Cir. 2016).

EEOC claims that its "case-by-case" approach to religious defenses is the least restrictive means. But, as multiple other courts have recognized, there are "a number of alternatives the EEOC

could have taken, which are less restrictive" of the Bishops' religious exercise. *Herzog Found.*, 2025 WL 1734470 at *12; *accord CBA I*, 732 F. Supp. 3d at 1027; *Dobson* at 19. For example, EEOC could enforce federal law as written by Congress, giving full scope to statutory religious exemptions. Or it could use the Department of Education's Title IX approach, where employers can voluntarily submit requests for assurances of exemption. 34 C.F.R. § 106.12(b). Or it could follow HHS's adoption of presumptive safe harbors for religious objectors to similar federal regulatory mandates. *See* 45 C.F.R. § 92.302; 89 Fed. Reg. 37,522, 37,657 (May 6, 2024). Or it could look to federal agencies' failed attempts to force religious employers to violate their beliefs, which eventually concluded after over a decade of nationwide litigation by exempting such objectors outright. *See Little Sisters*, 591 U.S. at 663. *Braidwood* itself identified such frameworks as plausible, less restrictive alternatives. 70 F.4th at 940 n.59.

The existence of such alternatives, combined with the lack of evidence that EEOC even considered them, means EEOC flunks RFRA's "heavy burden." *McAllen*, 764 F.3d at 475-76.

## V.  EEOC's requirements violate the Free Exercise Clause here.

EEOC violates "bedrock" Free Exercise rights in two distinct ways. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (*FCA*).

First, a policy that burdens religion while reserving discretion for the government "to decide which reasons for not complying with the policy are worthy of solicitude" must satisfy strict scrutiny. *Fulton*, 593 U.S. at 537. EEOC admits that it reserves discretion to make "case-by-case" decisions on whether accommodating a particular employee or particular situation is an "undue hardship" that can be denied. 89 Fed. Reg. at 29,205. And, as noted above, EEOC performs this "individualized assessment" for religious objectors as well. *Id.* at 29,153. But this is precisely the "case-by-case analysis" that "is antithetical to a generally applicable policy." *FCA*, 82 F.4th at 688; *see also U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 838 (N.D. Tex. 2022) (policy's allowance of "individualized assessment of the reasons" for non-compliance means "favoritism is built into the mandate" and is not generally applicable). It allows EEOC to decide both whether dollars-and-cents interests are compelling enough to exempt a secular employer, and whether an

employer's religious belief is sufficiently important in EEOC's eyes to warrant its solicitude on an entirely discretionary basis. Allowing "exemptions based on the circumstances underlying each application" triggers strict scrutiny. *Fulton,* 593 U.S. at 534.

Second, if a law "treat[s] *any* comparable secular activity more favorably than religious exercise," it again must pass strict scrutiny. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *accord FCA*, 82 F.4th at 688. But here, for instance, EEOC exempts any secular employer who can show an "undue hardship" and *all* employers with less than 15 employers from its mandate, exempting about 80 percent of private employers and leaving millions of employees uncovered. *Supra* p. 25. Because EEOC chose to treat such secular interests more favorably than religious objections for "no apparent reason other than administrative convenience," EEOC must satisfy strict scrutiny. *Bear Creek*, 571 F. Supp. 3d at 613 (EEOC interpretation of Title VII burdening religion subject to strict scrutiny because, *inter alia*, it exempted employers with fewer than 15 employees).

Finally, even without the discretion and discrimination addressed in *Fulton* and *Tandon*, the Free Exercise Clause requires strict scrutiny whenever government "imposes a substantial burden on religious exercise" like the burden here. *See Fulton*, 593 U.S. at 614 (Alito, J., concurring).[3]

Having triggered strict scrutiny, EEOC fails it for the reasons identified above under RFRA.

## VI. EEOC's requirements violate the Free Speech Clause here.

EEOC's requirements violate the Free Speech Clause in two ways: (1) compelling the Bishops to associate with employees whose conduct and speech undermines the Bishops' religious expression and (2) restricting the Bishops' religious speech and compelling them to facilitate contrary messages of which they disapprove.

***Expressive Association***. EEOC's mandate violates the right of "expressive association." *303 Creative*, 600 U.S. at 586. "[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of" those activities. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (internal quotation marks omitted). This freedom

---

[3]    Plaintiffs recognize that this argument is barred by *Employment Division v. Smith*, 494 U.S. 872, 879 (1990), and preserve it here for appeal.

of association "plainly presupposes a freedom not to associate," and thus prevents an expressive association from being "forc[ed] … to accept members it does not desire." *Id.* at 648.

A group's associational rights are burdened when it 1) "engage[s] in some form of expression"; and 2) when the forced association would "significantly affect [its] ability to advocate" for its viewpoints. *Id.* at 648, 650. And a court must "give deference to [the] association's assertions regarding the nature of its expression" and its "view of what would impair [that] expression." *Id.* at 653. EEOC's requirements burden the Bishops' expressive association rights.

First, "[r]eligious groups" like those led by the Bishops are "the archetype of associations formed for expressive purposes," since their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring). It is "indisputable that an association that seeks to transmit … a system of values engages in expressive activity." *Dale*, 530 U.S. at 650. That applies to the Bishops. *See, e.g.*, Kunkel Decl. ¶¶ 47-53; Brown Decl. ¶¶ 18, 22-31.

Second, forced association with individuals who promote violating Catholic teachings would significantly impair the Bishops' collective expression of the Catholic Church's beliefs. That's why the Bishops do not allow speech or conduct encouraging such practices from their employees or faculty. For example, CUA recently terminated classroom instructors who had instructed students in a manner which it determined did not align with CUA's mission and identity. Brown Decl. ¶ 29. EEOC's mandate "force[s] the [Bishops] to send a message" that they accept violations of Catholic faith "as a legitimate form of behavior." *Dale*, 530 U.S. at 653; *see also Slattery v. Hochul*, 61 F.4th 278, 288-91 (2d Cir. 2023) (anti-discrimination law that barred pregnancy center from declining to hire employees' "whose actions suggest that they believe the opposite of the message it is trying to convey" violated associational rights).[4] EEOC's requirements thus burden the Bishops' rights to expressive association.

---

[4]     *See also Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 89, 91 (2d Cir. 2003); *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1184 (D. Colo. 2023); *Bear Creek*, 571 F. Supp. 3d at 614-16; *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 822 (E.D. Mo. 2018); *Priests for Life v. HHS*, 7 F. Supp. 3d 88, 109 (D.D.C. 2013).

**Free Speech.** EEOC's mandate violates the Bishops' free speech rights by censoring their religious speech within their ministries and by compelling them to permit messages that violate their beliefs. Both compelled speech and compelled silence are "presumptively unconstitutional." *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018). This is particularly true for religious speech, since "the Free Speech Clause provides overlapping protection for expressive religious activities" that, along with the Free Exercise Clause, "doubly protects religious speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022); *accord Darren Patterson*, 699 F. Supp. 3d at 1187 (funding program's anti-discrimination provisions impermissibly compelled speech).

EEOC's requirements violate these protections. The Final Rule states that it "broadly" prohibits anything that "might have dissuaded a reasonable worker" from seeking accommodations, including "interfer[ing]" in a request, "issuing a policy or requirement that purports to limit" seeking accommodations, or disciplining an employee for "assist[ing] a coworker in requesting" accommodation. 89 Fed. Reg. at 29,214-18. The Rule also bars "unwelcome, critical comments." *Id.* at 29,218. This prohibits the Bishops from informing applicants and employees of their policies and beliefs regarding, for example, fertility treatment accommodations. They also limit the Bishops' ability to encourage workers to make decisions consistent with Catholic teaching and prohibit the Bishops from counseling employees against violating those teachings. *See* Blomberg Decl. ¶ 7, Ex. 6 at 47 (EEOC guidance that religious speech "attempt[ing] to persuade another employee of the correctness of his beliefs" can constitute harassment); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.) ("There is no categorical 'harassment exception'" to the First Amendment.). All this infringes the Bishops' speech.

Because EEOC is burdening the Bishops' right to expressive association and free speech, that burden must be narrowly tailored to serve a compelling government interest. *McDonald v. Longley*, 4 F.4th 229, 246 (5th Cir. 2021). As shown above, *supra* pp. 24-26, it doesn't come close.

## VII. A permanent injunction, or in the alternative a preliminary injunction, is warranted.

A party is entitled to a permanent injunction when it establishes (1) "actual success on the merits," (2) "irreparable harm," (3) "that the balance of equities tips in" its "favor," and (4) "that

an injunction is in the public interest." *Crown Castle Fiber v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023). All the factors point the same way: "[T]he loss of First Amendment freedoms, for even minimal periods of time[,] unquestionably constitutes irreparable injury," vindicating those "freedoms" is "always in the public interest," and the balance of harms "weighs heavily" in "favor" of the First Amendment. *McDonald*, 4 F.4th at 255; *accord Franciscan All.*, 47 F.4th at 380 ("[T]he loss of freedoms guaranteed by the First Amendment … and RFRA … constitute per se irreparable harm."). Forcing the Bishops to "endorse non-conforming religious behavior for any period" cannot be remedied with damages after the fact and therefore constitutes irreparable harm. *Braidwood*, 70 F.4th at 932 n.33. And EEOC suffers "no harm at all" when an unconstitutional law is enjoined. *McDonald*, 4 F.4th at 255.

The standard for a preliminary injunction is largely the same, except that a plaintiff need only "show a likelihood of success on the merits rather than actual success." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Plaintiffs have more than satisfied this lower standard. Thus, even if this Court is unprepared to issue a final ruling, it should grant the Bishops' preliminary relief while a final resolution is pending.

## CONCLUSION

The Court should grant the Bishops partial summary judgment and a permanent injunction or, at the very least, a preliminary injunction.

Respectfully submitted,

/s/ Daniel H. Blomberg

James R. Conde                              Daniel H. Blomberg
  (W.D. La. Temporary Bar No. 918116)      (W.D. La. Temporary Bar No. 918117)
Boyden Gray PLLC                            *Trial Attorney*
800 Connecticut Ave. NW, Suite 900          /s/ Michael J. O'Brien
Washington, DC 20006                        Michael J. O'Brien
Phone: (202) 955-0620                         (LA Bar No. 38852)
Fax: (202) 955-0621                         Laura Wolk Slavis
jconde@boydengray.com                         (W.D. La. Temporary Bar No. 918118)
                                            Andrea R. Butler
                                              (W.D. La. Temporary Bar No. 918119)
                                            Jordan T. Varberg
                                              (W.D. La. Temporary Bar No. 918120)
                                            The Becket Fund for Religious Liberty
                                            1919 Pennsylvania Ave. NW, Suite 400
                                            Washington, DC 20006
                                            Phone: (202) 955-0095
                                            Fax: (202) 955-0090
                                            dblomberg@becketfund.org


*Counsel for Bishops Plaintiffs*

Dated: August 22, 2025

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limitations of Local Rule 7.8 and requirements of Local

Rule 56.1, as modified by this Court during the June 17, 2025 status conference. ECF 119.


/s/ Daniel H. Blomberg
Daniel H. Blomberg
  (W.D. La. Temporary Bar No. 918117)
  *Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
  (LA Bar No. 38852)

Dated: August 22, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, the foregoing was served on counsel for all parties via the Court's CM/ECF system.

/s/ Daniel H. Blomberg

Daniel H. Blomberg
  (W.D. La. Temporary Bar No. 918117)
  *Trial Attorney*

/s/ Michael J. O'Brien

Michael J. O'Brien
  (LA Bar No. 38852)

Dated: August 22, 2025